## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION AT COVINGTON

SARAH JONES, a/k/a/
JANE DOE,

      Plaintiff,

      v.

DIRTY WORLD
ENTERTAINMENT
RECORDINGS LLC dba
THEDIRT.COM, HOOMAN
KARAMIAN aka NIK
RICHIE aka CORBIN
GRIMES, DIRTY WORLD,
LLC dba THEDIRTY.COM,
and DIRTY WORLD
ENTERTAINMENT, LLC
dba THEDIRTY.COM,

      Defendants.

Case No. 2:09-cv-00219-WOB

Judge William O. Bertelsman

**MEMORANDUM OF LAW
IN SUPPORT OF
DEFENDANTS DIRTY WORLD, LLC
AND NIK RICHIE'S
MOTION FOR SUMMARY JUDGMENT**

In support of their Motion for Summary Judgment, Defendants Dirty World, LLC d/b/a THEDIRTY.COM ("DW") and Nik Lamas Richie a/k/a Nik Richie, by counsel, respectfully submit the following Memorandum of Law.  As explained herein, these Defendants are entitled to summary judgment for two entirely distinct reasons.  First, to the extent that Plaintiff Sarah Jones ("Ms. Jones") is seeking to impose liability upon these Defendants for material posted on Thedirty.com by a third party, the undisputed facts show that her claims are completely barred by the Communications Decency Act, 47 U.S.C. § 230(c) (the "CDA").

Separate and apart from this issue, to the extent that Ms. Jones is seeking to impose liability for material created by these Defendants themselves (as opposed to material created by a third party), the undisputed facts show that these Defendants are entitled to summary judgment because their statements are non-actionable expressions of opinion entitled to protection under the First Amendment and are non-defamatory as a matter of law.  Both of these points are explained fully herein.

## I.   INTRODUCTION

But for Plaintiff's untrue accusations of fact and gross misrepresentations of law, this motion would only require a single page.  Here, Plaintiff seeks to impose liability on these Defendants for "publishing" allegedly false material that was created solely by a third party user of these Defendants' website.  Without exception, this theory has been flatly rejected by <u>every</u> court that has ever considered it.  This is so because pursuant to 47 U.S.C. § 230(c)(1), "A defendant is … immune from state law liability if (1) it is a 'provider or user of an interactive computer service'; (2) the complaint seeks to hold the defendant liable as a "publisher or speaker"; and (3) the action is based on 'information provided by another information content provider …' ." *Shiamili v. The Real Estate Group of New York, Inc.*, --- N.E.2d ---, 17 N.Y.3d 281, 2011 WL 2313818, *2 (N.Y. June 14, 2011); *see also Doe v. Myspace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) (observing, "Parties complaining that they were harmed by a Web site's publication of user-generated content have recourse; they may sue the third-party user who generated the content, but not the interactive computer service that enabled them to publish the content online."); *see also Collins v. Purdue Univ.*, 703 F.Supp.2d 862, 877 (N.D.Ind. 2010) (explaining, "Near-unanimous[1] case law holds that Section 230(c) affords immunity to [website operators] against suits that seek to hold [them] liable for third-party content." Internal citations omitted); *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171–72 (9th Cir. 2008) (discussing CDA and noting, "The claim against the website was, in effect, that it failed to review each user-created [posting] to ensure that it wasn't defamatory.

---

[1] The district court's suggestion in *Collins* that the cases interpreting the CDA are "near-unanimous" was, in fact, too generous.  As explained further herein—where the underlying facts show that the Plaintiff seeks to impose liability on a website operator for material that was created exclusively by a third party and which was created without any direct involvement by the website host, no court anywhere in the United States has ever adopted the position Plaintiff is advocating in this action.  On this point and under these facts, the cases are literally unanimous.

That is precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230.")

As explained in this memorandum, the undisputed facts show the following: 1.) these Defendants provide an interactive computer service; 2.) Plaintiff's claims seek to treat these Defendants as a "speaker of publisher" and 3.) Plaintiff's claims are based on information created by a third party.  As such, Plaintiff's claims are plainly barred by the CDA to the extent they arise from material posted on www.thedirty.com by a third party.

Aware that she is swimming upstream against a strong and growing current of unanimous judicial opposition, these Defendants anticipate that Plaintiff will attempt to mislead this Court into reaching a different result by falsely suggesting that these Defendants had a substantive role in creating the allegedly defamatory statements about her (as opposed to merely making non-defamatory comments and expressions of opinion after-the-fact).  Any such an assertion is patently false and Plaintiff can offer no evidence to support it.  Thus summary judgment is proper.

In addition, these Defendants anticipate that Plaintiff will continue her previous efforts to mislead the Court into accepting that the immunity provided by CDA is far less robust than it actually is.  Specifically, citing entirely inapposite cases such as *FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009), Plaintiff previously argued that the CDA's protection may be lost if a website somehow generally "encourages" the publication of offensive material.  *See* Plaintiff's Memorandum Contra Defendant Dirty World, LLC's Motion to Dismiss (Doc. #36) at 13. Initially it is important to note that this allegation has no factual basis here and there is absolutely no evidence to show that these Defendants did anything to specifically "encourage" the allegedly defamatory posts about Plaintiff or that these Defendants encourage defamatory posts about anyone.  That said, and even assuming *arguendo* that these Defendants did somehow generally

"encourage" one or more of the posts at issue, this point is entirely irrelevant and cannot defeat summary judgment. This is so because the CDA's immunity is <u>not</u> affected by such conduct, and Plaintiff's arguments to the contrary are based purely on inaccurate statements of the law which directly conflict with dozens of prior decisions rejecting exactly the same legal argument.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

The material facts necessary to the disposition of this motion are somewhat lengthy, but they are entirely undisputed. Defendant Dirty World operates a website located at www.TheDirty.com. *See* Affidavit of Nik Lamas-Richie ("Richie Aff.") ¶ 1. The site originally began in 2007 as www.DirtyScottsdale.com, which at the time was primarily about Scottsdale, Arizona. Richie Aff. ¶ 1. Mr. Richie is the site's founder and editor-in-chief. Richie Aff. ¶ 1.

To provide some brief historical context for the Court, www.DirtyScottsdale.com was initially created to provide a forum for Mr. Richie to express humorous satirical commentary and criticism based on his perception of moral and social decay in Scottsdale's nightlife and club scene. When the site first began, Mr. Richie authored and posted his own comments which were often focused on lampooning "fake" (a/k/a "dirty") people living in Scottsdale colloquially referred to as "$30k millionaires". This is a derogatory term used to refer to young people (usually males in their early 20s) who live far beyond their financial means—driving expensive cars they cannot afford and living a lavish lifestyle often funded by maxed-out credit cards. In addition to his criticism of this lifestyle, Mr. Richie also published commentary and criticism of a wide variety of topics including, but not limited to: "beer-bong-chugging athletes, puking co-eds, drunken drivers and provocatively posing clubbers … ." Richie Aff. ¶¶ 2–4.

Mr. Richie's brutally honest sense of humor struck a nerve with his viewers and the site became incredibly popular literally overnight. Within a short period of time, www.DirtyScottsdale.com expanded nationwide, eventually growing to cover more than 50

different U.S. cities and more than 20 cities in Canada.  In the process, the site adopted a more geographically neutral name—www.TheDirty.com—and Mr. Richie (who initially kept his true identity a secret) gained significant fame if not infamy.  In January 2009 the Arizona Republic newspaper named Mr. Richie one of the top ten most fascinating people of 2008, noting, "what makes him interesting is that his site has prompted a dialogue about public and private space and about what is and is not celebrity." Richie Aff. ¶ 6

As the site has grown, its focus and format has changed.  Among other things, Mr. Richie no longer creates every post that appears on the site.  Richie Aff. ¶ 8.  Rather, users of the site (who colloquially refer to themselves as "The Dirty Army") are now permitted to "submit dirt" which can include news, photos, video or text on any topic, and users can post their own comments about material submitted by others.  Richie Aff. ¶ 8.  The submission form provided by the site is 100% content neutral; it does not ask users to post anything about any particular individual, nor does the site suggest what the author should say.   Certainly, neither the submission form nor anything else on the site suggests to authors that they should post false or defamatory information.  The only instructions given by the site are as follows: "Tell us what's happening. Remember to tell us Who, What, When, Where, Why."  Richie Aff. ¶ 12.

As of September 2011, www.TheDirty.com contains approximately 90,000 unique posts on a wide variety of topics and millions of comments from users.  Richie Aff. ¶ 10.  Many posts submitted to www.TheDirty.com relate to stories, news, gossip and other forms of commentary about local individuals who are not public figures, but not all posts are of this type.  On the contrary, in addition to posts about "non-celebrities", material appearing on www.TheDirty.com covers an extremely broad variety of more general topics including, but not limited to:

      a.  President *Barack Obama*; Richie Aff. ¶ 11(a);
      b.  *Donald Trump*'s presidential campaign; Richie Aff. ¶ 11(b);
      c.  *Politicians* playing solitaire; Richie Aff. ¶ 11(c);
      d.  *Sports*, including the 2010 World Series; Richie Aff. ¶ 11(d);

     e.  Stories involving the arrest of *celebrities*; Richie Aff. ¶ 11(e);
     f.  L.A. Lakers basketball player *Kobe Bryant*; Richie Aff. ¶ 11(f);
     g.  Falling *values of U.S. dollars vs. Canadian dollars*; Richie Aff. ¶ 11(g);
     h.  Mr. Richie himself; Richie Aff. ¶ 11(h).

As part of the submission process, users are asked to enter a "title" for their submission, along with basic information about the material they are submitting.  Specifically, users are asked to identify the "City", "College", and "Category" for their submission.  Richie Aff. ¶ 13. In terms of categories, the user is required to pick from a list of more than 40 different options provided by the site which include: "I HAVE NO IDEA", "Business", "News", "Spring Break" and so forth.  Richie Aff. ¶ 14.

As the site's editor, Mr. Richie reviews/moderates all new submissions, and he estimates that he rejects approximately 90% of submissions to the site, often because they contain nudity, vulgarity, or material that Mr. Richie deems inappropriate for other reasons.  Richie Aff. ¶ 13. When a new post is approved for the site, in most cases Mr. Richie will briefly review it and when necessary, he will remove certain types of information which may be unduly offensive (i.e., threats of violence, profanity, racial slurs, etc.).  Richie Aff. ¶ 14.  Furthermore, as a general rule, Mr. Richie will typically make a short, one-line comment about the post with some sort of humorous or satirical observation, but Mr. Richie does not materially change, create, or modify any part of the user-generated submission, nor does he "fact check" user submissions for accuracy.  Richie Aff. ¶ 15.

Although Plaintiff's operative Complaint (the Second Amended Complaint; Doc. #22) only refers to one specific posting dated December 7, 2009, this case arises from several posts about the Plaintiff on www.TheDirty.com, all of which were created and submitted to the site by third parties.  The first post, a copy of which is attached to Mr. Richie's affidavit as <u>Exhibit J</u>, appeared on the site on October 27, 2009 bearing the title: "Graham Does It Again".   The post

featured two photos of Plaintiff appearing at a public event with a Bengals player, kicker Shayne Graham.  The third party author who submitted this post also included the following text:

> Nik, this is Sara J, Cincinnati Bengal Cheerleader.  She's been spotted around town lately with the infamous Shayne Graham.  She has also slept with every other Bengal Football player.  This girl is a teacher too!!  You would think with Graham's paycheck he could attract something a little easier on the eyes Nik!

Mr. Richie did not create any part of this post, nor did he create the title of the post.  Richie Aff. ¶¶ 16–19.  Mr. Richie made no changes whatsoever to either the text of the post or the title; all of this material was authored solely by the third party who submitted it to the site.  *Id*.  Prior to the submission of this post, Mr. Richie did not know Plaintiff, had never met or spoken to Plaintiff, and had no idea who Plaintiff was.  Richie Aff. ¶ 20.

In keeping with his normal practice as the site's editor and moderator, Mr. Richie added a brief sarcastic quip regarding the Bengals football player shown in the photos—Shayne Graham—stating, "Everyone in Cincinnati knows this kicker is a Sex Addict.  It is so secret… he can't even keep relationships because his Red Rocket has freckles that need to be touched constantly.- nik".  Richie Aff. ¶ 21.  Nothing in Mr. Richie's comments referred to Plaintiff in any way.

The second post, a copy of which is attached to Mr. Richie's affidavit as <u>Exhibit K</u>, appeared on the site on December 7, 2009.  This post included a publicly-available photograph of the Plaintiff taken from the cover of the 2007 Cincinnati Bengals cheerleader calendar on which she appeared, and the post included the following text:

> Nik, here we have Sarah J, captain cheerleader of the playoff bound cinci Bengals.. Most ppl [sic] see Sarah has [sic] a gorgeous cheerleader AND highschool [sic] teacher.. yes she's also a teacher.. but what most of you don't know is.. Her ex Nate..cheated on her with over 50 girls in 4 yrs.. in that time he tested positive for Chlamydia Infection and Gonorrhea.. so I'm sure Sarah has them both.. whats [sic] worse is he brags about doing sarah in the gym.. football field.. her class room at the high school she teaches at DIXIE Heights.

As with the first post, each and every word of this text was created solely by the third party author who submitted the post; these Defendants did not create any part of this text, nor did they modify or change any part of it.  Richie Aff. ¶¶ 16–19.  In addition, the author of the post also created its title—"The Dirty Bengals Cheerleader"; no part of this title was created or modified by these Defendants.  *Id*.

Again, in keeping with his normal editorial practice, after the second post was submitted to the site, Nik made another brief satirical comment which read: "Why are all high school teachers freaks in the sack?- nik".  Richie Aff. ¶ 22.  This comment was not a factual assertion about Plaintiff's character or chastity, but rather was a rhetorical and hyperbolic expression of Mr. Richie's opinion about a common stereotype—i.e., that high school teachers publicly portray themselves as conservative while privately they may have a sexually wild or adventurous side. Richie Aff. ¶ 23.

On December 9, 2009, a third post about Plaintiff appeared on the site bearing the title "Bengals Cheerleader Boyfriend".  A copy of this post is attached to Mr. Richie's affidavit as Exhibit L.  The author of this post attached several photos of Plaintiff and her then-boyfriend (now husband), Nathan Wilburn, and included the following text:

> Nik, ok you all seen the past posting of the dirty Bengals cheerleader/teacher… well here is her main man Nate.  Posted a few pics of the infected couple.  Oh an [sic] for everyone saying sarah is so gorgeous check her out in these non photoshopped pics.

As was true of the first post, each and every word of the above text was created solely by the third party author who submitted the post; these Defendants did not create any part of this text, nor did they change any part of it.  Richie Aff. ¶¶ 16–19.  Once again, Mr. Richie added a short editorial comment about the post which read: "Cool tribal tat man.  For a second yesterday I was jealous of those high school kids for having a cheerleader teacher, but not anymore.- nik". Richie Aff. ¶ 24.

After these three posts appeared on Defendants' website, Plaintiff commenced this action on December 23, 2009. *See* Plaintiff's original Complaint; Doc. #1. As the Court is aware, rather than suing Defendants Dirty World, LLC and Mr. Richie, Plaintiff initially named and served a California entity named "Dirty World Entertainment Recordings LLC" which apparently operated a website with a similar name—www.thedirt.com. This California entity has no relationship whatsoever to www.thedirty.com, Dirty World, LLC, or Mr. Richie. Richie Aff. ¶ 26.

On December 28, 2009, several popular national media sources, including The Huffington Post, began reporting about this lawsuit, however the stories erroneously stated that Plaintiff had filed a lawsuit against www.thedirty.com, when, in fact, she had only sued the operator of www.thedirt.com. Richie Aff. ¶ 27. After the inaccurate Huffington Post story appeared in the national news media, on December 28, 2009 a fourth post regarding plaintiff was submitted to www.thedirty.com, a copy of which is attached to Mr. Richie's affidavit as Exhibit N. This post, entitled, "Teachers Can't Be Cheerleaders", included a photo of Plaintiff and it included the following text:

> Nik, I'm a lawyer who does a lot of internet work and I just saw the news story on The Huffington Post about you getting sued in Kentucky bysome [sic] airhead cheerleader. I know you have a kick-ass legal team already, but I just wanted you to know the law in this area is 100% on your side and is so clear I think you have a decent chance of getting all of your attorney's fees awarded as a sanction for this girl filing a frivolous action against you. Love the site and don't let anyone push you around. I know a lot of lawyers who love the site and I personally would be happy to represent you if you ever need it at no charge. Good luck and keep us posted on what happens!
>
> P.S. – I looked up her profile on their website and she is grossssss!!! Check it out http://www.bengals.com/team/cheerleaders/Sarah-J/772eb0af-d35f-4c26-b862-10f658415317

As with every previous post about Plaintiff, each and every word of this text was created solely by the third party author who submitted the post; these Defendants did not create any part

of this text, nor did they modify or change any part of it.  Richie Aff. ¶¶ 16–19.  In addition, the author of the post also created its title; no part of this title was created or modified by Defendants.  *Id.*.  As with every other post, Mr. Richie added an editorial comment about the post which read:  "I am all good in the legal department.  I have Cochran Kardashian (that is what I call him to his face) representing my ass.  This is just a desperate attempt for attention by some no name DreamKiller.  According to my lawyer CK, 'I just checked the court docket for all federal courts in Kentucky, and there's no record of this case being filed.'  Let's see how the media and every other blogger that hates me tries to spin this in her favor.- nik"  Richie Aff. ¶ 28.

Following even greater national media coverage about this case, a fifth and sixth post were submitted to the site on December 29, 2009.  Copies of these posts are attached to Mr. Richie's affidavit as <u>Exhibits O</u> and <u>P</u>, respectively, and once again, both posts were created and submitted to the site by a third party.  Richie Aff. ¶¶ 16–19.  To these Defendants' knowledge, Plaintiff does not allege that any of the posts from December 28 or 29th defamed her in any way or that the posts were unlawful in any manner.

Finally, on January 9, 2010, Mr. Richie added an updated comment to the first post about Plaintiff which read: "**So crazy that '*my guy*' told me to take the Jets heavy and the over because Shayne Graham will be shaving points today.  He said he has been paid off to throw the game.  Printing money today…thanks Red Rocket."  *See*, Post attached as <u>Exhibit A</u>.  Mr. Richie's statements were a reference to week-two of the 2009 NFL playoffs and had nothing to do with Plaintiff.  Richie Aff. ¶ 29.  Although he believed he was under no legal obligation to do so, Mr. Richie subsequently removed the first three posts regarding Plaintiff after he became aware that she had commenced litigation.  Richie Aff. ¶ 30.

Plaintiff is currently, and at all times relevant to this matter has been, a high school English teacher employed by Dixie Heights High School in Kentucky. *See* Deposition of Sara Jones, attached hereto as <u>Exhibit B</u>, ("Jones Depo.") at 10:22–11:11. In addition to her teaching work, since 2005 Ms. Jones has also worked as a cheerleader for the Cincinnati Bengals NFL football team. Jones Depo. 12:19–13:5. As of 2011, Ms. Jones is presently the head captain of the Bengals cheerleaders. Jones Depo. 13:13–20.

The part of the first post which alleges that Ms. Jones's ex-boyfriend "Nate" (whom she subsequently married) cheated on her is true. Ms. Jones admits that her then-fiancé (now husband) cheated on her with more than one person and she testified that she is in fact unaware of the total number of times he has cheated on her. Jones Depo. 87:4–13. Plaintiff otherwise denies the accuracy of the remaining text of each post.

With respect to Mr. Richie's satirical comment "Why are all high school teachers freaks in the sack?", Ms. Jones alleges that this comment defamed her, but when asked to explain what she believed the statement meant, she was initially unable to do so:

[By Defendants' counsel]

Q:    Did Nik Lamas Richie make any comments on this post?

[By Plaintiff]

A:    Yes.

Q.    Can you please read it?

A:    This particular one he said, "Why are all high school teachers freaks in the sack?"

Q:    What does that mean to you?

A:    Basically why the teachers have – like are they freaky in bed – <u>I mean, I don't know what he means by that</u>.

Jones Depo. 92:19–93:4 (emphasis added).   Upon further reflection, Ms. Jones attributed the following meaning to Mr. Richie's comment:

> A:      Basically what it means, I mean, why are all high school teachers freaks in the sack, meaning that he's just saying that all high school teachers sleep around or that they get freaky in bed in some sense, basically, pointing to me, saying that I'm a freak in the sack, which I'm not.

Jones Depo. 94:3–8.  It goes without saying that what constitutes a "freak" for any purposes is a matter of opinion and this is supported by Plaintiff's equivocal attempted response as to what is meant by the term "freak in the sack".

## III.    ARGUMENT

As the Court is aware, these Defendants contend that a substantial[2] part of this matter is controlled by the Communications Decency Act.   Specifically, to the extent Ms. Jones is attempting to impose liability upon Dirty World and Mr. Richie for "publishing" material created by *someone else* (i.e., a third party), her claims are completely barred by the CDA.

Although other courts have recently considered nearly identical facts to those presented here and found that the plaintiff's claims were barred by CDA, these Defendants are aware that no published CDA decisions exist in this district, nor has the Sixth Circuit ever directly addressed the matter.  *See Doe v. Sexsearch.com*, 551 F.3d 412 (6th Cir. 2008) (declining to consider whether an Ohio district court correctly applied the CDA when granting 12(b)(6) dismissal of website operator in *Doe v. Sexsearch.com*, 502 F.Supp.2d 719 (N.D.Ohio 2007),

---

[2] By its own terms, the CDA only provides immunity from tort claims based on the publication of material created by *another* person; i.e., a third party. *See Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) (explaining, "§ 230 limits immunity to information 'provided by another information content provider.'" Internal citations omitted.)  Thus, the CDA has no application at all to material which the website operator <u>itself</u> has created.  Of course, if the website's own statement are non-tortious (i.e., because they are merely expressions of opinion), then the application of the CDA is unnecessary.  *See, e.g., Phan v. Pham*, 182 Cal.App.4[th] 323, 327–28, 105 Cal.Rptr.3d 791, 794–95 (3rd Dist. App. 2010).

while affirming dismissal on other grounds).  Without binding authority from the Sixth Circuit, this Court is writing on a somewhat blank slate.  That said, the law from other Courts is substantial and overwhelmingly uniform in its application of the CDA.

Perhaps because of the clear nature of the CDA, in the past, some CDA opponents suggested that courts should simply ignore the law and decide cases based on emotion or what they believe might constitute "good policy".  *See Noah v. AOL Time Warner, Inc.*, 261 F.Supp.2d 532, 539 n. 5 (E.D.Va. 2003) (noting, "Plaintiff argues that providing ISPs immunity … is bad policy. Yet, it is not the role of the federal courts to second-guess a clearly stated Congressional policy decision.") (citing *Blumenthal v. Drudge*, 992 F.Supp. 44, 51–52 (D.D.C. 1998) (determining the scope of immunity under § 230 according to the statute as enacted, and rejecting an individualized policy argument).  Such approach has been unsuccessful and is obviously not appropriate however and obviously these Defendants trust this Court will disregard emotion and apply the law fairly and dispassionately.

Nevertheless, to help this Court understand why such policy-based arguments have been (and should continue to be) so unsuccessful, this memorandum will begin with a short discussion of the rationale and policy considerations behind the CDA.  This discussion is offered to help the Court navigate the CDA's admittedly counterintuitive rules and to help the Court understand why any decision that denies CDA immunity here would not make the Internet "safer", nor would it benefit others in Plaintiff's position.  On the contrary, denial of immunity in this case will almost certainly result in a drastic *increase* in the amount of offensive material appearing online as website hosts realize they may become liable for reviewing and screening any third-party content—exactly the result Congress intended to preclude with the CDA.

### A.  History Of The CDA

Although the CDA is a relatively new law first enacted in 1996, its origins have been extensively discussed in other cases, one of the earliest and most comprehensive of which was *Zeran v. America Online, Inc*., 129 F.3d 327 (4th Cir. 1997), thus a full discussion of the statute's history is not necessary here.  In sum and as explained in *Zeran*, Congress created the CDA to specifically overrule a New York state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co*., 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995), which created a "perverse" rule—i.e., if a website operator <u>did nothing</u> to review, screen, or block offensive material posted by third parties, then the website operator <u>could not</u> face liability for any user-generated material posted on its site.  On the other hand, if a website operator took an active role in screening or blocking offensive material, then the operator <u>could</u> face unlimited liability for any remaining user-generated content that it did *not* block.  *See Zeran*, 129 F.3d at 331 (explaining that under the holding of *Stratton Oakmont*, "computer service providers who regulated the dissemination of offensive material on their services risked subjecting themselves to liability, because such regulation cast the service provider in the role of a publisher.")

Congress quickly realized the *Stratton Oakmont* decision created a dangerous incentive for website operators to take a "hands-off" approach to monitoring third-party content, refusing to screen any user-generated material because any website that did so could be sued for whatever material remained while sites that performed no screening at all would remain entirely immune. This counter-intuitive result was the primary reason the CDA was enacted; "Congress was concerned with the impact such a holding would have on the control of material inappropriate for minors.  <u>If efforts to review and omit third-party defamatory, obscene or inappropriate material make a computer service provider or user liable for [any remaining] posted speech, then website</u>

operators and Internet service providers are likely to abandon efforts to eliminate such material from their site." *Batzel*, 333 F.3d at 1029 (emphasis added).

With these concerns in mind, the CDA was enacted to both "further [the] First Amendment …", *Batzel*, 333 F.3d at 1028, and to encourage website hosts like Dirty World and Mr. Richie to take an active role in reviewing, selecting, editing, and (where appropriate) blocking and/or removing third party material without fear of incurring liability for their editorial actions. *See Blumenthal*, 992 F.Supp. at 52 (explaining, "In some sort of tacit *quid pro quo* arrangement with the service provider community, Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, even where the self-policing is unsuccessful or not even attempted.") (emphasis added); *see also Batzel*, 333 F.3d at 1031 (noting, "a central purpose of the [CDA] was to protect from liability service providers and users who take some affirmative steps to edit the material posted.  Also, the exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message.").

The CDA accomplishes these goals by providing broad federal immunity to website hosts for any claims arising from third-party postings. *See Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (explaining, "The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'") (quoting *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006)).   Under the CDA, as long as the offensive material was provided by a third party and was not materially altered by the website, the site is completely immune from any claims based on that content. *See Roommates.com*, 521 F.3d at 1169 (explaining, "A website operator who edits user-created content—such as by

correcting spelling, removing obscenity or trimming for length—retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality.")

In all candor, the results required by the CDA can sometimes seem unjust and somewhat counterintuitive.  In other words, it can sometimes "feel" extremely unfair to give a website host complete immunity even where it actively chooses to publish offensive or even defamatory material and particularly where it makes a profit from doing so.  Many previous courts have struggled with these same concerns.  *See Blumenthal*, 992 F.Supp. at 51–52 (noting, "If it were writing on a clean slate, this Court would agree with plaintiffs … .  Because it has the right to exercise editorial control over those with whom it contracts and whose words it disseminates, it would seem only fair to hold AOL to the liability standards applied to a publisher or, at least, like a book store owner or library, to the liability standards applied to a distributor.  But Congress has made a different policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others."); *see also Barrett v. Rosenthal*, 40 Cal.4[th] 33, 62–63, 146 P.3d 510, 529 (Cal. 2006) (concluding, "The prospect of blanket immunity for those who intentionally redistribute defamatory statements on the Internet has disturbing implications. Nevertheless, by its terms section 230 exempts Internet intermediaries from defamation liability for republication.  The statutory immunity serves to protect online freedom of expression and to encourage self-regulation, as Congress intended.  Section 230 has been interpreted literally.  It does not permit Internet service providers or users to be sued as 'distributors,' nor does it expose 'active users' to liability. Plaintiffs are free under section 230 to pursue the originator of a defamatory Internet publication. Any further expansion of liability must await Congressional action.")

To help illustrate why the CDA is such a beneficial law that should continue to be broadly construed in favor of protecting website sites, Defendants offer a very simple example.

This example is intended to help illustrate the serious flaw in Plaintiff's theory; i.e., that Mr. Richie should be punished because he actively "selected" the posts about her for publication. Imagine that five different users of www.thedirty.com create and submit five separate posts to the website for possible publication.   As the site's editor, unless he permits all submissions without any review, Mr. Richie must screen each of these submissions to determine which ones should appear on the site and which ones should be rejected.   The five hypothetical submissions are summarized as follows:

| | |
|---|---|
| **Submission #1** | Post containing graphic images of child pornography |
| **Submission #2** | Post with stolen social security numbers and banking information |
| **Submission #3** | Post filled with profanity/obscenity/racial slurs |
| **Submission #4** | Post containing home addresses of several federal judges and statements encouraging viewers to take action against judges |
| **Submission #5** | Post with picture of Plaintiff taken in public place with comment stating Plaintiff is ugly and her fiancé is promiscuous |

After reviewing these five submissions, Mr. Richie makes an editorial decision to block the first four posts while allowing the fifth post to appear on the site.  Understandably, Plaintiff is horrified by Mr. Richie's choice, but clearly the alternative, i.e., allowing all 5 posts to go forward, is far more horrific.   The question becomes, does the decision to eliminate clearly illegal posts while allowing posts that are not illegal or questionable on their face justify imposing unlimited liability upon Mr. Richie for material created entirely by someone else?

Congress certainly did not believe so, and in the 15 years since the CDA was enacted, courts have consistently and repeatedly rejected liability in such cases.  As this example shows, without the immunity provided by the CDA, the Internet would be substantially different in one of two ways.  First, because website hosts like Mr. Richie who review, select, and censor content could be sued for any remaining material, this would cause website hosts to immediately stop performing any type of review of user-generated submissions.   In that scenario, rather than actively blocking posts containing death threats, child pornography or stolen social security

numbers, website hosts like Mr. Richie would become much more passive, thereby allowing more unfiltered content to appear online *en masse*.

Furthermore, without the CDA, any website host faced with a legal threat or demand challenging the accuracy of material would have a strong economic incentive to simply remove the disputed material rather than risking the cost of litigation. In this scenario, the amount of online content would be drastically reduced—another detrimental result that Congress specifically intended to prevent with the CDA. *See Zeran*, 129 F.3d at 330–31 (explaining, "Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.")

Thus, despite any superficial appeal, Plaintiff's emotional pleas are misguided because they are focused only on the material at issue in this case while ignoring all of the *other* offensive material that these Defendants have blocked and can block specifically because of the CDA and vigorous application of the same. Thus, her theory directly violates the CDA; "To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

### B. The CDA Bars Plaintiff's Claims To The Extent Those Claims Are Based On Material Created By A Third Party User Of Thedirty.com

As explained above, the CDA plainly bars any claim which seeks to treat Mr. Richie or Dirty World as the "speaker or publisher" of material created by a third party. Excluding only Mr. Richie's single sentence question ("Why are all high school teachers freaks in the sack?") it is undisputed that all of the allegedly defamatory material at issue in this case was created solely by a third party user or third party users of www.thedirty.com, not by Mr. Richie or Dirty World.

Standing alone, these facts mandate summary judgment in favor of these Defendants as to all claims in this matter to the extent those claims are based on such third party material.

These Defendants anticipate that Plaintiff will argue that the CDA does not apply here because Mr. Richie somehow "encourages" defamatory posts.  That said, any such accusation would be completely without evidentiary support.  Mr. Richie denies that he has ever encouraged anyone to post *false* statements on www.thedirty.com, and he further denies doing anything to specifically "encourage" the posts about Plaintiff.  *See* Richie Aff. ¶ 19.  Because Mr. Richie denies these allegations, assuming the Court finds that these points are material to the question of CDA immunity (which ultimately, they are not), in order to defeat summary judgment Plaintiff must present admissible evidence to support her accusations; "Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Cunningham v. Humana Ins. Co.*, 2011 WL 4054689, *1 (W.D.Ky. 2011) (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008)).   Plaintiff has no such evidence and in fact does not herself believe that Mr. Richie wants false information posted on thedirty.com.

However, assuming arguendo Plaintiff could introduce admissible evidence showing that Mr. Richie somehow "encourages" derogatory posts, this is *per se* insufficient to deny CDA immunity.  This was precisely the holding by the highest state court in New York—the Court of Appeals—in *Shiamili v. The Real Estate Group of New York, Inc.*, --- N.E.2d ---, 17 N.Y.3d 281, 2011 WL 2313818 (N.Y. June 14, 2011), a case which involved analogous if not identical facts.

As Ms. Jones has done here, in *Shiamili* the plaintiff sued a website operator claiming that it was responsible for defamatory posts appearing on the defendant's website, even though it was undisputed that the posts were written by a third party.  *See Shiamili*, 2011 WL 2313818. Importantly, just like in this case, the plaintiff alleged that the website host engaged in various conduct sufficient to deprive it of CDA immunity.  Specifically, the plaintiff alleged that the

website host lost its immunity because: 1.) the host posted its own offensive comments in response to the original third party post including an anti-Semitic statement referring to the plaintiff as "King of the Token Jews"; 2.) Defendant "promoted" the original third party content by moving it from a blog comment mixed in with other comments to a stand-alone article, and 3.) Defendant's website was intended to "encourage" the posting of negative information. These arguments and theories are essentially identical to those present in this case.

Just as in this case, the plaintiff cited various cases, including the Ninth Circuit's *en banc* opinion in *Roommates.com*, as support for the principle that by adding content to the third party post and by allegedly "encouraging" such material to be posted, the website host lost CDA immunity. In a clear and concise manner, the New York Court of Appeals <u>flatly rejected</u> all of these arguments, finding that none of the website host's actions "materially contributed" to the illegality of the third party's statements and therefore the host retained its CDA immunity:

> As an initial matter, the complaint alleges that the defamatory statements were first posted by anonymous users; there is no allegation that defendants actually authored the statements. A website is generally not a "content provider" with respect to comments posted by third-party users. <u>We reject Shiamili's contention that defendants should be deemed content providers because they created and ran a website which implicitly encouraged users to post negative comments about the New York City real estate industry.</u> **Creating an open forum for third-parties to post content—*including negative commentary*—is at the core of what section 230 protects**.

*Shiamili*, 2011 WL 2313818 at *4 (emphasis added) (citing *DiMeo v. Max*, 248 Fed.Appx. 280, 282 (3rd Cir. 2007); *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1196 (10th Cir. 2009)).

If this language was not clear enough, the *Shiamili* Court also considered and then directly rejected the argument that a website may lose immunity if it chooses to publish third party content on a non-neutral basis; "<u>Notably, the statute does not differentiate between 'neutral' and selective publishers</u> …" *Shiamili*, 2011 WL 2313818 at *3 (emphasis added) (citing *Batzel*, 333 F.3d at 1031 (holding "the exclusion of 'publisher' liability necessarily precludes liability for

exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message")).

Further, exactly as Plaintiff has argued in this case, the *Shiamili* Court rejected the contention that cases such as *Roommates.com* and *FTC v. Accusearch* support the view that "even if the data are supplied by third parties, a website operator may still contribute to the content's illegality and thus be liable as a developer of the content." *Shiamili*, 2011 WL 2313818 at *5. The New York court explained its reasoning as follows:

> Those cases, however, are easily distinguishable. In *Roommates.com*, the non-parties providing the data were required to post actionable material to the defendant website as a condition of use, and the website's "work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism [was] directly related to the alleged illegality of the site". Here, in contrast, there are no allegations that posting false and defamatory content was a condition of use, or that the site worked with users to develop the posted commentary. This case also differs considerably from *Accusearch Inc.*, where the defendant website paid researchers to obtain information for the site to disseminate that "would almost inevitably require [the researcher] to violate the Telecommunications Act or to circumvent it by fraud or theft". There is no comparable allegation against these defendants.

*Shiamili*, 2011 WL 2313818 at *5 (internal citations omitted). This same is true here—there is no evidence in this case showing that TheDirty.com *requires* users to post defamatory material or that the site's host create illegal material itself (as in *Roomates.com*), nor is there any allegation that these Defendants paid the author of the postings about Plaintiff to create false or unlawful material about her (as in *Accusearch*). In the absence of such evidence, Plaintiff's reliance in *Roommates* and *Accusearch* is unavailing and insufficient to defeat summary judgment.

The final point discussed in *Shiamili* is perhaps the most important one of all—the court concluded that even though the website host "added" to the third party's post by inserting an extremely offensive anti-Semitic statement calling the plaintiff "King of the Token Jews", the court agreed that this type of non-defamatory statement was *per se* insufficient to affect the website's immunity under the CDA; "This is not a defamatory statement, since no 'reasonable

reader could have concluded that ... [it was] conveying facts about the plaintiff'. The illustration was obviously satirical and, although offensive, it cannot by itself support Shiamili's claim of defamation. Nor, contrary to the dissent's view, does it 'develop' or 'contribute to the illegality' of the third-party content within the meaning of the CDA." *Shiamili*, 2011 WL 2313818 at *5 (quoting *Gross v. New York Times Co.*, 82 N.Y.2d 146, 152 (1993)).

> In closing, the New York Court of Appeals stated as follows:
>
> Simply put, the complaint alleges that defamatory statements were posted on defendants' website, and some of them were reposted by the defendants. These statements are all "information provided by another information content provider". Defendants' added headings and illustration do not materially contribute to the defamatory nature of the third-party statements. Shiamili has therefore failed to state a viable cause of action against defendants, as his claims for defamation and unfair competition by disparagement are clearly barred by the CDA and were properly dismissed below.

*Shiamili*, 2011 WL 2313818 at *5 (quoting 47 U.S.C. § 230(c)(1)). Unless this Court rejects the holding in *Shiamili* (which is supported by extensive case law) these Defendants are plainly entitled to summary judgment. The mere fact that *some* users of TheDirty.com *may* post unlawful material does not make these Defendants responsible for everything posted on their site. *See Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F.Supp.2d 929, 933 (D.Ariz. 2008) (holding, "It is obvious that a website entitled Ripoff Report encourages the publication of defamatory content. However, there is no authority for the proposition that this makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site.").

The Ninth Circuit's decision in *Roommates.com* strongly supports Defendants' position. In that case, the website itself required all of its users to answer questions (which the website itself created) regarding their race, sex, family status, religious status, etc., in order to search for rental housing, find a roommate, or to offer rental housing. The Ninth Circuit determined that

merely *asking* these type of discriminatory questions in a housing-related transaction could violate the Fair Housing Act, *without regard to any content provided by a third party*.   For that reason, because the website itself was directly involved in illegal conduct, the Ninth Circuit determined that the CDA did not apply to that extent.  *See Roommates.com*, 521 F.3d at 1175.

At the same time, in reaching this holding, the Ninth Circuit also noted that CDA immunity is not an "all or nothing" proposition.  Far from suggesting that immunity may be lost if a website host does something to generally "encourage" its users to post material, the Ninth Circuit emphasized that only <u>direct participation</u>[3] in the creation of illegal content will affect the host's immunity, and that any "close cases" must be resolved in favor of immunity:

> We must keep firmly in mind that this is an immunity statute we are expounding, a provision enacted to protect websites against the evil of liability for failure to remove offensive content.  <u>Websites are complicated enterprises, and there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality</u>.  <u>Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites</u>, fighting off claims that they promoted or encouraged–or at least tacitly assented to–the illegality of third parties.  Where it is very clear that the website directly participates in developing the alleged illegality … immunity will be lost.  But <u>in cases of enhancement by implication or development by inference … section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles</u>.

*Roommates.com,* 521 F.3d at 1174–75 (emphasis added).

In order for the anti-CDA logic of *Roommates.com* to apply to this case, Plaintiff would have to show that on its own, some aspect of [www.thedirty.com](www.thedirty.com) is *per se* unlawful, and that the site itself was unlawful without regard to any material created by third parties.   Here, Plaintiff has adduced no evidence that could possibly support such a conclusion.

---

[3] The Ninth Circuit explained that "direct participation" requires a showing that the website operator itself <u>*materially* changed or altered</u> the user-supplied content to convert an "innocuous" message into a "libelous" one; "A website operator who edits in a manner that contributes to the alleged illegality—such as by removing the word 'not' from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune."  521 F.3d at 1169.

Rather, the undisputed facts show that these Defendants operate a website that permits third parties to share thoughts, ideas, and comments about a wide-variety of topics ranging from sports to presidential politics, and these Defendants did nothing to create or to materially change the text which Plaintiff asserts is defamatory.  As such, these Defendants remain immune under the CDA, even if www.thedirty.com could be said to implicitly encourage negative posts.  To restate the wisdom of the New York Court of Appeals; "We reject [plaintiff's] contention that defendants should be deemed content providers because they created and ran a website which implicitly encouraged users to post negative comments about the New York City real estate industry.  Creating an open forum for third-parties to post content—including negative commentary—is at the core of what section 230 protects." *Shiamili*, 2011 WL 2313818 at \*4 (emphasis added).

Based on the immunity provided by 47 U.S.C. § 230(c)(1), these Defendants are entitled to summary judgment as to all of Plaintiff's claims to the extent they are based on material that was created by a third party user of these Defendants' website.  This is true even if Plaintiff argues that these Defendants somehow "adopted" or "ratified" material created by a third party.  Such an "adoption" theory lacks any legal support and is directly contrary to the express language of the CDA.  *See Parisi v. Sinclair*, 774 F.Supp.2d 310, 316 (D.D.C. 2011) (rejecting Plaintiff's argument "that CDA immunity should be withheld because [defendant] BAM adopted the [third party's] promotional statements as its own.  Indeed, it would be contrary to the purpose of the CDA … to require a fact-based analysis of if and when a defendant 'adopted' particular statements and revoke immunity on that basis.")

### C.  Mr. Richie's Own Comments Are Not Actionable

As noted above, the CDA is only implicated when a plaintiff attempts to impute liability to a website host or user for allegedly unlawful material created by *another* person.  Thus,

because Mr. Richie admits to authoring the statement: "Why are all high school teachers freaks in the sack?- nik" the CDA has no application to the actionability of *that* text.  Of course, the fact that the CDA does not apply to Mr. Richie's own words does not mean that Plaintiff automatically prevails.

On the contrary, these Defendants are still entitled to summary judgment as to any and all claims arising from Mr. Richie's single-sentence "freaks in the sack" comment because this statement was not a statement of fact, but rather it was an expression of pure opinion entitled to protection under the First Amendment.  Furthermore, this statement cannot support any of Plaintiff's claims because the statement was not "of and concerning plaintiff".

### 1.  The First Amendment Protects Expressions Of Opinion

Few rights in this country are as highly valued as those enshrined in our First Amendment.  Indeed, as the U.S. Supreme Court has repeatedly explained, "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).  This principle is not subject to arbitrary application based on matters of taste, nor does the First Amendment's protection depend on whether a statement is benevolent or offensive; "the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

On the contrary, "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it.  <u>Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection</u>." *FCC v. Pacifica Foundation*, 438 U.S. 726, 745, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978) (emphasis added); *see also*

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S.Ct. 3409, 3424, 73 L.Ed.2d 1215 (1982) ("Speech does not lose its protected character ... simply because it may embarrass others or coerce them into action") (emphasis added); *Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788 (1971) (noting, "it is nevertheless often true that one man's vulgarity is another's lyric.")

Based on these principles, courts have consistently held that claims which seek to punish a defendant for expressing an opinion raise serious First Amendment concerns:

> It is well established that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment … . Thus, regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech.

*Snyder v. Phelps*, 580 F.3d 206, 217–18 (4th Cir. 2009) (emphasis added), *aff'd*, 131 S.Ct. 1207 (2011) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 264-65, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)).  In this context, no matter how offensive or hurtful they may be, expressions of opinion are simply *per se* non-actionable; "although there is no categorical constitutional defense for statements of 'opinion,' the First Amendment will fully protect 'statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual."  *Snyder*, 580 F.3d at 218 (quoting *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 22, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) (recognizing, "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.")

In Kentucky, courts generally distinguish fact from opinion by applying a common-sense standard recommend by the Restatement (Second) of Torts:

> "A defamatory communication may consist of a statement in the form of an opinion, but <u>a statement of this nature is actionable only if it implies the al-legation of <u>*undisclosed* defamatory fact as the basis for the opinion</u>.</u>" ... The Restatement takes the position that the court "must determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts which may justify the expressed opinion about the undisclosed facts."

*Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1990) (emphasis added) (quoting Restatement (Second) of Torts § 566  cmt. c (1977)).  As implied by the Kentucky Supreme Court's decision in *Yancey* and as explained in greater detail in the Restatement, a converse rule can also be stated as follows: "An opinion cannot be defamatory where the underlying facts upon which the opinion is based *are disclosed*."  On this issue, the Restatement explains that:

> One common form of defamation has been ridicule that exposes the plaintiff to contempt or derision.  Humorous writings, verses, cartoons or caricatures that carry a sting and cause adverse rather than sympathetic or neutral merriment may be defamatory.  But the distinction drawn in Comment b is applicable to ridicule. <u>If all that the communication does is to express a harsh judgment upon known or assumed facts, there is no more than an expression of opinion of the pure type, *and an action of defamation cannot be maintained*</u>.

Restatement (Second) of Torts § 566 cmt. d (1977) (emphasis added); *see also Global Telemedia, Inc. v. Doe*, 132 F.Supp.2d 1261, 1266–67 (C.D.Cal. 2001) (explaining, "By supplying the underlying document which supports his views, [the defendant] has set forth an opinion, not fact."); *Nicosia v. De Rooy*, 72 F.Supp.2d 1093, 1102 (N.D.Cal.1999) (noting, "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.") (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156–57 (9th Cir. 1995)).

The Restatement further recognizes that even instances of cruel "verbal abuse" are still entitled to First Amendment protection, and therefore even if a statement initially *appears* to contain assertions of fact, the statement is still non-actionable as long as it "cannot reasonably be

understood to be meant literally and seriously and are obviously mere vituperation and abuse." Restatement § 566 cmt. e.  No matter how offensive they may be, such non-literal abuse is not actionable, in recognition of "the reality that exaggeration and non-literal commentary have become an integral part of social discourse." *Levinsky's, Inc. v. Wal-Mart Stores, Inc*., 127 F.3d 122, 128 (1st Cir. 1997).  Furthermore, By protecting speakers whose statements cannot reasonably be interpreted as allegations of fact, courts "provide[ ] assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695 (quoting *Falwell*, 485 U.S. at 53-55, 108 S.Ct. 876).

Although no directly analogous Kentucky cases exist with comparable facts, this logic was applied by the U.S. District Court in *Stanley v. General Media Communications, Inc*., 149 F.Supp.2d 701 (W.D.Ark. 2001).  In *Stanley*, the plaintiffs were two female high school students on spring break in Panama City, Florida who were photographed participating in a contest which "required each participant to place a blindfold over her eyes, unwrap a condom, and place the condom on a 'demonstrator,' which was a white plastic phallus."  *Stanley*, 149 F.Supp.2d at 704. One of the plaintiffs won the contest and photos of both underage girls subsequently appeared in *Penthouse* magazine along with a story about the event which contained suggestive and arguably offensive comments written by the magazine's editor about the plaintiffs.  *See id.*

The plaintiffs sued the publisher of *Penthouse* for a variety of state-law torts including libel, intentional infliction of emotional distress, invasion of privacy-false light, and invasion of privacy-appropriation.  The defendants moved for summary judgment on all claims, arguing that the facts of the case could not support a judgment in favor of the plaintiffs on any theory.

The District Court granted summary judgment in favor of defendants on all claims, explaining that because the magazine disclosed the facts upon which its comments were based

(i.e., the photographs of the plaintiffs), the editor's comments about the photos necessarily constituted protected expressions of opinion:

> The Plaintiffs agree that the photo is an accurate, unmanipulated depiction of themselves participating in the condom-fitting contest. In her deposition, Stanley complained that the text referred to them as "skilled participants," in a "test of dedication and dexterity," and characterizes the event as an "ecstatic moment." <u>The plain text accompanying the photo can only logically be understood as describing the events in the photo</u>. … <u>The editor's comment in italics cannot be reasonably understood to be a statement of fact</u>

*Stanley*, 149 F.Supp.2d at 707 (emphasis added).  The same is true here.  This is so because Mr. Richie's single-sentence hypothetical question: "Why are all high school teachers freaks in the sack?- nik" was plainly a *response* to the comments made in the original third party author's post. *See,* Post attached as <u>Exhibit C</u>.  By simply commenting about the original post, Mr. Richie's statement constituted a protected expression of opinion, not an assertion of fact.

In making his single-sentence comment, Mr. Richie did not express nor did he imply the existence of <u>undisclosed</u> defamatory facts.  Rather, the comment was nothing more than a generic observation about the *disclosed* facts set forth in the author's story about Ms. Jones. Nothing in Mr. Richie's comment stated or implied that he knew Plaintiff personally, nor did Mr. Richie's comment imply that he had ever engaged in sexual relations with Plaintiff as would be required for him to actually know whether or not she was, in fact, "a freak in the sack".

Rather, Mr. Richie merely expressed a passing comment arising from the assertions contained in the author's original post without in any way confirming or corroborating the truth of those statements.  Viewed in context and given these undisputed facts, these Defendants are entitled to summary judgment as to Mr. Richie's single-sentence comment; "This type of opinion is not actionable because '[t]he reader is in as good a position as the author to judge whether the conclusion' reached by the author was correct.'"  *Holley Perf. Prods. v. Smith-CNC China*

*Network Co*., No. 1:06-CV-165-M, 2009 U.S. Dist. LEXIS 33670 at *8 (W.D. Ky. Apr. 21, 2009) (quoting *Lassiter v. Lassiter*, 456 F.Supp.2d 876, 882 (E.D.Ky. 2006).

### 2.  Mr. Richie's Statement Was Not "Of And Concerning" Plaintiff

Even assuming *arguendo* that Mr. Richie's "freak in the sack" comment was capable of a defamatory meaning, which it is not, the statement is nevertheless non-actionable as to Plaintiff because it was not "of and concerning" her.  As a matter of law, statements which generally impugn a large group are not actionable by individual members of the group.  *See* Restatement (Second) of Torts § 564A cmt a (1977) (explaining, "As a general rule no action lies for the publication of defamatory words concerning a large group or class of persons … .  On the same basis, the statement that 'All lawyers are shysters,' or that all of a great many persons engaged in a particular trade or business or those of a particular race or creed are dishonest cannot ordinarily be taken to have personal reference to any of the class.") (emphasis added); *see also O'Brien v. Williamson Daily News*, 735 F.Supp. 218, 223 (E.D.Ky. 1990) (holding affirmed 931 F.2d 893 (6th Cir. 1991); *Louisville Times v. Stivers*, 252 Ky. 843, 68 S.W.2d 411 (1934).

Although Defendants are unaware of the actual total number of high school teachers in the United States, anecdotal evidence from the National Center for Education Statistics suggests there are approximately 3.7 million teachers in the U.S. as of 2011. *See* http://nces.ed.gov/fastfacts/display.asp?id=372.  Whatever the actual number of high school teachers may be, the Court may take judicial notice of the fact that the total number of high school teachers in the United States is far in excess of the 29-person limit held to be "too large" to permit individual group members to pursue claims based on a statement impugning the group. *See O'Brien*, 735 F.Supp. at 222–23 (finding group of 29 high school teachers was too large to pursue defamation claims based on newspaper article alleging sexual misconduct by "Phelps High School teachers".)

### 3.  Defendants Did Not Act With Actual Malice

Finally, although the Court need not reach this issue, these Defendants are entitled to summary judgment as to Plaintiff's defamation claim because Plaintiff is a public figure and she has no evidence whatsoever showing that Defendants acted with the "actual malice" required by *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).  Whether a plaintiff is a public figure presents a question of a question of law for the Court.  *See Yancey*, 786 S.W.2d at 859; *Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758, 761 (Ky. 1990).

Because the standards for ascertaining an individual's status as a public figure are so highly subjective and incapable of precise definitions, engaging in a comprehensive analysis of the issue is nearly impossible.  For that reason, rather than devoting dozens of pages of analysis to this topic, these Defendants will keep the discussion as brief as possible.

As noted above, the undisputed facts show that in addition to her work as a high school teacher, for the last six years Plaintiff has also worked in the public eye as a cheerleader for the Cincinnati Bengals, a famous NFL football team.  In her capacity as an NFL cheerleader, Plaintiff's name, photos, occupation and other biographical information appears on the Bengal's website (*see* http://www.bengals.com/cheerleaders/ben-gals.html).

It is undisputed that as an NFL cheerleader, Plaintiff appears and performs before tens of thousands of fans at every Bengals home game, with potentially millions more fans watching each televised game.  Far from taking a minor role in these events, Plaintiff has actively pursued greater and greater public prominence throughout her cheerleading career.  It is further undisputed that she is currently the captain of the Bengals cheerleaders, she recently participated in the nationally televised Pro Bowl game in Miami (which included giving television and radio interviews), she frequently attends charity events with and on behalf of the team, and she has

even travelled overseas to entertain U.S. troops in Iraq.  Of course, in addition to these activities, Plaintiff also posed for and appeared on the cover of the Bengals 2007 cheerleader calendar in extremely provocative apparel, and Plaintiff's racy photograph from that calendar was submitted in conjunction with the December 7, 2009 Post which forms a substantial part of her claims here. These facts are more than sufficient for the Court to find that Plaintiff is a public figure.

While these Defendants are unaware of any directly analogous cases from Kentucky involving NFL cheerleaders, a helpful and thorough discussion of similar facts is found in *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 353 N.E.2d 834 (N.Y. 1976) in which the Court found that a professional belly dancer qualified as a public figure due to her efforts to attract public attention:

> The essential element underlying the category of public figures is that the publicized person has taken an affirmative step to attract public attention. Of course, not all persons reported upon in the media have sought the publicity. However, there are individuals who, for a variety of reasons, have strived to achieve a measure of public acclaim. Thus, in this case, we have no doubt that the plaintiff cooperated in having the interview with defendant's reporter and was far from unhappy about any attendant notoriety. Her obvious purpose was to attract customers to the club where she was performing. A larger audience for her performances would be beneficial to her economic interest. In short, the plaintiff welcomed publicity regarding her performances and, therefore, must be held to be a public figure with respect to newspaper accounts of those performances. By her purposeful activity, she thrust herself into the public spotlight and sought a continuing public interest in her activities.

*James*, 40 N.Y.2d at 422–23, 353 N.E.2d at 876.

Viewing the facts of this case in a light most favorable to Plaintiff, there is no question that Plaintiff has repeatedly and continuously taken affirmative steps to attract public attention to herself, particularly with respect to her physical appearance and her role as an NFL cheerleader. By their very nature, cheerleaders are *not* intended to be ignored or disregarded by the public. On the contrary, while many cheerleaders are also top athletes/gymnasts in their own right, they generally exist as a form of entertainment and their *raison d'etre* is to attract attention from fans,

often by being physically attractive and by wearing provocative, tantalizing uniforms and dancing in an evocative manner.

As a person who has actively pursued public attention and notoriety over a period of more than half a decade, Plaintiff's actions establish that she in a public figure within the meaning of *Sullivan* and its progeny.  As such, in order to prevail here she is required to produce clear and convincing evidence showing that Defendants either knew that the posts about her were false, or that they entertained serious doubts as to their accuracy such that they acted with reckless disregard for the truth.  *See Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc.*, 179 S.W.3d 785, 789 (Ky. 2005) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)).

Plaintiff has not and cannot meet this burden.  To begin, Plaintiff has no evidence to show that these Defendants "knew" any of the postings about her were false and these Defendants expressly deny any such knowledge.  Indeed, Plaintiff has conceded that at least one of the primary allegations in the posts was in fact true—that Plaintiff's then-ex-boyfriend (now husband) was unfaithful.  *See* Jones Depo. 87:4–13.

With respect to the remaining allegations (i.e., that Plaintiff's ex-boyfriend tested positive for certain extremely common and curable venereal diseases), particularly in light of the undisputed fact that Plaintiff conceded that it was true her ex-boyfriend cheated on her multiple times, this allegation is hardly so outlandish that it would support a finding that Defendants must have excepted it was false or that they entertained serious doubts as to whether it was true.  *See E.W. Scripps Co. v. Cholmondelay*, 569 S.W.2d 700, 704 (Ky.App. 1978) (noting, "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard

for truth or falsity and demonstrates actual malice.") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)).

For these reasons, in the event the Court finds that Defendants are not entitled to immunity under the CDA for material created by third parties, Defendants are nevertheless entitled to summary judgment as to that material because they did not know the statements at issue were false, nor did they publish any statements about Plaintiff with a reckless disregard for the truth.  In addition, because Plaintiff is a public figure, absent a showing that Defendants are liable for defamation, her claim for intentional infliction of emotional distress is plainly barred by the Supreme Court's classic decision in *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)).

On the other hand, even if Plaintiff was *not* a public figure, because the statements at issue in this case involved matters of substantial public concern such as her conduct as an NFL cheerleader and fitness as a public school teacher, her emotional distress claim is nevertheless barred by the Supreme Court's decision in *Snyder v. Phelps*, 562 U.S. ___, 131 S.Ct. 1207 (2011) (holding that even where defendant's speech was "outrageous", deliberately hurtful and utterly deplorable, and even where defendant's contribution to public discourse was "negligible", First Amendment still barred emotional distress claims arising from protected speech about matters of public interest and concern).

## IV.   CONCLUSION

For the reasons stated herein, summary judgment should be entered in favor of Defendants and against Plaintiff as to all claims in this matter.

**DIRTY WORLD, LLC AND
NIK LAMAS-RICHIE**


 /s Alexander C. Ward_____
Of Counsel

Alexander C. Ward, Esquire
**HUDDLESTON BOLEN LLP**
855 Central Avenue, Suite 301
P.O. Box 770
Ashland, KY 41105
606.329.8771

and

Alexis B. Mattingly, Esquire
**HUDDLESTON BOLEN LLP**
611 Third Avenue
P.O. Box 2185
Huntington, WV 25722-2185
304.529.6181

**Counsel for Defendants,
Dirty World, LLC and
Nik Lamas-Richie**