1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF KENTUCKY
2             NORTHERN DIVISION AT COVINGTON

3

SARAH JONES,                    :  Docket No. CV 09-219
4                               :
          Plaintiff,            :  Covington, Kentucky
5                               :  Tuesday, January 22, 2013
          versus                :  10:00 a.m.
6                               :
DIRTY WORLD, LLC, et al.,       :
7                               :  **DAY 1 of 3**
          Defendants.           :
8

9                          - - -

10            TRANSCRIPT OF TRIAL PROCEEDINGS
               BEFORE WILLIAM O. BERTELSMAN
11            UNITED STATES DISTRICT COURT JUDGE

12                         - - -
     APPEARANCES:
13
     For the Plaintiff:      ERIC C. DETERS, ESQ.
14                           Eric C. Deters & Partners, PSC
                             5247 Madison Pike
15                           Independence, KY 41051

16   For the Defendants:     ALEXANDER C. WARD, ESQ.
                             ALEXIS MATTINGLY, ESQ.
17                           Huddleston Bolen, LLP - Ashland
                             855 Central Avenue, Suite 301
18                           P.O. Box 770
                             Ashland, KY 41101
19                            and
                             DAVID GINGRAS, ESQ.
20                           Gingras Law Office, PLLC
                             E. Chandler Boulevard
21                           #106-243
                             Phoenix, AZ 85048
22
     Court Reporter:         JOAN LAMPKE AVERDICK, RMR-CRR
23                           Official Court Reporter
                             35 W. Fifth Street, Box 1073
24                           Covington, KY 41012
                             (859) 291-9666
25        Proceedings recorded by mechanical stenography,
     transcribed by computer.

2

1          (Proceedings commenced at 10:00 a.m.)

2          (Voir dire was conducted but not transcribed.)

3          THE COURT:  Good afternoon, everybody.  Are you ready

4     to proceed with opening statements?

5          MR. WARD:  Yes, Your Honor.

6          MR. DETERS:  Yes, Your Honor.

7          THE COURT:  Okay.  One right after the other.  All

8     right.  Bring the jury in, please.

9          (The jury entered the courtroom at 1:02 p.m.)

10         THE COURT:  Please be seated, ladies and gentlemen.

11    Good afternoon.  I should point out that in these federal

12    civil cases, if all ten of you haven't been excused for

13    illness or something by the time we deliberate, all ten will

14    deliberate.  There are no alternates, per se.  I just have to

15    have six left at the end.  If somebody had to be excused, the

16    rest could continue; but whoever's left at the end will

17    deliberate.  So everybody needs to pay close attention.

18         Mr. Deters, you may proceed with your opening

19    statement.

20         Opening statements, ladies and gentlemen, are not

21    evidence, but rather predictions of what the evidence is going

22    to be.  It's up to you, at the end, to decide whether those

23    predictions came true and what weight to give the evidence.

24         MR. DETERS:  May I stand next to the viewer, Your

25    Honor?

1           THE COURT:  Pardon me?

2           MR. DETERS:  May I stand next to the viewer?

3           THE COURT:  You can stand at the presenter there.

4           MR. DETERS:  Good afternoon.  This case involves

5    thedirty.com.  That is the web site that led to the lawsuit

6    and why we're here.  And what I'm going to do is outline for

7    you what the testimony and what the evidence is going to be.

8           Sarah Jones is going to take the stand after the

9    opening statements are finished; and subsequent to that, I'm

10   going to cross-examine Mr. Richie.  And that's going to be our

11   case.  I'm going to put Sarah Jones up there.  You're going to

12   get to hear from her.  You're going to get to hear from Nik

13   Richie.  They'll put on their case.  And then you'll get to

14   decide your verdict.

15          Now, I want to give you a few facts the evidence is

16   going to show.  And I'm going to cover this with Mr. Richie

17   during his testimony.  But thedirty.com, he gets a thousand

18   submissions a day, and the top 150 to 200 stay; 600,000 hits a

19   day, 18 million a month.  He's in 50 cities.  He's got a

20   hundred subsections or colleges.  He's in Canada, Paris, and

21   Mexico.  And it's tallied as "the world's first-ever reality

22   blogger."  And you'll hear his testimony that he got this idea

23   from watching reality television.

24          And the defendant -- there's two defendants, Dirty

25   World, LLC and Mr. Nik Richie.  Now, he lives in Scottsdale,

4

1    Arizona.  You're going to hear his testimony that at different

2    points in his life, he's used three different names.  Okay, I

3    guess, if you're in the entertainment.  Nik Richie and Nik,

4    that N-I-K, is what he uses on his web site.

5          Now, it's important for you to understand that

6    thedirty.com is his livelihood.  Very important for you to

7    understand that.  It generates money.  He pays himself a

8    salary.  He says he does lots of speaking engagements, and it

9    builds value to the benefit.  The plan, according to his

10   deposition testimony, is to cash out sometime.

11         A web site like this -- and you're going to hear

12   testimony from him.  I'm going to ask him.  He'll admit it.

13   Part of that, the value of it, is based on traffic.  Traffic

14   to the web site increases what thedirty.com makes in revenues

15   and increases the value of the site.  And you're going to hear

16   from him that the more you get, the more traffic that you get

17   to your web site, the more advertisers are going to pay.

18         What's his role?  His role is everything.  He's the

19   part owner.  He's the managing member of the LLC.  Those of

20   you that are not familiar with that term, an LLC is called a

21   limited liability company.  For your purposes, consider it

22   kind of like a corporation.  He decides what goes up; he

23   decides what goes down on the web site.  He alone decides

24   that, is what the testimony is going to be.

25         You're going to hear him testify he edits postings

1   and he also writes posts he claims are others'.  Okay?  Now,

2   there -- and you have to understand, we've taken depositions.

3   We've exchanged discovery.  We kind of know what the other

4   side's going to say.  You will hear testimony from him that

5   this is about the First Amendment.  About the First Amendment.

6        You are going to receive jury instructions at the

7   conclusion of this case from the Honorable Judge Bertelsman

8   that will instruct you on what defamation is.  Defamation,

9   libel is written word; slander oral.  And you're going to have

10  these legal terms.

11       The reason why you're going to be getting those is

12  our case is simple in the fact it is based upon defamation.

13  And you're going to obviously conclude from the fact that

14  you've been given those jury instructions that the First

15  Amendment does not protect defamation.  It does not.  We all

16  have a right to speak, but defamation is defamation.

17       Now, this is the crux of what was on that web site

18  that is in issue.  Now, they posted -- these are the three

19  main defamatory statements that were on that web site.  "Sarah

20  Jones had sexually transmitted diseases, including chlamydia

21  and gonorrhea."  And that was in, I believe, October of '09.

22  Then there was a post later, "Sarah Jones had sex with every

23  football player on the Bengals team," she being a Ben-Gal.

24  "Sarah Jones and her former husband, Nate Wilburn, had sex in

25  her classroom and on the football field when she taught at

1    Dixie."

2         Now, another thing about thedirty.com is that he's

3    got something, you're going to hear testimony, called The

4    Dirty Army.  The Dirty Army.  And you're going to hear

5    testimony that the web site says, according to Mr. Richie --

6    these are his words -- "I love how the Dirty Army has war

7    mentality."

8         Now, you're going to hear testimony from them where

9    they are going to attempt -- and you're going to hear the

10   cross-examination of Sarah -- that what bad things there are

11   in her character, because, you see, truth's a defense.  I will

12   represent to you, ladies and gentlemen of the jury, that

13   you're going to hear no evidence whatsoever that any of those

14   are true.  They're all false.  False, false, false, what

15   you're going to hear.  So they're going to hint around the

16   edges, and you're going to hear her defend herself.

17        Now, I'm not going to get into all the details of the

18   evidence because I like to be brief in my opening, but you're

19   going to get to hear it all.  So if I'm leaving something out,

20   don't worry.  We're going to cover it.

21        Sarah has checked at the gynecologist since she was

22   18.  And she has medical records, because she wanted to prove,

23   once that got out there -- and she's going to tell you all she

24   went through.  I'm not going to cover that right now -- that

25   she does not have any of those two STDs.  Now, the testimony

7

1    is going to be that she contracted in the eighth grade, not

2    from a sexual encounter, hepatitis A.  And based upon what I

3    know that they're going to argue, they're going to bring that

4    up.  Okay?  So part of the evidence and part of their case is

5    going to be the fact that she has hepatitis A, it's okay that

6    they posted that she had gonorrhea and chlamydia, regarding

7    the truthfulness of the postings.

8         Sarah has never been around any of the football

9    players outside of the professional organization.  Why is that

10   important?  You're going to hear that she's a Ben-Gal.  She

11   was a Ben-Gal.  When she was a Ben-Gal, you couldn't date the

12   football players.  So the fact that they're saying, on a

13   public web site, that she had sex with every one of them, that

14   caused her problems.

15        She's never had any STDs.  Let me correct that.

16   She's had hepatitis A, if that's considered an STD.

17        Sarah's never had sex in her classroom, on the

18   football field, in the gym, or anywhere at Dixie Heights High

19   School with anyone.

20        Now, you're going to hear her admit on that witness

21   stand all of her lies that she told in conjunction with the

22   investigation by the Edgewood Police Department and her

23   subsequent plea to a felony diversion; that she engaged in a

24   relationship that was inappropriate with a high school student

25   who was 17 at the time, subsequently turned 18, and she's

1    still dating.  And she is 27 years old.  And you're going to

2    hear testimony that this was all -- the whole relationship is

3    with the support of both sets of parents.

4         And you're going to hear how she had to resign from

5    the school as a teacher and how she had to plead guilty to a

6    felony.  And during the police investigation, you're going to

7    hear that she lied to the police initially about it.  And

8    you're going to see where she lied publicly that she wasn't

9    involved.  She lied, lied, lied.  And you're going to hear

10   their testimony to basically be if she lied about that, it's

11   okay that we said these things.

12        Now, the time frame that we're asking you for damages

13   for what they did to her is only up to February 1st, 2011.

14   And you're going to see this time frame.

15        So I asked you during voir dire, I said, will you

16   promise me that you're going to forget about all these other

17   things over here, and you promised me you would.  Promised me

18   you would.  Because the issue in this case, as you're going to

19   hear the evidence, isn't what she did at Dixie.  It's what

20   they did on thedirty.com.  Just because she did what happened

21   at Dixie does not vindicate them for doing this two years

22   before Dixie ever happened.

23        Also, Nathan, her ex-husband, cheated on her, you're

24   going to hear testimony -- ladies, this will strike you --

25   over 50 times from high school through marriage.  And you're

1    going to hear testimony she couldn't help taking him back time

2    and time again because she loved him.  And you're going to

3    hear testimony that Sarah Jones' only intimate sexual

4    relationship, from high school through marriage, was Nate

5    Wilburn, the guy that cheated on her 50 times.  You're not

6    going to hear any testimony or any evidence somebody's taking

7    that stand and said, I had sex with Sarah Jones, I had oral

8    sex with Sarah Jones.  Nothing.  Nothing.

9         So she kept taking Nate back.  And then, before 2011,

10   okay -- after October, 2011, she had sex with Cody.  But

11   they're going after her character.

12        Comments on the site.  See, once these sites go up,

13   the Dirty Army gets to work.  Come on, Army, war mentality.

14   Let's get out there and post.  Because what you're going to

15   hear the testimony is, somebody posts something and then the

16   Army gets to work.  What do you say?  Well, here's what you

17   say:  "You nasty whore.  Good luck teaching now that you're on

18   this web site.  Ugly fat ass.  Photo shop is for liars and

19   those with models."  And you're going to hear testimony from

20   Sarah what that did to her.  And you're going to hear, because

21   we're being permitted to, to show you how they do that to

22   other people, the Dirty Army with that war mentality.

23        Bottom line, the evidence is going to be that those

24   posts are false.  False.  The testimony's going to be they are

25   about Sarah.  The testimony's going to be that they were

1    published to hundreds of thousands and millions of people.

2    The testimony and evidence is going to be that they acted with

3    malice.  And the testimony is going to be and the proof's

4    going to be that they caused her harm.  And ladies and

5    gentlemen, one through five is defamation proven, tipping

6    those scales of justice, not beyond a reasonable doubt,

7    although it will be beyond a reasonable doubt.

8            Now, it gets worse, our story.  I apologize if I get

9    emotional.  She's my friend.  She begged and begged, take them

10   down.  Over 20 times, take those down.  They didn't.  So what

11   did we do?  We filed a lawsuit.  In fact, testimony's going to

12   be Mr. Richie got one final letter from me that said, take

13   them down or we file the lawsuit.  What happens when that

14   happens to Nik Richie?  He taunts.  You're going to hear

15   testimony and evidence that when you take on Nik Richie, it

16   gets worse for you on his web site.  It gets worse.

17           Now, they're going to make this big deal about money.

18   Money.  Well, there's -- I'm enamored at this talk about her

19   wanting $11 million.  I've heard -- let me tell you what we

20   want you to do.  After you hear all the evidence, we're going

21   to want you to award her a sum of money that you think is

22   fair.  And then we're going to ask you to do what's called

23   punitive damages, which you're able to award much more than

24   compensatory damages.  It's called punitive damages.  And we

25   want you to award, in honesty, as much money as you can

1   stomach, because we're going to ask you to do that to put him

2   out of business.

3           Now, when they bring this up about her wanting money,

4   think of this:  You're going to see all the testimony, all the

5   evidence.  She kept begging, I don't want to sue; just take it

6   down.  Just take it down.  So if any of you-all don't like

7   lawsuits, keep in mind, she didn't want to file one.

8   Testimony's going to be she just wanted it down.

9           Now, this is the time frame.  I promised you one.

10  I'll give you one, the facts of this case.  The postings on

11  October 27th, 2009 and December 7th, 2009 regarding her were

12  completely false.  And we seek damages only to February 1st,

13  2011.  Now, you're going to say why.  Well, because things

14  started to happen with Cody after that period, and I didn't

15  want her to have to endure the text messages and all that.

16          Now, this Court has made a pretrial ruling where

17  they're going to be allowed to present you text messages that

18  deal with her lying.  Only lying, not all the graphic stuff.

19  Every time that they present her with one of those, just know

20  she's going to admit it.  And you'll have to judge whether her

21  lying about that let's them off the hook for this.

22          Now, what she went through.  Threw up.  She was so --

23  by the way, this all happened within that time frame.  We're

24  not talking -- we're not asking you to award her damages for

25  permanent mental misery.  For just those two years.  She threw

1    up.  She was depressed.  She was on Lexapro.  She couldn't

2    keep from checking the posts.  She just has to keep checking.

3    Can't tell you how many times I've said, Sarah, will you

4    please stop checking.  She keeps checking.

5         She kept having to tell the students she had no STDs.

6    The school told her, you've got to talk to the students.  A

7    teacher having to say, I don't have STDs.  The kids were all

8    checking out thedirty.com.  They had to cut it off at the

9    school.  All eyes were on her everywhere she went; church,

10   community events.  She felt like, oh, my God, they all think

11   I've got gonorrhea and chlamydia.  She was worried about her

12   job.  She was taunted.  She was worried about her position as

13   a Ben-Gal.  She missed a few days of work.  It affected her

14   marriage, which later ended in divorce, and other

15   relationships.

16        Most important ladies and gentlemen -- ladies and

17   gentlemen of the jury, the Internet is permanent.  It's

18   permanent.

19        Now, I've got two more here and I'll be finished.

20   There is many virtues in life, and I want this to be the

21   virtue that you see in her as she testifies, is courage.  I

22   think you're going to love her when she gets done testifying.

23   I don't think you're going to see her as that teacher in the

24   scandal.  I think you're going to love her.  I think you're

25   going to like her.  Courage to sue and fight back against

 1    them.  And her cause is the same cause for all those similarly

 2    situated.

 3              Nik, you're going to hear testimony he brags he never

 4    loses.  You're going to hear testimony, you're going to see

 5    postings where he mocks me, he posted on my daughter, and he

 6    mocks the Court, and he mocks Kentucky.  I'm going to show it

 7    all to you.  Big man from Arizona mocking us.

 8              You're also going to hear testimony from him, okay,

 9    what he does with that site.  Now, I'm a plaintiff's attorney,

10    and I don't make any apologies.  If somebody's harmed, I hope

11    they call me.  Everybody thinks we're, quote unquote,

12    ambulance chasers.  Well, guess what?  Under the Seventh

13    Amendment of the Constitution, United States Constitution,

14    Sarah can't hire me and Chuck and Chad and my boys to go beat

15    him up.  That would be a crime.  She can only sue and ask for

16    money.

17              Can't make them remove.  She begged.  They didn't

18    want to.  She can't make them stop.  They're still taunting

19    her.  Still taunting her.  You can only award money.  You can

20    only award money.  And my concern is -- and I'll be honest

21    with you.  You give her 50,000 bucks, we'll be happy.  You

22    award $10,000, to be honest with you, we'll be happy.  At

23    least we can say we won.  But I want you to get out of your

24    head how a lot of money would benefit her and focus on how a

25    whole lot of money would hurt him.  And we're going to present

14

1    this through two witnesses, Sarah Jones and Nik Richie.

2            Thank you very much.

3            THE COURT:  Whoever wants to speak for the defense.

4            MR. WARD:  I will, Your Honor.

5            THE COURT:  Okay.

6            MR. WARD:  May it please the Court, Counsel.

7            For a case about the Internet, you guys are about to

8    see somebody who's completely inadequate at technology.

9            I'm just going to turn this on right now.  I'm not

10   ready to play anything.

11           DEPUTY CLERK:  Okay.

12           MR. WARD:  What does it say about a person when they

13   want to clear their reputation, but they have to lie to do

14   that because the truth can send them to prison?

15           Good afternoon, ladies and gentlemen.  I'm Alex Ward.

16   My partner, Alexis Mattingly, and Dave Gingras, we represent

17   the defendants in this case.

18           And I guess there's an old saying, beware of the half

19   truth; you might have hold of the wrong end.  Mr. Deters is

20   going to try to make this case all about evil web sites.

21   That's half the truth.  And I submit, I think you've got the

22   wrong end.

23           This case is actually about the plaintiff's

24   reputation, because that's what a defamation case is.  And the

25   person I just described having to lie to clear their

1    reputation, I mean, if you think about that, that's the

2    plaintiff.

3         The plaintiff is here asking you folks to give her

4    money.  Mr. Deters said, I don't know where this infatuation

5    with $11 million came from.  It came from what they filed in

6    this case and asked for.  Wasn't pulled out of thin air at

7    all.  So that's a lot of money she's going to ask you-all to

8    give her.

9         And she says she should get that money because she

10   says some stuff that was posted on a web site, my client's web

11   site, by someone, apparently someone with Facebook access to

12   the plaintiff, she says that was untrue; the posts were

13   untrue.  But when she went on a TV show to clear that

14   reputation that she claims these posts damaged, the truth of

15   her life and her conduct was so bad that she couldn't tell the

16   truth.  She had to lie.  She went on a TV show to clear her

17   reputation and she had to lie.

18        And the plaintiff lies a lot.  Mr. Deters said it.

19   He said, she lied, she lied, she lied, she lied, as though we

20   should get out the broom and sweep it under the door and not

21   care.  Well, that's not the way it works.  I am going to talk

22   about those lies because it affects every aspect of this case.

23        Her credibility is on trial here because she has to

24   convince you, okay, of what is true and what was false.

25   Mr. Deters kept talking a whole lot about they're not going to

1    put a witness on the stand to say that's false or they're not

2    going to do this or that.  It's her burden to prove to you

3    that what was posted was false.  So that's why her credibility

4    is so important.

5         The meat of this case is simply this:  The plaintiff

6    is a convicted felon and an admitted and committed liar.  And

7    the lies I'm talking about is on an unbelievable scale.  When

8    you guys hear the talk about she lied to the police and she

9    lied on a TV show, you hear it and you think wow, that's a lot

10   of lying.  It's unbelievable.  The evidence that she will show

11   you as to how often and extensive her lies were, it's

12   unbelievable, the scale.

13        And I know that that sounds harsh.  We're taught you

14   don't point fingers at people and you don't call them liars.

15   But it's the truth.  And it's so important in this case that

16   there's really no other way for me to put it.  It's just a

17   fact.

18        I told you she's lied on television shows that she

19   went on to talk about this case.  And I told you that first

20   thing about going on and lying to protect her own reputation.

21   I don't want it to just be me talking about it, because

22   you-all don't know me.  So I'm going to show you the

23   plaintiff's own words describing what happened when she went

24   on "Anderson Cooper" to fix her reputation.

25        (The following video clip was played in open court.)

1   Q.   *In the text messages, during the time you were in*

2   *New York for "Anderson Cooper," you said to Cody, "I said I*

3   *had only been with one person, though, because I had to for*

4   *court."  Do you remember saying that to Cody?*

5   A.   *That may be in the text message, but I don't necessarily*

6   *remember texting something a year ago.*

7   Q.   *Okay.  What does that mean?*

8   A.   *When they had asked me on the interview, during the*

9   *interview at "Anderson Cooper," I strategically said that at*

10  *the time of the posting, I had only been with the guy, the man*

11  *I married, I'm married to now, because that's true, the only*

12  *person.  With my deposition, under oath, I've always claimed*

13  *that I've only been with one person.  That would be Nathan.*

14      *But Cody and I had had sex in October.  And it wasn't*

15  *like I could come out on the interview and say that, so I made*

16  *it clear that I'd only been with -- and like I said, I said it*

17  *in a way that people would understand that, during the time of*

18  *the postings, I had only been with one person, and now I had*

19  *been with two.  And I make that clear in the text messages,*

20  *that it's only been two.*

21                  (Video clip concluded.)

22          MR. WARD:  Okay.  So maybe she thinks she didn't lie.

23  Maybe it was strategically worded.  Did you-all catch that?

24  But that wasn't the only time that she's even lied to a

25  television show.  In fact, she went on one show twice, first

18

1    to lie to the show and then a second time, after her guilty

2    plea, to admit she lied but justify it.  Let me show you a few

3    more clips on that one.  And we'll just kind of walk through

4    what's going on there.  Here's the first one.

5           (The following video clip was played in open court.)

6    Q.   *Did you ever have sex with a student?*

7    A.   *No.  It was never like that, no.  It was --*

8    Q.   *Emotional?*

9    A.   *Yes.*

10   Q.   *But not sexual?*

11   A.   *No.  It was never -- never about that, never like that.*

12                     (Video clip concluded.)

13          MR. WARD:  So there we see a good, strong denial,

14   good eye contact.  No, never had sex with a student.  Here's

15   clip 2.

16          (The following video clip was played in open court.)

17   Q.   *You stood up in open court and admitted, I lied.  I had*

18   *sex with him.  I had a relationship with him.*

19   A.   *As anybody knows, it's hard to admit your mistakes, and*

20   *you hope that people will forgive you.  But it is literally*

21   *the saying, the truth will set you free.  It was like the*

22   *stress fell off of me after it was out there and I didn't have*

23   *to hide anymore.*

24                     (Video clip concluded.)

25          MR. WARD:  All right.  So clearly something's changed

1    between number 1 and 2, right?  We went from a good, strong

2    denial to the truth setting us free.  And let's see why we

3    changed.

4          (The following video clip was played in open court.)

5          *MS. JONES:  I sent sexually explicit text messages to*

6    *Cody York while he was a student.  I had sexual contact with*

7    *Cody York in Kenton County while he was a student and I was a*

8    *teacher at Dixie Heights High School.*

9                    (Video clip concluded.)

10          MR. WARD:  All right.  So that's what happened,

11    right?  She goes on first, lies about it.  Says no, I didn't

12    have sex.  Then she got caught, pled guilty to it, so she goes

13    back on the show to fix her reputation and says, well, yeah, I

14    did.  But she's obviously upset in that video right there

15    testifying in the court, right?  Let's see what she did the

16    next day when she's back on.

17          Let's see.  I think it starts about right here.  This

18    is the next day.

19          (The following video clip was played in open court.)

20    A.   *I didn't know what to do.*

21    Q.   *I've been going through the transcripts of our interview.*

22    *You even lied to us.*

23    A.   *What did I say?*

24    Q.   *I said to you, "Did you ever have sex with this student?"*

25    *You said, "No, it was never, never like that.  No."*

1    A.    *That's part -- that's partly true.  It was never like*

2    *that.  You know, there's a fine line between telling the*

3    *truth, lying.*

4    Q.    *You did have sex with him, though?  You said no to that*

5    *question.*

6    A.    *Right.  Well, openly in an interview, you can't really*

7    *come out and express what the facts of the case are.  We're*

8    *talking about a criminal court case.  It would not be very*

9    *smart for me, on an interview, to come out and tell you the*

10   *truth when I had a court case in a couple months.*

11                    (Video clip concluded.)

12            MR. WARD:  She didn't seem as upset the next day, did

13   she?  Did you catch that?  The day before, she was in tears

14   that day.  "You lied to us."  "Well, what did I say?"  The

15   smile.  But again, maybe all that's just for TV.  Maybe she's

16   someone who goes on television, says things to help her

17   reputation.  We don't know.  Let's go back to her deposition.

18         (The following video clip was played in open court.)

19   Q.    *Okay.  We're talking about "The Today Show" and*

20   *"Dateline" as well.  You did tell the interviewer, during your*

21   *first interview with him, that you did not have a sexual*

22   *relationship with Cody; is that correct?*

23   A.    *He asked me if it was a sexual relationship, and it*

24   *wasn't -- although we had had sex, it wasn't a sexual*

25   *relationship so I answered it by saying no because, in my*

21

1   *mind, it wasn't a sexual relationship.  It wasn't based off of*

2   *sex.  It was a romantic relationship.*

3   Q.   *But it was a relationship in which sex was involved,*

4   *correct?*

5   A.   *Correct.*

6   Q.   *Okay.*

7                    (Video clip concluded.)

8          MR. WARD:  All right.  So I know what that was.  That

9   was the strategic wording.  But the fact of the matter is,

10  you-all just saw it.  The question he asked her was, did you

11  have sex with Cody, and she said no.  There was no ambiguity

12  there.

13         So she's lied on all those occasions.  She's lied to

14  school officials, because you can't have an affair with one of

15  your students without doing that, right?  Or you at least have

16  to conceal the fact that you're having sex with one of your

17  students.

18         She's lied to police investigators.  We've heard

19  that.  And I'll show you this one on the viewer.  If you'll

20  look down here, this is part of her criminal plea when she

21  pled guilty to a felony.  You have to do what's called an

22  allocution or a proffer of truth.  If you'll look at number 9

23  there, during her interview, "I was not truthful with the

24  Edgewood Police Department regarding my relationship with Cody

25  York."  So there it is in writing that she lied to the police.

22

1          And she wasn't shy about admitting those lies either

2     in deposition that she gave in this case.  Here's the video.

3          (The following video clip was played in open court.)

4     Q.   *You were interviewed by the Edgewood Police Department on*

5     *November 29th, 2011, correct?*

6     A.   *Yes, ma'am.*

7     Q.   *Okay.  And the officer who interviewed you was Officer*

8     *Inman, correct?*

9     A.   *Um-hmm.  Yes.*

10    Q.   *Okay.  As part -- and you subsequently pled guilty to a*

11    *couple of crimes; is that correct?*

12    A.   *Yes.*

13    Q.   *And as part of your plea agreement, you admitted that*

14    *during that interview with Officer Inman, that you lied about*

15    *certain things, correct?*

16    A.   *Yes.*

17    Q.   *Okay.  Specifically, you admitted that you lied when you*

18    *told her that you had never texted Cody York; is that correct?*

19    A.   *Correct.*

20    Q.   *Okay.  And you admitted that you lied when you told her*

21    *that you had never had sex with Cody York, correct?*

22    A.   *Correct.*

23    Q.   *Okay.  Why did you lie to Officer Inman about texting and*

24    *having sex with Cody York?*

25    A.   *I was being investigated by the police and I knew that it*

1     *could have -- it could have -- criminal charges could come*

2     *from it.*

3                       (Video clip concluded.)

4             MR. WARD:  So she lied to the police to help herself

5     out to make sure she didn't go to jail for her admitted legal

6     conduct, right?  Why else did she lie to the police?  All

7     right.  We know she did it to stay out of jail.  Let's hear

8     why else she did it.

9           (The following video clip was played in open court.)

10    Q.  *All right.  Essentially, you just felt like you wouldn't*

11    *get caught; isn't that correct?*

12    A.  *No, I didn't think that they were going to be able to get*

13    *text records.*

14                       (Video clip concluded.)

15            MR. WARD:  She lied to stay out of jail, but she also

16    lied because she had no idea they had the text messages.  She

17    thought she wouldn't get caught.

18            So we lie to help our court case.  We lie to stay out

19    of jail for conduct that we did that we know is illegal.  And

20    we did it all because we think there's no way anybody will

21    ever catch us.

22            So obviously she's lied about her affair with her

23    student to a lot of people, and she's even lied about it to

24    her mom.  On "Dateline," they were talking to her mom about

25    whether or not she had ever asked point-blank, did you do it.

24

1          (The following video clip was played in open court.)

2     Q.   *Did you sit Sarah down and say, Look at me in the eye;*

3     *it's just us here, just us girls --*

4     A.   *Um-hmm.*

5     Q.   *-- and tell me what happened?*

6     A.   *Yeah.*

7     Q.   *What did she say?*

8     A.   *She said, Mom, nothing has happened.  We are friends.*

9     *She assured me that there was -- there was nothing.*

10    Q.   *No sex?*

11    A.   *Nothing.*

12                    (Video clip concluded.)

13         (The following video clip was played in open court.)

14    Q.   *Did you ever have sex with a student?*

15    A.   *No.  It was never like that, no.  It was --*

16    Q.   *Emotional?*

17    A.   *Yes.*

18    Q.   *But not sexual?*

19                    (Video clip concluded.)

20         MR. WARD:  So she lied to TV reporters, police.

21    Fine.  All those people are strangers.  She lied point-blank

22    to her mom, somebody she knows.  And she's lied or misled

23    people about the timing of her marriage and separation.

24         She's lied about the student who busted her illegal

25    relationship.  And she got pretty feisty about a student

1    telling the truth about her relationship.  I'm going to show

2    you a text message here.  We'll see some more of these, but

3    this is probably the first time we look at it.  Let me see if

4    I can get it up right here for you.   And it's kind of hard to

5    see so I'll read it.  One highlighted part says, "If Morgan

6    does that again, I'm pressing charges on her."  And what

7    Morgan did that she shouldn't do again is told the police that

8    the plaintiff was sleeping with another student.

9            And if you look up there, the feisty part, it says,

10   "And my mom's going to beat her ass so Griffin doesn't have

11   to," talking about a student at her school who just told the

12   truth about illegal conduct.

13           She lied a bunch to avoid criminal penalties.  We've

14   already saw that.  But she also lied, admittedly in her own

15   words, to help this case.  Show you some more texts.  She

16   says, quote -- this is texting with Cody -- "Nik Richie said,

17   'I think you got married to someone who cheated.'"  They've

18   admitted that's true, right?

19           MR. DETERS:  Objection.  May we approach?  Will you

20   take that off, please?

21                   (Bench conference.)

22           THE COURT:  All right.  Go ahead.

23           MR. DETERS:  I haven't seen these things, these text

24   messages.  What concerns me is he's putting them up there with

25   a whole big group.

26

1          THE COURT:  I can't read them.

2          MR. DETERS:  I can't either.  So my concern is, could

3     the jury read text messages they shouldn't be reading while

4     they're reading the ones you want them to read?

5          THE COURT:  They're fuzzy.  Unless they've got better

6     eyes than I do.

7          MR. WARD:  You can't read them at all.

8          MR. DETERS:  Okay.  Okay.  I just wanted to make

9     sure.

10         MR. WARD:  That's why we highlighted them, because

11    they're almost impossible to see.

12         MR. DETERS:  Thanks.

13         THE COURT:  Okay.

14              (Bench conference concluded.)

15         MR. WARD:  I think we were on this one.  We talked

16    about the, "Nik said I got married to someone who cheated.

17    And I said, 'You live and you learn, and I learned from those

18    mistakes and I moved on.  I said I'd only been with one

19    person, though, because I had to for court.'"

20         And then -- that's important to look right there

21    because that's before any of these indictments.  So when she

22    says "I had to for court," she means here.  She means so that

23    you-all don't hear.

24         This is going to -- after that, you're probably

25    thinking this guy just loves calling her a liar, but I don't

1    take it lightly.  I just have no choice here.  And that's why

2    I showed you all these clips and video, so you can see it's

3    not just me saying it.  It's her saying it about herself, when

4    she has to.

5          With that in mind, I'm going to touch on a few

6    important issues for this case really quickly, or I hope it

7    will be quickly.

8          One, the evidence is going to be that the plaintiff

9    was by no means a private person before these posts went on my

10    client's web site.

11          The plaintiff was a cheerleader for the Bengals.

12    Absolutely nothing wrong with that.  As part of that job, she

13    did public appearances, traveled, all kinds of stuff.  Went to

14    the Pro Bowl, went overseas.  She did swim suit modeling.

15    I'll show you some examples of that.  These are just some of

16    them.  This is a calendar.  I can't put it on the viewer, but

17    this is a calendar.  You'll see autographed, "Love, Sarah."

18    She did another one, autographed another year in the calendar.

19    You can see.  Yet another calendar.  And finally another

20    calendar.  So she did all these.

21          These are just the Bengals calendars.  There were

22    also swim suit shows.  I can show you this one, another

23    picture of her.  I'll put it on the viewer in case you can see

24    it.  It says it's another swim suit issue that's not related

25    to the calendar.

1          So you can see these are some of the activities

2     involved with being a Ben-Gal.  There's also going to be

3     evidence that, in certain situations, they could go do public

4     appearances and be paid for it.  And again, there's nothing

5     wrong with any of that.  But it's important to realize in this

6     case that, despite what's said about the plaintiff just

7     wanting a quiet life, she was actually anything but private

8     before any posts on thedirty.com.

9          Two, the plaintiff has to show that what was posted

10    about her was untrue, both the specifics and the substance,

11    right?  And the Judge has already talked briefly about that

12    substantial truth when he gave the embezzlement, I think,

13    example.  If what was posted about the plaintiff was, instead,

14    substantially true, that's it.  Game over.  If the gist of

15    what was posted matches her life, that's it.  We go home.

16    Verdict for my defendant.  Okay?  For my client.

17         So what was posted?  And let's remember, the posts

18    were made by someone who knew the plaintiff, who had at least

19    Facebook access.

20         MR. DETERS:  Objection.  May we approach, Your Honor?

21                    (Bench conference.)

22         THE COURT:  I have ruled that he is a publisher of

23    what they said so if you say that, then I'm going to have to

24    interrupt and say that he's responsible for what they posted.

25         MR. WARD:  That's fine.  My only point was --

1          THE COURT:  Or you can say it yourself if you want.

2          MR. DETERS:  My objection is Nik Richie says he

3   doesn't know who posted it.  So he's basically trying to say

4   somebody that knows her posted that.  That's not what the

5   testimony --

6          MR. WARD:  I was going to say who knows her or

7   Facebook access.

8          MR. DETERS:  That's not what the testimony is.

9          MR. WARD:  Not from my client, from her.

10         THE COURT:  Hold on, fellas.  We were doing well up

11  to this point.

12         MR. DETERS:  I'm sorry.

13         THE COURT:  Well, you can say -- he doesn't know that

14  for sure.  You can say it seems that way or seems --

15         MR. WARD:  Somebody with Facebook access.  I can say

16  that.

17         THE COURT:  Right.  Right.

18         MR. WARD:  Because she said she thought they were

19  pictures taken off her Facebook account.

20         THE COURT:  Right.  But I can't allow you to imply

21  that he's not responsible --

22         MR. WARD:  Right.

23         THE COURT:  -- for what these people posted, because

24  until some other Court reverses it, if they do, why, then,

25  that's the law of the case.

1          MR. WARD:  My very next statement is going to be

2     about the fact that he admits that he edits stuff on the site

3     and that it's his responsibility.

4          THE COURT:  Okay.  All right.

5          MR. DETERS:  Okay.  Sorry.

6                    (Bench conference concluded.)

7          MR. WARD:  Like I was saying, it appears that these

8     posts were made by somebody with Facebook access to the

9     plaintiff's Facebook.  And Mr. Deters spoke a little bit in

10    his opening about being a sole -- a partial owner, the sole

11    editor, et cetera, of thedirty.com.  That's true about Nik.

12         And there's going to be evidence in this case that

13    Nik -- it all started out as everything was actually uploaded

14    by Nik, written by Nik, okay, back when this was a local web

15    site in Arizona.  Then he got the capability to make it an

16    interactive service, which means users could submit content.

17    And through the years, it's become more and more that almost

18    everything you see on there is user submitted.  Not

19    everything.  There are still instances where Nik will gather

20    information and make his own posts.  Okay?  But over time,

21    it's moved toward a lot more of this stuff is user versus Nik.

22    Okay?  I just wanted to clarify that while we're on it.

23         So I'm going to show you the posts.  Then we'll walk

24    through them briefly.  This is one of the posts that went up

25    on the site.  And again, I don't even know how well you-all

1    can read that, but it says, "Nik, this is Sarah J, Cincinnati

2    Bengals cheerleader.  She's been spotted around town lately

3    with the infamous Shayne Graham."  Shayne Graham, I don't

4    recall any of you-all raising your hands for being Bengals

5    fans.  He was a kicker for the Bengals a few years ago.  I

6    think he might be with the Houston Texans now.

7          You can see two pictures, apparently on two different

8    dates because Shayne is wearing two different shirts.  So

9    anyway, it says, "She's been seen around lately with Shayne

10   Graham.  She's also slept with every other Bengals player.

11   This girl's a teacher, too.  You would think with Graham's

12   paycheck, he can attract things a little easier on the eyes,

13   Nik."

14          Here's the next post that really gets into the heart

15   of what we're talking about here.  "Nik, here we have Sarah J,

16   captain cheerleader of the playoff-bound Bengals.  Most people

17   see Sarah as a gorgeous cheerleader and high school teacher.

18   Yes, she's also a teacher.  But what most of you don't know is

19   her ex, Nate, cheated on her with over 50 girls in four

20   years."  That's obviously about Nate and that's obviously

21   true.

22          "In that time, he tested positive for chlamydia

23   infection and gonorrhea," again talking about Nate, "so I'm

24   sure Sarah has both also.  What's worse is he," Nate, "brags

25   about doing Sarah in the gym," which means Nate's telling

1    people he had sex with her in the gym, "on the football field,

2    in her classroom where she teaches at."

3        So again, that post, Nate cheated, Nate has the STDs,

4    I'm sure she does too.  Nate brags about her having sex with

5    him in different locations.

6        So essentially, their complaint is that the posts

7    said the plaintiff was sexually immoral or promiscuous and

8    that the plaintiff potentially had STDs.  So what's the truth?

9    The truth is that the plaintiff was sexually immoral.  She had

10   a sexual relationship with her student when she was a teacher

11   at Dixie Heights.  And the truth is that she has an STD.

12       We'll talk a little bit more about the affair in just

13   a second; but as to the STD issue, someone said that her

14   fiance had STDs and they were sure she did too.  The actual

15   truth is that the plaintiff has hepatitis A, which is

16   classified by the Centers for Disease Control in Atlanta, the

17   CDC, as a sexually-transmitted disease.  She's going to

18   testify that she did not get that sexually.  You will have to

19   judge her credibility on that.  But it doesn't much matter.

20   It's still classified as an STD.

21       You'll be asked to decide if that's defamation.

22   That's your-all's call, based on all your judgment of the

23   credibility, what was said versus what was true.

24       As to the sexual morality issue, if you look at this,

25   this is part of her plea agreement.  It notes that she is a

1    convicted felon.  And she's a convicted felon because she's a

2    teacher who slept with her student.

3         That's right.  All the talk about loving her job as a

4    teacher, being terrified she would lose it because of the

5    posts on the web site -- at one point, she told this Court

6    that teaching was her ministry, okay -- point-blank, she used

7    her position of authority, that ministry, to seduce a student

8    into a sexual relationship.  And that's the reason that she'll

9    never teach again, not any posts on thedirty.com or any other

10   web site.

11        Showing you an order here, number 7 highlighted, part

12   of her plea deal.  "Defendant agrees to make the attached

13   proffer as true facts of this case.  Defendant agrees that she

14   will not apply for nor accept any teaching or coaching

15   position in any school at any point in the future."  That's

16   why she's not a teacher anymore.

17        And that's bad, but it gets worse.  The evidence is

18   going to show that she fell in love with her student when he

19   was a freshman, 14 years old, before any posts on my client's

20   web site.  I'm going to go through a few of those text

21   messages with you just to give you a flavor for that

22   information about when they fell in love.  Here is one that

23   says, "I loved you then.  I fell in love with you a long time

24   ago, but I wasn't as crazy about the" --

25        THE COURT:  What's the date on this?

34

```
 1            MR. WARD:  These are November 5th, 2011.
 2            THE COURT:  All right.
 3            MR. WARD:  "I loved you then.  I fell in love with
 4   you a long time ago, but I wasn't as crazy about you as I am
 5   now.  I'll be honest, I knew from the moment I saw you I was
 6   going to be with you, your freshman year.  I knew from Day 1
 7   we'd be together.  Just had a crazy, weird feeling.  It's good
 8   but maybe weird though because you were so young, but you
 9   can't help who you love.  I always wanted you, Cody.  You're
10   not immature at all.  I probably am more than you.  I just
11   meant that it's weird 'cause you were like 14 and I was like
12   22."
13            The next one, from the same date, Your Honor, it
14   says, "Your freshman year, you said, look what I have on my
15   phone, hah, and showed me when you were on the football field.
16   Love at first sight.  Loved me and flirt so much.  I missed
17   you so much that summer," the summer after the freshman year.
18   "I've known since Day 1 we were meant to be together."  Then
19   it moves on.
20            So you see, they fell in love when he was a
21   14-year-old freshman.  Then it says -- and this is again is
22   November of 2011 -- "I know we've been together for like a
23   year.  That's insane.  I mean, technically, we've been living
24   a lie for a year.  We have to sneak around to see each other
25   and we have to pretend to be single when we are in a serious
```

1  committed relationship.  Will we ever be normal?"

2       So what's that tell us?  She's asking you for damages

3  from February of 2011 going forward, right?  That takes us

4  back before February, 2011, back into 2010, right?  Because

5  they say in November of 2011, "We've been together over a

6  year, living a lie for over a year."  Necessarily, we're back

7  into their relevant time period.

8       And then he says, talking about his freshman year,

9  "Yeah, I remember you stayed the last day after the bell and

10  we got a picture and you hugged me, and I'd never felt that

11  way.  And I had to find a way to talk to you.  I missed you."

12       Then it says, "Oh, my gosh, yes, but I was like

13  ashamed that I could like you, and I couldn't believe I felt

14  that way.  I'm telling you, I felt this way for a long time.

15  I tried to wait, but your junior year, I just fell harder and

16  couldn't anymore.  I stopped caring about everything and

17  focused on you."  So again, junior year takes us back into

18  2010.  I'll just move on from those.

19       And then you also notice in there, there's a mention

20  it was wrong, "kind of weird.  I felt like, how could I like

21  you."

22       But let's go back briefly to what I talked about, how

23  she'll lie.  Her defense to those text messages that show it

24  going back into 2010, back into his freshman year as far as

25  the romantic feelings, guess what it is?  Her defense to that

1    is that she was lying to the kid she was texting with.  Just

2    think about that for a minute.  She was lying to the person

3    she was texting with about how long those two had been

4    together.  She was saying, I know you know how long we've been

5    together, but I'm lying to you about it?  It doesn't make any

6    sense.  Let me show you how she explained it.

7        (The following video clip was played in open court.)

8    Q.   *Do you dispute that you had romantic feelings for him*

9    *during his freshman year?*

10   A.   *I dispute that, yes.*

11   Q.   *Okay.  So do you dispute that you said this to Cody,*

12   *quote, "I knew from the moment I saw you that I was going to*

13   *be with you.  Your freshman year, I knew from Day 1 that we'd*

14   *be together"?*

15   A.   *I said that, correct.*

16   Q.   *You didn't mean it?*

17   A.   *No.  We always discussed that.  I mean, you say things,*

18   *you know, to make him feel better.*

19   Q.   *So you lied to him?*

20   A.   *I didn't lie to him.  I've always cared about him.*

21   Q.   *So when you said, quote, "It may be weird, though,*

22   *because you were so young, but you can't help who you love.*

23   *I've always wanted you, Cody," that was not truthful?*

24   A.   *It was truthful in the sense that I cared about him.*

25   Q.   *Did you think it was -- and you said, "It's weird because*

37

1    *you were like 14 and I was like 22." Did you have feelings*

2    *for him when he was 14 and you felt weird about it?  Is that*

3    *what you meant?*

4    A.    *No.*

5    Q.    *What did you mean?*

6    A.    *I didn't mean -- that was a year ago.  I don't know*

7    *exactly what I meant.  But I just meant that I had -- I cared*

8    *about him.  I cared about his parents, his niece, who I watch,*

9    *things like that.  Just that I cared about him.*

10    Q.    *So you would dispute that you fell in love with him at*

11    *first sight?*

12    A.    *Yes.*

13    Q.    *Even though you told him that it was love at first sight?*

14    A.    *Right.*

15    Q.    *So you lied to him?*

16    A.    *I mean, he said the same thing.  I mean, you know, we've*

17    *discussed it, yeah.*

18                    (Video clip concluded.)

19        MR. WARD:  Okay.  And you also might hear this one.

20      (The following video clip was played in open court.)

21    Q.    *Okay.  Why did you tell him later on, in that same page,*

22    *that you had been living a lie for a year, that you'd been*

23    *together for a year?*

24    A.    *Because, I mean, there were times when we would -- it*

25    *wasn't a romantic relationship, but we had discussed the*

38

1    *outcome of the relationship.*

2    Q.   *Okay.  So you don't recall telling him that you had been*

3    *dating for a year?*

4    A.   *I mean, we had had a friendship/relationship, but not*

5    *necessarily -- like it was never romantic.  Just because*

6    *you're in -- you hang out with somebody doesn't mean it was a*

7    *romantic relationship.*

8    Q.   *So if you say that about your friend, you would say,*

9    *quote, we've only been dating for a year?*

10   A.   *You don't say that about your friend, no.*

11   Q.   *So why did you say that with Cody if it wasn't true?*

12   A.   *It was just texting.*

13                    (Video clip concluded.)

14              MR. WARD:  "It was just texting."  I have no idea

15   what that means.

16              So Mr. Deters told you that the plaintiff's going to

17   deny that she had sex with any Bengals players.  You'll judge

18   her credibility on that.  But she has to admit that she had

19   sex with a student.  You'll have to decide if that's

20   defamation.

21              Third thing important.  The plaintiff has to show you

22   why she should get money even if you believe that it was

23   defamation, right?  What harm was done to her reputation?  And

24   I listed those separately somewhat, that she has to show it

25   was false and that she has to show that she was harmed, but

1    they do overlap.  If the truth of your life is horrendous and

2    someone says something bad about you, was your reputation

3    harmed?  So was her reputation actually harmed?

4         On that point, the plaintiff remained a teacher after

5    all the posts on thedirty.com.  She'll tell you herself that

6    the people close to her didn't believe the posts.  In fact,

7    she remained a teacher until she was about to be indicted for

8    a felony.  She lost that job because of her crimes.

9         Same thing for her cheerleading.  She'll tell you the

10   other cheerleaders didn't believe the posts.  If they had, she

11   would have been dismissed, because she's not allowed to be

12   with the players.  And again, the plaintiff remained a

13   cheerleader after all the posts on any web site.  In fact, she

14   was promoted to head cheerleader.  She got invited to the Pro

15   Bowl, which apparently is the greatest honor that an NFL

16   cheerleader can get.

17        So in other words, the evidence is going to show that

18   the posts on the web site didn't damage her.  Her own criminal

19   actions damaged her.  And purely as to her reputation, the

20   evidence is going to be that it wasn't much before any of

21   these posts at all.

22        So in short, the evidence is going to show that the

23   posts the plaintiff complains about were substantially true;

24   that the gist of the posts matches up with the facts of her

25   life.  As to whether the specifics are true, you're really

1    going to have to take her word for it to whether they are or

2    not, if you want to rule in her favor, because she has to

3    prove they were false to recover.  Her burden.  And she's the

4    only one they're calling to say that they were false.  If she

5    can't do that, we all go home with a verdict for the

6    defendants.

7           And I've shown you some of the evidence of lying,

8    even lying specifically to recover in this case.  With that in

9    mind, I haven't shown you the proof that's going to be

10   presented as to why she seems so willing to lie.  And you can

11   imagine why she lied about her legal relationship with her

12   student.  You can imagine why she lied to the police

13   investigating that relationship.  And you can imagine why she

14   lied about and even mentioned threats toward the student who

15   outed that relationship.  But why did she lie about things for

16   this case?  Well, I'm guessing that you can figure that one

17   out as well, but you don't have to.  Those text messages spell

18   it out even for me.  Okay?

19          When they were talking about it in the text messages,

20   they talked about a few different things.  In this one, you've

21   got Sarah saying -- talking about a house they're going to buy

22   together.  "I want pink shutters on the outside.  I do want a

23   pink swimming pool, though, and a bowling alley in my basement

24   with pink bowling balls."

25          So we've got a house with a bowling alley in the

basement and a pink swimming pool.  And the evidence will also

be she talked about buying her teenage boyfriend a Mercedes.

But don't worry too much about that because they talk about

how it's only like 80 Gs for the Mercedes.  And then Sarah

assures it's actually not that bad at all.

        So we've got a white Mercedes for her, not too bad,

80 Gs, and a house with a pink swimming pool and a bowling

alley in the basement.  She was desperate for that money,

folks.  Why was she desperate for the money?  She had made it

so far on her salary, right?  Why was she desperate for the

money?  Well, the texts also fill in that for us.  She tells

Cody, "Without the money and your Mercedes, you'd be long

gone."  So she needs that money, right?

        Pure and simple, this is a money grab by a convicted

felon and an admitted liar, and it's a grab for a lot of

money.  If you take their $11 million figure, that breaks down

to something like 290 years worth of her salary as a teacher,

the job she lost because she got indicted.  And she was

spending that money before she came to the court to ask

you-all for any of it, right?  She already picked out her

house, picked out his car.

        But how desperate was she to cash in?  You heard

something about her ex-husband.  She actually testified that

she married her ex-husband so that he would testify for her in

this case.

42

1          (The following video clip was played in open court.)

2     Q.   *You then said that you wanted to push the wedding to*

3     *October because of Nate's upcoming deposition in August, 2011;*

4     *is that correct?*

5     A.   *Right.*

6     Q.   *Can you explain that, what that means?  Why did that*

7     *matter for you?*

8     A.   *There were several things that were going into us not*

9     *getting along so I wanted to push it off just to basically buy*

10    *time, because I had not -- I did not want to go through with*

11    *the wedding; but all the plans, all the invitations,*

12    *everything was sent out.  So I asked him to just push it off,*

13    *and he had told me basically, if you push it off, then we're*

14    *not going to -- like we won't be together and I won't testify*

15    *for you.*

16                    (Video clip concluded.)

17          MR. WARD:  Again, she married a man that she would

18    separate from 20 days after that deposition to ensure that he

19    would offer testimony for her in this case.  That's how

20    desperate she was for that money.

21          Why in the world, knowing all that we know about the

22    plaintiff, would she think she could pull this off and that

23    you-all would give her that money?  Well, that's explained for

24    us, too.

25          (The following video clip was played in open court.)

43

1    A.    *Sarah's a good actress.*

2                              (Video clip concluded.)

3          MR. WARD:  That's her mom, "Sarah's a good actress."

4    She strategically words things, she lies until she's trapped,

5    and she's a good actress.  You remember crying in the criminal

6    court?  The next day, what did I tell you all, the smile on

7    "Dateline"?  She thinks she can get away with this because

8    she's a great actress.

9          With that in mind, and I appreciate your service,

10   helping us out here.  I do value your time; and, as I always

11   do, I promise to be respectful of that time.  I'm not calling

12   any unnecessary witnesses, and I won't beat a dead horse,

13   although I think there's one gasping on the ground beside me

14   right now.  So to keep that last promise, I'm going to go sit

15   down.  Thank you.

16         THE COURT:  All right.  That will conclude the

17   opening statements.  We'll take a break for about 20 minutes

18   and we'll start the evidence.

19         Ladies and gentlemen, when we take the afternoon

20   recess at this time, continue to heed the admonition of the

21   Court.  Do not discuss the case among yourselves or with

22   anyone else.  If you have any access to any media or anything,

23   don't consult that either.  And don't post anything on any of

24   it.  All right, 20 minutes.

25                     (The jury left the courtroom at 2:08 p.m.)

44

```
 1                  (Recess at 2:08 p.m. until 2:28 p.m.)
 2              THE COURT:  Okay.  Moving along to the evidence.  I
 3     usually go till about 4.  If people are in the middle of
 4     something, it may be 4:15 or something.  Any questions?
 5              MR. WARD:  No, Your Honor.
 6              MR. DETERS:  So we're going to end the day at 4:15?
 7              THE COURT:  Pardon?
 8              MR. DETERS:  We're going to take a break or end the
 9     day?
10              THE COURT:  Probably end the day.
11              MR. DETERS:  Okay.
12              THE COURT:  Probably be about time for a break
13     anyway.  Just combine the break.
14              MR. DETERS:  I like that.
15              THE COURT:  4:00 or 4:15.  The case is moving along
16     fast.  I don't think we'll have any trouble finishing this
17     week.
18              MR. WARD:  What time do we start tomorrow, Your
19     Honor?
20              THE COURT:  After the first day, I usually start at
21     9.  Okay.  Bring them in, please.
22              I think they're predicting some snow for Thursday so
23     we'll have to see about that.
24                  (The jury entered the courtroom at 2:32 p.m.)
25              THE COURT:  All right.  Good afternoon, ladies and
```

1    gentlemen.  Please be seated.  We'll start with the evidence.

2    We'll go over tonight till about 4 or 4:15, depending on how

3    we're moving along and where we are.  All right.  You can call

4    your witness.

5             MR. DETERS:  We call Sarah Jones, Your Honor, the

6    plaintiff.

7             THE COURT:  Come around, Ms. Jones.

8             DEPUTY CLERK:  Raise your right hand.

9          PLAINTIFF'S WITNESS, SARAH JONES, SWORN

10                    DIRECT EXAMINATION

11   BY MR. DETERS:

12   Q.  Please state your name for the record, please.

13   A.  Sarah Elizabeth Jones.

14   Q.  All right.  Sarah, I'm putting up here the --

15            THE COURT:  That's sideways.

16   Q.  I'm putting up here the Miriam Webster dictionary of

17   reputation.  "Overall quality of character as seen or judged

18   by people in general.  Recognition by other people of some

19   characteristic or ability."

20        Sarah, in your own words, up until the scandal at Dixie

21   Heights High School, what did you believe your reputation in

22   the community was?

23   A.  According to before the postings and before the criminal

24   charges, it was flawless.

25   Q.  Okay.  Let's go through, very briefly, your life,

*Jones - Direct*

```
 1    starting at birth.  Where did you go to grade school?
 2    A.   I went to Kenton Elementary.
 3    Q.   And where is that?
 4    A.   That's in Independence, Kentucky.
 5    Q.   And your mother and father, what did your mom do?
 6    A.   My mom was a teacher at Kenton Elementary at the time
 7    that I was there.  She went on to being a principal.  And then
 8    my dad owned a convenient store for 28 years.
 9    Q.   Okay.  And how many brothers and sisters did you have?
10    A.   I have a 30-year-old brother named Josh and a 20-year-old
11    sister named Rachel.
12    Q.   Okay.  What does Josh do?
13    A.   Josh is a supervisor at Fidelity, I believe the Covington
14    location, and my sister is still currently in school.
15    Q.   Okay.  Where did you go to high school?
16    A.   I attended Simon Kenton High School.  And that's also in
17    Independence, Kentucky.
18    Q.   All right.  Do you remember what your class rank was?
19    A.   19 out of 347, I believe.
20    Q.   Okay.  What extracurricular activities did you
21    participate in during high school?
22    A.   I participated in a lot.  I was on the varsity basketball
23    team for four years, until I got hurt and had to have four
24    shoulder surgeries my senior year.  I played volleyball and
25    soccer throughout high school.  I was involved with Fellowship
```

*Jones - Direct*

47

 1    for Christian Athletes, and I was also involved in a group

 2    called Postponing Sexual Involvement, where you go talk to

 3    middle school students about postponing sex involvement and

 4    waiting until marriage.

 5    Q.   Okay.  What year did you graduate?

 6    A.   I graduated high school in 2003.

 7    Q.   All right.  Nate Wilburn, who later would become your

 8    husband, what year did you start dating him?

 9    A.   I was a senior in high school and he was a junior in high

10    school.  We have -- my birthday's in April and his birthday's

11    in November, so we have six months, but he was a grade younger

12    than me.  And we started dating when he was a junior and I was

13    a senior.

14    Q.   All right.  Did you have sex --

15            THE COURT:  In what year -- oh, wait.  What year

16    would that have been?

17            THE WITNESS:  It would have been 2002-2003.

18            THE COURT:  Go ahead.

19    Q.   Did you have sex during high school?

20    A.   No.

21    Q.   All right.  What was your reputation when you left high

22    school?  You graduated from Simon Kenton.  What was your

23    reputation in the community, as you knew it?

24    A.   I was a good girl.  Didn't -- I never had sex in my life.

25    I never slept around.  That's probably where the cheating came

*Jones - Direct*

48

1    from from Nathan, but never did anything.  I was focused on

2    academics and athletics.

3    Q.   Now, by the time you graduated from high school, did you

4    choose a career that you wanted to do?

5    A.   Yes.

6    Q.   And what was that?

7    A.   That was middle grades education.  That's what I wanted

8    to focus on, teaching 5 through 9.

9    Q.   All right.  Where did you go to college?

10   A.   Northern Kentucky University.

11   Q.   And did you obtain any degrees from Northern Kentucky

12   University?

13   A.   Yes.  I majored in middle grades education with a double

14   emphasis in mathematics and English.  And I had planned on

15   teaching middle school.

16   Q.   Okay.  What year did you graduate from NKU?

17   A.   I graduated in 2008.

18   Q.   Did you participate in extracurriculars at NKU?

19   A.   Not -- not at NKU.  I was in the French club because I

20   took a lot of French classes, but not in anything

21   extracurricular.

22   Q.   When you graduated from NKU, how old were you?

23   A.   I was 21 -- 22.  You do four years and then you have --

24   the other time, you do student teaching.  So it took me about

25   four and a half years to get through school in order to be a

*Jones - Direct*

49

1    teacher.

2    Q.   Okay.  What was your reputation, as you knew it, in the

3    community after you graduated from NKU?

4    A.   Again, there was no issues.  I never drank, never went

5    out and partied, and I had -- I was waiting till I was married

6    to have sex.

7    Q.   All right.  Did you have -- when did you lose your

8    virginity?

9    A.   Around the time of 20 -- 20 years old, 21.

10   Q.   Okay.

11   A.   I'm not exactly sure of the exact time, but I was not a

12   teenager.  I was in my 20s.

13   Q.   Was that Nate Wilburn?

14   A.   Yes.

15   Q.   All right.  You would later marry Nate Wilburn and

16   divorce, correct?

17   A.   Yes.

18   Q.   All right.  Now, with respect to after college, you

19   graduate.  Where did you work?

20   A.   I -- since my dad owned the Ameristop Food Mart, the

21   local store, I worked there.  It was a family business, so we

22   would let people off on holidays and worked on holidays.  So I

23   was a cashier there.  And also managed a pool for Cincinnati

24   Pool Management.  The Florence Aquatics Center, I managed

25   that, became a lifeguard.  And I was also a nanny for -- it's

*Jones - Direct*

50

1  a set of twins and two younger children -- throughout all four

2  years of college.

3  Q.   All right.  When did you get your first teaching job?

4  A.   I applied in 2008, in April, I believe.  And I had

5  hoped -- I was hoping to be in middle school, but two

6  positions in two separate high schools, one of which was Simon

7  Kenton and one of which was Dixie, was offered to me.

8  Q.   Okay.  And what one did you teach?

9  A.   I took -- in high school?

10  Q.   Yes.

11  A.   You only focus on one, so there was a math position at

12  Simon Kenton offered and there was an English position at

13  Dixie.  And my sister was still currently a senior at Simon

14  Kenton so that's why I took the Dixie job.

15  Q.   Okay.  And how long were you a teacher at Dixie from the

16  time you got the job until you resigned?

17  A.   Three and a half years.

18  Q.   Okay.  And during that three and a half years, what did

19  you teach?

20  A.   I taught freshman English.  And that would be -- that

21  would consist of English 1A, English 1B, Accelerated English

22  1A, Accelerated English 1B.

23  Q.   Okay.  And did you do any extracurriculars at Dixie

24  Heights?

25  A.   I was also the cheerleading coach.  They had asked me

1    when I was hired if I would be willing to take over that

2    position as cheerleading coach.  I didn't have a background in

3    cheerleading because I had played basketball; but with me

4    being hurt, I, in the course of college, had tried out for the

5    Ben-Gals; and with that on my resume, they had asked me if I

6    would take over that position as cheerleading, and I told them

7    that I would.

8    Q.   All right.  When you were -- when did you first become a

9    Ben-Gal, try out for Ben-Gals?

10   A.   I was -- at that time -- now you have to be 21 in order

11   to try out.  At that time, you only had to be 20.  So tryouts

12   were -- I was 20 years old as I was trying out, and the actual

13   tryout date was on my 21st birthday.  So I started in 2006.

14   Q.   Okay.

15   A.   Tried out for the Bengals my first year.

16   Q.   Did you make it?

17   A.   Yes.

18   Q.   All right.  How long were you a Ben-Gal?

19   A.   I was a Ben-Gal for six seasons.

20   Q.   Okay.  So you resigned as a Ben-Gal after the Dixie

21   Heights scandal?  For lack of a better word, let's call it a

22   scandal.

23   A.   I finished out that year, the sixth season, and I did not

24   return the following season.

25   Q.   Okay.  Did you meet a Kristy Molony at Dixie Heights High

*Jones - Direct*

52

1    School?

2    A.   Yes.

3    Q.   Who was Kristy Molony?

4    A.   Kristy Molony was the cheerleading coach before me.  And

5    they had asked me to, again, take over that position, so I was

6    asked to replace her --

7    Q.   Okay.

8    A.   -- as a cheerleading coach.  And other than that, she

9    taught a grade -- I cannot tell you what grade she taught, but

10   she taught a grade higher than me.  So she -- my classroom was

11   on the second floor and her classroom was directly below on

12   the first floor.

13   Q.   Okay.  How did you get along with the teachers?

14   A.   I got along great with the teachers.  It takes -- you

15   know, you say you don't judge a book by its cover, but some of

16   them did.  And even they were -- even as student teaching, I

17   had teachers come up to me and say, we'd really like to sit in

18   on your class.  Come on in.  You guys can, you know, see what

19   goes on.  And I had teachers come up and say, we really, we

20   kind of misrepresented you, and that I was a great teacher.  I

21   got along great with all the teachers besides Kristy Molony.

22   And it was always a personal thing, but I -- it's not that I

23   didn't get along with her, but I had to confront her for

24   saying things to the students at one time.

25   Q.   All right.  Did you get along with the students?

*Jones - Direct*

53

1    A.   Yes.

2    Q.   All right.  Were you a liked teacher?

3    A.   Yes.

4    Q.   During the entire time at Dixie Heights High School, did

5    you get reviewed every year?

6    A.   Yes.

7    Q.   Did you ever have a bad review?

8    A.   No.  My record at Dixie Heights High School was

9    exemplary.

10   Q.   Okay.  What was the -- when everything broke with the

11   scandal at Dixie Heights, were people like shocked?  What you

12   observed, were they shocked, or were they like, well, we saw

13   that coming with Sarah Jones?

14   A.   It was shocking.

15   Q.   Okay.  At the time that you were -- up until -- and this

16   is the time frame.  Up till February 1st of 2011, February

17   1st, 2011, what was your reputation in the Northern Kentucky

18   community, as you saw it?

19   A.   I had a good reputation.  My family had a good

20   reputation.  No issues.

21   Q.   Where do you work now?

22   A.   I work at your law firm.  I'm, I would say, I guess a

23   legal secretary, but I'm in the process of -- I'm in charge of

24   viewing all the criminal discovery.  So any criminal case that

25   comes in, I view all criminal discovery on that and help with

*Jones - Direct*

54

1    that case to prepare.

2    Q.    All right.  Did you do that in your own case?

3    A.    Yes, I did.

4    Q.    All right.  Describe the relationship that you have, so

5    people understand it since you work for me, with your family

6    and me.

7    A.    Your wife that passed away from cancer was my aunt's

8    sister.  So it's a long-time family friend.  I've known you

9    for a long time.  And my uncle is now divorced from that

10   sister of Lisa, but we still have that ongoing relationship.

11   You were invited to my wedding.  Known you for a while.

12   Q.    Do you -- after you had to resign as a teacher and you're

13   in the middle of a scandal, did you have other job

14   opportunities?

15   A.    No.

16   Q.    Okay.  Now, Sarah, before we go through some things

17   chronologically, I want to go through some things that were

18   mentioned in defense counsel's opening statement.

19        During the course of the investigation of you at Dixie

20   Heights High School, did you lie?

21   A.    Yes.

22   Q.    When the Edgewood police officer first brought you in to

23   be questioned before there were any charges against you, when

24   you met with that Edgewood police officer and they asked you

25   about your relationship with Cody York, did you lie?

*Jones - Direct*

55

1    A.   Yes.

2    Q.   Was that -- were those lies that you told -- in fact,

3    let's just do this in one big one.  Every lie that you told

4    that was focused on by defense counsel in his opening

5    statement, did any of those lies occur before the scandal at

6    Dixie Heights High School?

7    A.   No.

8    Q.   Was anyone aware -- well, since they weren't, are you

9    aware of how they obtained those lies, the information of

10   those lies?

11   A.   As far as how did the police get it?

12   Q.   In other words -- no, how did defense counsel obtain all

13   those lies?

14   A.   We turned it over to them.

15   Q.   All right.  During the course of this lawsuit?

16   A.   (Nods head affirmatively.)

17   Q.   Prior to the scandal at Dixie Heights High School, did

18   anybody out there know that you would lie if you were charged

19   with a crime?

20   A.   No.

21   Q.   Why did you lie?

22   A.   I was scared.  I was being questioned by the police.  I

23   knew I had done something wrong, and I was -- I was at the

24   police station.  I knew if I was out there and I told them

25   what had happened, I was going to go to jail and there was

*Jones - Direct*

56

1   going to be no trial.  I was pleading guilty basically by

2   telling the truth.  So I was scared, simple as that.

3   Q.   Okay.  Now, they brought up something about Morgan and

4   you and your mom were going to beat her ass.  I want you to

5   tell us what that text message was referencing.

6   A.   As far as pressing charges, Morgan had -- I never had her

7   as a student, but she was making Facebook posts saying that a

8   specific teacher in the school was a slut, things on Facebook.

9           MS. MATTINGLY:  Your Honor, objection.  May we

10   approach?

11           THE COURT:  Let me see where it's going.  Okay.

12                      (Bench conference.)

13           MS. MATTINGLY:  Your Honor, she's testifying as to

14   things that a non-witness allegedly said about her on

15   Facebook.  It's obviously hearsay, so we would just object to

16   the extent that she was testifying --

17           THE COURT:  Well, it's obviously hearsay.  What was

18   the question that led up to this?

19           MR. DETERS:  The question is this, Your Honor.  The

20   question was pretty broad.  It was why did -- explain to me

21   what those posts were.  And with all due respect, they choose

22   the Facebook posts, her Facebook posts, to say, oh, you were

23   going to go beat her ass.  Well, those Facebook posts were

24   hearsay.

25           MS. MATTINGLY:  I didn't have a Facebook post.  They

*Jones - Direct*

57

1    were text messages.

2          THE COURT:  Who is this Morgan lady?

3          MR. DETERS:  Morgan is the person that assaulted her

4    at LA Fitness, filed a false police report.  And then what

5    else did she do?  Those things were totally unrelated to that.

6          THE COURT:  Well, anyway, you opened it up in the

7    opening statement.

8          MS. MATTINGLY:  For her to say, "Morgan posted this

9    about me on Facebook," I mean, that's what she's going to say.

10         THE COURT:  Wasn't she mentioned in the opening

11   statement?

12         MR. DETERS:  Yes.

13         THE COURT:  You opened it up.

14         MS. MATTINGLY:  Sarah said that she was --

15         THE COURT:  Well, lay a better foundation.  In this

16   opening statement, I didn't hear any objections.  I let a lot

17   of stuff in I didn't think were proper opening statement.

18         MR. DETERS:  I didn't either.

19         THE COURT:  But you got it in now.  He's got a right

20   to ask her.

21         MS. MATTINGLY:  Well, it's not evidence in opening

22   statement.  It's getting ready to be evidence now.  She's

23   testifying as to what Morgan said.  She can testify to things

24   Morgan did to her allegedly.

25         THE COURT:  What was the question?

*Jones - Direct*

58

1        MR. DETERS:  I just wanted her to explain what that

2   incident was all about.

3            THE COURT:  Well, just rephrase the question.

4            MR. DETERS:  I'll rephrase the question.

5                (Bench conference concluded.)

6            THE COURT:  See if you can't rephrase it.

7   BY MR. DETERS:

8   Q.   Sarah, who is Morgan McCafferty?

9   A.   Morgan McCafferty was a student at Dixie Heights High

10  School, and she was also Cody York's ex-girlfriend.

11  Q.   Okay.  Did Morgan McCafferty -- was she a cheerleader?

12  A.   Yes, she was one of my cheerleaders.

13  Q.   Was Morgan McCafferty relieved from the cheerleading team

14  while you were the cheerleading coach?

15  A.   Yes.

16  Q.   Why was she relieved from the cheerleading team while you

17  were the cheerleading coach?

18  A.   She and her mom had had some issues.  Her mom had found

19  out that she was smoking pot, and a few girls had come forward

20  to the coaches and told us that she had smoked pot at a

21  practice, outside a practice.  So her mom, before we were even

22  able to tell her she can't come back to the cheerleading

23  squad, her mom sent her to live with her dad in Illinois.

24  Q.   Okay.

25  A.   So I took the brunt of it because I was head coach.

*Jones - Direct*

59

1    Q.   All right.  Relative to Morgan, you mentioned about an

2    opening -- in opening, they read a text message about Morgan

3    doing something.  Who was the person that broke -- or not

4    broke.  Who was the person that, more than anyone else, led to

5    the investigation of you?

6    A.   Morgan.

7    Q.   Okay.  And what did Morgan do that led to that?

8    A.   She had hacked into Cody's Facebook and saw Facebook

9    messages, which they were just, "Hey, you forgot your binder,"

10   normal things.  They're in criminal discovery.  And normal

11   conversation.  And she had gone forward, she had written a

12   statement on Facebook basically referring to the Facebook

13   posts, and then deleted it immediately, and went forward to

14   the police or to the principal of the school.

15        And the principal did an investigation, called me down.

16   And we had just decided that there was nothing to it and went

17   along with our day until the police had called me in to their

18   office, and then --

19   Q.   Did she hack into his Facebook page?

20   A.   She told the police that she did.

21   Q.   In all the Facebook messages and everything else that

22   were part of the criminal investigation, did any of them

23   implicate you with Cody?

24   A.   No.

25   Q.   All right.  Now, what about LA Fitness?  Describe what

*Jones - Direct*

1    happened at LA Fitness.

2    A.   This was before I was charged, because I had talked to

3    the police on November 29th, and that was the day I resigned,

4    but I wasn't charged until March 20th.  So I had seen her in

5    between that time frame -- I believe it was February -- at

6    LA Fitness.  And she -- it was consistent.  She would always

7    say things at school, and then this was just icing on the

8    cake.

9        She had, to my knowledge, called the police and made a

10   false police report saying I tried to fight her in LA Fitness.

11   And I talked to the managers -- the manager from that day --

12   and they said that they reviewed video footage that they had

13   there and that never happened.

14   Q.   All right.  Did she --

15            MS. MATTINGLY:  Objection, Your Honor.  Can we

16   approach?

17                      (Bench conference.)

18            THE COURT:  What's the objection?

19            MS. MATTINGLY:  Your Honor, hearsay.  She's

20   testifying now to what a manager at LA Fitness allegedly told

21   her.  She can't keep telling everyone what everyone said to

22   her.  If she wants those people to testify, she needs to bring

23   them here to testify.

24            THE COURT:  I'm not quite getting the context of all

25   this.

*Jones - Direct*

```
1            MR. DETERS:  I'll tell her to be more careful.

2            THE COURT:  Well, I've got other problems with this.

3    This is jumping around so much, I don't see how the jury can

4    possibly follow it.  You're familiar with all these people and

5    all these events --

6            MR. DETERS:  I understand.

7            THE COURT:  -- but I'm not even, and neither are

8    they.

9            MR. WARD:  It's irrelevant as well.

10           MR. DETERS:  I'm going to move on to something else.

11           THE COURT:  Okay.

12               (Bench conference concluded.)

13   BY MR. DETERS:

14   Q.  Sarah, when did you first become familiar with

15   thedirty.com posting something about you?  Tell us what

16   happened.

17   A.  I was posted October 27th, 2009, was the original post.

18   And I was informed through -- I'm not exactly sure if it was

19   a -- I believe it was a Facebook message by Shayne Graham, who

20   was the kicker of our team at the time, that we were posted on

21   there and his fiance was questioning it, and he just needed

22   confirmation from me and was letting me know that I was posted

23   on that site with him.  And I had never -- I had never visited

24   the site prior to that.

25   Q.  Okay.  This is what defense counsel used on opening, and
```

*Jones - Direct*

62

1    it's Plaintiff's Exhibit Number 1.  When was the top picture

2    taken?

3    A.   That was at an organization.  It's a celebrity Benihana

4    event in Ohio, and we were both celebrity people at Benihana.

5    It was a charity event.

6    Q.   Second picture?

7    A.   That was at the Bengals organization Christmas party.

8    Q.   Okay.  Did you ever date Shayne Graham?

9    A.   No.

10   Q.   Did you ever have sex with Shayne Graham?

11   A.   No.

12   Q.   All right.  It says, "She's been spotted around town

13   lately with the infamous Shayne Graham.  She has also slept

14   with every other Bengal football player."

15        Now, the implication -- well, okay.  You didn't sleep

16   with Shayne Graham.  Did you sleep with any other Bengals

17   football players?

18   A.   No.

19   Q.   All right.  Is it substantially true that you slept with

20   every other Bengal football player?

21   A.   No.

22   Q.   Is it true at all --

23        MS. MATTINGLY:  Objection, Your Honor.  May we

24   approach?

25        THE COURT:  I'm getting a lot of exercise this

*Jones - Direct*

63

1   afternoon.

2                         (Bench conference.)

3          MS. MATTINGLY:  Your Honor, asking questions such as,

4   is it substantially true, that's for a jury to determine.

5          THE COURT:  Well, it's a question of law.  Is it true

6   in any way.  We've argued about true and substantially true

7   and your co-counsel went on for ten minutes about it.

8          MR. DETERS:  Exactly.

9          MS. MATTINGLY:  Right.  But again, that's not

10  evidence.  If he wants to say, Is it true in any way.

11         THE COURT:  Just ask her did she ever do it.  I think

12  he already did.

13         MR. DETERS:  I already did.

14         MS. MATTINGLY:  And I think that was sufficient.

15                    (Bench conference concluded.)

16  BY MR. DETERS:

17  Q.  Did you, when you learned about this -- first of all, do

18  you know who posted this?

19  A.  I have no idea who posted it.  I just know it was on

20  Mr. Richie's site.

21  Q.  All right.  Did you ask Nik Richie, by e-mail, to remove

22  that?

23  A.  Yes, several times.

24  Q.  Well, this was posted on what date?

25  A.  October 27th, 2009.

*Jones - Direct*

64

1    Q.   All right.  This is Plaintiff's Exhibit 2, which is an

2    e-mail dated October 29th.  Is that the e-mail that you sent

3    to Nik Richie?

4    A.   That's not the first one that I sent.  I sent it via

5    MySpace because I -- since I'd never heard of the site, I

6    didn't know how to get ahold of him.  And did some research,

7    found him on MySpace.  Never got a message back.  And this was

8    my first attempt to e-mail him after I found his e-mail

9    address on the web site.

10   Q.   Okay.  You conclude, "I know you can't make everyone

11   happy and delete all the pictures.  Anyway, I appreciate your

12   time."  Did you threaten him in any way?

13   A.   No.  I was very cordial.  The whole point was, I was

14   asking him nicely to just please take it down.  I didn't want

15   to -- and kids were questioning it at school.  I didn't want

16   it up.

17   Q.   Did you send to Nik Richie an e-mail November 1st, 2009

18   asking him to remove it?

19   A.   I don't know the exact dates, but I'm sure I did because

20   that was a few days after, and I did it consistently over the

21   course of time.  Not just asking.  Begging and pleading for

22   him to take those down.

23   Q.   Did you ask him on November 6th, 2009 to take it down?

24   A.   Yes.

25   Q.   Did you ask him on November 8th, 2009 to take it down?

1   A.   Yes.

2   Q.   By e-mail?

3   A.   Yes.

4   Q.   Did you send Nik Richie an e-mail November 11th, 2009?

5   A.   Yes.

6   Q.   Did you send him an e-mail November 12th, 2009?

7   A.   Yes.

8   Q.   Did you send him an e-mail November 13th, 2009?

9   A.   Yes.

10  Q.   Did you send him an e-mail November 14th, 2009?

11  A.   Yes.

12  Q.   Did you send him an e-mail November 15th, 2009?

13  A.   Yes.

14  Q.   Did you send him an e-mail November 19th, 2009?

15  A.   Yes.

16  Q.   Did you send him an e-mail more than once on November

17  19th, 2009?

18  A.   Yes.

19  Q.   What did you want him to do?

20  A.   I just wanted him to take it down.  At that point in

21  time, I taught high school, so they were getting on the web

22  site and Googling it and getting on the web site and reading

23  it and giving me a hard time about it.

24       We had smart boards so at one point in time, there was

25  even students who displayed the posting.  And I just -- I

*Jones - Direct*

66

1    didn't want to take any action.  I just wanted it to be

2    removed from the site.

3    Q.   All right.  Well, let's stop there.  Between that time,

4    October and November 29th, did that cause you any problems?

5    A.   Yes.

6    Q.   Describe that for us.

7    A.   I didn't --

8    Q.   And by the way, when you answer, you can't say what

9    somebody said, just what you know and what you did.

10   A.   It was posted October 27th.  Immediately -- my mom's a

11   principal in the district, so immediately I contacted her and

12   said, what are my options here?  Can I get in trouble?  And

13   I -- we had gone to the principal of the school, and I let her

14   read what was posted.

15        She said obviously it's not good, doesn't look good for a

16   teacher to have that posted of them at all, but that they

17   would block the site.  From the Kenton County Board of

18   Education, they would block the site so the kids couldn't get

19   on there to read it, basically.

20   Q.   What about Ben-Gals?

21   A.   There had been other Ben-Gals previously posted on the

22   site so I know that other people had heard about it, and they

23   were shocked.  I mean, it says that I had slept with other

24   Bengal football players.  And if anybody knows, part of the

25   rules are you can't even fraternize.  You can't flirt.  You

*Jones - Direct*

67

1    can't go out to dinner, anything like that.

2    Q.   Can't date?

3    A.   Can't date, unless it's an organization.  Like take, for

4    example, Shayne Graham.  I went to his Kicks for Kids charity

5    event every year.  So there were times when we were in close

6    proximity with the players, but you could not ever go past

7    that line.  So a lot of the cheerleaders were questioning it.

8    Q.   Did it cause you problems with Nate about that being

9    posted, that you had sex with all the Bengal football players?

10   A.   Yes.

11   Q.   All right.  Now, this also was presented in the opening

12   statement of the defense.  And this is Plaintiff's Exhibit 16.

13   And this is dated December 7th, '09.  "The Dirty Army:  Nik,

14   here we have Sarah J, the captain cheerleader of the

15   playoff-bound Cincy Bengals.  Most people see Sarah as a

16   gorgeous cheerleader and high school teacher.  Yes, she's also

17   a teacher.  What most of you don't know is her ex, Nate,

18   cheated on her with over 50 girls in four years.  In that

19   time, he's tested positive for chlamydia infection and

20   gonorrhea, so I'm sure Sarah also has those.  What's worse is

21   he brags about doing Sarah in the gym, football field, or

22   classroom at the school.  She teaches at Dixie Heights."  And

23   then underneath that, "Why are high school teachers freaks in

24   the sack?  Nik."

25        Now, Sarah, with respect to this, did -- do you have

1    personal knowledge that Nate ever tested positive for

2    chlamydia or gonorrhea?

3    A.    No.

4    Q.    No, he didn't, or you don't know?

5    A.    He told me that he had been tested and he had never

6    tested positive for either.

7    Q.    Have you ever tested positive?

8    A.    No.

9    Q.    All right.  After this -- well, first of all, what kind

10   of troubles did this one cause you?

11   A.    This posting caused a lot of problems, with not just

12   cheerleading, not just relationship, not just school, just a

13   plethora of things.

14        Let's just start off with the school aspect.  It says I

15   had sex in the school, on the football field, in the

16   basketball court, or on the basketball court, and in my

17   classroom; and I wanted to prove that that had not been true.

18   Nathan had never even attended Dixie Heights High School.  So

19   when this post went up, we had gone to the principal and the

20   superintendent.  They were all called in.  And I had to

21   discuss where we go from here, based on this being posted

22   about me.

23        And the superintendent said that I needed to -- because

24   there were so many parents and students saying things, I would

25   have to sit down with my class, which I taught five -- four

*Jones - Direct*

69

1    classes out of the five periods in the day, and explain to my

2    students that I did not have two STDs.  So that was the school

3    aspect of it.

4         And then everybody had known -- it wasn't secret -- that

5    Nathan had cheated on me in the past.  It was -- I had had sex

6    with him and lost my virginity to him, and I felt that that's

7    the person I was going to spend my life with.  And then this

8    just kind of poured salt on the wound that he had cheated.

9         And I know that I had never been -- I had never tested

10   positive for any STD.  I had been checked ever since I was 18,

11   and I had medical records to prove that.

12   Q.   Did you go out after this and get tested to prove to who

13   you needed to prove that you didn't have those two STDs?

14   A.   Yes.  I had gone ever since I was 18, but I wanted to --

15   I wanted people to know that this was absolutely not true and

16   that I had never had STDs and there was never even an issue of

17   having STDs.

18   Q.   Did the school watch videotapes to verify you didn't have

19   sex with him on the school property?

20   A.   Yes.

21   Q.   What about the posts that followed these things, from the

22   Shayne Graham post and this post; what were some of the things

23   The Dirty Army, with that war mentality, posted?

24   A.   After that had been posted -- the first posting was

25   October 27th.  That one was December 7th.  And I had still,

1   after that, begged him to take it down.

2       And then after the begging, they just consistently

3   started posting, and it was over the top.  They posted

4   pictures.  And up to that point, those pictures were on the

5   Bengals web site, those ones from October 27th and December

6   7th.  So nobody had personal access to my Facebook for those

7   pictures because those were public.  But after that, people

8   had access so that those pictures -- it was a picture of

9   Nathan and I from Disney World on vacation -- in a vacation

10  with my parents.  And they had posted things about Nathan and

11  I, me personally.

12  Q.  Did you -- first of all, did you have chlamydia infection

13  and gonorrhea?

14  A.  No.

15  Q.  Have you ever?

16  A.  No.

17  Q.  Did you ever have sex with Nate in the gym, in the

18  football -- on the football field, or in the classroom at the

19  school?

20  A.  No.

21  Q.  By the way, did you ever have sex with Cody at the

22  school?

23  A.  No.

24  Q.  How many times did you have sex with Cody before you pled

25  guilty?

*Jones - Direct*

71

A.    Twice.

Q.    How old is Cody?

A.    He's 18.

Q.    Are you-all dating?

A.    Yes, we are.

Q.    The relationship that you had, right or wrong, did the
parents know about it?

A.    Yes.

Q.    Did they approve of it?

A.    Yes.

Q.    Does his parents like you?

A.    Yes.

Q.    What's his parents do for a living?

A.    His parents' names are Dave and Melissa.  Melissa is the
manager at Christ Hospital, and he works for a company called
JPL, and it's just a company.  I'm not exactly sure what he
does.

Q.    Okay.  On December 8th, did you send an e-mail to Nik
Richie asking him to take it down?

A.    Yes.

Q.    Did he?

A.    No.  And between all these e-mails, he was corresponding
back with me.

Q.    December 9th, did your father send an e-mail asking him
to take it down?

*Jones - Direct*

72

1    A.   I believe it was my mom from my dad's -- my dad's e-mail,

2    yes.

3    Q.   All right.  Did you send an e-mail December 28th that

4    said, "I am begging you, before you ruin my reputation, to

5    please remove my photos from your web site"?

6    A.   Yes.

7    Q.   Did he?

8    A.   No.

9    Q.   What was his reaction, his responses to you, as you were

10   doing all this begging?

11   A.   Well, he would respond, and right off the bat he would

12   ask me, what were the links?  You know, like he was going to

13   take them down.  And I was relieved, and I'd send them to him.

14   Then out of the blue, he sent a message that said, "Shayne

15   pissed me off.  It's staying up," which again -- and I even

16   pled to him afterwards.  I said, I don't know your personal

17   relationship with Shayne.  I just want the pictures of me off.

18   And we'd go back and forth consistently, me asking and him

19   acting like he'd take them down, and then they were never

20   taken down.

21   Q.   Okay.  Here's the Plaintiff's Exhibit 24, a post that I

22   do not believe the defense counsel has put up during the

23   closing -- or opening, excuse me.

24       All right.  Says, "The Dirty Army:  Nik, I'm a lawyer who

25   does a lot of Internet work, and I just saw the news story on

*Jones - Direct*

1    the Huffington Post about you getting sued in Kentucky by some

2    airhead cheerleader.  I know you have a kick-ass legal team

3    already, but I just want you to know the law in this area is

4    100 percent on your side, and it's so clear, I think you have

5    a decent chance of getting all your attorney's fees rewarded

6    for the girl filing a frivolous action against you.  Love the

7    site and don't let anyone push you around.  I know a lot of

8    lawyers who love the site, and I personally would be happy to

9    represent you if you ever need it, no charge.  Keep us posted.

10   PS, I looked up her profile on the web site, and she is

11   gross."

12       And then this is Nik, "I'm all good in the legal

13   department.  I have Cochran Kardashian -- that is what I call

14   him to his face -- representing my ass.  This is just a

15   desperate attempt for attention by some no-name dream kill.

16   According to my lawyer, C.K., "I just checked the court docket

17   for all federal courts in Kentucky, and there's no record of

18   this case being filed."  Let's see how the media and every

19   other blogger that hates me try to spin this in her favor.

20   Nik."

21       Did you send e-mails to him after this asking him to take

22   that down?

23   A.   After all the posts were -- it was just a consistent

24   plead, in hopes that he would just want to just -- you know,

25   me to leave him alone, because I had, at that point in time,

*Jones - Direct*

74

1    sent so many e-mails, I would think I was getting annoying and
2    I would just hope that he would take that down.
3    Q.   What about The Dirty Army; what were some of the things
4    that they would post about you, Sarah?
5    A.   They would call me a slut.  The physical things, they
6    would consistently focus on if I was fat or if I had bad teeth
7    or my complexion.  They consistently focused on my physical
8    aspects, but that wasn't the part that hit home, because I
9    didn't feel like I was fat.  I didn't -- you know.  But it
10   hurt my feelings, obviously.  When you see stuff like that,
11   you never get used to reading it about yourself.
12       But the main parts were that I was a cunt, a slut, that I
13   was a nasty whore, knowing that I had only slept with one
14   person, the person that I had planned on marrying.  I just
15   shook my head at all the comments.  It's one after the other.
16   It doesn't get any better.  And all these people are posting
17   anonymous.  They don't have to put their name on it.  They
18   don't have to -- you know, where at least if it's a news
19   story, they have to do it off Facebook and their name pops up.
20   This is all anonymous so I have no idea who was posting all
21   those awful things.  They would post -- my address is on his
22   web site now.  Somebody posted my address.  So just comment
23   after comment.
24   Q.   Did you want to sue him?
25   A.   No.  I even said that in an e-mail, I think.  I begged

*Jones - Direct*

1    him.  I said, I just want these posts down.  I don't want to

2    go forward with the legal -- with legal action.

3    Q.  All right.  When you first filed -- when the lawsuit was

4    first filed, do you have any personal knowledge, was it Sarah

5    Jones or Jane Doe?

6    A.  We'd -- I'd asked for it to be Jane Doe.  I did not

7    want -- I didn't want anybody to know I was suing because I

8    knew the whole war mentality that I had seen before, that he

9    was going to come after me, and in the sense from the he was

10   going to continuously keep posting me.

11   Q.  All right.  The defense counsel mentioned in his opening

12   statement $11 million.  Do you recall the defendant that was

13   sued, the Dirty World Entertainment Recordings, LLC, that they

14   never filed an answer?

15   A.  I didn't get into the legalities of it, but I knew that

16   they had not responded.

17   Q.  Okay.  And do you recall getting a default judgment

18   against them?

19   A.  Yes, August the 25th.

20   Q.  All right.  And do you recall that default judgment being

21   1 million compensatory damages and 10 million punitive

22   damages?

23   A.  Yes.

24   Q.  And have you ever collected a nickel of that?

25   A.  No.

*Jones - Direct*

76

1   Q.   All right.  Did you publicize that?

2   A.   Yes.

3   Q.   Why was that publicized?

4   A.   My goal in that was that I won.  In my point of view, I

5   knew I wasn't going to collect on that, but it was winning to

6   me because --

7           MS. MATTINGLY:  Your Honor, objection.  May we

8   approach?

9           THE COURT:  Why don't you clarify that that was not

10  this corporation.

11          MR. DETERS:  Yeah, that was not --

12          THE COURT:  That was an error with the corporate

13  name.

14  Q.   It was an error in the corporate name.  It was not Dirty

15  World, LLC, who's represented by Nik Richie?

16  A.   Right, I know that.

17  Q.   All right.

18          THE COURT:  Maybe you know it, but the jury didn't.

19  That's the objection.

20  A.   As far as that goes, why we did it, I knew that if I

21  would have gone in there and said, I slept with these players,

22  I have these, he would not have awarded me 11 million.  So by

23  public knowledge, I was hoping that the public would see that

24  if we were able to get a default judgment against a company,

25  then obviously these things weren't true.  So we publicized it

*Jones - Direct*

77

1    for that reason.

2    Q.    Did something happen on thedirty.com after the default

3    judgment?

4    A.    Yes.

5    Q.    What happened?

6    A.    They had finally removed my posts.  It's entitled "The

7    Dirty Bengals Cheerleader."  It was put under protection,

8    meaning that if you would search it on his web site, my

9    picture would come up, but the posts were protected.  So the

10   comments, the actual -- everything that was said on there was

11   protected.  And that was done on August 27th, two days after I

12   received the default judgment from this other company.

13   Q.    Now, has it gone back up?

14   A.    Not to my knowledge.  That posting, I'm not exactly sure

15   if it's up or not.

16   Q.    All right.  But you can still access everything through

17   the Internet?

18   A.    Yes.

19   Q.    So everything that's posted that was done about Shayne

20   Graham and then about the gonorrhea and chlamydia, is it still

21   on the Internet?

22   A.    Yes.

23   Q.    Do you want the jury to award you monetary damages for

24   any time past February 1st, 2011?

25   A.    No.

*Jones - Direct*

78

1    Q.   Do you want them to award you monetary damages?

2    A.   The Internet's permanent so I can't ask them -- I can't

3    beg them to tell them to stop posting me after this trial.  So

4    the only thing that they could offer me in order for that

5    would be money.

6    Q.   Does he continue to post about you today?

7    A.   Yes.

8    Q.   Does he mock you?

9    A.   Continuously.

10   Q.   Does he taunt you?

11   A.   Yes.

12   Q.   Does he send you a Christmas message?

13   A.   Yes.

14   Q.   Does he send you messages right before the trial?

15   A.   Yes.

16   Q.   How's that make you feel?

17   A.   I just want him to leave me alone.  I don't want to be

18   posted on the web site anymore.  I just want to be left alone.

19   That's all I want.

20   Q.   Do you think he's ever going to leave you alone?

21   A.   No.  It's been on there over 40 times now.

22   Q.   Do you know Erica Deters?

23   A.   Yes.

24   Q.   Who's Erica Deters?

25           MS. MATTINGLY:  Your Honor, objection.  May we

79

1    approach?

2         THE COURT:  Well, I have to hear who Erica Deters is

3    and what the question is.  Who's Erica Deters?

4    A.   Erica Deters is your daughter.

5    Q.   All right.

6         THE COURT:  What's the question?

7    Q.   What is her general reputation in the community?

8         THE COURT:  All right.  I don't see the relevance of

9    it.  You'll have to approach the Bench.

10                   (Bench conference.)

11        THE COURT:  What's the relevance of this one?

12        MR. DETERS:  You said that we could use a few

13   examples of how they did this to other people and to show what

14   he's done.  He put a picture of my daughter kissing her

15   boyfriend, like a smooch kiss, nasty stuff stated after it;

16   and it's just to show the malice, the meanness, and what he

17   does to other people.

18        MS. MATTINGLY:  And, Your Honor, our motion was filed

19   on this issue.  Everything is stated therein.

20        THE COURT:  Slow down a little.  Everything what?

21        MS. MATTINGLY:  Everything we stated therein is the

22   argument here; that it's evidence of other wrongs.

23        THE COURT:  I think it's some other wrongs.  I think

24   it's evidence of malice, especially since it's connected to

25   the lawsuit.  I'll allow it.

*Jones - Direct*

80

```
 1            MR. DETERS:  Thank you.
 2                 (Bench conference concluded.)
 3   BY MR. DETERS:
 4   Q.   What is Erica Deters' general reputation in the
 5   community?
 6   A.   She has a good reputation.  She's going to law school.
 7   Always been a good girl.  She's younger than me.
 8   Q.   It's my daughter?
 9   A.   Yes.
10   Q.   Did Nik Richie post a photograph of my daughter on the
11   dirtyworld.com?
12   A.   Yes.  I was the one that found it.
13   Q.   Okay.  And were there nasty things posted?
14   A.   Yes.
15   Q.   Was that after the lawsuit was filed?
16   A.   Yes.
17   Q.   Did you ever miss school or work -- up till February
18   11th, 2011, did you ever like be so devastated, you missed
19   work?
20   A.   Yes.
21   Q.   What about your -- well, did students -- don't tell me
22   what -- did students ask you about the posts?
23   A.   Yes.
24   Q.   Was there remarks made about you throughout the school
25   about the comments on thedirty.com, prior to February 1st,
```

*Jones - Direct*

81

1    2011?

2    A.   Yes.

3    Q.   In the defense counsel's opening, they made a comment

4    about the person that made that original post had to have

5    access to your Facebook page.  Did you hear that?

6    A.   Yes.

7    Q.   Do you know who posted that?

8    A.   No.

9    Q.   Did you try to find out?

10   A.   Yes.

11   Q.   All right.  Do you have any personal knowledge of whether

12   Nik Richie ever gave us that information?

13   A.   I don't have that information.

14   Q.   Do you know whether that was done by somebody that knew

15   you that didn't like you or not?  Do you know that?

16   A.   No.

17   Q.   What's it feel like to be -- describe, what's it feel

18   like to be a twenty -- when they posted the ones about

19   gonorrhea and chlamydia, how old were you?

20   A.   That was in 2009 so I was --

21   Q.   How old were you?

22   A.   24, 25.

23   Q.   What's it like to be a 24-year-old woman, single, teacher

24   in the school, and millions of people see that you must have

25   chlamydia and gonorrhea?

*Jones - Direct*

82

1    A.   It made me sick to my stomach that anybody thought that;

2    that they assumed that obviously if I had these STDs, that I

3    slept with Bengals football players.  I lost respect.  It was

4    devastating, obviously.  I mean, anybody that -- I would

5    assume that no woman would want to have, you know, it saying

6    that they had two STDs all over the Internet.  Nobody would be

7    okay with that.

8    Q.   Sarah, let's go over some of the comments that you made

9    after all of this.  "Strategically worded," was there any

10   strategic wording by you up till February 1st, 2011?

11   A.   Yes.

12   Q.   Okay.  Well, with respect to thedirty.com --

13   A.   You mean November, 2011?

14   Q.   Yeah, excuse me.

15   A.   Was the first time.

16   Q.   Okay.  Was there any -- okay.  When did you become

17   romantically involved with Cody?

18   A.   Romantically?

19   Q.   Sexually.

20   A.   October of 2011.

21   Q.   Okay.  I want you to describe your relationship with Cody

22   up until that time, relative to the family.

23   A.   Cody's family and my family were close.  We'd go out to

24   dinners together.  He has -- he's the youngest of three.  He

25   has a 33-year-old sister and a 25-year-old brother.  So we've

*Jones - Direct*

83

1    known each other for a long time.  And it just happened I

2    would actually do charity events for their neighbors, for the

3    Bengals, things like that.  So I had known them prior to him

4    being a student at school.

5    Q.   Were you sexually -- did you consider your -- did the

6    public, did the community, see you as sexually immoral, prior

7    to February 1st, 2011?

8         MS. MATTINGLY:  Objection, Your Honor.  Can we

9    approach?

10        THE COURT:  Well, I'll allow it.  It's as far as she

11   knows.

12   Q.   As far as you know.

13   A.   No.

14   Q.   What's the public think now?

15   A.   Public obviously has changed their viewpoint.

16   Q.   Okay.  I would like you to describe -- let's explain the

17   context of some of these texts.  First, the pink swimming

18   pool, the pink bowling balls, what was that all about?

19   A.   We consistently would joke -- which those text messages,

20   they have 30 days of text messages of mine and Cody's out of a

21   long time.  Those are just a small, miniscule amount of what

22   we would text about.  And we had an ongoing joke that he was

23   going to be a comedian and make lots of money.  Because it was

24   a joke because he wasn't funny.  So we would jokingly talk

25   about all that.  I even talked about this in text messages,

*Jones - Direct*

84

1   that we were just going to be rich because he was going to be

2   a comedian because he was so funny, as a joke.

3       So we would discuss the lawsuit.  And he knew that the

4   default judgment was not collectible, and we discussed those

5   things.  But those text messages are two lines of a

6   completely -- of a conversation where we would just get off

7   the phone or something.  We were just joking.

8   Q.  Okay.  What about the actress?  Your mom, they cut it,

9   "Sarah's an actress."  Describe the con -- were you present

10  when that interview took place?

11  A.  Yes.

12  Q.  And without saying who said what, do you recall the

13  question that was asked?

14  A.  I don't recall the exact question, but they were

15  discussing how --

16  Q.  What was the context?  What was the -- what was the

17  topic?

18  A.  We were talking about how I dealt with these things as a

19  teacher, like how did I go -- or how did I go out and act like

20  I wasn't hurt by these things that were being said about me.

21  Q.  Was it about how you lie and manipulate everybody, or was

22  it about how you were putting on a good face?

23  A.  It was about putting on a good face.  My mom even said,

24  which, of course, they cut out, that you have to -- when you

25  have a professional career, or any career, you don't bring

*Jones - Direct*

85

1    your personal life into your career.  You just have to go and

2    put on a face that, you know, makes that seem like

3    everything's good at home.  Maybe not everything's good at

4    home, but you have to at least put on a face and get the job

5    done that you're supposed to do.  And that's what she meant in

6    that context that I'm an actress; that -- I mean, a lot of

7    people have to do that.  They have to act like everything's

8    okay at work.

9    Q.    Sarah, 2012, you got divorced.  Well, first of all,

10   because Nate's name came up here --

11   A.    Um-hmm.

12   Q.    -- and they brought up the issue of Nate.  And do you

13   recall the statement that was made by defense counsel relative

14   to Nate telling the truth, or that you did not want to get

15   divorced because of the lawsuit?

16   A.    That's not why we got divorced.

17   Q.    I know.  Why did you get divorced?

18   A.    Nathan, as everybody knows like already, that he had

19   cheated on me several times.  I believe I had walked in on him

20   at one point in time.  But we were -- we were working through

21   our problems.  My family never really approved of him.  He was

22   very physically and mentally, emotionally abusive, and it was

23   never a healthy relationship.  And my family begged me not to

24   get married.

25         But at that point in time, I -- the Internet said I had

*Jones - Direct*

86

1    two STDs.  Who was going to date a woman that they think have

2    two STDs, you know, much less want to be with them?  So I

3    settled in.  Nathan and I discussed that.  He knows what

4    the -- why we ended up getting back together.

5         We were engaged July 3rd, 2010, and he had promised me

6    that he would stop doing cocaine.  At Dixie, his drug dealer

7    was -- happened to be a teacher parent that had got arrested,

8    and I had found out that he was still currently doing cocaine,

9    after I had already been engaged and done all of the plans,

10   all of the invitations.  And also I had found out that in

11   March, he had gone to Vegas on his bachelor party and had

12   slept with two women before we were getting married.

13   Q.  Did you, at some point in time, have to obtain a domestic

14   violence order against Nate?

15   A.  Yes.

16   Q.  Have you received any communications from Nate, through

17   other people, since the domestic violence order?

18   A.  Yes.

19   Q.  Did you ever receive an e-mail from Nik Richie to Nate?

20   A.  Yes.

21        MR. DETERS:  Your Honor, could we have a conference

22   call?  I mean a side bar.

23                    (Bench conference.)

24        MR. DETERS:  Your Honor, they have been trying to

25   subpoena Nate Wilburn to testify.  And Nate Wilburn and her

*Jones - Direct*

87

1   has kind of made peace.  And he gave that to her.  I think it

2   was last week.  It's from Nik Richie to Nate Wilburn.

3           MS. MATTINGLY:  Your Honor, we have correspondence

4   that we --

5           THE COURT:  Wait a minute.  I'm trying to find out

6   who --

7           MR. DETERS:  This is Nik to Nate.

8           THE COURT:  Okay.  "Nate, these are my lawyers" --

9   okay.  I don't see how it's relevant.  What are you trying to

10  prove?

11          MR. DETERS:  What I'm trying to prove with it is that

12  they're talking about that she was so obsessed with this

13  lawsuit that she didn't want, you know, to get divorced

14  because of it or anything else, and she was willing to lie,

15  lie, lie, lie.  And here they are trying to get him to lie for

16  them.

17          MS. MATTINGLY:  Number one, Your Honor, that's a

18  misrepresentation.

19          THE COURT:  You said it wants him to tell the truth.

20          MS. MATTINGLY:  And also, Your Honor --

21          THE COURT:  I think we're getting far afield so I'll

22  sustain the objection.

23                  (Bench conference concluded.)

24          THE COURT:  I don't know that you ever said what date

25  she got married in there.

*Jones - Direct*

88

1    BY MR. DETERS:

2    Q.   What date did you get married?

3    A.   I was married on July 15th, 2011.

4    Q.   And how long were you together and you were separated

5    already?

6    A.   We had gone on a honeymoon, and he had -- again, I

7    thought he had stopped doing drugs, and he had tried to buy

8    drugs on the beach.  And he was up at the bar most of the days

9    on the honeymoon, and I knew that it wasn't going to work out

10   as soon as that happened.

11   Q.   What was your relationship with Nate Wilburn like between

12   October 29th of 2009 and February 1st, 2011?

13   A.   It was never good.

14   Q.   Okay.  Did you -- did they post comments on the site on

15   your post, "You nasty whore"?

16   A.   Yes.

17   Q.   "Good luck teaching now that you're on this web site"?

18   A.   Yes.

19   Q.   "Ugly fat ass"?

20   A.   Yes.

21   Q.   "Photo shop is for liars"?

22   A.   Yes.

23   Q.   Were those posts -- the chlamydia and gonorrhea, the

24   sleep with every Bengal, and having sex at Dixie -- were those

25   false?

*Jones - Direct*

89

1    A.   Yes.

2    Q.   Were they about you?

3    A.   Yes.

4    Q.   Were you aware that -- well, first of all, have you read

5    Nik Richie's deposition?

6    A.   I've watched some of it.  I've not read it.

7    Q.   Were you aware that they get 18,000 hits a month?

8    A.   From what I've heard, yes.

9    Q.   Sarah, at any point in time after these posts were up,

10   did you throw up, physically get sick?

11   A.   Yeah.  I have bad anxiety.  As soon as -- as soon as all

12   that happened, the anxiety just hit.  I would throw up.  I

13   lost, I believe, ten pounds after missing school, not eating,

14   throwing up.

15   Q.   Were you depressed?

16   A.   Highly depressed.

17   Q.   Were you ever prescribed, during that time period of

18   October of 2009 and February 1st, 2011, Lexapro?

19   A.   Yes, by my family physician.

20   Q.   Sarah, did you ever like just leave the posts alone,

21   leave thedirty.com alone and just leave it alone?

22   A.   In October, I did that.  I had planned on just dropping

23   it until the December 7th posting.

24   Q.   Okay.

25   A.   And that's when I -- that's a posting that I could not

*Jones - Direct*

90

1   have up.  I did not want that one to stay up.

2   Q.   What was it like when you went to church and community

3   events and things like that?  How did you feel during that

4   time period?  Again, October, '09 to February 1st, 2011.

5   A.   I was judged.  People had read the posts.  They knew the

6   context of the postings.  And it was trying to do damage

7   control, trying to explain to the people that I did not have

8   two STDs, that I shouldn't have to explain to people.  I had

9   only been with one person, the person that I was marrying.

10  And I had never been with -- I had never slept with him

11  without a condom, so I knew that was not even a possibility

12  that I would have two STDs, and I had gotten checked for that.

13  Q.   They brought up Zeke Pike in their opening and said it

14  had no reference to you.

15            MS. MATTINGLY:  Your Honor, objection.

16            THE COURT:  Hang on.  What did they bring up?

17            MR. DETERS:  Zeke Pike.  They brought up Zeke Pike,

18  who was a Dixie Heights quarterback.

19            THE COURT:  Okay.

20            MR. DETERS:  They brought it up in opening.  That's

21  all I just said.  I didn't ask a question yet, Your Honor.

22  I'm sorry.

23            THE COURT:  All right.

24                      (Bench conference.)

25            THE COURT:  Who is Zeke Pike?

1          MR. DETERS:  He's a quarterback that they claim was

2     the other high school boyfriend, and they brought it up in

3     opening statement.

4          MS. MATTINGLY:  We did not, Your Honor.

5          MR. WARD:  No, no, no.  I brought it up in your

6     chambers.

7          MR. DETERS:  No, you brought it up.

8          THE COURT:  I'll let it go for now.  What did they

9     say about it?

10          MR. DETERS:  That's his girlfriend -- that's her

11     other boyfriend.  That's the boyfriend.

12          THE COURT:  I don't recall that they said that.

13          MS. MATTINGLY:  It didn't happen.

14          THE COURT:  You can check it.  You can get it from

15     the court reporter overnight.  Let's move on.

16          MS. MATTINGLY:  Your Honor, may we get it corrected

17     if he didn't say that?

18          THE COURT:  I just said you can bring it up.  You can

19     get it corrected if you didn't bring it up.

20          MR. WARD:  Okay.

21               (Bench conference concluded.)

22     BY MR. DETERS:

23     Q.  Who is Zeke Pike?

24     A.  Zeke Pike was a student at Dixie Heights High School.

25     I'd known his family prior as well.

*Jones - Direct*

92

1   Q.   Okay.   Did thedirty.com ever post anything about you and

2   Zeke Pike?

3   A.   Yes.

4   Q.   What did they say?

5   A.   I believe they referred to him as my other boyfriend.

6   Q.   Have you ever been involved in any way, shape, or form

7   with Zeke Pike?

8   A.   No.

9   Q.   Did -- do you ever recall a posting on thedirty.com

10   referencing you as a Kardashian?

11   A.   Yes.

12   Q.   All right.   Do you have any reality television show in

13   the works?

14   A.   No.

15   Q.   Did you ever?

16   A.   No.

17   Q.   You testified before about the Christmas message.   Do you

18   remember that?

19   A.   Yes.

20   Q.   "The Dirty Army:   Nik, I just wanted to wish you a merry

21   Christmas and a happy new year.   You have brought me to tears

22   to laughter over the years.   I want to let you know the

23   justice system will never be on your side.   I know your trial

24   with Sarah Jones begins next month."   It goes on.   "Merry

25   Christmas to everyone.   You too, Sarah.   Nik."

*Jones - Direct*

93

```
 1        Did you ever -- I got to ask you a question.  Was there
 2    ever a posting on thedirty.com that Nik Richie put your name
 3    under that wasn't yours?
 4    A.   A comment?
 5    Q.   Yeah, a comment.
 6    A.   There were postings on there that would be referred to as
 7    Sarah Jones' posting, but I've never posted on that site.
 8    I've never commented on that site.
 9    Q.   Okay.
10    A.   And he will respond to me as if I have.  Like, "Sarah, if
11    you would just have done this."  And he is replying to a
12    comment that's been made, and he assumes that it is me, but I
13    have never posted on that site.
14        MR. DETERS:  Your Honor, I feel bad, but I've got to
15    have a side conference.
16        THE COURT:  Pardon me?
17        MR. DETERS:  I'm sorry, but I've got to have a side
18    conference.
19            (Bench conference.)
20        MR. DETERS:  And I'm sorry, but he just posted this.
21    That's what I want to use.
22        THE COURT:  Well, what's the relevance of it?
23        MR. DETERS:  The relevance is the taunting is never
24    going to go away.
25        THE COURT:  Where does he say that?
```

1    MR. DETERS:  I guess I can cross-examine him with it.

2    MS. MATTINGLY:  But I don't even know -- right now,

3    there's no foundation.  I don't even know what this is from.

4    MR. WARD:  Your Honor, I would add this, if I may.  I

5    think they've blown the door wide off this February 1st, 2011

6    date.  They talk about the posts in 2011.

7    MR. DETERS:  They talk about how he keeps taunting

8    her.

9    THE COURT:  You went way beyond the date.

10   MR. WARD:  How can they say damages in February, 2011

11   and say what is the reputation in the community now?

12   THE COURT:  Well, you can rebut it.

13   MR. DETERS:  Your Honor, with all due respect, he

14   focused the entire opening statement on things that were past

15   it, calling her a liar.

16   THE COURT:  Okay.  It's getting late in the

17   afternoon.  Wait, come back.  Let the Court make a record

18   here.

19   During the opening statement -- it's not somebody

20   where we've got somebody who's not familiar with the law.  A

21   criminal is fully represented.  I'm not a lawyer here so I'm

22   not making any objections, but I thought the opening statement

23   of the defendants went beyond the cutoff date.  And now he's

24   trying to come back, and now you can't blame him for trying to

25   rebut it.  But do it with Nik when he's up there.

*Jones - Direct*

95

1          MR. DETERS:  Okay.

2          THE COURT:  I don't know that this is relevant.  It

3     might be unduly prejudicial.

4          MR. DETERS:  Okay.

5          THE COURT:  It just says it's his opinion that there

6     will be a vote between freedom and censorship.  I guess that's

7     what he thinks.  He's got a right to think that.  He's a

8     citizen of the United States.  He can think that if he wants.

9          MR. DETERS:  Okay.

10               (Bench conference concluded.)

11    BY MR. DETERS:

12    Q.  Sarah, at any given time that you sent those requests to

13    Nik Richie asking him to take them down, at any time, did he

14    agree to do so?

15    A.  He never said he was going to take it down.  He would ask

16    me which posting is it and I'll look at it.  But he never said

17    that he was going to take it down.  But it was kind of like he

18    was going to -- like he would look at it and look into it.

19    Q.  Okay.  Sarah, did you appear on any television shows

20    relative to this, dirty.com?

21    A.  Yes.

22    Q.  Okay.  Which shows?

23    A.  "20/20."  They contacted me and asked me.  They were

24    doing a special on Internet and being able to post anonymously

25    and asked if I would talk about my story, and I agreed to do

*Jones - Direct*

96

1    so.  And then when they had actually flown me to New York and

2    discussed it, I had been aware that Mr. Richie was also being

3    interviewed on the same show.

4    Q.   Did they contact you or did you contact them about being

5    on the show?

6    A.   They contacted me.

7    Q.   Okay.  So you appeared on that show the same time as Nik

8    Richie?

9    A.   It was -- I had gone there in March.  And from the way

10   the interview was --

11   Q.   March, what year?

12   A.   March of 2011, I believe.

13   Q.   Okay.

14   A.   And by his interview questions, I concluded that they had

15   interviewed him first.  And then after the interview, I asked

16   them, and they said that they had talked to him, yes; and we

17   were not being interviewed together, but his interview, his

18   separate interview, would be airing the same show as my

19   separate interview.

20   Q.   In March of 2011, when you did the interview, were you

21   sexually involved at all with Cody York?

22   A.   No.

23   Q.   All right.  They spent a lot of time on Cody York and

24   these messages that you had sent referencing when he was a

25   freshman.  Can you explain the context of all of that?

*Jones - Direct*

97

A.   Again, Cody and I knew each other long before it was a

student-teacher relationship, so it was almost awkward that he

was my student because I didn't view him as that.  So -- and

we consistently talked.  Cody is the type of person that needs

to be reassured in a relationship, as I am too.  We

consistently reassure each other.  And I believe I make a

comment in there --

Q.   Most men do.

A.   -- that it was love at first sight.  You know, and just

because you say it's love at first sight, I mean, it's being

taken out of context.  You say that in a relationship, you

know, when you're being lovey and you're sending these

messages to the person that you love.  And did I love him at

first sight?  No.  But --

Q.   Did you send him one or do anything inappropriate when

Cody York was a freshman?

A.   No.  I never -- we never text, e-mailed, saw each other,

nothing.

Q.   Okay.  Did your relationship with Cody York have anything

to do with the fact that you were a teacher at Dixie High

School?

A.   No.

Q.   Did you ever teach him?

A.   He was in my freshman class.

Q.   Okay.

1    A.   In two thousand -- it was my first year teaching and his

2    first year of high school.

3    Q.   Okay.  Did you ever send texts to Cody York that you're

4    embarrassed about today?

5    A.   Yes.

6    Q.   Have you sent embarrassing texts to other people?  I'm

7    talking about --

8    A.   Describe embarrassing.  Are you talking sexual?

9    Q.   No, I'm talking about just -- well, you lied to your mom.

10   A.   I sent text messages.

11   Q.   You lied to your mom.  I mean, why did you lie to your

12   mom?

13   A.   I was embarrassed.

14   Q.   Okay.  All right.  What were you embarrassed about?

15   A.   The text messages were taken out of context.  Again, we

16   were texting and talking, and that is a small snippet of

17   anything.  So we could have gotten off the phone and been

18   talking about something and then text about it.  Or, you know,

19   he would be texting my sister at some point in time.

20        There were -- all of those messages are taken out of

21   context in the sense that, yes, I was embarrassed of them, and

22   some of the things that I said I am very ashamed of that I

23   sent.  But those are the only -- I've never sent any type of

24   messages like that to anyone else besides him.

25   Q.   Other than the Cody York scandal, what have you lied so

*Jones - Direct*

99

1    profusely about?

2    A.   Nothing.

3    Q.   Is that the only thing that you've lied about like you've

4    lied about?

5    A.   Yes.

6    Q.   And why?

7    A.   I was being investigated by the police, and any criminal

8    investigation, you go through the process of the justice

9    system.  And by the time I was being questioned, that was

10   November 29th.  And again, I went in there because I was

11   informed that the police investigation was coming to a close.

12   So when I went in there, I had no idea that I was going to get

13   blind-sided like that, so I didn't even know how to respond.

14   So we immediately called you as my attorney to discuss what we

15   were going to do from there.

16        So, yes, I did -- I did lie to the police out of fear

17   because I don't -- had I told them, what was going to happen

18   after that.

19   Q.   Okay.  You publicly stated -- this is something they

20   didn't have.  You publicly stated that you were not guilty of

21   those charges.

22   A.   Yes.

23   Q.   Why did you publicly state you were not going to be found

24   guilty of those charges?

25   A.   I was being charged with sex abuse, and I was not -- and

1    luring by electronic means.

2    Q.   Did you use a single text, or was there any luring by

3    text, Cody York?

4    A.   No.

5    Q.   All right.  And relative -- why did you think you were

6    going to be found not guilty if that case would have went to

7    trial?

8    A.   There were a lot of things involved in the case.  A judge

9    that was very close with Cody York had signed on all of the

10   things, so I didn't know what was going to happen.

11   Q.   Could they prove that you had -- did those text

12   messages -- could they prove that you were guilty of those?

13   A.   No.

14   Q.   Why did you plead guilty to what you pled guilty to and

15   then put up there and you signed that statement?  Why'd you do

16   that?

17   A.   It's really scary to be in a trial, and I didn't know

18   what the outcome was.  When you leave something up to a jury,

19   it's scary because it could go one way or the other.  And with

20   criminal charges pending, I didn't know what was going to

21   happen.  I knew that I had Cody and his parents testifying for

22   me, but I knew that the prosecution didn't have evidence to

23   prove what they were trying to prove.

24   Q.   If you complete your diversion, does the felony go away?

25   A.   Yes.  It's felony diversion.

1   Q.   Are you considered a -- do you have to register as a sex

2   offender?

3   A.   No.

4   Q.   Did you serve any jail time?

5   A.   No.  I was arrested on March 29th, so I was in jail for

6   four hours, but I didn't serve jail time.

7   Q.   How long were you home incarcerated?

8   A.   I was home incarcerated for six months, on level 3 home

9   incarceration, meaning that you can only go to work, and I had

10  special permission to attend church and to care for my

11  grandmother.

12  Q.   And can you ever teach again?

13  A.   No.

14        MR. DETERS:  That's all the questions I have.  Thank

15  you.

16        THE COURT:  Okay.  I guess we could get started, go

17  till about 4:00, or we can go over to tomorrow if you'd

18  rather.

19        MS. MATTINGLY:  Okay, Your Honor.  Thank you.

20  Actually, can we have a conference before we begin, Your

21  Honor?

22                    (Bench conference.)

23        MS. MATTINGLY:  Your Honor, based upon her testimony,

24  there are a few issues that involve some of the text messages,

25  some of the more risque ones, that we would like to get in, so

1    I'd like to address those with you before we get started.

2          THE COURT:  Well, why don't I let the jury go home

3    and we'll go into chambers?

4          MS. MATTINGLY:  That's fine, Your Honor.

5          THE COURT:  Okay.

6                (Bench conference concluded.)

7          THE COURT:  Okay.  Ladies and gentlemen, we have some

8    legal matters we have to discuss before the cross-examination;

9    and rather than keep you waiting, we'll let you go home and

10   we'll discuss them while you're gone.  So we'll adjourn as far

11   as you're concerned until 9:00 tomorrow morning.

12         You know what I'm going to say.  Remember to heed the

13   admonition of the Court.  Do not discuss the case among

14   yourselves.  Do not discuss it with your family members or

15   anyone else, anybody you might go to a meeting with or bowling

16   with or something tonight.  Don't discuss it with the press,

17   obviously.

18         More than that, don't view any publicity concerning

19   it.  If you should be watching the news and something come on

20   about it, turn it off, walk out of the room.  Remember that

21   posting something on your Facebook page, Twitter, or something

22   like that is the same thing as talking about the case; and if

23   you would do that and it would come out, it's likely to cause

24   a mistrial and we'd have to start all over.  Great expense to

25   all of us as taxpayers, great expense to all those people in

1    the court.  So you must cooperate with the Court on this.

2    It's your obligation under your oath.

3            As far as you're concerned, we'll be in recess until

4    9:00 tomorrow morning.  Counsel, you can come around to

5    chambers.

6                (The jury left the courtroom at 3:46 p.m.)

7                (Proceedings concluded at 3:46 p.m.)

8                              -   -   -

9                        C E R T I F I C A T E

10

11           I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that the
     foregoing is a correct transcript from the record of
     proceedings in the above-entitled case.

12
      \s\ Joan Lampke Averdick          February 28, 2012
13    JOAN LAMPKE AVERDICK, RMR-CRR     Date of Certification
      Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

104

                                INDEX
PLAINTIFF'S WITNESSES


SARAH JONES
        Direct examination........................... Page 45


                              -   -   -