1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF KENTUCKY
2             NORTHERN DIVISION AT COVINGTON

3

SARAH JONES,                 :  Docket No. CV 09-219
4                        :
         Plaintiff,       :  Covington, Kentucky
5                        :  Wednesday, January 23, 2013
        versus            :  9:00 a.m.
6                        :
DIRTY WORLD, LLC, et al.,    :
7                        :  **DAY 2 of 3**
        Defendants.      : 
8

9                            - - -

10             TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE WILLIAM O. BERTELSMAN
11          UNITED STATES DISTRICT COURT JUDGE

12                           - - -
APPEARANCES:
13  For the Plaintiff:      ERIC C. DETERS, ESQ.
                      Eric C. Deters & Partners, PSC
14                  5247 Madison Pike
                  Independence, KY 41051
15

For the Defendants:     ALEXANDER C. WARD, ESQ.
16                  ALEXIS MATTINGLY, ESQ.
                  Huddleston Bolen, LLP - Ashland
17                  855 Central Avenue, Suite 301
                  P.O. Box 770
18                  Ashland, KY 41101
                   and
19                  DAVID GINGRAS, ESQ.
                  Gingras Law Office, PLLC
20                  E. Chandler Boulevard
                  #106-243
21                  Phoenix, AZ 85048

22  Court Reporter:         JOAN LAMPKE AVERDICK, RMR-CRR
                   Official Court Reporter
23                  35 W. Fifth Street, Box 1073
                  Covington, KY 41012
24                  (859) 291-9666

25      Proceedings recorded by mechanical stenography,
transcribed by computer.

1          (Proceedings commenced at 9:00 a.m.)

2          THE COURT: Okay. Well, we laid down our ground

3     rules, I think, while we were in chambers. Jury's all here, I

4     understand, so let's bring them in.

5          COURT SECURITY OFFICER: Yes, sir.

6          (The jury entered the courtroom at 9:18 a.m.)

7          THE COURT: Good morning again. Thank you for coming

8     in again and being on time. We were discussing some matters

9     in chambers that will actually speed things up. I apologize

10    for being a few minutes late.

11         The weather report is for some heavy snow Friday

12    morning so we're going to try to finish tomorrow. To do that,

13    we may have to go a little later today, but the attorneys have

14    told me they'll cooperate. They want to get finished, too.

15    As you know, sometimes people, when we have snow in this area,

16    people have trouble getting in, getting out of their street

17    and that sort of thing. So we'll try to finish tomorrow if we

18    possibly can.

19         Toward that end, let's get started. I think the

20    plaintiff was on the stand. Come around, ma'am. You've been

21    sworn yesterday and you're still under oath. You may start

22    cross.

23         MS. MATTINGLY: Thank you, Your Honor.

24         THE COURT: You may ask.

25

1                     CROSS-EXAMINATION

2   BY MS. MATTINGLY:

3   Q.   Good morning, Ms. Jones.

4   A.   Good morning.

5   Q.   How are you?

6   A.   I'm good.  Thank you.

7   Q.   I want to begin by talking about some things that

8   occurred during your time as a Ben-Gal cheerleader.  I'm going

9   to show you a document that we've premarked as Defendant's

10  Exhibit A.

11          MS. MATTINGLY:  Your Honor, may I approach the

12  witness?

13          THE COURT:  Yes, that's fine.

14  Q.   Ms. Jones, does this document look familiar?

15  A.   Yes, ma'am.

16  Q.   Is it a fair and accurate copy of the rules by which you

17  were bound while a Ben-Gal cheerleader?

18  A.   Yes, ma'am.

19          MS. MATTINGLY:  Your Honor, I move to admit this as

20  Defendant's Exhibit A.

21          THE COURT:  All right.

22          MR. DETERS:  No objection.

23          THE COURT:  All right.  Let it be admitted.

24       (Defendant's Exhibit A admitted into evidence.)

25  Q.   Now, according to these rules, Ben-Gal cheerleaders are

1    role models in the community, correct?

2    A.   Correct.

3    Q.   And many of these rules address requirements regarding

4    personal appearance; is that correct?

5    A.   Correct.

6    Q.   Okay.  Now, as part of your role, you even had what is

7    referred to as a glamour evaluation; is that correct?

8    A.   Correct.

9    Q.   Now, isn't that because as a Ben-Gal cheerleader, you're

10   in the spotlight at games and other public events?

11   A.   Not necessarily because we're in the spotlight.  Because

12   we are -- we're supposed to just be held accountable for the

13   way we look, as far as an NFL cheerleader.

14   Q.   Okay.  Would you dispute that you're in the spotlight as

15   a Ben-Gal cheerleader?

16   A.   We're on the field, but as far as being in the spotlight,

17   a lot of people don't notice us on the field.  The only time

18   that -- and we're out in the community a lot, but not

19   necessarily in the spotlight.

20   Q.   Okay.

21   A.   And nobody knows my name as far as a Ben-Gal cheerleader.

22   Q.   Okay.  We'll get into that a little bit later.

23   A.   Okay.

24   Q.   According to these rules, you were even allowed to do

25   paid appearances, provided you did so many charity events; is

1  that correct?

2  A.   The coaches -- it's pretty much up to the coach.  So if

3  you do a lot of charity events -- like, we have maybe 10 to 20

4  each month that we allot to each girl.  There's 30 girls on

5  the team.  And depending on if you volunteer for those, it's

6  pretty much up to the coach to say, hey, you've done this many

7  charity events, you pretty much deserve a paid appearance,

8  because we only got $75 a game.

9      So it was kind of like your reward for getting out in the

10 community and doing stuff like that.  So it wasn't necessarily

11 open to anybody.  The coach would have to select whoever

12 received a paid appearance.

13 Q.   Okay.  But there were events where you could go and

14 receive payment just for appearing in your role as a Ben-Gal

15 cheerleader; is that correct?

16 A.   You had to be selected; but, yeah, there were times when

17 you could get up to $50 for a charity event, something like

18 that that was a paid appearance for somebody asking the

19 Ben-Gals to be there.  But it was very rare.

20 Q.   And were you ever chosen for any of those paid

21 appearances?

22 A.   Over the time, I was the captain so I was also in charge

23 of choreography, so a lot of my time that I spent was on the

24 choreography and stuff like that, kind of in the stadium

25 working on dances and stuff.  So I was chosen for a few, but

1    not many.

2    Q.   Okay.  And you also participated in fashion shows in your

3    role as a Ben-Gal cheerleader; is that correct?

4    A.   Not fashion shows.  There was one time, one instance,

5    when Cincinnati Tan, they were our sponsor.  We are kind of a

6    separate entity from the Bengals.  Although we are with the

7    Bengal organization, we are in charge of all of our own

8    clothing.  We come up with all of our money to do all that.

9    And a lot of that's from the proceeds from the calendar.  So

10   things like that.

11         Cincinnati Tan was our sponsor, and they had asked, I

12   believe, five to eight girls to come and do a fashion show,

13   which it wasn't really a fashion show.  It was in a parking

14   lot.  And it was a designer of a bathing suit that was a local

15   designer, and she gave us each two outfits to wear, and we

16   were just supposed to walk around in the parking lot, and like

17   25 people were there.  So that was the only fashion show that

18   I had ever done with the Bengals.

19   Q.   Okay.

20         MS. MATTINGLY:  Your Honor, may I approach the

21   witness?

22         THE COURT:  Yes.

23   Q.   Sarah, I'm going to show you what's been premarked as

24   Defendant's Exhibit B.  Do you recognize this document?

25   A.   Yes.  That's from the Cincinnati Tan fashion show.

1    Q.   Okay.  And is this a fair and accurate depiction of you?

2    A.   Yes.

3    Q.   Okay.

4         MS. MATTINGLY:  Your Honor, I move to admit this as

5    Defendant's Exhibit B.

6         MR. DETERS:  No objection.

7         THE COURT:  Let it be admitted.

8         (Defendant's Exhibit B admitted into evidence.)

9    Q.   Okay.  You were also chosen to go to Germany, Iraq, and

10   Kuwait on behalf of the Ben-Gals; is that correct?

11   A.   My flight stopped in Germany, but I wasn't in Germany.

12   It was a -- we went from Cincinnati to New Jersey, from

13   New Jersey to Germany, Germany to Kuwait.  We did stop in

14   Kuwait, and then we flew on a C130 from Kuwait to Iraq.  So I

15   was only in Kuwait in a flight.

16   Q.   And that was part of a USO tour; is that correct?

17   A.   Yes, ma'am.

18        MS. MATTINGLY:  Your Honor, may I approach the

19   witness?

20        THE COURT:  You may.  You can have blanket

21   permission.  You don't have to ask it.

22        MS. MATTINGLY:  Thank you, Your Honor.

23   Q.   And this is marked as Defendant's Exhibit C.  And do you

24   recognize these documents?

25   A.   Yes, ma'am.

1      Q.   Are these fair and accurate depictions of you?

2      A.   Yes, ma'am.

3      Q.   And these are photos from that trip; is that correct?

4      A.   Yes, ma'am.

5           MS. MATTINGLY:  Your Honor, I move to admit these as

6      Defendant's Exhibit C.

7           MR. DETERS:  No objection.

8           THE COURT:  Let it be admitted.

9           (Defendant's Exhibit C admitted into evidence.)

10     Q.   And can you just describe for the jury -- I'm going to

11     put each one on the screen.  You can just tell them what they

12     are.

13          THE COURT:  You have it sideways, upside down.

14          MS. MATTINGLY:  I know.  I'm trying to rotate it

15     there.  There we go.

16     A.   This is the morning that we were taking off from

17     Cincinnati.  This is in the Cincinnati Airport.  And there

18     were -- yeah, there were eight girls selected so I was

19     counting them.  There were eight girls selected to go on the

20     trip for ten days -- I believe it was ten to eleven days.  And

21     that is on our day that we were taking off for New Jersey.

22     Q.   And is that you kind of in the middle to the left?

23     A.   Yes.  I'm the fourth one.  I'm in the middle.

24     Q.   Okay.  Here's the next one.  And this has to be either

25     Kuwait or -- it's Kuwait, isn't it?

1   A.   Yes, ma'am, this is Kuwait.  We had a flight, like I

2   said, from New Jersey to Germany and then Germany to Kuwait.

3   And it was -- and that whole flight, I believe, took 29 hours,

4   and we had just landed.  This is like 5:00 in the morning in

5   Kuwait.

6   Q.   And you're in the front row near the right; is that

7   correct?

8   A.   Yes, ma'am.

9   Q.   Okay.  Can you tell us a little bit about this one?

10  A.   Yes.  This was in one of the places that we visited as

11  far as one of the groups that we -- groups of soldiers.  And

12  we visited -- like I said, we started off in Kuwait, and we

13  visited different bunkers and met with soldiers, some soldiers

14  that hadn't had visitors in six months.  And this is one of

15  those.  And I believe this was on maybe the second-to-last day

16  that I was there.

17  Q.   Okay.  And you're in the front --

18  A.   Yes, ma'am.

19  Q.   -- in the middle, correct?

20  A.   Yes.

21  Q.   And these were all in 2011, January 2011?

22  A.   January, 2011.  I left on January 18th.

23  Q.   Okay.  And a little bit about this one, please?

24  A.   This one was one of my second days there.  This is still

25  in Kuwait, before we had taken off on a C130, and they were

1    showing us different helicopters.  And we were -- we had to

2    ride in Blackhawks for transportation for security purposes at

3    that time, and this is one of -- we didn't actually ride in a

4    helicopter, but that was -- we just took a picture in front of

5    it.  And I am, I believe, bent down in front.  Sorry.  We all

6    have sunglasses on.  I'm bent down in front, I believe.

7    Q.   Okay.  And here's one final.  Can you tell us about this

8    one, please?

9    A.   Yes.  This is at one of the bases, and he's one of the

10   generals.  And at each base that we stopped at, since we were

11   doing community service for the soldiers, they presented us

12   with a certificate of -- for basically doing the charity work

13   and coming and visiting the soldiers with it being in such a

14   dangerous place.

15   Q.   Okay.  Now, as a Ben-Gal, you also had a biography posted

16   on the Bengals web site, which was www.Bengals.com, correct?

17   A.   Yes, ma'am.

18   Q.   I'm going to approach with what's been premarked as

19   Defendant's Exhibit D.

20   A.   Thank you.

21   Q.   Now, does this document look familiar?

22   A.   Yes, ma'am.

23   Q.   Is this a fair and accurate depiction of your biography

24   that appeared on the Bengals web site?

25   A.   For one of the years, yes, ma'am.

1      MS. MATTINGLY:  Okay.  Your Honor, I move to admit

2  this as Defendant's Exhibit D.

3      THE COURT:  Let it be admitted.

4      MR. DETERS:  No objection.

5      (Defendant's Exhibit D admitted into evidence.)

6  Q.  And did you submit the answers for these questions?

7  A.  Yes, ma'am.

8  Q.  Okay.  I don't know if the jury will be able to see this

9  or not.  I'll try to zoom in.

10      Please read your answer to the question that says the

11  most memorable Ben-Gal moment.

12  A.  "Most memorable Ben-Gal moment:  Cheering in Miami for

13  the 2010 Pro Bowl, being named side captain in 2009, and

14  getting the cover of the swim suit calendar in 2007."

15  Q.  Okay.  So not only were you a Ben-Gal cheerleader, but

16  you were also the captain, correct?

17  A.  For -- not for -- I was there for six seasons, so I

18  wasn't the captain for all those years, but I was selected

19  side captain in 2009, and then I was selected as -- right

20  before we went to Iraq, I was selected as high captain.  And

21  so that would have been 2010-2011.

22  Q.  Okay.  And you were chosen to be on the cover of the

23  Ben-Gals cheerleader -- or calendar, correct?

24  A.  Yes, my second season with the Ben-Gals.

25  Q.  And you appeared in the calendar in other years as well,

1  correct?

2  A.  Yes, ma'am.  That's part of the -- like I said, that's

3  our -- because we're a separate entity for the Bengals, we

4  have to raise our own money for our uniforms.  We pay for all

5  of our own uniforms, all of our music and choreography,

6  cutting the music.  All that stuff is generated by the

7  cheerleaders only.  We don't get money from the Bengals.  So

8  in order to do that, we have to do a calendar that we shoot in

9  either June, July, or August, and then it gets released in

10  September.

11  Q.  And these are sold to the public, then, to generate those

12  funds, correct?

13  A.  Yes.  They're sold for $10 apiece.

14  Q.  Okay.  I'm going to approach you with these calendars

15  that have been premarked as Defendant's Exhibit E.  Do you

16  recognize these?

17  A.  Yes, ma'am.

18  Q.  Okay.  Are these fair and accurate depictions of those

19  calendars for each of the years?

20  A.  I sent them to you.  Yes.

21       MS. MATTINGLY:  Your Honor, I move to admit these as

22  Defendant's Exhibit E.

23       THE COURT:  Let them be admitted.

24       (Defendant's Exhibit E admitted into evidence.)

25  Q.  I won't be able to put these on the screen so I'll just

1    show the jurors.

2    A.    That was the year that I was -- that's 2007, the year

3    that I was selected as the cover of the calendar, which was my

4    second year.

5    Q.    And this is another one, correct?

6    A.    Yes, ma'am.  I believe it was maybe January?

7    Q.    Yes.  And here you are January again?

8    A.    January, um-hmm.

9    Q.    Okay.  And this is November?

10   A.    November.  That was my last season with the Bengals.

11   Q.    Okay.  So this would have been around 2011?

12   A.    That was, yes, 2011, and the shoot was in June.

13   Q.    Okay.  And several of these you autographed; is that

14   correct?

15   A.    They're signed, yeah.  We would do -- like we would sign

16   some of them before we sold them, for the pro shop.  And, as I

17   said, they're sold for $10.  And that money, we get $7 of the

18   money back, and then the pro shop, I believe, makes $3 off of

19   them, or maybe the opposite way.  I'm not exactly sure.  I

20   don't know.  But, as I said, that money comes back to us where

21   we can pay for our uniforms.

22   Q.    Okay.  And I think you previously testified that you were

23   chosen out of all the other Ben-Gal cheerleaders to go to the

24   Pro Bowl in Miami, Florida in 2010; is that correct?

25   A.    Yeah.  2010, we didn't have a contract with Hawaii, I

1    believe, so that was the only year that they sent girls to

2    Miami.  But I was selected in December of 2009 to go to the

3    Pro Bowl.

4    Q.  And a poster was made of all the Pro Bowl cheerleaders;

5    is that correct?

6    A.  Yes, ma'am.

7    Q.  I'm going to approach you with what's been marked as

8    Defendant's Exhibit F.  Is that a fair and accurate depiction

9    of the poster?

10   A.  Yes, ma'am.

11   Q.  Okay.

12        MS. MATTINGLY:  Your Honor, I move to admit this as

13   Defendant's Exhibit F.

14        THE COURT:  Let it be admitted.

15        (Defendant's Exhibit F admitted into evidence.)

16   Q.  This is going to be kind of hard to put up on the screen

17   as well.  You are --

18   A.  Close to the middle.

19   Q.  -- right here; is that correct?

20   A.  Yes, ma'am.

21   Q.  Okay.  Right here in the middle.

22        Now, during that week, you had some public appearances,

23   including radio appearances, television appearances, and a

24   fashion show, correct?

25   A.  We did several -- there were four different groups;

1    AFC-1, AFC-2, NFC-1, and NFC-2.  So we all didn't do each

2    appearance, but we were selected to -- like one group would

3    wake up at 5:00 in the morning and go do this while the other

4    group went to another appearance.  So there were several

5    things, but we didn't get to do all of those.

6    Q.  But you did participate in some of those; is that

7    correct?

8    A.  Some of them, yes, ma'am.

9    Q.  All right.  I'm going to approach you with what's been

10    marked as Defendant's Exhibit G.  Do you recognize this?

11    A.  Yes, ma'am.

12    Q.  Is this a fair and accurate depiction of you?

13    A.  Yes, ma'am.

14         MS. MATTINGLY:  Your Honor, I move for this to be

15    admitted as Defendant's Exhibit G.

16         THE COURT:  Let it be admitted.

17         (Defendant's Exhibit G admitted into evidence.)

18    Q.  And this is a photo of you at the Pro Bowl week fashion

19    show, correct?

20    A.  Yes, ma'am.  They tried to do something special for us,

21    since we weren't selected -- since we weren't going to Hawaii

22    and we were staying in Miami, so we did a fashion show and we

23    danced.  They made this plastic runway over the pool and we

24    danced on there to represent our team.

25    Q.  Okay.  Now, you'll agree with me, won't you, that these

1   opportunities -- these fashion shows, charity events with

2   professional athletes, and traveling to foreign countries --

3   these are opportunities that not everyone in everyday life

4   has, correct?

5   A.   Not everyone, but we went -- we didn't do many things as

6   far as with professional athletes.

7   Q.   But you did -- you will agree with me that you did things

8   that, if you were just in your role as a teacher, you wouldn't

9   have been able to do these things, correct?

10  A.   Not necessarily.  I mean, anybody is able to do charity

11  events.  But to go to Iraq and perform for troops, that would

12  be limited to a select amount of people.

13  Q.   Okay.  Now, I want to talk a little bit about the

14  postings on my client's web site.

15  A.   Okay.

16  Q.   You -- do you have any personal knowledge that Nik Richie

17  did any of the following:  That he wrote any of them about

18  you?

19  A.   The actual postings or comments along with the postings?

20  Q.   The actual postings.

21  A.   I have no knowledge as to who wrote them, so I couldn't

22  say if he did or did not.

23  Q.   Do you have any personal knowledge as to whether he paid

24  anyone to write those about you?

25  A.   I have no personal knowledge.

1    Q.   Asked anyone to write them about you?

2    A.   Not that I know of.

3    Q.   Or changed anything that anyone else submitted about you?

4    A.   I don't know who posted it so I don't know what the

5    original would have looked like, if it was changed.

6    Q.   Okay.  And you previously admitted that at least some of

7    these photos were from you, that were posted to your Facebook

8    page, correct?

9    A.   The two that contained the defamatory posts are not from

10   my Facebook.  The ones after, after I filed the lawsuit, where

11   they were -- it was where The Dirty Army had the war mentality

12   and they kept posting me, those pictures were from my

13   Facebook.  But the original two with the defamatory statements

14   are public pictures that anybody could have had access to.

15   Q.   Okay.  And with respect to some of them that were

16   admitted, the ones that you were talking about, you testified

17   that whoever did this was a Facebook friend, correct?

18   A.   Whoever did the following posts, yes.

19   Q.   Okay.

20   A.   But not necessarily the original two.

21   Q.   Okay.  And you've testified about some of the so-called

22   mean comments about you that appeared in the Comments section

23   of my client's web site.  You'll agree with me that you've

24   been written about on other web sites as well, other news

25   media and whatnot, correct?

1    A.    Before February, 2011?

2    Q.    No, at any time.

3    A.    I've been posted on different web sites based off of the

4    criminal case.  But as far as thedirty.com, I've never seen

5    any negative comments on other sites about myself.

6    Q.    Okay.  But since then, have you seen comments about

7    yourself, comments that you considered to be mean --

8    A.    Yes, ma'am.

9    Q.    -- on other web sites?

10   A.    Yes, ma'am.

11   Q.    After your "Anderson Cooper" appearance, did you look at

12   his web site and see any of the comments that appeared on

13   there?

14   A.    No, ma'am.

15   Q.    Okay.  Would it surprise you to find out that there were

16   comments there that said mean things about you as well?

17   A.    Everybody has their own opinion, so if somebody were to

18   make comments, they're not always in favor of me or always

19   against me, you know, or against me.  So it wouldn't surprise

20   me if there were any comments on there.

21   Q.    Okay.  Now, in one of the posts for which you are suing,

22   the post says, quote, "Nate has tested positive for both

23   chlamydia infection and gonorrhea so I'm sure Sarah also has

24   both," end quote.

25   A.    Um-hmm.

1    Q.   Do you remember that posting?

2    A.   Yes, ma'am.

3    Q.   Okay.  Now, first of all, this doesn't really say that

4    you have STDs, does it?  I mean, isn't this just an inference

5    that if Nate has STDs, then most likely you do as well?

6    A.   No, ma'am, I did not take it that way.

7    Q.   Okay.  Do you believe it could be taken that way by some

8    people?

9    A.   I can't tell you what other people would take it as.  I

10   can only tell you what I can take it as.  And with him saying

11   that Nathan has tested positive for STDs, that is a factual

12   statement by saying he has two STDs; and by saying "I'm sure"

13   means that they're positive, that they are sure that I have

14   them as well --

15   Q.   Okay.

16   A.   -- because I had had sex with him.  That's what I took it

17   as.

18   Q.   So you don't see any difference if that phrase was left

19   out, the "I'm sure"?

20   A.   No, ma'am.

21   Q.   Okay.  And you previously admitted, under oath, that you

22   have no firsthand knowledge as to whether or not Nathan

23   Wilburn has been diagnosed with chlamydia or gonorrhea,

24   correct?

25   A.   I have only told you that he has told me that he has

1   been -- that he has been tested and that he did not have two

2   STDs.

3   Q.   And you'll agree with me that it is possible that he lied

4   to you, correct?

5   A.   Nathan has a track record of not being honest so he could

6   lie about that; but as again, I can only go off based what he

7   told me, and that is that he was tested and that he didn't --

8   he was not -- I actually heard a voice mail from the doctor,

9   but I don't know of -- you know, they didn't go into detail.

10  They just said, Give us a call.

11  Q.   Okay.  And you didn't -- you didn't go to those

12  appointments with him?

13  A.   No, ma'am.

14  Q.   Okay.  And you can't verify the accuracy of anything

15  about that?

16  A.   No, ma'am.

17  Q.   I'm going to approach you with what's been premarked as

18  Defendant's Exhibit H.  Ms. Jones, are these documents fair

19  and accurate depictions of some of the medical records of

20  yours?

21  A.   Yes, ma'am.

22  Q.   Okay.

23          MS. MATTINGLY:  Your Honor, I move to admit these as

24  Defendant's Exhibit H.

25          THE COURT:  Any objection?

1          MR. DETERS:  No.

2          THE COURT:  Let it be admitted.

3          (Defendant's Exhibit H admitted into evidence.)

4    Q.   Now, this first one from 2007, it shows that you were

5    concerned about STDs and STD exposure, correct?

6    A.   I had -- if you see on the second page, it says --

7    Q.   Let's look at the first one first, please.

8    A.   Oh, yeah.  Okay.  But the reason I had went, I had gone

9    every time since I was 18, and I had found out that he was

10   cheating, and that is why I was going to get checked for STDs

11   anyway, because I got checked every year.

12   Q.   Okay.  And specifically down here, the 9 -- I don't know

13   if it's a 2 or a 12 -- '07, this right here says, "Concerned

14   about STD," correct?

15   A.   Just based off because I had been sexually active with

16   him one time and he had cheated.

17   Q.   Okay.  And it says "STD exposure" right here, correct?

18   A.   Well, that's not -- I wasn't saying I had an STD, if

19   that's what you mean.

20   Q.   I'm just asking you if that's what it says.  Is that

21   correct?

22   A.   That's what the document says, but --

23          THE COURT REPORTER:  Please speak one at a time.

24   Q.   Okay.

25   A.   But I have the test down from this; and that as well,

1    that shows that they tested me for chlamydia and gonorrhea and

2    they both showed negative.

3    Q.   Okay.  And the medical records that we have from you,

4    those were provided by you or your lawyer, correct?  We didn't

5    get them directly from any facility; is that correct?

6    A.   Correct.

7    Q.   And we only have what you gave us, right?

8    A.   I would assume, yes.

9    Q.   Okay.  And we don't have any records for you for the year

10   2008; is that correct?

11   A.   I'm not sure.

12   Q.   Okay.  Do you have any knowledge that you have given us

13   any records from 2008?

14   A.   I have given you every time I've gone to the doctor

15   regarding a gynecological appointment.

16   Q.   Okay.  And all I'm asking is, do you have any knowledge

17   that you have given us any records from the year 2008?

18   A.   No.

19   Q.   Okay.  Now, regarding the STD test that you said you had,

20   you would agree with me that a negative test one year and a

21   negative test in a later year, that doesn't necessarily mean

22   that a person didn't contract an STD between those two dates,

23   received treatment, and then the records -- if you received

24   treatment from another facility, those records wouldn't

25   reflect that you had an STD; is that correct?

1  A.  I've given you every record that I've ever gone to the

2  doctor for regarding an appointment about that, and I -- you

3  can't just -- chlamydia and gonorrhea, you can't just let it

4  go and hope that it goes away.  You have to be treated for it.

5  And I have never been treated.  I have never had medicine

6  given to me to treat an STD, and I have all my gynecological

7  records from year to year that prove -- that show negative for

8  chlamydia, negative for gonorrhea, every STD test negative.

9  Q.  And I understand that's what you've told us and you've

10  testified to that --

11  A.  Yes, ma'am.

12  Q.  -- but that wasn't my question.  I'm asking if you have

13  records from a certain clinic for one year and another year,

14  that doesn't mean that you couldn't have contracted an STD

15  during that time, gone to a separate clinic, received

16  treatment so that it went away, so the subsequent year it

17  would not show up in that record; is that correct?  Is that a

18  possibility that that could happen to a person?

19  A.  To a person, yes.

20  Q.  Okay.

21  A.  But to me, no.

22  Q.  Okay.  And, in fact, you have been diagnosed with

23  hepatitis A, correct?

24  A.  Yes.  Could I tell you -- could I explain that?

25  Q.  Just one second.  I want to put up this record.  And

1    that's indicated in Question 15; is that correct?

2    A.   Yes, ma'am.

3    Q.   Okay.

4    A.   Could I explain that?

5    Q.   Just one second.

6    A.   Okay.

7    Q.   Are you aware that the Center for Disease Control

8    considers hepatitis A to be an STD?

9    A.   I'm aware that a type of that could be.

10   Q.   Okay.

11   A.   But I'm --

12   Q.   Okay.  And are you aware that transmissions --

13        THE COURT:  Let her finish her answer.

14   A.   I was just going to say that the way I contracted it,

15   through an inhaler and food, could not be considered an STD.

16   Q.   Okay.  Are you aware that the Centers for Disease Control

17   has stated that hepatitis A may result from sexual activity

18   that occurs because of fecal oral contact?

19   A.   I am not aware what the Center of Disease Control says.

20   Q.   Okay.  And Ms. Jones, have you ever engaged in fecal oral

21   contact during sexual activity which may occur through oral

22   anal sex?

23   A.   No.

24   Q.   Okay.

25        MS. MATTINGLY:  Your Honor, may we approach, please?

1      THE COURT:  Yes, go ahead.

2                  (Bench conference.)

3      THE COURT:  It's not working.  All right.  Well,

4  let's try to keep your voice at a level I can hear it but the

5  jury can't.  What's up?

6      MS. MATTINGLY:  I wanted to ask her about these text

7  messages.

8      MR. DETERS:  That she had oral anal sex.

9      MS. MATTINGLY:  As we had discussed yesterday, she

10 has now denied on the record that she has ever engaged in

11 these acts.  These text messages reflect that she intended to

12 do so; and therefore, it's reasonable to assume that she did

13 so.  She and Cody discussed, this is what I'm going to do to

14 you.

15     MR. DETERS:  Intended to.  No proof that she ever

16 does.

17     THE COURT:  She answered that she didn't.  This is

18 after the deadline.

19     MR. DETERS:  Thank you.

20                  (Bench conference concluded.)

21     THE COURT:  Objection sustained.  You may continue.

22 BY MS. MATTINGLY:

23 Q.  Now, Ms. Jones, as we sit here today, you are a convicted

24 felon, correct?

25 A.  Correct.  I have pled guilty to a felony that's going to

1  be diverted, yes, ma'am.

2  Q.  Okay.  I'm going to show you what's been premarked as

3  Defendant's Exhibit I.

4  A.  Now, before we get to this, do I get to answer the

5  hepatitis A question or no?

6  Q.  I'm going to move on to this line of questioning.

7  A.  Okay.

8  Q.  Now, in this document -- can you tell us what it is,

9  first of all?

10  A.  Yes, ma'am.  I went through a criminal case, and I was

11  offered a plea deal the Friday before the trial, and this

12  is -- these are the documents that the prosecutor and my

13  attorney and myself sat down and came up with.

14  Q.  Okay.

15       MS. MATTINGLY:  Your Honor, I move to admit this as

16  Defendant's Exhibit I.

17       THE COURT:  Very well.

18       (Defendant's Exhibit I admitted into evidence.)

19       THE COURT:  Ladies and gentlemen, this evidence goes

20  to the credibility of the witness.  It's limited to that

21  purpose.

22  BY MS. MATTINGLY:

23  Q.  And you'll admit that this document states that as of

24  today, you are a convicted felon until or unless you meet the

25  requirements for the diversion program, correct?

1    A.   As far as I know, it's not on my record.  Like if

2    somebody were to do a background check, it would not be on my

3    record because it is a diverted felony.  So I am a convicted

4    felon, but if you were to check my record, then it will not

5    show up as a felony.

6    Q.   Okay.

7    A.   I just will have a misdemeanor on there.

8    Q.   But you're not disputing that you are a convicted felon,

9    correct?

10   A.   Yes, that's correct.

11   Q.   Specifically, you were convicted of custodial

12   interference, a felony, correct?

13   A.   Yes, ma'am.

14   Q.   Okay.  And you testified yesterday that you did not lure

15   Cody with any text messages, correct?

16   A.   Correct.

17   Q.   Okay.  But you'll admit that you did exchange text

18   messages with Cody that were very sexually explicit and

19   steamy, correct?

20   A.   Yes, ma'am.

21   Q.   Now, as part of your plea agreement, you've agreed that

22   you will never apply for or accept any teaching or coaching

23   position at any school ever again, correct?

24   A.   Yes, ma'am.

25   Q.   Okay.  Now, Ms. Jones, you've made a point to tell us

1    that Cody was not your student at the time of the sexual

2    relationship, correct?

3    A.    Yes, ma'am.

4    Q.    But before it became public knowledge that you were in a

5    relationship, you and Cody were trying to arrange for him to

6    become your aide, correct, your teacher's aide?

7    A.    He was my peer tutor his junior year, yes, ma'am.

8    Q.    Okay.  And this is at the time of the relationship,

9    correct?

10   A.    He was not my peer tutor at the time of the sexual

11   relationship, no, ma'am.

12   Q.    Okay.  Do you deny that you were trying to find a way to

13   conceal it within the school administration?

14   A.    I deny that.  There were -- there is -- how peer tutoring

15   works is you have to sign off -- the student has to get

16   permission from the teacher.  And I had, I would say, a good

17   10 to 20 students asking me to be their peer tutor, and I had

18   about 10 peer tutors; and Cody is one of those that came and I

19   signed his to be my peer tutor.  And in order to give them

20   permission, you have to send e-mails to their counsellor to

21   let them know that you would like to have them as your peer

22   tutor.  So yes, I did sent an e-mail to his counsellor, but I

23   also sent an e-mail to nine other student counsellors to

24   request them to be my peer tutor as well.

25   Q.    Okay.  And who is Tibbs?

1    A.   Mr. Tibbs?

2    Q.   It just says Tibbs.  I don't know who that is.

3    A.   Mr. Tibbs was Mr. Larry Tibbs.  He was the principal.  He

4    was the assistant principal for my first three years of

5    teaching, and then he was moved to principal my fourth year.

6    Q.   Okay.  So November 15th, 2011, at that time, you had

7    already engaged in a sexual relationship with Cody, correct?

8    A.   Yes, ma'am.

9    Q.   Okay.  Do you deny that you said to Cody, quote, "Tibbs

10   will never know.  You're my aide now and I can't get in

11   trouble.  I was so excited to come tell you"?

12   A.   If it's in the text messages, then, yes, ma'am, I admit

13   that I said that.

14   Q.   Okay.  But you just told us that at no point during the

15   time of your sexual relationship was Cody your aide, correct?

16   A.   Correct.  He -- Morgan had gone to the administration,

17   and she basically told them what she had heard.  She didn't

18   have any facts, but she had told them what she heard.

19        And Mr. Tibbs called me down in September of 2011, and he

20   said -- he asked me -- at that point in time, he was my aide.

21   From August to September, he was my aide.  But then Mr. Tibbs

22   and I decided that it would be best if Cody was removed from

23   being my peer tutor.  So at the time, he was removed

24   September 9th, 2011 as my peer tutor.  So he was not my peer

25   tutor in October and November.

1   Q.   But Ms. Jones, this text message in November of 2011

2   says, "Tibbs will never know that you're my aide now and I

3   can't get into trouble.  I was so excited to come tell you."

4       How do you reconcile that with your testimony that he was

5   not your aide in two thousand -- in November of 2011?

6   A.   Because what -- he had moved -- because of his class

7   schedule, he had moved to another teacher's aide, so that

8   teacher -- and that was my planning period.  Because he was my

9   aide on planning period, and I had -- another class was using

10  my class so I had to be in the library.  And the library --

11  the librarian was who he got switched to, so he was in the

12  library as well.  So by stating that he was technically my

13  aide meant that he was going to be in the same area as I was

14  going to be during that fifth period.

15      So, yeah, that's correct in which I said that, but he was

16  not -- he was not technically my peer tutor from a school

17  standpoint.

18  Q.   Okay.  Do you dispute that you told Cody, on

19  November 17th, 2011, after he got in trouble or got you in

20  trouble for the aide situation, quote, "Our situation was

21  perfect and no one knew about it.  You just drew so much

22  attention to the fact that you're technically my aide.  And if

23  Tibbs hears that, I'm" -- and then you use an expletive.

24  A.   Yes.  He had left -- since he was an aide, he had

25  baseball after school.  He had gone to his car, and I guess

1    somebody had seen him, and he -- he didn't get in trouble, but

2    they had called and said where was he supposed to be, and he

3    was supposed to be in the library.  And I was the only teacher

4    in the library at that time to attest to the fact that him and

5    three other students were in there.  So it was basically going

6    to come back on me that he left.

7    Q.   So you dispute that these text messages that I just

8    referenced show a scheme by you and Cody to conceal from the

9    school administration that you had set up this system whereby

10   Cody could spend time with you at school?

11   A.   No, I agree that we set that up.  But you asked me if he

12   was my peer tutor during November --

13   Q.   I said the word "aide," which was actually the word that

14   you used, and you said no.

15   A.   My aide or peer tutor.  He was not -- from a school

16   standpoint, he was not my aide or peer tutor so I answered

17   that question that, yes, he was not at the time.  But did we

18   see each other at school during that time?  Yes, ma'am.

19   Q.   And you referred to him as technically your aide,

20   correct?

21   A.   In the text messages, yes, ma'am.

22   Q.   Okay.  Now, in the proffer that's attached to your plea

23   deal, you admitted that you, quote, "masked or changed phone

24   numbers in an effort to conceal," end quote, communications

25   with Cody York, correct?

1    A.   Yes, ma'am.

2    Q.   And you admitted in your proffer that you accused other

3    students of lying when they outed your relationship, correct?

4    A.   Yes, ma'am.  I admitted that in the plea deal.

5    Q.   Okay.  Which was under oath, signed under oath, correct?

6    A.   Signed under oath, yes.  Yes, ma'am.

7    Q.   Okay.  So with respect to the one student who outed you,

8    you even told Cody in a text message, quote, "She can really

9    get in a lot of trouble for this," end quote, and that if she,

10   quote, "does it again, I'm pressing charges on her," end

11   quote?

12   A.   Yes, ma'am.

13   Q.   Okay.

14   A.   Not in reference to her telling on me, but in reference

15   to what she was doing on Facebook.

16   Q.   Okay.  Do you dispute that the text messages that

17   surround that show that you were afraid of getting in trouble

18   with the police and you were afraid that the police were on to

19   you?  And I can show them to you if you would like.

20   A.   No, ma'am.  I was very scared.  Yes, ma'am, I agree with

21   that.

22   Q.   Okay.  And in the context of these text messages, that's

23   all that reveals, that, "Oh, I'm scared they're on to me.

24   Morgan can get in a lot of trouble.  I'm going to press

25   charges"?

1    A.   That is taken out of context --

2    Q.   Okay.  Okay.

3    A.   -- because they're 30 days of our text messages.

4    Q.   Okay.  I'm just asking about those text messages --

5    A.   Right.

6    Q.   -- right there in that same line of communication.

7    A.   Right.

8    Q.   Okay.

9    A.   But you wouldn't have known if there were private -- if

10   there were other conversations to discuss that issue of

11   Morgan.  So I agree that those are -- those are my text

12   messages, but they are taken out of context because it's such

13   a short, miniscule amount of our time, our communication.

14   Q.   So you deny that you considered taking legal action

15   against someone for accusing you of something that you, in

16   fact, actually did, correct?

17   A.   We were discussing the Facebook.  So at the time, Morgan

18   didn't have any factual information.  She just had posted very

19   obscene things on Facebook regarding me, and that is what I

20   was discussing as far as pressing charges, because I did.  I

21   contacted the administrator.  I contacted -- I discussed it

22   with my mom; what are my actions here if she continues to post

23   on Facebook.  And that would be documented.

24   Q.   Okay.  I would like for you to read this exchange, then,

25   to the jury, so that they can get the context that's present

1    here in these text messages.

2         MR. DETERS:  Your Honor, I would like to be shown

3    that before it's read.  (Reviewing document.)  Can we

4    approach, Your Honor?

5         THE COURT:  Come around and do it the way we had the

6    last time.

7                        (Bench conference.)

8         MS. MATTINGLY:  This bracketed part is what I'm

9    referring to, Your Honor.

10         THE COURT:  Okay.  Well, it sounds like it's

11   cumulative.

12         MR. DETERS:  It has nothing to do with credibility.

13   And I'm choosing this fine line not to object.  Some of these

14   things she's getting over to whether she lied.  But this here,

15   she admitted that she was mad about that, the context, so that

16   statement right there has nothing to do with credibility.  It

17   just happened to do with her wanting to kick somebody's ass.

18         MS. MATTINGLY:  No, we can leave the "kick ass" part

19   out if you want, Your Honor.

20         MR. DETERS:  That has nothing to do with the

21   credibility issue, and it's after the February, 2011 date.

22         MS. MATTINGLY:  Well, respectfully --

23         THE COURT:  All of these are after the February,

24   2011.  This is on the credibility issue.  I think it shows

25   that she was engaged in a -- conspiracy might be too strong a

1    word, but some kind of a plan to keep this relationship from

2    being found out, so I would admit it.

3                MS. MATTINGLY:  Can we read the entire portion?  If

4    there's anything you don't want her to read, I'll leave it

5    out.

6                THE COURT:  You can read it all.

7                MS. MATTINGLY:  Thank you, Your Honor.

8                    (Bench conference concluded.)

9    BY MS. MATTINGLY:

10   Q.  Ms. Jones, beginning with "can you text me," I'd like for

11   you to read until this red line right here.

12   A.  You want me to read the red as well?  Is that included?

13   Q.  Yes, we'll need that.

14   A.  Should I just read my text messages or our text messages?

15   Q.  I would like the whole conversation, please.

16   A.  "Kim text me and said they haven't found anything yet and

17   it" --

18                THE COURT REPORTER:  Please read a little slower.

19   A.  Yes, ma'am.  "Kim text me and said they haven't found

20   anything yet and it should be over today, hopefully.  And my

21   mom said she's going to beat her ass so Griffin doesn't have

22   to."

23        "Are they trying to find something still?  And haha.  Get

24   her."

25        "Surely.  I guess they still are."

1        "How?  Did Kim talk to them?"

2        "Yeah."

3        "And what was said?"

4        "Nothing new.  This will be finalized and they won't find

5   anything.  If Morgan does this again, I'm pressing charges on

6   her."

7        "Good.  Do it.  Thank you."

8   Q.   And who is Kim?

9   A.   Kim is the former principal of Dixie.

10  Q.   Okay.  So she would have been considered school

11  administration for Kenton County, correct?

12  A.   That year, she was at -- she was with Kenton County.  So

13  she was the previous principal, but she was in the school

14  district.

15  Q.   Okay.  And so you were having this conversation with Cody

16  about what Kim was looking into, correct?

17  A.   We had known that the police were contacted.  I'm not

18  exactly sure what date that is.  Could you tell me what date

19  that was?

20  Q.   Yes.  It was November 21st, 2011.

21  A.   I was informed November 18th that the police were

22  involved; and so at that time, I did know.  And I had

23  contacted -- I had discussed it with my mom, saying that the

24  police are involved.  Again, my mom didn't know any details,

25  but I contacted her.

1    And Kim is also one of my mom's friends, so I was able to

2    discuss this with them and see if the police were involved.

3    And at that point in time, November 29th, I was told that the

4    police investigation was over, so that's what I thought.

5    Q.   Okay.  Now, the proffer that's attached to your plea

6    agreement, it also states that your romantic relationship with

7    Cody York began in February of 2011, correct?

8    A.   No, ma'am.  It just says that this relationship began in

9    February, 2011.  It does not say romantic.

10   Q.   Okay.  What relationship began in February of 2011 then?

11   A.   When we were sitting down with the prosecutor, they

12   originally had said that they would go with October, 2011, but

13   we had to come up with a date that we both agreed with.  And

14   February, 2011 is when we started texting.

15       I was going -- as I said before, Nathan and I were going

16   through a lot of issues so -- invitations, everything had been

17   sent out; but I had found out that he was still currently on

18   cocaine, and I had discussed a lot more closely with Cody on

19   that because he could -- he has had -- his older brother was

20   into drugs, so he was my support system.  So we did talk in

21   there.

22       So the we -- the prosecutor, my attorney, and myself --

23   sat down, and we all came up with -- they originally had

24   "romantic" in there, but we said -- I said I cannot put

25   romantic relationship in there if it's February, 2011 because

1    it was not romantic until October, 2011.

2    Q.   But you previously testified that you knew Cody York for

3    years, correct?

4    A.   Yes, ma'am.

5    Q.   Okay.  So to say that just a general relationship began

6    in February, 2011, that wouldn't be accurate either, correct?

7    A.   The pros -- correct.

8    Q.   Okay.

9    A.   The prosecutor came up with this --

10   Q.   Okay.

11   A.   -- and said is this something that you're willing to say;

12   are all these things true?  And I agreed that I could do that,

13   and we just changed the date.

14   Q.   Okay.  So under oath, you have agreed that your

15   relationship with Cody York began in February of 2011,

16   correct?

17   A.   A relationship, yes, ma'am.

18   Q.   And at that time, you were engaged to Nathan Wilburn,

19   correct?

20   A.   Yes, ma'am.

21   Q.   And you later married Nathan Wilburn in the summer of

22   2011, correct?

23   A.   Yes, July.

24   Q.   Now, your romantic relationship with Cody actually goes

25   back a lot farther than 2011, despite what you've told the

1    jury, correct?

2    A.   No, ma'am.

3    Q.   Okay.  You deny that you told Cody in November of 2011

4    that you, quote, "fell in love with him a long time ago," end

5    quote, and that you loved him when you went to Iraq?

6    A.   I -- I'm not denying that I said that because if it's in

7    the text messages, ma'am, I said that.

8    Q.   Okay.  And when did you go to Iraq again?

9    A.   I went to Iraq at the end of January.  It was January, I

10   believe, January 18th through -- I got back in February maybe.

11   Q.   And that was -- so obviously, that was before the date

12   listed in your proffer, correct?

13   A.   That was -- yes, ma'am.

14   Q.   Okay.  Did you also tell Cody that you, quote, "knew from

15   the moment I saw you I was going to be with you your freshman

16   year.  I knew from Day 1 that we'd be together," end quote?

17   A.   Yes, ma'am, I said that in my text messages.

18   Q.   Okay.  And what year was his freshman year?

19   A.   It was my first year of teaching, which would have been

20   2008.

21   Q.   And that was before anything was ever posted about you on

22   thedirty.com, correct?

23   A.   Correct.  But again, those are my text messages; and,

24   like I said, that's a short amount of time.  And at that point

25   in time, we were in a relationship.  We were seeing each

1     other.  And right or wrong -- absolutely wrong -- we were

2     still seeing each other.  And when you're in a relationship,

3     when you say, oh, I was in love with you at first sight, we're

4     taking that a little too literal here.

5          When I first saw Cody, it was a long time ago, since I've

6     known his family for so long.  So did I fall in love with him

7     at first sight?  No.  But in a relationship, when Cody and I

8     have discussed things, he'll say, "Oh, you know, I was in love

9     with you at first site.  You're the most beautiful girl in the

10    world."  Well, just because he thinks I'm beautiful doesn't

11    mean that I'm the most beautiful girl in the world.  It's all

12    out of perception and how you are talking about the

13    relationship.

14         So, you know, those text messages are messages that were

15    between Cody and I, and did I think the world was going to get

16    to see those?  No, I did not.  They were wrong that I sent

17    them, but I still -- yes, I did say that.  But did I fall in

18    love with him when he was a freshman?  No, ma'am, I did not.

19    Q.   Okay.  But you keep talking about -- you use the phrase,

20    "We're taking things too literally."  We're talking about the

21    face of what's on these text messages, correct?

22    A.   Yes, ma'am.

23    Q.   Okay.  And this is actually what they say, correct?

24    A.   Yes, but it's also a hyperbole.  When you say, I told you

25    a million times, it doesn't mean I told you a million times.

1    It just means that I told you a lot.  So that's what I mean by

2    saying that we're taking it literally.  We're taking it --

3    when I say, "I've been in love with you from the first day I

4    met you," that is not a literal term.  That is a -- it's an

5    exaggeration in a relationship.

6    Q.   Okay.  It's interesting that you say that because with

7    respect to the posts on my client's web site, you want us to

8    read those literally and on their face, without any kind of

9    interpretation; but with respect to your own words, you want

10   us to kind of look around things and read them differently

11   than how they are on their face, correct?

12   A.   I can't tell you what those people meant by that.  I can

13   just take it how I perceived it, just as how you're perceiving

14   my text messages.

15   Q.   Okay.  And if we read them on their face, they say you

16   fell in love with him his freshman year, correct?

17   A.   Correct.

18   Q.   Okay.

19   A.   Yes, ma'am.

20   Q.   And you said to him, quote, "May be weird, though,

21   because you were so young, but you can't help who you love.

22   I've always wanted you, Cody."  Did you say that?

23   A.   Yes, ma'am.  If it's in the text messages, I said it.

24   Q.   Okay.  And you said, quote, "It's weird because you were

25   like 14 and I was like 22," end quote, correct?

1    A.   I said that if it's in the text messages, yes.

2    Q.   Okay.

3    A.   But again, I -- and again, I'm not happy -- I'm not proud

4    of myself for sending messages to a student at the time.  But

5    again, in my line, it wasn't a student-teacher relationship.

6    I knew that I was going to be with him after the fact, which

7    I'm still currently in a relationship with him.  I'll still in

8    love with him.

9         We are in a normal relationship that both of our parents

10   are accepting of, and it -- those text messages are such a

11   small amount from what you're seeing of a relationship.  It's

12   a 30-day time period.  Again, I did send those messages, not

13   necessarily proud of it, but I -- those are my words.  So if

14   you keep saying did I say it, if it's in the text messages,

15   yes, ma'am, I said it.

16   Q.   Okay.  And I'm just asking if that's what they say on

17   their face --

18   A.   Right.

19   Q.   -- correct?

20   A.   Right.

21   Q.   Now, did you deny, then, the text messages, you spoke to

22   Cody about the fact that you two would flirt when he was a

23   freshman in your class?  Do you deny that they say that?

24   A.   I don't deny that they say that.

25   Q.   Okay.  Now, this flirting would obviously have taken

1  place at school, correct?

2  A.   Not necessarily.  As I told you before, our families have

3  been friends.  We would go out to dinner together.

4  Q.   Okay.  Now, in November -- the important date that you've

5  given us is February of 2011, correct?

6  A.   Yes, ma'am.

7  Q.   Okay.  So in November of 2011, do you deny that you told

8  Cody you'd, quote, "been together for like a year.  That's

9  insane," end quote?

10  A.   It says "like a year."

11  Q.   Okay.

12  A.   Which means that it's not specifically a year.

13  Q.   Okay.  Well, let's get to that.

14  A.   Okay.

15  Q.   You then said, quote, "Technically, we've been living a

16  lie for a year."  Not "like a year."  "A year," end quote,

17  correct?

18  A.   Yes, ma'am.  Yes, I said that.

19  Q.   Okay.  And, quote, "We have to sneak around to see each

20  other, and we have to pretend to be single when we're in a

21  serious, committed relationship," end quote?

22  A.   Yes, ma'am.

23  Q.   Okay.  Now, did you deny that you told him that you

24  missed him the summer after his freshman year and that you've,

25  quote, "known since Day 1 we were meant to be," end quote?

1    A.   I don't deny that I said that.

2    Q.   Okay.

3    A.   But again, I didn't just see him at school.  We would see

4    each other at family events.

5    Q.   Okay.  All right.  Well, let's talk about something that

6    happened at school.  You told him that the last day after the

7    bell, during his freshman year, that you hugged him, you took

8    a photo together, and you, quote, "had never felt that way"

9    end quote.  Did you deny that you said that?

10   A.   No, ma'am.

11   Q.   Okay.  And that would have been at school, correct, the

12   photo and the hug?

13   A.   Yeah.

14   Q.   Okay.

15   A.   That was not -- Cody was not the only student that came.

16   You know, I was a 22-year-old teacher.  A lot of the students

17   felt comfortable with me in my room.  Honestly, I had more

18   girls in my room more than guys, so I was taking pictures with

19   several girls.  It's the last day of school when you sign

20   yearbooks and things of that nature.  So Cody would not have

21   been the only person.

22   Q.   Okay.  Well, was Cody the only person that you had,

23   quote, "had never felt that way," end quote, about?

24   A.   No.  I mean, I said that in the text messages.

25   Q.   Okay.  Okay.  And you said that you felt ashamed that you

1    could like him when he was a freshman; is that correct?

2    A.   Yes.  I -- I know I sent all those messages.  Again, I

3    can't talk my way out of that.  I sent them.

4    Q.   Okay.

5    A.   And it was wrong.

6    Q.   Okay.  And in 2011, didn't you tell him that you're,

7    quote, "crazy in love with him and have been for years"?

8    A.   I said that I was crazy in love with him in November,

9    2011, yes, ma'am.

10   Q.   Quote, "and have been for years," end quote?

11   A.   I disagree with that.  Yes, I agree that I said it, but I

12   have not been in love with him for years.  That was just a

13   term.

14   Q.   Okay.  Now, when the criminal investigation was going on,

15   you started taking additional steps to conceal your

16   relationship with Cody, didn't you?

17   A.   When -- after the police had been involved?

18   Q.   Just anytime during the criminal investigation.

19   A.   No.  They were -- they had questioned me November 29th,

20   and they had text messages, and I knew that there was nothing

21   else that there was to be found on the relationship.  I

22   believe you're discussing the birthday cards, and they were --

23   Q.   I can tell you what I'm discussing.

24   A.   Okay.

25   Q.   Did you ever instruct Cody to delete text messages, deny

1    everything, tell his friends to deny it, and, quote, "don't

2    ever tell a soul," end quote?

3    A.   I told him that, yes, ma'am.

4    Q.   Okay.  And didn't you also instruct him to delete Tweets

5    between the two of you?

6    A.   I did.  But we had just had a Twitter -- like I had sent

7    him a -- it was a public Tweet.  I just said happy birthday.

8    But our intentions were -- and I also gave him birthday cards

9    throughout the years with our families.  And our intentions

10   were just to basically get rid of anything that correlated the

11   two of us --

12   Q.   Okay.

13   A.   -- which is wrong; but, yes, ma'am, I did do that.

14   Q.   And you mentioned the birthday cards.  You also

15   instructed him --

16   A.   Yes, ma'am.

17   Q.   -- to destroy birthday cards, correct?

18   A.   Yes, ma'am,

19   Q.   Now, you'll admit, Ms. Jones, that you were on pretty

20   friendly terms with students you taught, correct?  I mean, you

21   talk about hugging them and taking pictures with them, whether

22   they be male or female, correct?

23   A.   I had a good relationship with students.  I was younger

24   so they -- I could identify with them more.  We could talk

25   about football, you know, at the games.  I was on a different

1    level with them; but, yes, I still -- I still remained

2    professional in that sense.

3    Q.    Okay.  And you said that you mentioned that you could

4    identify with them more; is that what you said?

5    A.    Yes, ma'am.

6    Q.    Okay.  And do you mean more than other teachers could

7    identify with them?  Is that what you were referring to?

8    A.    No.  You were just saying that I was friendly with them.

9    Just because that you're friendly, I mean, I got along with

10   them.  I -- I told you I was five through nine, and I was

11   expected to get middle school level, but I ended up getting a

12   high school -- a high school job.  And I just -- identifying

13   well means that I could kind of -- they would talk to me more

14   about it because I was younger.

15   Q.    More than who?

16   A.    In general.  I would say that the students did enjoy

17   being around me.  Not necessarily more than other teachers,

18   but they enjoyed being around me.

19   Q.    Okay.  Do you -- did most of the other teachers hug their

20   students --

21   A.    Yes, ma'am.

22   Q.    -- and talk to them about gossip and things like that?

23   A.    Yes, ma'am.

24   Q.    Okay.  I'm going to approach you with something that you

25   had given to the Court, I believe back in August of 2010,

1  during this lawsuit.

2         MR. DETERS:  I'd like to see it, please.

3         MS. MATTINGLY:  Yes.

4  Q.  Do you recognize that?

5  A.  Yes, ma'am.

6  Q.  Now, in this statement, you referred to teaching as your,

7  quote, "ministry," end quote, didn't you?

8  A.  Yes, ma'am.

9  Q.  And you've referred to teaching as your, quote,

10  "passion," end quote; is that correct?

11  A.  Yes.  I loved my job.

12  Q.  Okay.  Now, you've told this jury that the things posted

13  about you on my client's web site were devastating to you

14  because you felt like your students didn't look at you or

15  respect you the same after those postings, correct?

16  A.  That was one of the reasons, one of the many reasons.

17  Q.  Okay.  Now, I want to reconcile that with some other

18  issues.  Now, despite all of that talk about your ministry and

19  wanting respect from the students, you chose to engage in a

20  romantic and sexual relationship with a student, correct?

21  A.  Yes, ma'am.

22  Q.  Okay.  But do you believe that rumors that you slept with

23  Bengals players, have STDs, and have sex with your fiance at

24  school are more harmful to your profession, your ministry as

25  you call it, than the truth you were having sex with a

1  student?

2  A.  No, ma'am.

3      MR. DETERS:  Objection.  May we approach?

4      THE COURT:  Just make your objection from there.  I

5  think I know what it is.

6      MR. DETERS:  I object.  I don't have any problem with

7  her making the statement.  My concern is, is it's past

8  February, 2011.  So she's asking her --

9      THE COURT:  You need to stick to that timeline, the

10  timeline that we discussed in chambers.

11      MS. MATTINGLY:  I understand, Your Honor.  I would

12  note that there, as we've discussed as evidence, that the

13  romantic relationship predated February, 2011 so --

14      THE COURT:  Well, you can ask her that if you want.

15      MS. MATTINGLY:  Okay.  Can she answer the question?

16  She can't answer the question then?

17      MR. DETERS:  Your Honor, the question, she was asking

18  her to compare what hurt her career the most, and that's not

19  the issue in this trial.

20      THE COURT:  Right.  Ask her -- if you want to ask her

21  about when the relationship began, ask her when

22  the relationship --

23      MS. MATTINGLY:  Okay.  And we've covered that.

24      THE COURT:  -- when the improper relationship with

25  Cody began.

1          MS. MATTINGLY:  Okay.

2     BY MS. MATTINGLY:

3     Q.  Now, you told Cody that the criminal investigation was,

4     quote, "worse than the web site stuff," end quote, correct?

5     A.  I explained to him that if it were to come out that I

6     was --

7          MR. DETERS:  Objection.  It's the same, what's worse.

8          THE COURT:  This is after the deadline.  I'm going to

9     be pretty strict about that.

10         MS. MATTINGLY:  Okay.

11         THE COURT:  With both sides.  Cutoff date, I mean.

12    BY MS. MATTINGLY:

13    Q.  Now, you testified yesterday that having sex with Bengals

14    players was a line that you didn't cross, correct?

15    A.  Yes, ma'am.

16    Q.  And that's a line that cheerleaders weren't expected to

17    cross, correct?

18    A.  Yes, ma'am.

19    Q.  But you've been convicted of a felony for crossing a line

20    with a student, correct?

21    A.  It was a consensual, sexual, romantic relationship that I

22    am still involved in now that I plan on marrying next year.

23    Q.  Okay.

24    A.  So, yes, as opposed to sleeping with 50 random people

25    that I don't know and the one consensual sexual relationship

1   with somebody that I love, yeah, there's a difference.

2   Q.   All right.  What was the name of the "Dateline" episode

3   on which you appeared?

4   A.   "Dateline"?

5   Q.   Um-hmm.

6   A.   They had filmed -- they had followed the story for

7   months, but it was aired October 19th, I believe.

8   Q.   Do you know the name of the episode, what it was called?

9   A.   It was called "Crossing the Line."

10  Q.   Okay.  Now, in this statement that we've talked about,

11  that you provided to the Court, you talk about the posts and

12  your reaction to them, correct?

13  A.   Yes, ma'am.

14  Q.   Okay.  Now, the first post, I think you testified, was

15  October, 2009, correct?

16  A.   October 27th, 2009.

17  Q.   And in this statement, didn't you say that pretty much no

18  one believed it?

19  A.   Well, it had said that I had slept with every single

20  Bengals player and -- it was a broad statement.  But the

21  people that know me knew.  People view cheerleaders very

22  stereotypically; and I knew that somebody, if they read that,

23  they would think that was true.  Again, like I said, I was

24  teaching 15-year-olds, so if they read it on the Internet,

25  they assumed it to be true.  And students even asked me about

1    it on several occasions; have you really been with all these

2    Bengals players.

3         So they didn't know me personally, but when I said that

4    in my statement that people knew it wasn't true, that means if

5    they knew me personally.  My parents knew it wasn't true.  My

6    close friends knew it wasn't true.  But the rest of the world

7    didn't know it wasn't true.

8    Q.   And you took it to the Ben-Gals organization, correct,

9    and someone told you that they knew this was a "jealous

10   attempt to remove me from the team and supported me fully,"

11   correct?

12   A.   Yes, ma'am.  Charlotte Jacobs is my -- she was my coach

13   at the time.  And again, she knew me personally so she knew

14   that that wasn't true.  But it still, from an outward

15   perspective, if that was on the web site, regardless of

16   whether she knows it's true in her heart, she still has a job

17   to do and still needs to keep that organization professional.

18   So I had no idea and she had no idea if I was going to even be

19   able to stay on the team because of what the general public

20   thought that I had done with the Bengals players.

21   Q.   But nothing did happen to you with respect to the

22   Ben-Gals, correct?  You stayed with that organization at that

23   time, correct?

24   A.   Yes, ma'am.

25   Q.   Okay.  In fact, after that post, you were even promoted

1    to the captain of the Ben-Gals, right?

2    A.   Was I promoted because of the posts?

3    Q.   I'm not asking.  I'm just saying --

4    A.   Promoted afterwards, yes, ma'am.

5    Q.   Okay.  And also after that, you were chosen to go to the

6    Pro Bowl on behalf of the Ben-Gals, correct?

7    A.   At that point in time, Pro Bowl had already been

8    selected.  It just had not been announced.  According to my

9    coach, that she had selected it before the posts had been up,

10   but it wasn't announced until I believe the Kansas City Chiefs

11   game, which would be December 27th.  So I didn't know that I

12   was going to Pro Bowl, but she had selected it far before the

13   postings up on the web site.

14   Q.   And this post didn't affect -- several of these posts

15   didn't affect your ability to attend the Pro Bowl, correct?

16   You were still --

17   A.   The air --

18   Q.   You were able to attend, and you did?

19   A.   They had already had all my airport stuff.  So even if

20   they wanted to jeopardize that, it was -- I was selected and I

21   was sent because everything had already been in the works

22   so --

23   Q.   So you think nothing could have affected your ability to

24   go to the Pro Bowl at that time?

25   A.   I'm sure that if they didn't want me to go, absolutely,

1    they could have pulled me.

2    Q.   Okay.  And they wanted you to go.  They still wanted you

3    to go --

4    A.   To represent --

5    Q.   -- despite all these things on the Internet, correct?

6    A.   To represent the team, yes, ma'am.

7    Q.   Okay.  And you even talked about after the second and

8    third posts, that a lot of people defended you and supported

9    you, correct?

10   A.   After the second -- after the previous -- after the

11   original posts, he continuously posted me.  And that was after

12   I filed the lawsuit.  So people were in support of me filing

13   the lawsuit.

14   Q.   Okay.  Well, did you say, quote, "In support to me, I had

15   a plethora of e-mails from my students' parents claiming their

16   support of me in the lawsuit.  My students baked me a cake and

17   signed a card that said how wonderful a teacher I was and that

18   this web site was just an act of jealousy," end quote?  Did

19   all of those things happen?

20   A.   All of those things happened.

21   Q.   Okay.

22   A.   But there were also other things that were very hurtful.

23   Q.   Okay.  But you said this was in support of you and your

24   lawsuit, correct?

25   A.   With having the courage to take -- you know, having the

1    courage to take on an entire web site that has 800,000

2    followers, people that get on there, it takes courage to do.

3    Q.   Okay.  So obviously, if they believed these things about

4    you, they wouldn't have baked you cakes and sent you e-mails

5    and cards telling you, yeah, go forward with this; we support

6    you, correct?

7    A.   On a smaller scale.  And I said, the people that knew me

8    personally.  But the general public, the world, did not know

9    that those things were not true.

10   Q.   Okay.  But the world in which you mostly doubt, in your

11   Ben-Gals organization, it didn't hurt you there.  You didn't

12   lose your job as a result of this, correct?

13   A.   Well, after I had filed the lawsuit, they -- people

14   continuously posted other cheerleaders.  So I was getting the

15   brunt of that; that because I filed the lawsuit, everybody was

16   coming down because of me.  So I was given a very difficult

17   time with the cheerleading organization because they felt like

18   they were being posted on there because I had decided to file

19   the lawsuit.  So --

20   Q.   But you weren't removed from that position, correct?

21   A.   Regardless whether I was removed, several of the girls

22   were not happy that I had filed the lawsuit.  I mean, I had a

23   difficult time.

24          THE COURT:  The question was, were you removed?

25   A.   No, ma'am.  No, ma'am.

1          THE COURT:  Okay.  Ask the next question.

2     Q.   And you were not terminated in your teaching profession

3     as a result of the things posted on thedirty.com, correct?

4     A.   It was discussed; but, no, the end result was that I was

5     not terminated.  I did have to meet with the principal and the

6     superintendent to discuss if my position -- if I was going to

7     be able to, because they did not think, with me being posted

8     on there, that it was good.  And that's when I discussed

9     yesterday, I had to sit down with each one of my classes, tell

10    them -- read the posts and tell them that I -- in front of 30

11    kids that I don't have two STDs.

12    Q.   Well, obviously, the school believed you though because

13    they let you do this.  I mean, they wouldn't let you stand up

14    in front of your students and lie to them, right?  So they

15    believed you, right?

16    A.   They had to because they were getting so many parent

17    phone calls and saying, who is teaching our child that is

18    sleeping with all these Bengals players and that has these

19    STDs.  So they had to do something about it.

20    Q.   Right.  But they chose to believe you.  Had they not

21    believed you, they were not going to send you into a room full

22    of students to let you tell them, oh, this is not true, if it

23    was true, correct?

24    A.   I don't know what their intentions were; but, yes, ma'am,

25    I was not terminated for that reason.

1    Q.   Okay.  Okay.  What was your salary at the time?

2    A.   At the time that -- of what?

3    Q.   The postings.

4    A.   38,000.

5    Q.   Okay.

6    A.   38 or 39.  I'm not exactly sure.

7    Q.   Did your salary take any kind of hit as a result of this

8    web site?

9    A.   No, ma'am.

10   Q.   Okay.  Now, later in your statement, you said this:

11   Quote, "I had to read the comments about me, stating how ugly

12   and fat I was and how disgusting I was, each time being

13   extremely devastated and crying after I've read it.  I would

14   have to read the comments about Nathan cheating on me with

15   many girls, which hurt me severely emotionally and mentally."

16   Is that correct?

17   A.   Yes, ma'am.

18   Q.   Okay.  And you would agree with me that the part about

19   Nate cheating on you was true, correct?

20   A.   Yes, ma'am.

21   Q.   Okay.  And that wasn't confidential, was it?

22   A.   No.

23   Q.   Okay.  So it sounds like, from reading this statement,

24   that the things that you claim are false, the STDs, that no

25   one around you in your immediate circles believed those.  You

1   had support from your friends, your students, and all that.

2   But the stuff that really hurt you were the things that were

3   true, right, the things about Nate?

4   A.   No, ma'am.  The things -- the most devastating thing to

5   me was that it said that I had two STDs, and I knew I had

6   never -- I had only been with one person that I was marrying.

7   Again, with -- I had only slept with him with a condom.  I had

8   never been with him without one.  So to know that people were

9   calling me a slut and a whore and those things when I was 23

10  and I had only been with one person was very devastating to

11  me.

12  Q.   But you also said that hearing about Nate cheating on

13  you, quote, "hurt me severely emotionally and mentally,"

14  correct?

15  A.   Those were involved in the comments, yes, but the most

16  devastating was the STD comment.

17  Q.   Okay.  And you go on a lot about, you know, the things --

18  the negative things that people were saying about you and the

19  comments about being ugly and fat, which, you know, no one

20  wants to hear that.  You know, that's not fun.  But you agree

21  that those are opinions, right?

22  A.   Correct.

23  Q.   You're not trying to hold my --

24  A.   It's defamatory.  If anybody can -- if that's the whole

25  freedom of speech thing, they can say as far as opinionated.

1    But when they say factual information that I have two STDs,

2    that is unacceptable.  Because, you know, not many

3    27-year-olds can say they have only had sexual intercourse

4    with two people, one of which they married, one of which that

5    they are in love with.  Not many 27-year-olds can say that.

6    Q.   Okay.  But several times, you've told the jury how it was

7    hurtful to hear these things, that they were calling you ugly

8    and fat and things like that?

9    A.   Yes, ma'am, very hurtful.

10   Q.   But just so they understand, you're not contending that

11   my client should be held liable for that, correct?

12   A.   For those comments, no, ma'am.

13   Q.   Okay.  And you understand that being an NFL cheerleader,

14   you know, you're out there on the weekends and people see you,

15   correct?

16   A.   People -- yeah.  I mean, I'm at the games on Sundays.

17   Q.   And, you know, you may be shown on the cameras, the big

18   screen at the games, or even on TV, correct?

19   A.   Very rarely, but yes, ma'am.

20   Q.   Okay.  And part of that, you know, you're going to have

21   people judge you because of that.  And like we said, you know,

22   people calling you things that, you know, maybe aren't nice

23   and you don't want to hear, correct?

24   A.   Yes, ma'am.

25   Q.   Okay.  Now, you were interviewed by the Edgewood Police

1  Department on November 29th, 2011, correct?

2  A.  Yes, ma'am.

3  Q.  Okay.  And the officer who interviewed you was named

4  Officer Inman, correct?

5  A.  Yes, Officer Julie Inman.

6  Q.  Now, during that interview, did you tell Detective Inman

7  that you, quote, "won," end quote, this lawsuit?

8  A.  I told her that I'd won a default judgment, yes, ma'am.

9  Q.  Okay.  Isn't that a little bit misleading -- well, you

10  said you won a lawsuit against my client, you won a lawsuit

11  against Nik Richie?

12  A.  I said that I won a default judgment, which, again, we're

13  basing this off money.  Winning that default judgment was

14  winning to me because, again, why would we publicize

15  something, why would we publicize it if it was going to be

16  damaging?  If I would have gone in to the Judge and sat down

17  and said, I do have this STD, I did sleep with a couple

18  Bengals players, he was not going to award a default judgment.

19      He was only going to do that if I was able to present

20  medical records, I was able to tell him I had only been with

21  one person at that time.  That is why he gave me a default

22  judgment.  So that is winning to me.

23  Q.  Okay.  But you understand that my client was not involved

24  in that in any capacity whatsoever, correct?

25  A.  Again, I never got into the legalities of the issue.  I

1    had my attorney handle that.  So I don't know.  I, to this

2    day, cannot explain the whole wrong, who we sued that was

3    wrong.  I don't know.

4    Q.   You don't believe that, to this day, you have a judgment

5    against my client, correct?

6    A.   Correct.

7    Q.   Obviously, we wouldn't be here today if --

8    A.   Correct.

9    Q.   -- that were the case, right?

10   A.   Yes.

11   Q.   So do you dispute that you told Officer Inman that, you

12   know, there was this stuff posted about you on this web site

13   and you didn't know why you were there, but you thought it

14   might be related to this lawsuit because you had won a

15   judgment against Nik Richie?  Do you dispute that?

16   A.   At that time, whatever I said to Ms. Inman, I was being

17   investigated by the police.  I was very scared.  I didn't know

18   what they were asking me, why I was in there.

19        At that point in time, I had no idea why I was in there.

20   I had been informed that the police were involved, but I

21   didn't know why they had -- why they had called me in there.

22   So whatever I said to her, I said.  But I did say that I won a

23   default judgment against, you know, a web site.

24   Q.   Okay.  So you were trying to give her an image of

25   yourself, correct, so that maybe she wouldn't go further with

1    it or she might, you know, get this image that maybe, you

2    know, you hadn't done whatever you were there to be

3    investigated for; is that correct?

4    A.   No, I was just giving her background information on

5    things that had happened in the course of my life.  So -- just

6    because she didn't know anything about me, I mean, other than

7    what she was investigating.  So I was just giving her

8    background, and that's a big part that you share.

9    Q.   Okay.  But you admit that during that interview, you did

10   lie to her, correct?

11   A.   Yes, ma'am.

12   Q.   And specifically, she asked you whether you had ever

13   exchanged text messages with Cody York, correct?

14   A.   Yes, ma'am.  And I said that we had not, and we had.

15   Q.   Okay.  And at that time, you didn't know that she had

16   copies of those text messages, correct?

17   A.   No, ma'am.

18   Q.   So you lied when you told her that you hadn't texted him.

19   You also lied when you told her that you had never had sex

20   with Cody York, correct?

21   A.   Yes, ma'am.

22   Q.   You were interviewed by "Dateline NBC" as we discussed

23   earlier, and you told the interviewer that you lied about

24   having sex with Cody because you, quote, "had no idea that it

25   was even in the realm of possibilities that they had the text

1   messages," end quote, correct?

2   A.   Yes, ma'am.

3   Q.   And because you felt, quote, "blind-sided," end quote, by

4   them, correct?

5   A.   Yes.  I thought in order for -- and again, this is

6   completely not knowing.  I thought that in order to get

7   text-message records, that either -- that you had to have a

8   victim go forward or that you had to get parental permission

9   in order to review text messages.  And his parents were -- I'm

10  very close with them.  I knew that they weren't going to give

11  somebody permission to have their text records.  Again, his

12  phone records were not even under his name.  They were under

13  his dad's.  So I had no idea that the text messages were going

14  to even be obtainable.  So that's what I mean by I was

15  blind-sided.

16  Q.   Okay.  So if you knew that she had proof, you wouldn't

17  have lied to her, correct?

18  A.   Well, I was being investigated by the police so I -- no

19  person that's being investigated would go in and say, yes, I

20  did this.  I would immediately -- if I had known that she had

21  my text records, I would not have -- I would have (A) not have

22  talked to her.  I would have had my attorney present.  Because

23  then I would have let the justice system take its course

24  rather than me sitting there saying yes, I did this.

25       It wouldn't have been smart for me to admit to everything

1    in the police station without having a court case.  So had I

2    known they had the text message, I would not have even been at

3    the police station without an attorney.

4    Q.   And by that, you're admitting that you wouldn't have told

5    her, no, I didn't do this at that time, correct?

6    A.   Correct.  I lied to her, yes, ma'am.

7    Q.   Okay.  And you told the "Dateline" interviewer that,

8    quote, "It would not be very smart of me on an interview to

9    come out and tell you the truth when I had a court case in a

10   couple of months," end quote, correct?

11   A.   Correct.

12   Q.   Okay.  So you lied because you didn't want to get caught,

13   correct?

14   A.   Correct.

15   Q.   Okay.  And you lied because you didn't want to hurt your

16   case, correct?

17   A.   If this criminal case wasn't here, there would be no -- I

18   mean, after February, 2011 is the only thing that's hurting me

19   there.

20   Q.   No, I'm talking about you lied because you didn't want to

21   hurt your criminal case, correct?

22   A.   Oh, yes, ma'am.

23   Q.   Okay.  Okay.  Now, you testified yesterday that you

24   didn't start lying until after the Cody scandal or that you

25   didn't lie about things that weren't connected with covering

1   up a scandal, correct?

2   A.   Yeah, I never said that I had never told a lie.

3   Everybody tells lies sometimes.  But as far as on that realm

4   of things, yes, I had never -- I've never told a lie as far as

5   anything on that big of a scale goes.  But I did lie about the

6   entire Cody situation.

7   Q.   Okay.  Is your testimony that you didn't lie about

8   anything big that's unconnected to the Cody situation?

9   A.   No, my statement just meant that when you were asking me

10  as far as -- I mean, have I lied before in the past?  Yes.  I

11  don't think anybody could come under oath and say that they've

12  never lied.  Yeah, I lied.

13  Q.   Okay.  And you testified in a deposition a few months ago

14  that you didn't want to marry Nate, correct?

15  A.   Correct.

16  Q.   Okay.  And that you asked him to, quote, "push it off,"

17  end quote, meaning the wedding.  And then in quotes, "And he

18  told me basically, if you -- if you push it off, then we're

19  not -- then we're not -- like we won't be together, and I

20  won't testify for you," end quote.  Is that correct?

21  A.   Yes, ma'am.  I said that in my deposition.

22  Q.   Okay.  And you separated from him --

23  A.   August 24th, 2011, about a few weeks after the -- a few

24  weeks after I was married.

25  Q.   Okay.  And that was also a few weeks after the

1   deposition, correct, that he gave in this case?

2   A.   His deposition was August 4th.

3   Q.   Okay.

4   A.   And again, in that course of time, I had thought -- when

5   I was engaged July 3rd, 2010, I thought that he had stopped

6   doing cocaine, had stopped doing steroids, and stopped

7   cheating.  And it was great for -- up until January of 2011,

8   and he had stopped doing that.  But then I had -- I found the

9   steroids, I found the cocaine, and I heard that he had cheated

10  on me with two girls in Vegas on his bachelor party.

11       So by the time that we were getting married, I did not

12  want to get married, but the invitations, everything was paid

13  for.  And he specifically -- I wouldn't use the word

14  blackmail, but he told me, if you -- I just want to let you

15  know, if you call this off or we don't get married, then

16  you're going to regret it.

17       And Nathan was very physically and mentally abusive to

18  me.  I told you several times in my deposition, he would make

19  me sleep on the floor, he would hit me with ironing boards.

20  And he'll tell you that he was never physically abusive,

21  meaning that he did not ever punch me in the face, and he was

22  correct in that.  But he was very physically and mentally

23  abusive throughout the entire relationship.

24  Q.   Okay.  And all I'm asking you is, you told me that he

25  told you that he wasn't going to testify for you?

1    A.   Correct.

2    Q.   Okay.  Now, that was in -- the separation was in August

3    of 2011, correct?

4    A.   Yes, ma'am.

5    Q.   You were interviewed by Detective Inman in November of

6    2011, correct?

7    A.   Yes, ma'am.

8    Q.   So that was a few months in between, during which you

9    were not in a relationship with Nathan Wilburn, correct?

10   A.   Yes.  We had discussed filing an annulment, but in order

11   to get an annulment in Kentucky -- we were going to do an

12   annulment because the marriage had not been consummated.  We

13   never had sex after we were married.

14   Q.   Okay.

15   A.   So we just --

16            THE COURT:  Ma'am, I think we ought to try just

17   answering the questions.

18            THE WITNESS:  Oh, okay.  Sorry.  And --

19            THE COURT:  Jury's going to need a break pretty soon.

20   How much longer do you have?

21            MS. MATTINGLY:  I've probably got maybe 15 minutes to

22   a half an hour.

23            THE COURT:  Okay.  Well, let's assume it's going to

24   be the half hour and take a break.

25        All right.  Ladies and gentlemen, we'll take your morning

1    recess at this time.  Continue to heed the admonition of the

2    Court.  Do not discuss the case among yourselves or with

3    anyone else; or if you have any access to any media, don't

4    watch it, don't contribute to it.  We'll take 20 minutes.

5             (The jury left the courtroom at 10:33 a.m.)

6             (Recess at 10:33 a.m. until 10:57 a.m.)

7             THE COURT:  Please be seated.  Ma'am, before the jury

8    comes back -- that's all right.  I wanted to say something to

9    you.  If you're asked a question, just answer the question.

10            THE WITNESS:  Yes, sir.

11            THE COURT:  If you need to make some explanation, you

12   can ask permission to make an explanation.

13            THE WITNESS:  Okay.

14            THE COURT:  And maybe we'll move along a bit faster.

15   You may take the stand.  Bring in the jury.

16            (The jury entered the courtroom at 10:59 a.m.)

17            THE COURT:  All right.  Good morning again, ladies

18   and gentlemen.  Thank you again for your continued attention.

19   Everybody may be seated.  You may continue.

20            MS. MATTINGLY:  Thank you, Your Honor.

21   BY MS. MATTINGLY:

22   Q.  Now, Ms. Jones, when we took a break, we were discussing

23   your interview with Detective Inman, correct?

24   A.  Yes, ma'am.

25   Q.  And during that interview, do you remember telling

1  Detective Inman that you had recently gotten married?

2  A.  Yes, ma'am.

3  Q.  Okay.  And again, just so we can get back on track, that

4  interview was in November of 2011, correct?

5  A.  Yes, ma'am.

6  Q.  And you had actually separated from your husband back in

7  August of 2011, correct?

8  A.  Yes, ma'am.

9  Q.  Okay.  Now, do you remember telling her that you had

10  recently, quote, "gone under oath," end quote, to testify that

11  you had only slept with one person, who you identified to her

12  as your husband?

13  A.  Yes, ma'am.

14  Q.  Okay.  And you obviously intended to make her believe

15  that, as of November, 2011, you had only slept with one

16  person, correct?

17  A.  She wasn't asking me if I -- she wasn't asking me about

18  my marriage.

19  Q.  Right.  You were volunteering information to her,

20  correct?

21  A.  Yes, ma'am.

22  Q.  Okay.  And that's how you worded it, that you'd only

23  slept -- you testified you only slept with one person,

24  correct?

25  A.  Yes, ma'am.

1    Q.   Now, at the time that you told her that, that was not

2    true.  You had slept with more than one person, correct?

3    A.   Correct.

4    Q.   Okay.  I want to show you a couple of e-mails that you

5    sent to my client in November of 2009.  And I'm going to talk

6    about the bottom one first.

7    A.   Okay.

8    Q.   Does this look familiar to you?

9    A.   Yes, ma'am.

10   Q.   Do you admit that you sent those e-mails to my client?

11   A.   Yes, ma'am.

12   Q.   Okay.  Can you read -- well, what's the date?  It's

13   November --

14   A.   November 19th, 2009, at 1:07.

15   Q.   Okay.  Can you read the highlighted portion, please?

16   A.   "I was 19 years old on the top pic and 20 on the bottom

17   pic.  I am now 25 and look much different.  Those pictures are

18   horrible."

19   Q.   Let me get that back, please.  Now, since this was

20   November 19th, 2009, there had only been one post about you on

21   thedirty.com at that time, correct?

22   A.   Yes, ma'am.

23   Q.   And was that the post with Shayne Graham?

24   A.   Yes, ma'am.

25   Q.   Okay.  And in this e-mail, you said that you were 19 in

1    the first picture and 20 in the bottom one, correct?

2    A.   Yes, I said that.

3    Q.   Okay.  At this time, were you a Ben-Gal cheerleader

4    during these pictures?

5    A.   Yes, ma'am.  I was not 19.

6    Q.   Okay.  Why did you --

7    A.   Go ahead.

8    Q.   But in the e-mail to my client, you said that you were

9    19, correct?

10   A.   Yes, ma'am.  I was hoping -- could I explain?

11   Q.   Well, can I just read one thing first?  Okay.  Later in

12   the e-mail, you said to him, quote, "People go on there and

13   are calling a then-teenager a slut and ugly," end quote,

14   correct?

15   A.   Yes, ma'am.

16   Q.   Okay.  You were not 19 in either of these pictures,

17   correct?

18   A.   No, ma'am.

19   Q.   You were not a teenager, correct?

20   A.   No, ma'am.

21   Q.   You previously testified that at the time that you tried

22   out for the Ben-Gals, you had to be 21, correct?

23   A.   Correct.

24   Q.   So you lied to my client, correct?

25   A.   Correct.

1    Q.   Okay.  Now, you were on the "Anderson Cooper" show,

2    correct?

3    A.   Yes, ma'am.

4    Q.   Okay.  And you went up there in November of 2011,

5    correct?

6    A.   Yes, ma'am.

7    Q.   Okay.  And we have text messages between you and Cody

8    while you were there, correct?

9    A.   Yes, ma'am.

10   Q.   Okay.  You were telling Cody about the interview,

11   correct?

12   A.   Yes, ma'am.

13   Q.   Okay.  Do you recall telling Cody, quote, "Nik Richie

14   said, 'I think you got married to someone who cheated.'  And I

15   said, 'You live and learn, and I've learned from those

16   mistakes, and I moved on.'  I said I had been only -- I had

17   only been with one person, though, because I had to for

18   court," end quote, correct?

19   A.   Yes, ma'am.

20   Q.   Okay.  And those text messages were dated 11/4/2011,

21   correct?

22   A.   Yes, ma'am.

23   Q.   So at that time, you had no knowledge of any police

24   investigation about you and Cody, correct?

25   A.   Correct.

1    Q.   So the court that you were talking about was this

2    lawsuit, correct?

3    A.   Yes, ma'am.

4    Q.   Okay.  And just a few minutes later, you said, quote,

5    "I've been with two people, but they can't know that," end

6    quote, correct?

7    A.   Yes, ma'am.

8    Q.   And during your deposition, you referenced this as

9    strategically wording, correct?

10   A.   Yes, ma'am.

11   Q.   Okay.  Now, during the interview with "Anderson Cooper,"

12   you wore your wedding ring, didn't you?

13   A.   Yes, ma'am.

14   Q.   And again, that was in November of 2011, correct?

15   A.   Yes, ma'am.

16   Q.   We established earlier, you weren't with Nathan anymore

17   at that time, correct?

18   A.   Correct.

19   Q.   Okay.  And you told Cody that Nik, which is my client

20   sitting here today, quote, "can't know I got a divorce yet,"

21   end quote, correct?

22   A.   Correct.

23   Q.   Okay.  And all of that was dealing with this lawsuit, not

24   any criminal investigation, not any criminal court case.  That

25   was dealing with this lawsuit, correct?

1    A.   Yes, ma'am.

2    Q.   Okay.  So we're here in court today because of alleged

3    lies that you say were posted on my client's web site,

4    correct?

5    A.   Yes, ma'am.

6    Q.   Okay.  But we've established that in November of 2011,

7    you were trying to hide things from my client so that it

8    wouldn't hurt you in this court case, correct?

9    A.   I did not want to be posted on there that I was going

10   through a divorce publicly, that's correct.

11   Q.   Okay.  But you related it to, "They can't know that,"

12   correct, "because I had to for court," correct?

13   A.   Meaning that, yes, correct, that I didn't want them to

14   know that I had been with Cody.

15   Q.   Okay.

16   A.   It wasn't -- it was not about that.  It was about the

17   criminal case -- or the civil case.

18   Q.   Okay.  You wanted to keep things from court, correct?

19   A.   Yes, ma'am.

20   Q.   Which is this court, correct?

21   A.   Not from the Court.  I didn't want him to know.  My

22   reason for saying those, I didn't want him to post on there

23   that I was going through a divorce.

24   Q.   Okay.  But you said that you said something, quote,

25   "because I had to for court"?

1    A.   Yes, ma'am, I said that.

2    Q.   Okay.  Okay.  Now, you've previously told me in a

3    deposition that you never received monetary compensation for

4    any interviews, right?

5    A.   Correct.

6    Q.   The "Anderson Cooper" and the "20/20," correct?

7    A.   Correct.  They flew me there, but I didn't receive

8    compensation.

9    Q.   Okay.  But in text messages to Cody, you said, quote, "I

10   got money for doing," end quote, "the 'Anderson Cooper'

11   interview," correct?

12   A.   I told him that, yes.

13   Q.   Okay.  And you also told him, quote, "I get money for all

14   those interviews," correct?

15   A.   I told him that; but, yes, I --

16   Q.   Okay.  So you repeatedly told us that you're bringing

17   this lawsuit so that you can take a stand for others and to

18   set an example, right?

19   A.   That's not the main reason; but, yeah, I filed the

20   lawsuit because those things are not true about me and he does

21   this to the general public and it's not fair.

22   Q.   Okay.  But you talked a lot to Cody about money, right?

23   A.   We discussed money in issue, as far as having a family

24   together, buying a house together, future plans, several

25   times.

1    Q.   Okay.  Do you remember telling Cody that you get your,

2    quote, "money real soon," end quote?

3    A.   Yes, ma'am.

4    Q.   Okay.  And didn't you also tell Cody, quote, "Baby, as

5    soon as we get the money, it's ours," end quote?

6            MR. DETERS:  Objection as to relevancy.  It relates

7    to credibility.  It's past February 1, 2011, and it has

8    nothing to do with credibility.

9            THE COURT:  I'll allow that one, but I think that's

10   enough.

11           MR. DETERS:  Okay.

12           MS. MATTINGLY:  Your Honor, there's one other matter.

13   She had -- may we approach?

14           THE COURT:  You've exhausted the subject of money.

15   What's the next question?

16           MS. MATTINGLY:  Well, I was going to ask you

17   something about that, see if I could ask about it.

18           THE COURT:  Okay.  Come around.

19                        (Bench conference.)

20           MS. MATTINGLY:  Your Honor, she testified yesterday

21   that she and Cody were joking about the money situation.

22           THE COURT:  Right.

23           MS. MATTINGLY:  And I've said to you, there are

24   additional text messages to show that's not the case; that it

25   puts it all in context of this lawsuit.  So that goes to a

1    credibility issue.  And she told this jury that it was all in

2    context of joking, and it's not.

3         MR. DETERS:  No, she said the joking was about the

4    pink house, the pink pool.  That's what she said she was

5    joking about.  She was joking about the pink pool, the pink

6    bowling ball, the pink everything.

7         THE COURT:  Well, I think we're on a collateral

8    matter.  We're on the realm of relevance.

9         MS. MATTINGLY:  But, Your Honor, she testified as to

10   that yesterday.

11        THE COURT:  I'm going to say it's getting beyond

12   the -- it's getting repetitious and beyond what's probative.

13        MS. MATTINGLY:  Okay.

14        THE COURT:  Time it takes is not what it's worth.

15             (Bench conference concluded.)

16        MS. MATTINGLY:  Your Honor, I don't recall if she

17   answered the last question that you said that you would allow

18   that question but not this one.

19        THE COURT:  Okay.  Let me check it out.  You said it

20   was about this criminal case.  I'm not sure what she meant.

21   You can ask her that one again.

22        MS. MATTINGLY:  I thought it was a little beyond

23   that.

24        THE COURT REPORTER:  There's another one.  I can read

25   it.

1          THE COURT:  Okay.  The one about the money, that she
2    previously told him?
3          MS. MATTINGLY:  I believe you said she could answer
4    that question, Your Honor.
5          THE COURT:  She can answer that question.  That's the
6    end of it.
7    BY MS. MATTINGLY:
8    Q.  Did you say that?
9    A.  Yes, ma'am.
10   Q.  Now, Ms. Jones, we've gone through all of these lies that
11   you've told, correct?
12   A.  Yes, ma'am.
13   Q.  And you would agree with me that there have been a lot of
14   them?
15   A.  Yes, ma'am.
16   Q.  Including the fact that you'll lie if you believe that no
17   one can find the evidence to dispute it, correct, which you
18   didn't believe she had the text messages, correct?
19   A.  Yes, ma'am.
20   Q.  Okay.  So we're sitting here today because of a handful
21   of things, things that you call lies, that someone else, not
22   even my client, said about you on my client's web site,
23   correct?
24   A.  I don't know who said them.
25   Q.  Okay.  Yet, it's okay for you to lie?

1    A.   It's not okay for me to lie.

2    Q.   Okay.

3              MS. MATTINGLY:  Thank you.  That's all I have.

4              THE COURT:  Redirect.  Try not to be repetitious.

5                        REDIRECT EXAMINATION

6    BY MR. DETERS:

7    Q.   With respect to that last question, the text messages

8    that you had between you and Cody and the lies that you told

9    to the police officers, was that on a web site where the whole

10   world could see?

11   A.   No, sir.

12   Q.   So did you ever think that the lies you were telling to

13   them would be seen on the whole -- to the whole world?

14   A.   No, sir.

15   Q.   All right.  Other -- I've listened to the opening.  I'm

16   listening to the cross-examination of you.  And I have heard

17   one lie that relates to this claim from the postings to

18   February 1st, and that she just went over it.  And it's the

19   e-mail from November 19th, 2009, 1:07.  Do you still have that

20   in front of you?

21   A.   No, sir, I do not.

22             MR. DETERS:  Can I approach, Your Honor?

23             THE COURT:  You may.

24   Q.   Counsel asked you to read the highlighted portion.  Can

25   you read everything that follows the highlighted portion,

1  please?

2  A.   Should I read the entire thing?

3  Q.   What -- after the highlighted portion.  The jury's

4  already heard the highlighted portion.

5  A.   "I'm trying to be thick-skinned, but constantly reading

6  how ugly I am is really getting to me.  People go on there and

7  are calling a then-teenager a slut and ugly.  How is that

8  possible?  I just really need you to please put yourself in my

9  position and see how you would feel if this was happening to

10  you.  Teaching high school, I know that rumors don't normally

11  come up from nowhere; but in this case, I swear to you that I

12  have never been with, slept with, or associated with any

13  Bengals players.  Please, please, please take it down.  The

14  entire situation has been so devastating."

15  Q.   Okay.  Now, are you aware of a single lie that you've

16  told to anyone that caused Nik Richie to post what he posted

17  in October of 2009?

18  A.   No.

19  Q.   Are you aware of a lie that you told that caused him to

20  post any of these postings?

21  A.   No.

22  Q.   Have you told lies to cover up the postings?

23  A.   No.

24  Q.   All right.  They began their direct examination -- or

25  cross-examination with the Ben-Gal covers, the calendars.  Did

1   you like doing the photo shoots for the Ben-Gals?

2   A.   It was fun.  It was a fun aspect of cheerleading.

3   Q.   Okay.  Did you have any hopes of doing some modeling?

4   A.   Not modeling outside of Bengals.

5   Q.   Okay.  Is there anything criminally wrong, that you're

6   aware of, of doing those calendar posters?

7   A.   No, sir.

8   Q.   Okay.  The fact that you did those calendar posters, is

9   there anything that you're aware of that because if you're a

10  Ben-Gal and you do a poster like that, that means that

11  somebody could say you got chlamydia and gonorrhea?

12  A.   No, sir.

13  Q.   Explain to the -- explain to us how you got hepatitis A.

14  A.   In the seventh grade, I played basketball for my middle

15  school, and a girl had gone into the locker room.  And I had

16  asthma at the time, sports-related asthma, and she used my

17  inhaler.  And she had contracted hepatitis.  Her mom had

18  called my mom, and she had contracted hepatitis through food

19  at Applebee's.  And by her using my inhaler, it was

20  contagious; and afterwards, when I used my inhaler, I

21  contracted hepatitis A through the inhaler.

22  Q.   When did you learn about that?  How old were you?

23  A.   I was in the seventh grade.

24  Q.   Okay.  Did you contract hepatitis A by sex?

25  A.   No, sir.  I had not kissed anyone even at that time.

1  Q.   Okay.  Do you see yourself as a public celebrity?

2  A.   No, sir.

3  Q.   When you walk into a restaurant -- well, take that back.

4  Prior to February 1st, 2011, prior to February 1st, 2011, when

5  you walked in a restaurant, did people say, "There's Sarah

6  Jones, Ben-Gal cheerleader"?

7  A.   No, sir.

8  Q.   Did people at the restaurant come up and ask you for your

9  autograph?

10  A.   No, sir.

11  Q.   Prior to February 1st, 2011, did you do any television

12  shows, radio shows?

13  A.   No, sir.

14  Q.   These charity events that they covered, could anyone go

15  to the charity event if they paid the money to go?

16  A.   Yes, sir.

17  Q.   Now, they went over a lot of testimony -- or questions

18  with you about how you didn't lose your job as a teacher, you

19  didn't lose your job as a Ben-Gal.  The fact that you didn't

20  lose your job and you didn't lose your job as a Ben-Gal, did

21  you just -- does it not bother you?  These posts not hurt you?

22  A.   They were very devastating.  I was extremely depressed

23  just because of the posts.

24  Q.   All right.  Were you able to soldier on like a good

25  actress?

1   A.   At work, yes.  At home, no.

2   Q.   What would happen at home?

3   A.   I would constantly cry.  I'm constantly on that web site

4   reading everything that all these people have to say about me,

5   and I would throw up.  I lost weight.  I had to go see my

6   doctor to prescribe me Lexapro for depression.  And that was

7   after the posts.  And I went to go see a counsellor.  It's a

8   family therapist who talked a lot about -- my self-esteem

9   went -- just completely plummeted after this, so I talked to a

10  therapist a lot about self-esteem and the postings.

11  Q.   They covered your plea with the Commonwealth Attorney

12  from Louisville that handled that.  Were you required to

13  register as a sexual offender?

14  A.   No, sir.

15  Q.   When you were sending all these texts to Cody York and

16  anybody else that they used to say that you lied, credibility,

17  did you ever think anybody would ever see those?

18  A.   No, sir.

19  Q.   Now, the lies that you told between you and Cody York, up

20  until they were subpoenaed, did anybody see those besides you

21  and Cody York?

22  A.   No, sir.

23  Q.   How many people saw the chlamydia and gonorrhea postings?

24  A.   I couldn't tell you.  It was posted on the web site from

25  December 7th, 2009 till August 26th, 2010.

1   Q.   Now, we didn't -- relative to the site, in

2   cross-examination, she focused on your close-knit family

3   didn't believe things.  Remember those questions?

4   A.   Yes, sir.

5   Q.   Does thedirty.com have a special tab for Cincinnati?

6   A.   Yes, sir.

7   Q.   Now, do you have any idea how many people in the

8   Cincinnati area saw these postings about you?

9   A.   I don't know.

10   Q.   During the -- well, never mind.  Do you have any

11   information or personal knowledge that thedirty.com knew about

12   anything bad about you, anything bad about you and your

13   reputation, up to February 1st, 2011?

14   A.   No, they didn't have any information about me.

15   Q.   All right.  They brought up the idea of your interaction

16   with the students because you're a young teacher.  Were there

17   other young teachers at Dixie?

18   A.   Yes, sir.

19   Q.   Did they have the same kind of relationships with the

20   students?

21   A.   Yes, sir.

22   Q.   Why was that?  Why did a young teacher have a different

23   type of relationship with the students?

24   A.   Kids felt more comfortable to come to somebody that was

25   more -- that was closer in their age.

1    Q.  Okay.  Did you receive, at some point in time, an e-mail

2    from Jim Grdina that was also sent to Nik Richie and yourself

3    and the lawyers for thedirty.com?

4    A.  Yes, sir.

5          MS. MATTINGLY:  Your Honor, objection.  May we

6    approach?

7                    (Bench conference.)

8          MR. DETERS:  Jim Grdina is a co-owner of the site,

9    and the purpose of this is they're making it -- they used the

10    word "money grab," about this being a money grab, and she

11    focused on the money.  And what that e-mail points out is the

12    owner of the web site was actually on the same page as her,

13    just take it down and it will end this.  Of course, they

14    didn't listen to him.  But that's the relevancy.

15          MS. MATTINGLY:  Your Honor, my position would be

16    anything that we said was in an effort to avoid, you know, any

17    legal cost of ours.  It's in the realm of a settlement

18    negotiation or subsequent remedial measure, something that it

19    has no relevance to show that --

20          MR. DETERS:  That was copied to her.  Loses all

21    privilege.

22          MS. MATTINGLY:  It has nothing to do with privilege.

23    I'm not making a privilege argument, Your Honor.

24          THE COURT:  Is this from your client?

25          MR. DETERS:  That's from Jim Grdina.  The owner of

1  the web site wrote it.

2          THE COURT:  Who's Dusty?

3          MR. DETERS:  I don't know who that is.

4          MS. MATTINGLY:  He was an employee at the time.

5          THE COURT:  That's an internal thing about settling

6  it.  That's privileged.

7          MR. DETERS:  Even if it's copied?  Note my objection.

8          MS. MATTINGLY:  Thank you, Your Honor.

9              (Bench conference concluded.)

10          MR. DETERS:  Can I submit this to the Court on

11  avowal?  I'd like to have it.

12          THE COURT:  You can mark it as a tentative exhibit.

13          MR. DETERS:  Thank you.

14  BY MR. DETERS:

15  Q.  When the posting appeared relative to Nate on

16  thedirty.com, up till that time, did the general public -- do

17  you have personal knowledge the general public knew about

18  Nate's cheating on you?

19  A.  I think they knew -- the general public or -- my family

20  knew that he was cheating on me.

21  Q.  I'm talking -- is your family the general public?

22  A.  No.  My family knew.

23  Q.  Did the general public in Cincinnati, Sarah, know that

24  Nate cheated on you 50 times?

25  A.  No.

1  Q.  Okay.  Once it goes up on thedirty.com, how did that make

2  you feel?

3  A.  Everyone knew about it.

4  Q.  All right.  Did it humiliate you?

5  A.  Yes.

6  Q.  You testified -- and there was some cross-examination

7  questions about whether this is about money.  And you

8  testified that you don't think it's ever going to end.

9  During the course of this trial, has Nik Richie continued to

10  post about you?

11          MS. MATTINGLY:  Objection, Your Honor.

12          THE COURT:  All right.  We have the time limit that

13  you established and that's beyond it.  Objection sustained.

14  Q.  The posting relative to Shayne Graham, did that cause any

15  problems between you and someone else, besides Shayne Graham?

16  A.  Yes.

17  Q.  Who?

18  A.  His fiance.

19  Q.  And who was his fiance?

20  A.  Her name's Kate.  I'm not -- I don't know her last name.

21  Q.  Okay.  And what happened as a result of that?

22  A.  When he had notified me, he was simply notifying me to

23  let me know that I was on the site, but also to confirm --

24  have me confirm that this was not true to appease her, to let

25  her know that we had never been together, because it was his

1    fiance.

2    Q.   Did you have to kind of smooth that over --

3    A.   Yes, sir.

4    Q.   -- to reassure her?

5    A.   Yes, sir.

6    Q.   Did you ever receive e-mails to your professional e-mail

7    at school relative to these postings?

8    A.   Yes, sir.

9    Q.   And what did those say?

10   A.   Very derogatory e-mails.  And they would post -- they

11   would say, "You're really dirty, aren't you?"  Would make

12   references to the STDs.  And those were coming as a smart

13   board in my classroom, so they were coming to my e-mail that

14   would show on a public screen to my kids.

15   Q.   The second posting about the Bengals, who did you first

16   learn about those?  Who was it that called you?

17   A.   My coach, Charlotte Jacobs, from the Bengals called me on

18   that evening to let me know that I was posted.

19   Q.   And when she told you this on the phone, what happened to

20   you?

21   A.   I read it and I could not believe that the people are

22   saying this.  I didn't know who could do it.  I was absolutely

23   devastated.  That night was the worst night of my life.  It

24   was awful.

25   Q.   And that was the chlamydia and gonorrhea post?

1    A.   Yes.

2    Q.   Did you go to school the next day?

3    A.   No.

4    Q.   Why didn't you go to school the next day?

5    A.   I didn't even want to face anyone.  I knew it was on the

6    Internet so I didn't want -- I didn't know who had seen it.  I

7    didn't know -- I didn't know how to take it.  I didn't -- I

8    had e-mailed him.  I already -- I knew it wasn't going to come

9    down because I had already e-mailed him, but I was hoping that

10   if I kept e-mailing him, he would just take it down finally,

11   and I could not physically get myself to go to school the next

12   day.

13   Q.   After the postings, did you consider quitting your job?

14   A.   Yes, sir.

15   Q.   Why?

16   A.   I did not want -- as a teacher and with those things

17   being on the Internet stating that I had slept with 50 Bengals

18   players or the entire time and that I had two STDs, I didn't

19   want to be in front of kids.  I didn't want them -- there were

20   comments that were saying, "This slut had sex in my

21   classroom."  I don't want to go in that classroom anymore.  I

22   didn't want to teach anymore.

23   Q.   After you filed the lawsuit, do you recall Nik Richie

24   posting a public letter on the post?

25   A.   Yes, sir.

1   Q.   "If you know the truth, then why do you care?  With all

2   the media attention, this is only going to get worse for you.

3   Your lawyer's trying to make a name for himself using you as

4   his pawn.  If anything, me just seeing your face on the news

5   right now will get you fired from your job.  All you had to do

6   was read the FAQ section like every other normal person that

7   gets stuff removed.  You dug your own grave here, Sarah.  I'm

8   a very reasonable person.  Hope it was worth it.  Nik."

9        Is that what he wrote?

10  A.   Yes, sir.

11  Q.   Did you read the FAQ section like every other normal

12  person to get stuff removed?

13  A.   Yes, sir.

14  Q.   And what happened?

15  A.   I sent a removal request several times, and he never took

16  it down.

17  Q.   Did you cry when you had to address your 15-year-old

18  students?

19  A.   Yes, in front of the entire class, each class.

20  Q.   Did you see a counsellor?

21  A.   Yes, sir.

22  Q.   When you got to Miami during the Pro Bowl, did other

23  cheerleaders know about this battle that you got yourself in?

24  A.   Yes, sir.

25  Q.   All right.  I want to talk -- ask you a few questions

1    about your lying to Cody.  You've testified that you lied to

2    Cody about the money, you lied to Cody about other little

3    things.  Why did you -- why did you tell those lies?

4    A.   The lies to Cody?

5    Q.   Yeah.  Like why would you tell lies?

6    A.   At the time of the interviews that I was doing, he did

7    not want me to do interviews.  He hates when -- he's very

8    private.  He hates attention.  And he did not want me to do

9    it.  And when I said that I had received money from the

10   interviews, I had received money as far as they paid for my

11   flight, they paid for my -- for that aspect of it.  They

12   didn't give me a check for doing an interview, but they paid

13   for everything while I was there.

14   Q.   Were you trying to impress him?

15   A.   Yes.

16   Q.   All right.  Did you do that during the course of your

17   relationship with him, even to this day, to try to impress

18   him?

19   A.   I try to impress him every day.

20   Q.   Does he try to impress you?

21   A.   Yes.

22   Q.   You lied to law enforcement.  You lied to your mother.

23   You lied to lots of people surrounding that investigation.

24   Why did you lie to them?

25   A.   I was scared.  I lied to the investigators because I was

1    scared.  I didn't know what was going to happen.  And I lied

2    to my parents because I was embarrassed and I was ashamed.

3    Q.   Okay.  Have you told the truth under oath here today?

4    A.   Yes, sir.

5    Q.   And yesterday?

6    A.   Yes, sir.

7    Q.   Okay.

8         MR. DETERS:  Nothing further.

9         THE COURT:  All right.  Any redirect?

10        MS. MATTINGLY:  Nothing, Your Honor.

11        THE COURT:  All right.  You may step down, ma'am.

12             (The witness was excused.)

13        THE COURT:  It's a little early for lunch so what

14   says the plaintiff?  Or does the plaintiff have any further

15   witnesses?

16        MR. DETERS:  I'll call Nik Richie.

17        THE COURT:  On cross-examination.  All right.  Come

18   around, Mr. Richie.  You can at least get started with him.

19   We'll take a lunch break when you start the witness.

20        MR. WARD:  Can we approach real quick, Your Honor?

21        THE COURT:  Very well.

22             (Bench conference.)

23        MR. WARD:  We might be able to get Nik done and her

24   today, but I don't want to bet on that.  If you think we

25   can -- and I don't know how long you're going to go.  I know

1  we'll be brief with Nik.  If you think we can, we can go ahead

2  and let him finish his case and then call Ms. Molony, but if

3  not, we might need to call her out of turn.

4         MS. MATTINGLY:  And I think she's short.  We might

5  get her done totally before lunch.  That's up to you.

6         MR. DETERS:  I would rather get started on Nik.  I

7  can assure you we'll get her today.

8         MS. MATTINGLY:  Okay.

9         THE COURT:  Whatever you want to do.  As long as you

10  use the time.

11         MR. WARD:  If we're going to get her today, that's

12  fine.

13         MS. MATTINGLY:  Kristy Molony, she's a teacher.

14         THE COURT:  All right.

15         MR. DETERS:  She'll be short.

16             DEFENSE WITNESS, NIK RICHIE, SWORN

17         THE COURT:  Okay.  I'll break for lunch about noon.

18  If you reach a breaking-off point sometime before then, you

19  can let me know.

20         MR. DETERS:  Okay.

21         THE COURT:  You may ask.

22                    CROSS-EXAMINATION

23  BY MR. DETERS:

24  Q.  Mr. Richie, we've met one other time before at a

25  deposition.  Do you recall that?

1   A.   That's correct.

2   Q.   And how many times have you given a deposition in the

3   past, besides that one?

4   A.   Two other times.

5   Q.   All right.  My first question is, why do you call your

6   site thedirty.com?

7        THE COURT:  Well, maybe you should ask him what his

8   name is.

9        MR. DETERS:  I forgot.  That's a good one.  My bad,

10  Judge.

11  Q.   What is your name?

12  A.   My name is Nik Lamas Richie.

13  Q.   Okay.  And how are you employed?

14  A.   I work for Dirty World, LLC.

15  Q.   Okay.  And the Dirty World, LLC owns thedirty.com,

16  correct?

17  A.   Correct.

18  Q.   All right.  Tell us how thedirty.com evolved.  In other

19  words, how you came up with the idea and how it started.

20  A.   It first started, I lived in Scottsdale, Arizona, and I

21  started as --

22       THE COURT:  Bring out his relationship -- for

23  technical reasons, bring out his relationship with this parent

24  company.

25       MR. DETERS:  Okay.

1    THE COURT:  Which one's incorporated, are they both

2  incorporated, or what.

3  BY MR. DETERS:

4  Q.  Dirty World, LLC, when it was formed, did you own any of

5  it?

6  A.  Yes.

7  Q.  All right.  Were you also the manager of it?

8  A.  Managing member.

9  Q.  Managing member.  Okay.  Do you currently own any of the

10  LLC?

11  A.  No.

12  Q.  All right.  When did you transfer your ownership?

13  A.  I'm guesstimating maybe three months ago, four months

14  ago.

15  Q.  Did you sell it or did you give it away?

16  A.  I gave it away.

17  Q.  Who did you give it to?

18  A.  I believe -- I'm not sure of the entity name.  I think

19  it's iNetwork.

20  Q.  What network?

21  A.  iNetwork.

22  Q.  All right.  Why did you give it to iNetwork?

23  A.  iNetwork -- it's kind of technical because the company,

24  we took a loan for it because we're not making money, so it

25  was to basically pay the debt.

1    Q.   Okay.  So you did receive money.  You paid off a loan

2    with the --

3    A.   No, I didn't pay off the debt.  They just -- they're

4    majority interest now.

5    Q.   Okay.  And who are "they"?

6    A.   They are just an entity that owns interest in Dirty

7    World.

8    Q.   Is it a publicly-traded company?  Is it owned by a couple

9    guys?

10   A.   No, it's not publicly traded.  It's just a company.

11   Q.   Who owns it?

12            MR. GINGRAS:  Objection, Your Honor; relevance.

13            THE COURT:  I'll allow it.  I have a couple myself.

14   Let me ask a couple while I'm thinking about it.

15            The LLC, when these postings were made, were you a

16   shareholder in the LLC?

17            THE WITNESS:  Yes.  Yes, sir.

18            THE COURT:  Okay.  Does it have offices like a

19   corporation, a president and a vice president, et cetera?

20            THE WITNESS:  No.

21            THE COURT:  No.  So did you have a title or anything

22   in connection with that?

23            THE WITNESS:  I was just the operator of the web

24   site.

25            THE COURT:  All right.  Now, what's the relationship

1    between the LLC and thedirty.com?  Is thedirty.com just a

2    trade name, or is it a separate corporation?

3              THE WITNESS:  It's just a domain name.

4              THE COURT:  Pardon me?

5              THE WITNESS:  It's a domain name.

6              THE COURT:  Domain name.  So it's really part of --

7              THE WITNESS:  Dirty World, LLC is the company.

8              THE COURT:  Is it a function of the LLC, one of its

9    activities, a trade name that it uses?

10             THE WITNESS:  I guess you could say that.

11             THE COURT:  Okay.  All right.  Go ahead.

12   BY MR. DETERS:

13   Q.   Does the Dirty World, LLC own the domain site?

14   A.   Yes.

15   Q.   All right.  At the time these were posted on October and

16   December of '09, you were the managing member of the LLC and

17   you were the editor of thedirty.com, correct?

18   A.   Yes.

19   Q.   It was your idea, was it not, to begin thedirty.com,

20   correct?

21   A.   Well, it evolved from DirtyScottsdale.com.  Because when

22   I first started the site, I was just my blog.  I was just

23   taking pictures of the kids and the nightlife, wearing funny

24   clothes, and I would write, you know, my satirical humor to

25   those posts.  It evolved once we did a couple more cities and

1   we just made a domain, like a hub site, called it

2   thedirty.com.

3   Q.   Okay.  Why did you name it thedirty.com?

4   A.   Only because Dirty Scottsdale, it was already originated,

5   so I just looked for domains that could be one-hub domains.

6   So we purchased thedirty.com.

7   Q.   Why did you call it Dirty Scottsdale?

8   A.   Just because it was the nightlife scene, and it was just

9   the term "dirty," I thought it was catchy.

10  Q.   Definition of "dirty," according to the Miriam Webster

11  dictionary, is "not clean or pure, morally unclean or corrupt,

12  likely to cause disgrace or scandal."  You know that's what

13  people think when they think of dirty, don't you?

14  A.   No.  That's what the dictionary says.

15  Q.   Okay.  Isn't it true that thedirty.com provides a place

16  where individuals can submit to you dirt on others for your

17  consideration to put on the site?

18  A.   They can submit whatever they want.  I do sports.  I do

19  politics.  I do, you know, celebrity stuff all the time.  It's

20  like YouTube.  You can upload whatever you want.

21  Q.   You're the editor?

22  A.   Yes.

23  Q.   From your deposition, I understand that there are a

24  thousand submissions a day, and you take the top 150 to 200

25  that you select that get posted, correct?

1  A.  That sounds about right.  It's a little bit more or less

2  depending on the day, if I can get more.  It's as many posts

3  as I can get up that I select that I think are worthy of going

4  on the web site.

5  Q.  And it's -- according to your deposition, you have

6  600,000 hits a day, 18 million a month?

7  A.  Yes.

8  Q.  You're in 50 cities, including Cincinnati?

9  A.  Yes.

10  Q.  You have a hundred subsections, including colleges?

11  A.  Yes.

12  Q.  And you're in Canada, Paris, and Mexico?

13  A.  Yes.

14  Q.  And you consider this the world's first-ever reality

15  blogger, yourself?

16  A.  I was the first one to bring it to market, yes.

17  Q.  Okay.  You are paid a salary to operate thedirty.com,

18  correct?

19  A.  Yes.

20  Q.  And you also do, I think you said, tons of speaking

21  engagements on behalf of thedirty.com?

22  A.  They're not speaking engagements.  They're celebrity

23  appearances.

24  Q.  Okay.  You're a celebrity?

25  A.  I would say -- classify it, yes.

1    Q.   Okay.  And isn't it true that the game plan was that, at

2    some point in time, to, quote unquote, cash out the web site,

3    sell it to someone?

4    A.   Well, the game plan in any business is to establish the

5    business to get to profitability, and then hopefully if, you

6    know, if I can sell the web site, that would be awesome.

7    Q.   And isn't it also true that traffic to the web site -- in

8    other words, the more people that go to it -- increases what

9    you're able to sell in advertising dollars to advertisers that

10   might want to advertise on your web site?

11   A.   It's true for any web site.

12   Q.   Including yours?

13   A.   Yes.

14   Q.   All right.  Isn't it true that in 2009 and through 2010,

15   you were the sole person who decided what gets posted, what

16   stays up, and what comes down?

17   A.   It still is, yes.

18   Q.   All right.  And isn't it also true that you can edit --

19   you've edited postings?

20   A.   Define the term "edit."

21   Q.   All right.  Somebody puts a post and you take a sentence

22   out of it?

23   A.   No.

24   Q.   You never edit a post?

25   A.   I'll put asterisks in bad words, but I don't edit the

1   third party -- whatever the third party writes.

2   Q.  Isn't it true in the past, and even to this day, you

3   sometimes write a post and you put somebody else's name to it?

4   A.  No.  What do you mean?  I do create content, if it's a

5   source of a celebrity story and I write it for them, yes.

6   Q.  No, that's not what I'm talking about.  I'm talking about

7   this.  Let's say -- this just popped in my head.  Let's say

8   you want to get me in trouble.  You could write a post

9   blasting a judge and put my name next to it.  Okay?

10      Isn't it true that you do that from time to time; that

11  you actually take some content that you write, and you put

12  somebody else's name to it and attribute it to them, when they

13  didn't write it?

14  A.  How would I put someone else's name to it?  I'm not

15  understanding that.

16  Q.  Okay.  So is it your testimony here today that you never

17  do that; that you never write a post and then put somebody

18  else's name to it?

19  A.  I'm not understanding your question.  Put someone else's

20  name to what?

21  Q.  Okay.

22  A.  I do create content.  Like, for instance, I've been

23  posting this trial stuff from other media outlets.  If I get a

24  story from someone, when they submit, if there's a phone

25  number or a contact where I need more information, if it's a

1    breaking story, I'll create the content, yes.

2    Q.   That's not what I'm talking about.  Here, I'm going to do

3    this.

4        Now, what I'm going to put up here is a completely

5    fictional, made-up comment that I'm using to make my point.

6    And it's poorly handwritten because I did it in a hurry.

7    "Judge Smith," a phony judge, "is a pedophile."  Signed Eric

8    Deters.  Do you write posts like this to where you'll write

9    something -- in other words, you would write "Judge Smith is a

10   pedophile" -- and put my name to it and post it on

11   thedirty.com?  Do you do that?

12   A.   If I got clearance from you.

13   Q.   Okay.  So if I said it was okay, you would do that?

14   A.   If you were the source and you gave me the information, I

15   would post it for you, yes.

16   Q.   Okay.  Now, what if -- so you're saying that you would

17   only do that if I gave you permission?

18   A.   Yes.

19   Q.   So if I did not give you permission to post that, you

20   would not post it?

21   A.   No.

22   Q.   Okay.  Thank you very much.

23       Do you know who submitted to thedirty.com the first post

24   about Sarah Jones and Shayne Graham and having sex with every

25   other Bengal football player?

1   A.   No.  No.

2   Q.   All right.  Now, you approved that for posting, correct?

3   A.   Yes.

4   Q.   All right.  And you also approved for posting the one

5   where it references Sarah Jones, her boyfriend being tested

6   positive for chlamydia and gonorrhea, and that she must have

7   it too, paraphrasing?  You also approved that post?

8   A.   Yes.

9   Q.   And you also approved the post about Nate Wilburn and her

10  having sex in her classroom, on the football field, when she

11  taught at Dixie, correct?

12  A.   Yes.

13  Q.   All right.  Isn't it true that despite over 20 e-mail

14  requests --

15  A.   Thirteen.

16  Q.   All right.  We'll go with your number.  Over 13 requests,

17  you never removed those posts until the default judgment was

18  entered against Dirty World Entertaining, LLC?

19  A.   I removed the posts, but it was after the -- I don't know

20  if you'd call it the fake lawsuit where you guys sued the

21  wrong company.  You sued the wrong company, Eric, and -- and I

22  got that information; but it was after that, yes, I removed

23  the posts.  The e-mails were actually the same e-mail, same

24  identical e-mails.  I had three separate e-mails, but Sarah

25  just kept sending the same exact e-mail over and over.

1    Q.   Okay.  So you're saying that the e-mails that she sent

2    were the same over and over and they weren't different?

3    A.   Majority of them were the same e-mail.

4    Q.   All right.  Why didn't you take them down?

5    A.   To be honest, I didn't really think the posts -- like the

6    first post wasn't really about her.  It was about Nathan.  You

7    know, or the -- sorry, the Shayne Graham posts, they were both

8    public figures.  He's a football player.  It's a celebrity

9    story.

10   Q.   You considered Sarah Jones a public figure?

11   A.   I do, yes.

12   Q.   All right.

13   A.   She's a Cincinnati Ben-Gal.

14   Q.   All right.  Now, so you didn't think that that was about

15   her?

16   A.   It was referencing Shayne Graham.  I referenced Shayne

17   Graham when I wrote my comment.  You know, it was about both

18   of them, I guess.

19   Q.   Well, here's what it said:  "The Dirty Army" -- first

20   off, who's The Dirty Army?

21   A.   Just fans of the site, you know.

22   Q.   You like their war mentality?

23   A.   I know you use the "war mentality," but it could be

24   anybody.  Anybody could be Dirty Army.

25   Q.   What did you mean by that, when you said they got the war

1  mentality?

2  A.   Just an Army.  It's like the blog nation.  It's the same

3  thing.

4  Q.   All right.  The Army, isn't it true The Dirty Army is

5  about finding the dirt in each city that can get posted on

6  your web site to drive traffic?

7  A.   No.  The Dirty Army's about a lot of things.  You know,

8  The Dirty Army raises money for charity.  You know, we donate

9  to Sarah Tara, which is a foundation in Kentucky.  You know,

10  it's about a lot of different things.  It's a face page

11  through the site.

12  Q.   Now, this post, "The Dirty Army:  Nik, this is Sarah J,

13  Cincinnati Bengals cheerleader.  She's been spotted around

14  town lately with the infamous Shayne Graham.  She has also

15  slept with every other Bengal football player," that was about

16  Sarah, wasn't it, not Shayne Graham?  "She has slept with

17  every other Bengal football player," that was about her,

18  right?

19  A.   Yes.

20  Q.   It's my understanding that you admit in your deposition

21  you don't believe that that's true.

22  A.   It's an exaggeration.

23  Q.   So you think she slept with one?

24  A.   I couldn't tell you.  You know, after -- to this day, if

25  you ask me now, I would say probably.  She lies a lot.

1   Q.  So you say probably?

2   A.  Yes, I think she probably has.

3   Q.  Okay.

4   A.  In my mind.

5   Q.  How many?

6   A.  I don't know.

7   Q.  Well, what proof do you have?

8   A.  I don't. It's not my job to fact-check the stuff.

9   Q.  You decide what is posted and whether it stays up, and

10  it's not your responsibility?

11  A.  I get thousands of submissions and I have over a hundred

12  thousand posts on the web site. It's impossible for me to

13  fact-check every single post.

14  Q.  Then why do you let them post if you know some of them

15  are going to be untrue?

16  A.  It's not my job to decide what's true and what's not

17  true.

18  Q.  All right. Do you have a Facebook page?

19  A.  Yes.

20  Q.  All right. When you post something on Facebook, Facebook

21  doesn't come and edit it, do they?

22  A.  No. If you flagged it, they remove it.

23  Q.  All right.

24  A.  You know, there's no porn on Facebook.

25  Q.  All right. Other than that, you can say Eric Deters is a

1   pedophile on your Facebook.  There's nobody that's editing

2   that, is it?  It's just you, right?

3   A.   No, because you can flag it to get removed.

4   Q.   Well, how do you flag and get removed from your site?

5   A.   Just like any other person, you do a removal request.  I

6   remove -- I review the link and tell you if I want to remove

7   it.  You know, if I think that there's -- if someone sends me

8   evidence that it's false, which Sarah never did, then I would

9   remove it.

10  Q.   How do you prove you didn't have sex with every Bengal

11  football player?

12  A.   I don't know.

13  Q.   Well, isn't it true that she sent through you -- and

14  we're going to get to it -- that she sent you messages, that

15  you got e-mails to remove this, and you refused to remove it?

16  A.   I didn't refuse to remove it.  I just asked what the link

17  was.  And then after the fact, something happened with Shayne

18  Graham because, you know, he was being promiscuous, and there

19  was other posts about Shayne Graham on the site that weren't

20  relevant to Sarah, but just his lifestyle, which Sarah agreed

21  in an e-mail.

22  Q.   I don't represent Shayne Graham.  I represent her.

23  "Everyone in Cincinnati knows this kicker is a sex addict.  It

24  is no secret.  He can't even keep relationships because his

25  red rocket has freckles that need to be touched constantly.

1   Nik."

2   A.    That's about Shayne Graham.

3   Q.    Exactly.  But there's two pictures of Sarah Jones with

4   Shayne Graham.  The Dirty Army says, "She slept with every

5   Bengal football player.  The girl's a teacher too!  You would

6   think with Graham's paycheck, he would attract something a

7   little easier on the eyes, Nik."  And then you made your

8   posting.  Now, isn't it true --

9   A.    I didn't write that post.

10  Q.    You didn't write the first part, you claim.

11  A.    I did not write the first part at all.  It's not about

12  claiming.

13  Q.    All right.  Are you telling this jury --

14  A.    Yeah.

15  Q.    -- straight-faced, clear microphone, that you do not

16  believe posting that and allowing someone to post that does

17  not hold Sarah up to public ridicule?

18  A.    She's a public figure.

19  Q.    In your opinion?

20  A.    In the world's opinion.  She's on national TV.  She's a

21  Ben-Gal.

22  Q.    Prior to --

23  A.    Chad Johnson scored a touchdown and ran over to Sarah and

24  gave her the football.  Like, she's on TV.

25  Q.    When you go out to dinner in Arizona, did people

1    recognize you and ask you for your autograph?

2    A.    They recognize me, but I don't -- I can tell you I've

3    signed two autographs in my life.

4    Q.    Okay.  The next post that I want to go over with you is

5    the post that appeared on December 7th, '09.  And The Dirty

6    Army says, "Nik, here we have Sarah J, captain cheerleader of

7    the playoff-bound Cincy Bengals.  Most people see Sarah as a

8    gorgeous cheerleader and high school teacher.  Yes, she's also

9    a teacher.  But what most of you don't know is her ex, Nate,

10   cheated on her with over 50 girls in four years.  In that

11   time, he tested positive for chlamydia infection and

12   gonorrhea, so I'm sure Sarah also has both.  What's worse is

13   he brags about doing Sarah in the gym, football field, her

14   classroom at the school.  She teaches at Dixie Heights."

15        What evidence did you have, when you decided to leave

16   this post up and let it stay up, that Nik had tested positive

17   for chlamydia infection and gonorrhea?

18   A.    I didn't test positive.

19   Q.    Excuse me, that Nate did.

20   A.    The post was about Nate primarily; and, you know, I

21   didn't have any evidence whatsoever.  But it sounded -- if you

22   read the post, it sounded like someone, maybe a girl that

23   slept with Nate.  And to me, I was like, okay, well, those

24   STDs, it's not just STDs.  It's pretty specific.

25   Q.    So you're saying this post with Sarah's Ben-Gal

1   cheerleading picture was more about Nate?

2   A.   If you read it, it's about Nate.

3   Q.   All right.  Is there a picture of Nate?

4   A.   No.  There's a picture of --

5   Q.   Picture of Sarah.

6   A.   Cheerleader.

7   Q.   And doesn't it say, "So I'm sure Sarah also has both"?

8   Isn't it true, Mr. Richie, that you allowed to be posted and

9   stay posted, up till February 1st, 2011, that Sarah Jones was

10  sure to have chlamydia infection and gonorrhea?

11  A.   No, that post was removed before that date.

12  Q.   When did it get removed?  After the lawsuit, right?

13  A.   Which not, to me -- the fake lawsuit?

14  Q.   Excuse me.  After the default judgment, it got removed?

15  A.   Against who?

16  Q.   The Dirty World Entertaining Recordings, LLC.

17  A.   Yes.

18  Q.   All right.  And that's when you took it down finally?

19  A.   Yes, I think.  Yes.

20  Q.   And based on the volume of numbers of thedirty.com,

21  600,000 hits a day, 18 million a month, isn't it true that

22  millions of people saw that Sarah Jones was sure to have

23  chlamydia and gonorrhea?

24  A.   No, because it was just a one-day -- if it goes on -- if

25  it's on the main page, I'm guessing that post probably got

1  50,000; in Cincinnati, probably 300 people.

2  Q.   Okay.  So only 50,000 people saw it and only 300 in

3  Cincinnati, according to what you're testifying to?

4  A.   I'm guessing, based on traffic.

5  Q.   Don't you think that's 50,000 and 300 too many?

6  A.   It's the Internet.  It's like going on YouTube and

7  Facebook.  It's the same thing.

8  Q.   Is it your position that with the Internet, that you are

9  allowed to post things that you know are not true about

10  another person because it's the Internet?  Is that your

11  position?

12  A.   My position's freedom of speech, and people are entitled

13  to their own opinions.  This is America.

14  Q.   All right.  You have given press conferences and you have

15  been -- you are an advocate that you think this is about

16  freedom of speech, correct?

17  A.   It's about what Congress passed, to me, I believe.  You

18  know, technically, I'm supposed to be protected under the

19  Communications Decency Act.

20  Q.   All right.  Are you aware of any law that you've read,

21  you've personally read, that says you're allowed to libel and

22  slander people on the Internet?

23  A.   I'm not doing anything that's illegal.  I'm doing what

24  every other -- if you look at YouTube, Facebook, Twitter, it's

25  all the same.

1    Q.   Okay.  Now, isn't it true that you continued with yet

2    another post that you allowed to go on, correct?  In other

3    words, there was another post that you posted later with her

4    and Nate?

5    A.   Yes.

6    Q.   All right.  And that post stayed up as well; did it not?

7    A.   Yeah.  I think I removed all of them around the same --

8    the same time frame.  But was that the one where she's at

9    Disney World?

10   Q.   Yes.

11   A.   Yeah, she's wearing her bathing suit at Disney World.

12   Q.   I got to ask you a question.  Why did you remove them

13   after the default judgment against a corporation that didn't

14   exist anymore?

15   A.   I don't even know what that corporation is.

16   Q.   Did you get scared?

17   A.   No.

18   Q.   This is that post.  "Nik, okay, you all seen the past

19   posting of the dirty Bengals cheerleader teacher.  Well, here

20   is her main man Nate.  Posted a few pics of the infected

21   couple.  Oh, and for everyone saying Sarah is so gorgeous,

22   check out these nonphoto-shopped pics."

23        And then your comment, "Cool tribal tat man."  Who's cool

24   tribal tat man?

25   A.   Well, looking at the image, it's pretty obvious.  Nate.

1    Q.  All right.  "For a second yesterday, I was jealous of

2    those high school kids for having a cheerleader teacher, but

3    not anymore.  Nik."

4       Now, isn't it true, as it's recorded here, 32 responses

5    to Bengal cheerleader boyfriend, and isn't it true that what

6    follows is basically just like with the other posts, there's a

7    lot of trashing of Sarah Jones?

8    A.  It's comments.  You can say whatever you want, like every

9    other web site.

10   Q.  Now, those comments, isn't it true that a lot of those

11   comments -- take that back.  Most of those comments are

12   anonymous?

13   A.  I would agree, yes.

14   Q.  All right.  So isn't it true, so I have this right, you

15   have a web site called thedirty.com.  You're the editor that

16   decides what goes up, what comes down, how long it stays on;

17   and you know that the comments that follow those posts, after

18   you make your comment, are from anonymous people that are free

19   to fire shots and no one ever know who they are?  You provide

20   that service to the United States of America in the business

21   of commerce, correct?

22   A.  Yeah, but I don't see the difference between that and

23   Facebook or any other, or even if you have a blog.  It's the

24   same things.

25            MR. DETERS:  This would be a good place to stop.

1          THE COURT:  I think so.  All right.  Ladies and

2     gentlemen, we'll take a break for lunch until 1:15.

3          Continue to heed the admonition of the Court.  Do not

4     discuss the case among yourselves or with anyone else, not

5     with the press.  Don't consult any media about it or publish

6     anything in any media about it, including Facebook, Twitter,

7     or anything like that.

8          All right.  We'll be in recess until 1:15.

9          COURT SECURITY OFFICER:  Please rise for the jury's

10    exit.

11               (The jury left the courtroom at 11:58 a.m.)

12                    (Lunch recess taken.)

13               (Proceedings resumed at 1:17 p.m.)

14         THE COURT:  Okay.  Anything to bring up before the

15    jury comes in?

16         MR. DETERS:  Yes, Your Honor.

17         THE COURT:  You do?

18         MR. DETERS:  Oh, I'm sorry.  I thought you said are

19    you ready --

20         THE COURT:  No, I said do you have anything you want

21    to raise?

22         MR. DETERS:  No.  No.

23         THE COURT:  All right.  Let them come in.  Bring the

24    jury in, please.

25               (The jury entered the courtroom at 1:19 p.m.)

1           THE COURT:  Good afternoon, ladies and gentlemen.

2     You may be seated.  Witness is on the stand.  You may ask.

3     BY MR. DETERS:

4     Q.   Nik, do you -- what are your thoughts about the fact that

5     Sarah sent you -- and you say 13 e-mails asking you to take it

6     down?  And isn't it true that a lot of her messages indicated

7     she didn't want to file a lawsuit; she just wanted to take --

8     you to take the postings down?  That's true, isn't it?  That's

9     what -- she says that in her messages to you, doesn't she?

10    A.   I believe the first e-mail she sent me, she didn't -- she

11    said, "I understand it's business.  If you can remove them,

12    that's great.  If not, no -- not a problem."

13    Q.   That's the first one.  And then as they progressed, isn't

14    it true she was begging you to take them down?

15    A.   I wouldn't say begging.  Every e-mail was different.  But

16    to be honest, she kept saying -- sending the same repetitive

17    e-mails so I didn't really -- I didn't take like notice of it

18    because it just seemed like, when I opened them, it was the

19    same e-mail.

20    Q.   Did you receive -- this is Plaintiff's Exhibit 1, which

21    has already been shown to the jury and witnesses.  It's the

22    October 27th, '09 first posting on thedirty.com.  And

23    Plaintiff's Exhibit 2 is October 29th, '09, a MySpace message

24    sent to you by Sarah Jones.  Did you receive that?

25    A.   Do you have -- could I see it --

1    Q.   Sure.

2    A.   -- just to refresh my memory?

3    Q.   Sure.

4         MR. DETERS:  May I approach, Your Honor?

5         THE COURT:  Yes, go ahead.

6         MR. DETERS:  And may I leave this with him?  It will

7    probably be easier because I'm going to go through some.

8         THE COURT:  Can you do what?

9         MR. DETERS:  Can I leave this at the stand?

10        THE COURT:  Yes.

11        MR. DETERS:  Thank you.

12   BY MR. DETERS:

13   Q.   Just keep that with you.

14   A.   Thank you.

15   Q.   It's Exhibit 2.  We've got a blue cover sheet in between

16   them to help identify.  There's a 39 at the bottom quarter

17   there.  Do you remember receiving that message?

18   A.   It was sent to my MySpace, yes.  This is the message

19   where she said, "If you're unable to do so, I'll understand

20   and move on."

21   Q.   Okay.  Now turn to page -- Exhibit 3, which is November

22   1st, '09, removal request to Nik Richie via a g-mail account

23   at 7:09 p.m.  Do you remember receiving that?

24   A.   Yeah, I received this message.  And this is one of the

25   ones she sent over and over again.  To be honest, when I read

1    it, she claimed that it was at a charity event; but the image,

2    the post itself, she said it was one event at Benihana or

3    something.  If you look at the post, it's actually two

4    different images.  So she kind of lied so I just brushed it

5    off.

6    Q.   Okay.  And then Exhibit 4, November 6, '09, removal

7    request, g-mail account, at 6:58 p.m., is that again the same

8    message that you were talking about?

9    A.   Yeah, it's the same e-mail.

10   Q.   Exhibit 5, November 8th of '09 at 7:17, again, same

11   message?

12   A.   Same e-mail.

13   Q.   Resent?

14   A.   Yeah.

15   Q.   Did you respond to any of these by e-mail?

16   A.   I remember -- not these particular ones, but I remember

17   responding.  Yeah, this next one I responded to.

18   Q.   All right.  November -- Plaintiff's Exhibit 6, 11/9/09,

19   removal request to Nik Richie via g-mail account at 6:08 a.m.,

20   now, this is different.  It says, "Hi, thanks for responding."

21   So you must have responded.  The link -- and she gives the

22   link.  It is the fourth one down entitled "Graham Does it

23   Again."  "This entire experience has been devastating due to

24   the fact that someone who obviously doesn't know me very well

25   sent a pic off my Facebook and told you false statements about

1    me and decided to state that I was a teacher.  Not that you

2    care, but this was the only time I've ever encountered Shayne

3    Graham at a charity event because I refused to associate with

4    the players.  I just want it deleted as soon as possible so I

5    can move on.  I truly appreciate you doing this for me.

6    Thanks so much, Nik."

7    A.    Yeah.  There was no promise of removal.  All I asked her

8    was where the link was.

9             THE COURT:  Before, I think the mike was too loud.

10   Now it's too soft.

11            THE WITNESS:  I can't hear myself so I apologize.

12            THE COURT:  I don't think the jury can hear you.  I

13   know I can't.

14            THE WITNESS:  I don't want to bump into it.

15            DEPUTY CLERK:  Just talk into it.

16            THE COURT:  Try it now.

17   BY MR. DETERS:

18   A.    As I was saying, I responded to the e-mail --

19            THE COURT:  Can you hear him, ladies and gentlemen?

20   A.    -- as to what I wrote here, what is the link.  What that

21   is, it's a hyperlink, basically a direct link to what the post

22   was.  Because at that time, I honestly, I didn't know who

23   Sarah Jones was.  I get tons and tons of submissions, so I was

24   trying to see what posts she was talking about.

25            She then, Mr. Deters, sent me the link to the entire

1    Cincinnati section.  So at that time, I still didn't really

2    know.

3         And why I asked for the direct link, because it saves me

4    time in my day so I can evaluate the post right away and

5    either remove it or move on.

6    Q.   All right.  Plaintiff's Exhibit 7 and Plaintiff's Exhibit

7    8 are some e-mails to you relative to that link issue.  And

8    then we get to Plaintiff's Exhibit 9, November 12, '09,

9    removal request, g-mail account, 12:03.  And at the bottom of

10   the next page, which is the exhibit, it's an e-mail to you.

11   "I had two students come to me today and had a parent call

12   about this web site.  People are making comments regarding my

13   career and I need them off immediately.  This isn't personal

14   anymore.  It's affecting my professional career as an

15   educator.  I asked a lawyer what I could do to protect myself,

16   and this is considered defamation because the statements are

17   false.  Please remove the link as soon as possible before my

18   other students and colleagues find it.  Thank you."

19        You received that, didn't you?

20   A.   Yes.

21   Q.   All right.  Next page, Exhibit 10, November 13th, '09,

22   removal request, 8:45.  And again, that was the same e-mail

23   sent again, right?

24   A.   Yeah.  I believe I responded to tell her that she sent me

25   all of the Cincinnati section.  So at that time, I still

1    was -- once again, I didn't know Sarah Jones.  I wasn't

2    following this.  It's just one post -- this is one post of a

3    hundred thousand.  So I was just trying to clarify exactly

4    what the situation was.

5    Q.   Okay.  And Exhibits 11, 12, and 13, again, she's sending

6    that e-mail to you again, and you're trying to square away

7    what the post is, right?

8    A.   Let me catch up with you.  Yes, she sends me the correct

9    link.

10   Q.   All right.  And this is Exhibit 14, a November 19, '09

11   removal request at 12:53.  And this is to you -- or no, this

12   is -- the end of my last e-mail, "I was 19 years old" -- well,

13   no, this is your e-mail to her.  I'm sorry.  "I understand" --

14   A.   That's her e-mail, the 19.

15   Q.   Right.  But you say, "Not coming down," from you to her.

16   At 12:39, you say to her -- and this is Plaintiff's Exhibit

17   14 -- "Not coming down now.  Graham pissed me off."

18   A.   Correct.

19   Q.   What did Graham do to piss you off?

20   A.   I'm trying to remember.  It was 2009.  It's such a long

21   time ago, but it's unrelated probably.  He must have sent me

22   some sort of nasty letter or something.  I don't know.

23   Q.   Did he complain about the post?

24   A.   I don't recall.  I don't remember what it was, but it was

25   something he did publicly or --

1  Q.  You were pretty rough on him, calling him red rocket, his

2  freckled -- you were rough on him, weren't you?

3  A.  I treat -- I don't treat him any different than anyone

4  else.  It was a joke referring to his promiscuity.

5  Q.  All right.  So then she responds to that at 12:53, Sarah

6  does, "I understand that he upset you, but can't you just find

7  another picture of him and start a new post?  I have nothing

8  to do with him.  The blog is damaging my career.  I literally

9  have never been associated with him.  Other girls on the squad

10 have, but that doesn't include me.  I have a serious boyfriend

11 who I've been dating since high school."

12 A.  Yeah, this was the e-mail where she confirmed that Shayne

13 was having relations with other girls on her cheerleading

14 squad.

15 Q.  She says, "I cry every time a new post is made.  I showed

16 my parents.  Students and faculty have asked about it.  Your

17 site's been blocked districtwide."  And then at 1:07, "To add

18 to my last e-mail," and that's the one that your counsel

19 covered with Sarah.

20     Now, from that point on, had you decided because Graham

21 had, quote unquote, pissed you off, you weren't going to take

22 it down?

23 A.  It was a combination of things.  At that time, the

24 Cincinnati Bengals, you know, the players were getting in a

25 lot of trouble in the media.  Sarah was a public figure.  She

1   was a cheerleader.  You know, I looked at it as more of a

2   celebrity-type post, you know, not a private matter.

3   Q.   I'm going to violate a rule of lawyering, ask you a

4   question I don't know.  Can you name me one NFL cheerleader

5   from the Arizona Cardinals?

6   A.   If I saw them, I could tell you.  I don't know what their

7   actual names.  I could tell you random names.

8   Q.   You live in Arizona?

9   A.   No, I don't.

10  Q.   You live in L.A.?

11  A.   I live in Southern -- Orange County, Southern California.

12  Q.   Name one cheerleader from the San Diego Chargers.

13  A.   I'm not a fan of the Chargers, to be honest.

14  Q.   Name one NFL cheerleader by name.

15  A.   Kelly.

16  Q.   Kelly who?

17  A.   Dillard.

18  Q.   What squad?

19  A.   I think Cowboys.

20  Q.   Name another.

21  A.   Couldn't tell you.  I don't -- I'm not a fan of

22  cheerleaders --

23  Q.   Isn't it true --

24  A.   -- watching them.

25  Q.   Isn't it true that NFL cheerleaders are pretty unknown

1    figures?  I mean, as a squad, people know them as, okay, this

2    is a Ben-Gal; but individually, not too many people know who

3    they are?

4    A.   I wouldn't agree with you.  You see them on TV.  You see

5    the Dallas Cowboys cheerleaders have their own TV show.

6    Q.   You're a man about town, because of your web site you're

7    in all these cities, and you could only name one cheerleader.

8    A.   Because I don't associate myself with them or football

9    cheerleaders.

10   Q.   Plaintiff's Exhibit 16, December 07, '09, second post of

11   thedirty.com.  We've already covered that.

12       Exhibit 17, 12/8/09, removal request.  Now, this is a new

13   request based upon what you posted.  And she mentions in here,

14   among other things, "You, however, are enabling people to

15   single-handedly ruin someone else's life.  Your rude and

16   hateful comments about me being a high school teacher are

17   unnecessary and ridiculous.  I want them removed immediately."

18       I mean, she's begging you, isn't she?

19   A.   I don't think -- I wouldn't call this begging.

20   Q.   Exhibit 18, 12/8/09 e-mail from --

21   A.   She did lie in that last e-mail.  I don't know if you --

22   Q.   Huh?

23   A.   The last exhibit, she did lie in that e-mail.  Well, the

24   reason -- the real reason why I read this e-mail and I saw who

25   she cced, and she said it was the district -- the district

1    principal of the district.  I, at the time -- you know,

2    obviously, I didn't know who Sarah Jones was.  And she said

3    she cced, and it was actually Cheryl Jones.  And I didn't know

4    Cheryl Jones.  I just assumed it was Sarah's mother.

5    Q.   Okay.

6    A.   So I wanted to cover that.

7    Q.   I don't have any questions about Exhibit Number 18 and

8    Exhibit 19.  Okay, Exhibit 19, 12/09/09, e-mail to Nik Richie.

9    And this is from Cheryl Jones on Tim Jones', her father's

10   account.  Now, you received this e-mail, right?

11   A.   Yeah.  It was confusing to me because I thought it was

12   coming from her father and it wasn't.

13   Q.   All right.  It says, "I e-mailed the other night and

14   asked you to remove the posts.  I don't know if you have kids

15   or even care, but please understand your web site is ruining a

16   career and a beautiful young woman.  Maybe in your mind she's

17   not very pretty.  Pretty on the inside is much more important

18   than the outside.  The girl's lived her life building a strong

19   moral reputation.  She's never had a drink in her life."

20        I've got to ask you a question.  On 12/9/09, other than

21   what you allowed to be posted, the chlamydia and the gonorrhea

22   and sex with every Bengal, other than those postings, what's

23   in there, can you name me -- as you're sitting there right

24   now, Mr. Richie, could you name me one thing about Sarah

25   Jones, other than those, that spoke to a bad reputation, as of

1  12/9/09?

2  A.   I'm not understanding.

3  Q.   All right.  At 12/9/09, it's Sarah's position, all the

4  way up to February 1st -- or excuse me, until your postings --

5  that she had a good reputation.  In other words, before the

6  October, '09 posting, she had a great reputation.  And then

7  you did these postings.  Okay?

8       Can you name one thing, from the time that she was born

9  through high school, college, teaching career --

10 A.   I don't know Sarah.

11 Q.   Can you name one bad thing about her, that you know

12 about, or you knew about at the time, on 12/09, up till your

13 first October, '09 posting?  Can you name one thing bad about

14 her that you knew?

15 A.   Once again, I don't know Sarah Jones.  I don't know her

16 family.  All I know is when people submit to my site, I ask

17 them, through the submission, for truthful and honest posts.

18 So there's no way of me telling you if what was true could

19 have been true.  I believed it was true, you know.

20 Q.   So isn't it true, the only witness that you're going to

21 call relating to her reputation is going to be Cindy Molony?

22 She's going to be called?

23 A.   Sure.  Yes.

24 Q.   All right.  Other than what she's going to testify to,

25 though, you cannot dispute her position that she had a great

1    reputation until your posts?  You can't dispute that, can you?

2    A.   That's like saying Lance Armstrong won all the Tour de

3    Frances, he never doped or anything.  It makes no sense.

4    Q.   I'm glad you brought that up.

5    A.   Okay.

6    Q.   Isn't it true that until the doping scandal broke, isn't

7    it true --

8    A.   He lied to everybody.

9    Q.   Yeah.  But isn't it true up till that time, his

10   reputation in the general public was outstanding?  Beat

11   testicular cancer.  Won the Tour de France.  Isn't it true

12   that it was stellar until the doping scandal broke?

13   A.   Mr. Deters, you know, when I look at these -- at least

14   when I look at The Dirty, I look at people and I want to see

15   the best out of people.  You know, I want the truth out of

16   people.  What you're telling me is, why didn't Lance just keep

17   lying.  That's what I'm getting from you.

18   Q.   No.  Sarah Jones --

19   A.   That's just wrong.  That's wrong.

20   Q.   Sarah Jones' reputation -- I'm going to move on.

21        Plaintiff's Exhibit 20 is the last posting about with her

22   and the lollipop.  Exhibit 21, 12/28/09, removal request to

23   Nik Richie via g-mail account at 2:38 p.m.  "I am begging you,

24   before you ruin my reputation, to please remove my photos from

25   your web site."  And you respond, "Did you e-mail remove

1    thedirty.com?  Also, what are the links?"

2    A.    Correct, because at that time, I still -- as much as

3    Sarah was e-mailing me, I still didn't remember her from the

4    other e-mails.  So I was still -- like I didn't know Sarah

5    Jones, so I was trying to get -- refresh my memory on what she

6    was talking about.

7    Q.    So despite being a public figure, you didn't know her?

8    A.    Despite being what?

9    Q.    A public figure, you didn't know her?

10   A.    Well, what I'm saying is that I didn't know who this

11   e-mail was from.

12   Q.    Now, the next e-mail, she sends you the links that you

13   request on December 28th, 2:09.

14   A.    Correct.

15   Q.    And then you respond, December 28th, 2009, 5:08, to her,

16   "Removal Department, please do not remove anything until we

17   get okay from Legal.  According to the press, she had sued us

18   so freeze everything for now."

19   A.    Yeah.

20   Q.    So the fact that she sued you, then you weren't going to

21   take anything down?

22   A.    No, it wasn't that.  It was the Associated Press released

23   something that you guys sued Dirty World, is it Recording,

24   something like that?

25   Q.    Dirty World.

1    A.    No, Dirty World --

2    Q.    Entertaining, LLC.

3    A.    Yeah, the wrong web site.  I believe it's dirt.com or

4    something like that.  And at that time, you know, generally

5    when stuff like this happens, when you sue something, you

6    know, media picks up, which they did, and they basically

7    reprinted all of Sarah's posts on other web sites.  So it just

8    made it more public so there was no point in removal because

9    they were on other sites.

10   Q.    Exhibit 24, December 28th, '09, fourth posting -- let's

11   stop there for a minute.  Isn't it true that if you removed

12   the postings, you wouldn't have been sued?

13   A.    I don't know.  If you would have sued me, yes.

14   Q.    I'm going to mark this Plaintiff's Exhibit 44.

15         MR. DETERS:  May I approach, Your Honor?

16         THE COURT:  Go ahead.

17   Q.    This is Plaintiff's Exhibit 44.  And isn't it true that

18   Sarah Jones sent, from her g-mail account, a request, like you

19   said she needed to -- and the date's on there.  December 9th,

20   I think.

21   A.    Yeah, this is of the same time.

22   Q.    She sent the removal to the place that you told her she

23   needed to send the removal to?

24   A.    Yeah, but this is after the fact.  Because you look at

25   the dates, they don't match.  This was during the same time I

1    asked her to freeze it.

2    Q.   Well, December 9th, '09, she sent it to you to be

3    removed, right?

4    A.   Yeah, but this is after the lawsuit.

5         MR. DETERS:  Your Honor, I move to introduce this

6    exhibit, Plaintiff's Exhibit 44.

7         THE COURT:  Any objection?

8         MR. GINGRAS:  No, Your Honor.

9         THE COURT:  Let it be admitted.

10        (Plaintiff's Exhibit No. 24 admitted into evidence.)

11   Q.   Now, Exhibit 24 of the plaintiff's, December 28th, '09,

12   is the fourth posting on thedirty.com.  And that's when you

13   brag about your legal team, right?

14   A.   Where?

15   Q.   Exhibit 24.

16   A.   Yeah.  This was submitted in reference to the lawsuit

17   that was all over the media.  Someone submitted it.  It was

18   another lawyer, obviously.  And I wrote as a joke, Cochran

19   Kardashian, is what I joke I call my lawyer.  Cochran

20   Kardashian is kind of like he's a mix between Johnny Cochran

21   and Robert Kardashian.

22   Q.   Now, Exhibit 26 is the fifth posting.  And that's when

23   you included a picture of other cheerleaders, correct?  Right?

24   A.   Yeah, I said something I just saw on the Huffington Post,

25   which is another web site, about the Bengals cheerleading

1   squad.

2   Q.   Made a comment about how ugly they were.  You heard

3   Sarah's testimony about how it started causing friction --

4   A.   I didn't call them ugly.

5   Q.   The Dirty Army did.

6   A.   It's the comments.

7   Q.   Let's read your comment.  "I think they all should be

8   kicked off and the Cincinnati Bengals should start over.  Note

9   to self:  Never try to battle The Dirty Army."

10   A.   Yeah, I was referencing it because now she made the story

11   a million times bigger and it was on national web sites like

12   the Huffington Post, pretty much like, you know, it magnified

13   this thing times 50 when it didn't need to be.

14   Q.   Now, isn't it true that Sarah Jones, because she sued

15   you, was punished even more because she did?

16   A.   That was Sarah Jones' doing, not mine.

17   Q.   I accept that if that's your position.  In other words,

18   she filed it so she paid that price, right?

19   A.   I can't control what Sarah Jones does.

20   Q.   You can control what thedirty.com, though, because you

21   run it and you're the editor.

22   A.   Correct.  But all I was doing was duplicating articles

23   from other media sources.

24   Q.   All right.  I got to ask you some more questions here to

25   catch up.  You have been on television shows, correct?

1    A.   Yes.

2    Q.   Talking about your site?

3    A.   Yes.

4    Q.   Including "20/20," "Anderson Cooper," "Nancy Grace,"

5    "Dr. Drew," and "Dr. Phil"?

6    A.   Correct.

7    Q.   And isn't it true that on November 11th, 2010, you

8    appeared on "Dr. Phil" to discuss your web site, and it was

9    called "Dirt, Lies, and the Internet"?

10   A.   Correct.

11   Q.   And you've seen this episode, correct?

12   A.   Yes.

13   Q.   Why did you go on that?

14   A.   I went on -- sorry.  I went on the show because the

15   person that was on the show -- I believe her name was Britta,

16   Bruta -- she was an aspiring model, and I went there to give

17   two sides to the story.  Because originally, they were

18   planning on just having her go on the show, similar like what

19   Sarah was doing going on those shows.  I always said, hey, you

20   know, can I at least speak my side of the story.  So that's

21   why I went on that show.

22   Q.   Okay.

23   A.   And it's edited because it was actually three other web

24   sites, but they cut it down to one actual other -- two other

25   web sites.  Facebook was excluded.  But they edited it into

1  just The Dirty.

2  Q.  Isn't it true, though, that the show that appeared on

3  television, that the things that it shows you saying are

4  accurate?  In other words, I understand that not all the

5  footage that was shot went into the show, but isn't it true

6  that everything that is spoken by you on the "Dr. Phil" show,

7  on November 11th, 2010, as it aired, was true?

8  A.  I don't know.  It's sensationalized.  When you go on

9  shows like this, they're talk shows.  They're there for the

10  ratings.  They're looking for Jerry Springer-type reaction.

11  And they were kind of using this show to kind of show the

12  Internet, you know, there are people out there, how to protect

13  yourself.  I'm for that.  I promote that.  I don't -- I don't

14  look at my site and say, hey, who am I going to ruin today.

15  It doesn't work like that.  It's very open-ended.

16  Q.  Well, you gained, did you not, from going on this show,

17  because "Dr. Phil" has a huge national audience, so you going

18  on this show benefitted you?

19  A.  I would say yes, I would agree.  You know, anytime you go

20  on these talk shows or you talk on radio.  I've done, you

21  know, a hundred different appearances for just different media

22  things.  It's to promote the web site.

23  Q.  Now, when I play this for viewing to the jury, are you

24  saying that when it shows you speaking, that the words coming

25  out of your mouth have been edited and they're not your words?

1  You're not saying that, are you?

2  A.   No, but on the show, Dr. Phil put me in a corner and

3  named names of people that were not even related to

4  thedirty.com, and he was just trying to get my reaction out of

5  it.

6  Q.   Okay.  But it's an accurate depiction of what you said?

7  A.   Well, the words out of my mouth, but I am an entertainer.

8  You know what I mean?  I did a TV show.

9  Q.   Strategically speaking?

10  A.   What do you mean?

11  Q.   Did you strategically speak on there?

12  A.   No.

13  Q.   Have you ever told a lie?

14  A.   Of course.

15        THE COURT:  Let's nail down whether the disk is

16  accurate or not.  Does the disk show what you said?

17        THE WITNESS:  I don't believe it's -- sorry.  I don't

18  believe it's a depiction of my character, no.

19        THE COURT:  No, all we're asking, the question is --

20  it's a simple one -- does the disk show what you --

21        THE WITNESS:  Yes.

22        THE COURT:  -- said?

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  All right.

25        MR. DETERS:  Your Honor, I do not have a laptop on me

1  at the moment.

2          THE COURT:  You can play it through that.

3          MR. DETERS:  Okay.  Good.

4          MR. GINGRAS:  Your Honor, may we approach?

5          THE COURT:  All right.

6                          (Bench conference.)

7          MR. GINGRAS:  Your Honor, I don't see the relevance

8  of this at all.  I think he's trying to impeach him with prior

9  consistent statements.

10          THE COURT:  No, I ruled on this before trial.  It was

11  to show malice.

12          MR. DETERS:  Right.

13          MR. GINGRAS:  By using another conduct --

14          THE COURT:  He says in the transcript -- it's been a

15  month or so since I read it -- those things.  I'm checking

16  them out.

17          MR. DETERS:  Right.  Right.

18          MR. GINGRAS:  It's undisputed that that's true.  I

19  just don't understand.  I think it's irrelevant.  I think it's

20  duplicative.

21          MR. DETERS:  Will he stipulate he did it for malice?

22          MR. GINGRAS:  No, he's going to testify he doesn't

23  check facts.  He's already testified to that.

24          MR. DETERS:  Your Honor, this has already been ruled

25  upon.  You said if he verifies it.

1      THE COURT:  I did rule on it.  I've read the

2  transcript.  I think it goes to show malice.  Objection's

3  overruled.

4            (Bench conference concluded.)

5      MR. DETERS:  Your Honor, we have a laptop in the car.

6  We can play it through that.

7      THE COURT:  Fine with me.

8      MR. DETERS:  Thank you.

9      THE COURT:  All right.  We'll take 15 minutes.

10 Ladies and gentlemen, continue to heed the admonition of the

11 Court.

12           (The jury left the courtroom at 1:49 p.m.)

13            (Recess at 1:49 p.m. until 2:10 p.m.)

14     THE COURT:  Are we ready?

15     MR. GINGRAS:  Your Honor, before we begin, I'd like

16 to renew my objection and clarify what I said before.  Can I

17 do that?

18     THE COURT:  Yeah.  The jury's not here.  You can

19 speak from there.

20     MR. GINGRAS:  Your Honor, just to be perfectly clear,

21 we're objecting to the playing of the video under both

22 Rule 403 and 404(b) of the Federal Rules of Evidence.

23         And, Your Honor, if you recall, at the start of this

24 case, you met in your chambers, you said that this was an

25 important case and you wanted to have a very clean record to

1    go to make sure that either side, if they wanted to appeal,

2    wouldn't get bogged down with a lot of collateral issues.

3    Well, here we have one, Your Honor.

4         If you allow this video to be played, which is

5    absolutely irrelevant to anything to do in this case and the

6    only purpose that it's being offered for is to show that some

7    other person had a negative experience, which may or may not

8    have been true, Your Honor, I believe you're going to commit

9    reversible error on that issue and we're going to have a much

10   more complicated appeal than necessary.  So we object to the

11   video on that basis.

12        Mr. Richie's already testified as to the way the web

13   site's run so the video's not going to help us on that, and

14   all we're going to do is hear another person crying about how

15   someone posted negative comments.  That is irrelevant, and

16   that's exactly what 403 -- 404(b) precludes.

17             MR. DETERS:  Among many things, this shows --

18             THE COURT:  I thought it just showed Mr. Richie?

19             MR. DETERS:  No, this show shows Dr. Phil and a --

20   and a person that he's vilified, and it explains how he runs

21   his site.

22             THE COURT:  That I recall.

23             MR. DETERS:  Goes to support malice.  It also

24   contradicts some of his testimony already on the stand.

25             THE COURT:  I think it's relevant for other reasons

1    besides what I said before.  First it's relevant to show the

2    existence of malice; not malice in the common parlance like

3    you hate somebody, but malice in the libel sense if you're

4    posting things frivolously or with an improper motive to take

5    money out of it.

6            MR. GINGRAS:  Your Honor --

7            THE COURT:  And I think further that if the jury

8    decides to award punitive damages, this is relevant to the

9    amount of punitive damages they might want to award.  Your

10   objection is overruled.  I ruled on this a month ago at least.

11           MR. GINGRAS:  Your Honor, I don't believe you allowed

12   the entire video to be played.

13           Your Honor, the other issue is, there is a second

14   appearance on "Dr. Phil" when Mr. Richie went back.  Dr. Phil

15   praised him.  Praised him.  And now I wouldn't even attempt to

16   offer that video because I don't think it's relevant, but it

17   certainly would be necessary to respond to this one.

18           MR. DETERS:  Your Honor, we were supposed to, under

19   26(a) -- I got beat up.  I submitted this as part of our

20   exhibits and what we're going to use long ago.  He didn't.

21   Based on a subsequent "Dr. Phil" video, he never did --

22           THE COURT:  I ruled on this a month ago.

23           MR. DETERS:  I know you did.  I agree, you did.

24           THE COURT:  I said it's admissible.  It's admissible.

25   You have your objection.  You can have an exception.

1          MR. GINGRAS:  Thank you, Your Honor.

2          THE COURT:  I don't think it's necessary anymore.  I

3   don't think it's necessary anymore.

4          All right.  Bring in the jury.  Play them the video.

5   How long is it?

6          MR. DETERS:  It's about 36 minutes, Your Honor.

7          THE COURT:  Oh, okay.  I thought it was longer than

8   that.

9          MR. DETERS:  There's no commercials so it's nice.

10         THE COURT:  Refresh my recollection.  Dr. Phil is on

11  it.  Mr. Richie's on it.  Who else is on it?

12         MR. DETERS:  Somebody that was a victim of the site,

13  for lack of a better word.

14         MR. GINGRAS:  Your Honor, and that's the part we

15  object to.  We don't know if this person was a victim because

16  we have no opportunity to conduct discovery.  This woman never

17  sued Nik, never filed a lawsuit, never asked for $11 million.

18  We don't know if she's coming --

19         THE COURT:  I think that part is -- I don't remember

20  that part from the transcript I read.

21         MR. DETERS:  Your Honor, the transcript is what's on

22  here.

23         THE COURT:  Okay.

24         MR. DETERS:  The transcript --

25         THE COURT:  Well, can you edit out what the other

1    person said, because she's not here to be cross-examined.

2             MR. DETERS:  Well, neither is Dr. Phil.

3             THE COURT:  Well, he didn't hire -- well, he just

4    asked questions.

5             MR. GINGRAS:  Well, and, Your Honor, you just helped

6    me out with a hearsay objection as well to the extent.  Again,

7    I don't -- the part that I'm concerned about is not

8    Mr. Richie.  And also --

9             THE COURT:  Okay.  Then we'll play Mr. Richie.

10            MR. DETERS:  The other thing, Your Honor, you ruled

11   is I'm allowed to use other examples of people --

12            THE COURT:  Yeah, but you have to have evidence.

13   They have to be in evidence.

14            MR. DETERS:  Okay.

15            THE COURT:  So you can ask him about that woman if

16   you want.

17            MR. DETERS:  Well, would you like me to edit -- how

18   do you want me to edit this tape?

19            THE COURT:  Well, can you, when you get to what she

20   says, fast-forward it?

21            MR. DETERS:  Yes, I can.

22            THE COURT:  She participated in dialogue?  I only

23   recall him and Dr. Phil on there.  Maybe I had a different

24   transcript.

25            MR. GINGRAS:  Your Honor, if I could also add one

1    other thing.  And I'm not even sure how to explain this

2    objection.  I was on this TV show with Mr. Richie.  I sat

3    there and talked to Dr. Phil because he asked me to be there

4    and explain the law to him.  I'm deeply concerned.

5          First of all, I argued the Communications Decency

6    Act.  I explained it to Dr. Phil.  At the time I made that or

7    had that discussion with him, Your Honor had not ruled on the

8    Communications Decency Act issue in this case.  And I'm deeply

9    concerned that if the jury sees me talking about that legal

10   issue --

11         THE COURT:  Is this the same one I saw the transcript

12   of?

13         MR. DETERS:  Yes, it is, Your Honor.

14         THE COURT:  All right.  Well, I think we can explain

15   that.  You have your interpretation of the law; I have mine.

16   I think I'm right; you think you're right.  Either some other

17   court will decide it or Congress will change the law,

18   whatever.

19         I, myself, do not think -- as I've said before, the

20   law was ever intended to be interpreted this way, and the

21   Ninth Circuit correctly recognized an exception to it where

22   people -- the sole purpose of the site is to publish legal

23   material.

24         Now, I'm not concerned about what Counsel says.  He

25   can make his argument wherever it's heard.  I am concerned

1    about this witness, this woman that's on there, who's not here

2    to be cross-examined.  That's hearsay.

3            MR. DETERS:  Is Shayne the wife?  Your Honor, I can

4    tell you this.  The first six, seven pages of the transcript,

5    the witness does not come on until page 8.  So I want the

6    Court to know that I think that we could go from there -- I

7    mean, we could take this to a -- I'm just offering this.  We

8    could get on -- I could send one of my staff members to go

9    edit out her comments and questions, and then we --

10           THE COURT:  That's what we usually do.

11           MR. DETERS:  Okay.  And I'll have it ready first

12   thing in the morning.

13           THE COURT:  All right.  If we can do that, then edit

14   out -- can you edit out counsel as well --

15           MR. DETERS:  Yes.

16           THE COURT:  -- since he's concerned about that?  Edit

17   them both out.  I'm just admitting what Mr. Richie said.

18           MR. DETERS:  Okay.

19           THE COURT:  Of course, as I recall what Dr. Phil

20   said, he just asked him questions.

21           MR. DETERS:  Okay.  So we'll edit out -- so we'll

22   edit out everything --

23           THE COURT:  Edit out what counsel said and edit out

24   what this woman said.

25           MR. WARD:  Your Honor, I'm not trying to interject

1    too much.  There is one part where Dr. Phil starts talking to

2    Nik about the impact of his conduct on the law and Dr. Phil's

3    opinion of what that is on the law.  I think that that

4    probably should come out because Dr. Phil says, You know this

5    is going to affect your court cases going forward, or

6    something like that.  It's like Dr. Phil's commentary on the

7    law.

8         THE COURT:  I don't know that that will hurt anything

9    that much.  There's been a lot said about the law, by the

10   witness and others.  Well, some of it isn't even controversial

11   that's not the law.  Others, some other higher court will have

12   to decide.

13        Okay.  So you can go on with other things.

14        MR. DETERS:  Yeah, we'll go on with other things,

15   sir.  I'll continue to cross-examine him, and then I think

16   we're going to call a witness out of turn after I'm finished

17   crossing him.

18        THE COURT:  Okay.

19        MR. WARD:  We might not have to if the video's not

20   today.

21        MR. DETERS:  Okay.  And, Your Honor, tomorrow morning

22   too, we'll redact everything in the transcript except Dr. Phil

23   and Nik.

24        THE COURT:  Okay.  That's the way to do it.  You do

25   this all the time.

1    Bring the jury back in now?  Mr. Deters, are you
2    ready to have the jury come back?
3         MR. DETERS:  Yes.  Yes.  Yes.
4         THE COURT:  Okay.  Bring the jury back.
5         COURT SECURITY OFFICER:  The jury's in.
6              (The jury entered the courtroom at 2:13 p.m.)
7         THE COURT:  All right.  Good afternoon, ladies and
8    gentlemen.  We were having some technical problems with the
9    video so we'll proceed with other evidence and show that in
10   the morning.  You may proceed.
11   BY MR. DETERS:
12   Q.   Isn't it true that you operate this web site -- well,
13   first off, I got to ask you this.  I just want to get a
14   clarification if there's any reason.  You have -- what is this
15   first name?  I don't want to mispronounce it.
16   A.   It's Hooman Karamian.
17   Q.   Okay.  And is that your birth name?
18   A.   Yes.
19   Q.   Okay.  What nationality is that?
20   A.   It's Iranian.
21   Q.   Okay.  And you're from immigrant -- I'm not saying
22   anything bad.  You're immigrants.  Your mother and father were
23   immigrants, correct?
24        MR. GINGRAS:  Objection, Your Honor; relevance.
25        THE COURT:  Well, he has these three names.  I don't

1    think there's anything too prejudicial about being an

2    immigrant.  We're all --

3              MR. DETERS:  Right.  Yeah.

4    BY MR. DETERS:

5    A.   They moved out here from Iran.

6    Q.   Okay.

7    A.   I was born in New Jersey.

8    Q.   Okay.  Corbin Grimes?

9    A.   That was my -- I was a music -- I did music management

10   for hip hop stuff.

11   Q.   Okay.

12   A.   I use that like -- kind of like how Puff Daddy and

13   P Diddy.  I was always Hooman Karamian aka Corbin Grimes.  It

14   was a name that I used as my middle name.

15   Q.   Okay.  Then Nik Lamas Richie is your adopted name?

16   A.   That's my -- yeah.

17   Q.   Okay.  And Lamas is?

18   A.   My wife's last name, Shayne Lamas.

19   Q.   All right.  Now, you operate this web site without any

20   office.  You do it from a laptop, correct?

21   A.   Yes.

22   Q.   And you have subcontractors and about four paid

23   employees, correct?

24   A.   Yes.

25   Q.   And you look for the stuff that's more realistic, in your

1 opinion; and you're like the lifeguard, correct?

2 A.   Yes.  If I didn't -- if I just let every post go up, then

3 you'd have -- you know, you could have rape, you could have

4 really bad things.  So I try to protect the site as best as

5 possible.

6 Q.   Okay.  Do you remember when I took your deposition by

7 video?  We mentioned that at the outset of your testimony.

8 A.   Yes.

9 Q.   Do you remember testifying that you control comments and

10 you delete stuff and that you look for stuff that is more

11 truthful?

12 A.   Yes.

13 Q.   And when your name appears on the web site, Nik, that is,

14 in fact, you?  In other words, when you have "Nik" next to

15 something, that is you?

16 A.   When contact comes, people upload it, and the nonbolded

17 Dirty Army part, that's the third party; and then the bolded

18 beneath it is my little commentary.

19 Q.   And you work 12 hours a day editing, and this is a 24/7

20 job that you eat, breathe, and sleep?

21 A.   Yeah.  It's part of my life.

22 Q.   Okay.  And the Removal Committee is you?

23 A.   My lawyer removes stuff, you know, from time to time.

24 Q.   And it's your job to put up truth -- stuff that you

25 believe is truthful?

1  A.  Well, once again, I'm not a fact checker, but I don't put

2  up stuff that I read that is not anything -- that, you know,

3  is too crazy.  I don't want -- it's not a porn site or

4  anything.

5  Q.  I've got to make sure that I don't miss anything.

6       I mentioned before about lying.  You say you've lied,

7  everybody lies, correct?

8  A.  I didn't say everybody.  I've admitted to lying before.

9  Q.  Okay.  Have you lied by text message?

10  A.  I don't recall.

11  Q.  Have you ever lied to the police?

12  A.  I don't recall.

13  Q.  Have you ever lied to your mother?

14  A.  I don't recall.

15  Q.  Have you ever lied to your wife?

16  A.  No.

17  Q.  Okay.  When you say you don't recall, that means you may

18  have; you just don't remember?

19  A.  Well, I'm thinking in my head when I was a little kid,

20  you know.

21  Q.  Okay.

22  A.  Elementary school or something.

23  Q.  Okay.  Isn't it true the fact that you put -- you allowed

24  these posts to go up and stay, that that was an intentional

25  act on your part?  In other words, you intended these posts to

1    go up, and you intended them to stay?

2    A.    No.  I remove a lot.  I remove like 20 posts a day.

3    Q.    I'm talking about Sarah's, the ones at issue in this

4    case.  You intended those to go up, and you intended them to

5    stay, correct?

6    A.    No, because I removed them.

7    Q.    Well, you removed them after the default, right?

8    A.    Yeah, but that wasn't why.

9    Q.    Well, isn't it true that a year went by before you

10   removed them?

11   A.    No.

12   Q.    Let's assume -- well, first of all, do you believe Sarah

13   had gonorrhea and chlamydia?

14   A.    You know, I couldn't tell you if she was lying or telling

15   the truth.

16   Q.    Okay.  If she did not -- in other words, if she did not

17   have chlamydia and gonorrhea -- don't you agree that allowing

18   that to be posted is offensive?

19   A.    You're asking me if like --

20   Q.    Yeah, if?

21   A.    What if she has it, though?  I don't understand what

22   you're saying.  It's like if I was a football player, I would

23   score a touchdown.

24        MR. DETERS:  That's all the questions I have, Your

25   Honor, at this time.

1          THE COURT:  You reserve the right to play the video?

2          MR. DETERS:  Yes.  Yes.

3          MR. GINGRAS:  Your Honor, I think we're going to go

4     out of turn because we have a witness waiting.

5          THE COURT:  That's fine.

6          MR. DETERS:  I consent to this.

7          THE COURT:  You can step down, Mr. Richie.

8          THE WITNESS:  Thank you.

9          THE COURT:  Who's witness is it, defense?

10         MS. MATTINGLY:  It's the defendant's witness, Your

11    Honor.

12         THE COURT:  All right.  Ladies and gentlemen, because

13    of the witness' schedule, they're going to call the witness

14    out of turn.  The plaintiff hasn't rested yet.  He still has

15    that video.  This is going to be a defense witness.

16         MS. MATTINGLY:  Your Honor, the defendants call

17    Kristy Molony.

18         THE COURT:  Come around, ma'am.

19         THE CLERK:  Raise your right hand.

20           DEFENSE WITNESS, KRISTY MOLONY, SWORN

21         THE COURT:  All right.  You may ask.

22         MS. MATTINGLY:  Thank you, Your Honor.

23                    DIRECT EXAMINATION

24    BY MS. MATTINGLY:

25    Q.  Good afternoon, Ms. Molony.

1   A.   Hi.

2   Q.   How are you?

3   A.   Good.

4   Q.   Thank you for being here.  Now, you're here today

5   pursuant to a subpoena that we issued to you, correct?

6   A.   Yes.

7   Q.   Okay.  And that compelled you to be here, correct?

8   A.   Yes.

9   Q.   Okay.  You didn't just volunteer to show up, right?

10  A.   No.

11  Q.   Tell the jury a little bit about yourself.  Do you live

12  around here?

13  A.   I do.  I've lived in Kenton County all my life.

14  Q.   Okay.  In which town do you currently reside?

15  A.   Edgewood.

16  Q.   Okay.  Do you have any family?

17  A.   I do.  I have three children; and one is 23, one is 19,

18  and the other one is 14.

19  Q.   Okay.  Where are you currently employed?

20  A.   At Dixie Heights High School with Kenton County Schools.

21  Q.   And how long have you been employed at Dixie?

22  A.   Since 2000, August of 2000.

23  Q.   And prior to that, did you teach anywhere else, or was

24  that your first teaching position?

25  A.   That was my second one.  I was in Cincinnati, Cincinnati

1    Public Schools.

2    Q.   Okay.  What do you teach?

3    A.   Social studies, mainly world civ.

4    Q.   And what ages?

5    A.   Sophomores.

6    Q.   Do you know the plaintiff, Sarah Jones?

7    A.   Yes, I do.

8    Q.   Can you tell the jury how you know her?

9    A.   She taught at Dixie with me.

10   Q.   Okay.  When did you first meet her?

11   A.   The day -- when she started.  I would say probably '08, I

12   think she started at Dixie, but I can't be for sure.

13   Q.   All right.  Now, are you aware of what Ms. Jones'

14   reputation was during her career at Dixie, specifically

15   involving her relationships with students?

16   A.   Only speculation.

17   Q.   Okay.  Can you give me -- and for this jury, tell us what

18   you believe your opinion of her reputation with students is.

19   A.   I didn't think it was inappropriate except for the

20   closeness that she seemed to develop with students just

21   calling her by her first name.  And that's really all I heard.

22   Q.   Was that common for students to do with other teachers?

23   A.   No, absolutely not.

24   Q.   So that was unique to Ms. Jones?

25   A.   Yes.

1    Q.   Do you allow students to call you by your first name?

2    A.   I do not.

3    Q.   Okay.  Do you have any knowledge of any conduct, other

4    conduct, by Sarah you consider to be inappropriate for a

5    teacher?

6    A.   No, I do not.

7    Q.   Was it common for teachers to text students?

8    A.   I don't know.  I mean, I can't specifically answer that

9    question.  For myself, no.  It's not something that -- it's

10   something that's frowned upon.

11   Q.   And when you say it is frowned upon, who frowns upon

12   that?

13   A.   I would say the administration and the profession

14   overall.

15   Q.   What about having students as, quote, friends on

16   Facebook?

17   A.   I personally have never had a social media network.  I've

18   never been on the web sites at all.  And we have just recently

19   been told by the Board that really is not something that's

20   acceptable when they, before that, swayed us away from it but

21   didn't restrict us from it.

22   Q.   Did you ever have any conversations with Ms. Jones about

23   her relationships with students?

24   A.   Can you be more specific?

25   Q.   Have you ever spoken with Ms. Jones about what is

1    appropriate or inappropriate interactions with the students?

2    A.    Yes.

3    Q.    Can you please tell the jury about that?

4    A.    She came into my room before school started one day and

5    said that she had heard that I was saying things about her at

6    school.

7    Q.    Had you been saying things about her at school?

8    A.    No, I had not.

9    Q.    Okay.

10   A.    She had said that she had heard that -- I can't remember

11   the context. It's been a couple years ago.  But basically,

12   that she had heard that I was saying things behind her back or

13   spreading rumors.  I don't know which word she used.  And I

14   said no.  And she said, "You've never said anything about me?"

15   And I said, "The only thing I have against you is the fact

16   that you allow students to call you by your first name."

17   Q.    Did she say anything in response to you during that

18   conversation?

19   A.    After -- I mean, like I say, I just can't say.  It

20   probably lasted all of five minutes, the conversation.  She

21   said that, yeah, some students had called her by her first

22   name.  I said, you're really not supposed to let that happen.

23   I said, it's disrespectful to you, as well as teaching in

24   general.  And she said that there had been some comments made

25   to her by students and she really wasn't sure how to deal with

1    them.  And I may not be using the exact words that she used.
2    And I said that you really had to shut them down; that you had
3    to shut it down or you had to ignore it, depending on the
4    severity of the comment.
5        And she suggested to the fact that I was somewhat more
6    experienced than her, obviously teaching longer, and that I
7    may have had those kind of comments said to me in my earlier
8    years.  And it was kind of laughed off, and then she left the
9    room.  I assured her that if she ever had anything to question
10   me about or talk to me about, she was more than welcome to
11   come in my room.
12   Q.   Okay.  And can you be a little more specific about she
13   said that you suggested you might have had these comments made
14   about you earlier in your career.  What kind of comments are
15   we talking about?
16   A.   I don't -- "inappropriate" was the words that were being
17   used, nothing specific.  And it all stemmed from calling her
18   by her first name, I mean, really.  At that time, we didn't
19   talk about texting or anything like that.
20   Q.   Do you believe that her relationship and her interactions
21   with students might have led them -- might have fostered that,
22   for them to think that that's okay for them to do?
23   A.   I don't think it was an intentional thing if she did, but
24   yes.
25   Q.   Okay.  Did Sarah's role as a Ben-Gal cheerleader affect

1  her reputation at the school?

2  A.   Adversely?

3  Q.   Just in any way.  I mean, was it something --

4  A.   Well, I'm sure her popularity was there because she was

5  known to be a Ben-Gal cheerleader.  But as far as a bad thing,

6  like people talking bad about her, I don't necessarily think

7  that.  I mean, just the fact that she was a Ben-Gal

8  cheerleader, I don't think that would be the result of some

9  things that may or may not have been said.

10 Q.   Okay.  Now, did your reputation -- did your opinion of

11 Ms. Jones change in a negative way as a result of the postings

12 on thedirty.com, or did you even know about them?

13 A.   I did not even know about the postings on thedirty.com

14 until well after it was said and done.  I'm not even quite

15 sure how I knew.  Like I said, last year, my son was a senior

16 at Dixie, and there were talks among students that there was a

17 web site.  But I can be honest with you, I don't think I even

18 saw, to this day, the web site comments personally.

19 Q.   Okay.  And Ms. Jones has testified that after the

20 postings went up and before she filed this lawsuit, that it

21 was kind of the talk amongst school that students were talking

22 about it, teachers were talking about it.  But from your

23 testimony, it seems that that wasn't the case.  At least you

24 didn't know about it, correct?

25 A.   I didn't know about what was said on the web site.  No, I

1    did not.

2    Q.   And would you consider yourself to -- well, do you have

3    friends at school, other teachers?

4    A.   Oh, sure.

5    Q.   And you talk to people on a regular basis, correct?

6    A.   Yes.  Yes.

7    Q.   Okay.  If something is the talk of the school, would you

8    think -- do you typically hear about it if it is the talk of

9    the school?

10   A.   Yes.

11   Q.   Okay.  Do you believe that Sarah's own actions had any

12   effect on her reputation as a teacher at Dixie Heights High

13   School?

14   A.   Again, adversely?  In any way?

15   Q.   Any actions.  Not anything in particular, but, yes, just

16   any of her own actions.

17   A.   Really, I think on my part, that would be speculation.  I

18   don't know.  I mean, I didn't see the adverse effect take

19   place until the last couple years.  And, you know, I don't

20   know if that was the result of the web site or the other

21   thing.  I don't know.

22   Q.   Okay.  Now, Sarah's counsel has brought up Zeke Pike and

23   questioned her about any relationships that she had with Zeke

24   Pike.  Have you ever heard anything about that or do you know

25   anything about that?

1  A.  I don't know anything about an inappropriate

2  relationship, just a conversation that I did have with Zeke

3  Pike.

4  Q.  And what was that?

5  A.  Sophomore year, his sophomore year.  I know this because

6  it would have also been my son's sophomore year.

7  Q.  And what year would that have been?

8  A.  '09-2010.

9  Q.  Okay.

10  A.  I had him in class.  And I totally believe, 100 percent

11  sure, that was the only time he was ever in my classroom,

12  under my supervision, and he asked if he could go to his

13  girlfriend's room.  And I felt that funny because his current

14  girlfriend, on and off again, I guess, was in my room at the

15  time.  And I said, "I don't know who you're talking about,"

16  and he said, "Sarah's."  I said, "I'm not sure which Sarah

17  you're talking about."  I honestly drew a blank when he said

18  that.  And he pointed above me, and her room was above me.

19      And I said, "You mean Ms. Jones?"  And he said, "Yeah,

20  Sarah."  And I said, "You really shouldn't call her that."

21  And no, I didn't let him go.

22      And then another student was in the room, or a couple

23  other students in the room, said she lets us call her Sarah;

24  she doesn't have a problem with that.  And I said -- and I

25  looked at Zeke and said, you shouldn't call her your

1    girlfriend.  It's inappropriate and disrespectful, not just to

2    her but to all teachers, that you would call her by her first

3    name.  And he said that she didn't mind, she didn't care.

4    Q.   And did that concern you?

5    A.   Sure, it did.

6    Q.   Okay.  And that's not something -- is that something that

7    you would have allowed as a teacher?

8    A.   No.  My kids have friends there, and I've known them

9    forever.  I've known Zeke forever.  And they've always called

10   me by my first name, but not at school.

11   Q.   And you said it was the '09 or 2010 school year, correct

12   A.   Yeah, the school year that ran from '09 to '10.  Sorry.

13   That would have been the sophomore year.  And I teach only

14   sophomores, and I did have Zeke in my class.

15   Q.   Do you know what time of year it was, whether it would be

16   fall or winter or spring?

17   A.   It would have been fall or winter.

18   Q.   Okay.

19   A.   We have three terms, three trimesters.

20        MS. MATTINGLY:  Thank you, Ms. Molony.  That's all

21   that I have for you.

22                    CROSS-EXAMINATION

23   BY MR. DETERS:

24   Q.   Based upon your knowledge of Sarah Jones and her

25   reputation in the community, particularly at Dixie Heights

1    High School, isn't it true that up until the scandal at Dixie

2    Heights with Cody York, isn't it true that Sarah Jones'

3    reputation was good?

4    A.   I would believe so, up until that time.

5    Q.   Okay.

6            MR. DETERS:  Thank you.

7            THE COURT:  Anything else for this witness?

8            MS. MATTINGLY:  Your Honor, just one follow-up.

9            THE COURT:  Okay.

10                     REDIRECT EXAMINATION

11   BY MS. MATTINGLY:

12   Q.   Now, you said that her reputation was good, but that's

13   notwithstanding the concerns that you previously discussed,

14   correct?

15   A.   Right.  It was the concerns -- I mean, I don't want to

16   venture into water-fountain talk or whatever, but it was just

17   the first-name calling possibly, and then there were rumors,

18   of course, about texting.  But as far as inappropriate

19   behavior, I personally did not hear relationship things with

20   students.  But I kind of keep myself secluded in my own little

21   room.  So I don't think that it was a damaging reputation that

22   she had prior to the web site or the scandal.

23   Q.   Okay.  But these were concerns that you have and things

24   that, as a teacher, you would not have allowed or thought to

25   be appropriate for yourself, correct?

1    A.   I absolutely would not have allowed, and I know that the

2    profession tells us not to allow those things.

3    Q.   And all these things that we're talking about, these

4    occurred prior to her -- the public knowledge about her

5    relationship with Cody York, correct?

6    A.   Yes, ma'am.

7    Q.   And prior to you having any knowledge of anything posted

8    on this web site, correct?

9    A.   Yes.

10              MS. MATTINGLY:   Thank you.   That's all I have.

11                       RECROSS-EXAMINATION

12   BY MR. DETERS:

13   Q.   I tried to keep it short.

14   A.   You're fine.

15   Q.   This thing with -- how long have you been a teacher?

16   A.   I've been a teacher for 17 years.

17   Q.   Isn't it true that high school boys and their

18   testosterone sometimes gets away from them?

19   A.   Yes.

20   Q.   And like, for example, Zeke Pike and other boys saying,

21   you know, "That's my girlfriend," and asking teachers to proms

22   and all that, that goes on, doesn't it?

23   A.   I've heard of it.

24   Q.   Your son, Mike Molony --

25   A.   Yes.

1   Q.   -- was in her class?

2   A.   Yes.

3   Q.   Loved her?

4   A.   He -- yeah.  He never complained.  As a matter of fact, I

5   have the capability, because I teach there, to choose the

6   schedule; and I believe Ms. Jones was new the same year that

7   class came as freshmans, and I chose her as a teacher because

8   I'm familiar with her mother.

9   Q.   It sounds like you gave her some good advice; that you

10  need to put a little wall up there --

11  A.   I tried.

12  Q.   -- you know, relative to texting, Facebook, first names,

13  because as an experienced teacher, you understand how those

14  young men could take advantage of that?

15  A.   You hear about it all the time, yes.

16  Q.   Right.  And you're saying that the school's now adopted a

17  policy, no more -- you shouldn't have Facebook?

18  A.   That you should not have.  I don't think they've actually

19  barred us from it, but it's actually been in discussion at the

20  beginning of the school years now that we really shouldn't

21  have social media contact.

22  Q.   And it sounds like you two handled that situation very

23  professionally in your dialogue?

24  A.   Um-hmm.  I think so.

25  Q.   Thank you.

1   A.   I didn't think another thing of it when she walked out of

2   my classroom.

3   Q.   And her reputation was good?

4   A.   Just the little -- I mean, letting people call her by her

5   first name, perceived to let them call her by her first name.

6   Q.   But that's an isolated thing.  That's not the big-picture

7   reputation.  Big-picture reputation was good?

8   A.   I think so.

9          MR. DETERS:  Thank you.

10         THE COURT:  Anything else?

11         MS. MATTINGLY:  Nothing further, Your Honor.

12         THE COURT:  All right.  You may step down, ma'am.

13  Thanks for coming in.

14             (The witness was excused.)

15         THE COURT:  Do you have anything further, Mr. Deters?

16         MR. DETERS:  No.  I mean, just what we already talked

17  about.

18         THE COURT:  All right.  Just the video?

19         MR. DETERS:  Yes.

20         THE COURT:  All right.  You might as well get started

21  with your part of the witness.

22         MR. GINGRAS:  Well, I thought a short break would be

23  in order to let me get my laptop plugged in.

24         THE COURT:  All right.  That will be fine.  I'm sure

25  the jury won't object.

1       All right.  Ladies and gentlemen, we'll have another

2   break, again to get set up for the next part of the case.

3   Continue to heed the admonition of the Court.  Do not discuss

4   the case among yourselves.  If you have any access to any

5   media, don't use it for this purpose.  We'll be in recess.

6   How much time do you need?

7       MR. GINGRAS:  Ten.

8       THE COURT:  All right.  We'll be in recess.  Make it

9   15.

10          (The jury left the courtroom at 2:36 p.m.)

11          (Recess at 2:36 p.m. until 2:59 p.m.)

12      THE COURT:  So we're going to proceed with your

13  direct examination of Mr. Richie?  It will be direct, your

14  side of the case.

15      MR. GINGRAS:  It will be direct and it will be short.

16      THE COURT:  Okay.  And do you have any other

17  witnesses?

18      MR. DETERS:  No, Your Honor.

19      MR. GINGRAS:  No, Your Honor.

20      THE COURT:  Well, good.  We will finish tomorrow.  I

21  can get these instructions done.  Okay.  Bring them in,

22  please.

23      COURT SECURITY OFFICER:  Yes, sir.

24          (The jury entered the courtroom at 3:00 p.m.)

25      THE COURT:  Good afternoon, ladies and gentlemen.

1    I'm sure you'll be glad to hear, unless something very

2    unforeseen occurs, we should be able to finish tomorrow.  We

3    have this one last witness and the video to play in the

4    morning, and then we'll be ready to take it to the jury.  So

5    you may be seated and call this witness.

6              Call your witness.

7              MR. GINGRAS:  Your Honor, defendants call Nik Richie.

8              THE COURT:  All right.  You're already under oath,

9    Mr. Richie.  This will be on direct examination.

10             MR. GINGRAS:  Your Honor, can we approach for one

11   second very, very quick?

12             THE COURT:  Okay.

13                       (Bench conference.)

14             MR. GINGRAS:  I just wanted to make sure, Your Honor,

15   because we've done a few things out of order, that the

16   plaintiff has not technically rested, right, so they would

17   have to make their motions?

18             THE COURT:  Right.  Not till the video's done.

19             MR. WARD:  Okay.

20                       (Bench conference concluded.)

21             THE COURT:  You may ask.

22             MR. GINGRAS:  Thank you, Your Honor.

23                       DIRECT EXAMINATION

24   BY MR. GINGRAS:

25   Q.   Nik, we've heard a lot about Sarah Jones so far in this

1    case.  We've heard some about the web site and some about you.

2    And I know it's getting near the end of the day, and I'd like

3    to kind of be as quick as I can, but I want to fill in some

4    blanks that the jury hasn't heard about yet.

5        There was -- initially, there was some discussion about

6    whether you lived in Arizona or California.  Can you sort of

7    clarify?  You're currently living in California?

8    A.   I currently live in Orange County, California.

9    Q.   Okay.  And you previously lived in Arizona?

10   A.   Yes.  I used to live in Scottsdale, Arizona.

11   Q.   Okay.  Do you remember when you moved to California?

12   A.   I would say about a little over two years.

13   Q.   Okay.  Are you married?

14   A.   Yes, I'm currently married.

15   Q.   How long have you been married?

16   A.   Almost -- coming up almost three years.

17   Q.   And who is your wife?

18   A.   Shayne Lamas.

19   Q.   And do you have any children?

20   A.   I have one child, one daughter.

21   Q.   Okay.  I'm not sure if I heard anything about this

22   before, but is Shayne well known for anything?

23   A.   Yes.  My wife is an actress.  She's the daughter of

24   Lorenzo Lamas.  Her grandfather is Fernando Lamas.

25   Q.   Okay.  And has Shayne been on any television programs in

1    her lifetime?

2    A.    Yeah.   She was a regular on a TV show called "General

3    Hospital."   She also won "The Bachelor," and she had her own

4    TV show on E called "Leave it to Lamas."   And we were just on

5    a VH1 show called "Couples Therapy."

6    Q.    You've answered my next question.   In addition to running

7    the web site, you do some other things, don't you?

8    A.    Yes.

9    Q.    One such thing being you were just on a reality

10    television program.   When was that?

11    A.    I think it aired in November of last year.

12    Q.    Okay.   Do you remember how many -- was it one episode or

13    was it more than one?

14    A.    No, it was ten episodes.

15    Q.    Okay.   And you've done a lot of national media interviews

16    regarding thedirty.com, haven't you?

17    A.    Correct.

18    Q.    Okay.   Do you remember, just kind of off the top of your

19    head, how many?

20    A.    I would have to say over a hundred.

21    Q.    Okay.   And I think Mr. Deters mentioned "Nancy Grace."

22    Did he mention "Nancy Grace" with one of them?

23    A.    He didn't; but, yes, I've been on "Nancy Grace."

24    Q.    Okay.   "Anderson Cooper"?

25    A.    Correct.

1   Q.   More than once?

2   A.   Twice.

3   Q.   Okay.  "Dr. Phil"?

4   A.   Twice.

5   Q.   Okay.  "20/20"?

6   A.   One time.

7   Q.   Okay.  And some of those interviews had to do with this

8   case and some didn't, right?

9   A.   Correct.

10   Q.   Okay.  Regarding the national media interviews that had

11   to do with this case, did you solicit the media to come talk

12   to you about the case?

13   A.   No.  Every media outlet that contacted me said, you know,

14   we want to get your side.  We're interviewing Sarah Jones; we

15   want to get your take.

16   Q.   So you didn't ask the media to promote this case.  They

17   just did it on their own?

18   A.   Yes.

19   Q.   Okay.  Nik, some people think that when you're on

20   television a lot, if you're on a reality show or whatever,

21   that you must get paid a fortune for all these TV appearances.

22   Has that been the case for you?

23   A.   No.  I've never got paid on any of the "Dr. Phils" or any

24   of those things.

25   Q.   Okay.  So "Dr. Phil" didn't pay you anything?

1    A.   No.

2    Q.   "Anderson Cooper" didn't pay you anything?

3    A.   No.

4    Q.   "20/20" didn't pay you anything?

5    A.   No.

6    Q.   Okay.  And how many local television or newspaper

7    interviews have you given, approximately?

8    A.   I would say over 500, between radio and print.

9    Q.   Okay.  And again, separate and apart from thedirty.com,

10   you also do -- I think we initially called them public

11   speaking appearances, but they're not really speaking

12   appearances.

13   A.   Yes.

14   Q.   Can you explain what sort of appearances you do?

15   A.   Nightclubs from all over the country pay me to show up

16   for a couple hours to -- as like a celebrity appearance, to

17   show up at their venue to draw crowds.

18   Q.   Okay.  And you've been doing that kind of thing, that

19   sort of public appearance and public television appearances

20   and so forth, for a number of years, right?

21   A.   Yes.

22   Q.   Do you remember kind of when that first happened for you?

23   A.   I want to say the first -- the first one was Dallas about

24   four years ago.

25   Q.   Okay.

1    A.   Three years ago, four years ago.

2    Q.   I don't know if you can see on your monitor.  I've got

3    something displayed there.  Do you remember back when you

4    started, initially you told Mr. Deters when you started

5    thedirty.com, it was called Dirty Scottsdale, right?

6    A.   Correct.

7    Q.   And for those who don't know, Scottsdale's where?

8    A.   It's in Arizona.

9    Q.   All right.  And so when you were in Arizona and you were

10   running Dirty Scottsdale, at some point, did that site grab a

11   lot of attention?

12   A.   Yeah, it got a lot of media attention and it was the buzz

13   of the town.

14   Q.   Okay.  And as part of that -- are you familiar with

15   AZCentral.com?

16   A.   "Arizona Republic," yes.

17   Q.   It's the "Arizona Republic" newspaper's web site, right?

18   A.   Yes.

19   Q.   And did they name you one of the ten most fascinating --

20   fascinating Arizonians in 2008?

21   A.   Yes.  They named me in print and they named me, I

22   believe, on their TV channels.

23   Q.   Okay.  I want to briefly talk about DirtyScottsdale.com

24   because I think there's some confusion over which site is

25   relating to what.

1     A.   Okay.

2     Q.   Tell us, when you first started Dirty Scottsdale, could

3     users upload anything to the web site?

4     A.   No.

5     Q.   Okay.  Describe briefly what that web site was about.

6     A.   Dirty Scottsdale was just kind of mocking the -- I call

7     it 30K millionaires, the kids that think they're rich and they

8     want to show off at the nightclubs.  Kind of, you know, made

9     fun of the town.  Also, it covered a lot of celebrity stuff

10    within Arizona.

11    Q.   Okay.  And so again, when you first started Dirty

12    Scottsdale, none of the content on that site was user

13    generated, was it?

14    A.   No.

15    Q.   Okay.  And when you were first running Dirty Scottsdale,

16    is that when you first began using the term "reality blogger"?

17    A.   Yes.

18    Q.   Okay.  And what's a blog, because some people don't use

19    the Internet, don't know what a blog is.  Can you generally

20    explain what that is?

21    A.   Blog's kind of like -- I would say kind of like a diary

22    of, you know, someone's personal web site.

23    Q.   And that's sort of what Dirty Scottsdale was, right?

24    A.   It was; but it evolved into, you know, a gossip site.

25    Q.   And do you remember -- and the gossip site became

1   thedirty.com?

2   A.   Yeah.

3   Q.   Do you remember when that changed generally, kind of

4   month and year when that happened?

5   A.   I would say 2009, you know.  I'm not sure of the exact

6   date it was.

7   Q.   Okay.  Now, just before we leave Dirty Scottsdale, at

8   some point, that site became not a general blog.  It became

9   where users could submit their own posts; is that right?

10  A.   It became a third-party platform, like a YouTube or, you

11  know, Facebook.

12  Q.   Okay.  And so at some point -- initially, you said that

13  when you first started the web site, 100 percent of the

14  content was from you --

15  A.   Yes.

16  Q.   -- and zero percent was from users.  And then over time,

17  eventually more and more content started coming from users?

18  A.   I would say over -- yeah, it formatted into 99 percent of

19  the content, which is all user based.

20  Q.   I'm sorry.  You said 99 percent today?

21  A.   Yeah, if -- unless I put some article up that's in the

22  media that's just there.

23  Q.   Okay.  You heard Mr. Deters talk, I think more than once,

24  about how content on thedirty.com -- I think he read a

25  dictionary definition and called -- you know, the word "dirty"

1    means filthy or soiling.  But let's talk about actual content

2    on thedirty.com.  Is every post on the web site -- first of

3    all, you've looked at presumably every post on the site,

4    right?

5    A.   Yes.

6           MR. DETERS:  Objection; leading.

7           THE COURT:  That's all right.

8           MR. GINGRAS:  Okay.

9    BY MR. GINGRAS:

10   Q.   Generally, what kind of posts are there?

11   A.   It's everything across the board from, I would say,

12   celebrity -- we get a lot of athlete stuff.  You know, it

13   could be the person next door.  It could be charity stuff.

14   It's totally open.  You can pretty much submit whatever you

15   want.

16   Q.   Do you ask users to submit anything specific?

17   A.   No.

18   Q.   Do you ask users to submit about any specific person?

19   A.   No.

20   Q.   Did you ever ask anyone to submit anything regarding

21   Sarah Jones?

22   A.   No.

23   Q.   Okay.  If somebody wants to post something on

24   thedirty.com, if I wanted to do that, how would I do that?

25   A.   There's a button on the top right-hand corner called

1    "submit posts," and you can upload your image and, you know,

2    your information to the image and leave your contact info.

3    It's pretty much just like YouTube.

4    Q.   Okay.  Nik, if you could look at the monitor for just a

5    second, do you see what's there?

6    A.   Yes.

7    Q.   Is that the Submit Posts page that you just described?

8    A.   Yes.

9    Q.   Okay.  And looking at this page, it says, "Send us your

10   news tips, pictures or videos.  Tell us your side of the

11   story."  And then scrolling down, what information do you

12   require or does the form require?

13   A.   It usually requires where the post comes from, like your

14   city or your college, also the category, sometimes, you know,

15   if it's athlete related.  We have different subcategories.

16   And, you know, obviously you put the post title, your name.

17   Q.   Okay.  Yeah, so there's a box that says -- and I don't

18   know if the jury can read it.  Oh, maybe it's not 100 percent

19   there.

20   A.   Yeah, but there's also a check box, which is our terms of

21   service.

22   Q.   I'll get to that in one second.  It's more or less

23   visible.  So the Submit Posts page, there's basically a blank

24   box that says "Your Post Title," right?

25   A.   Correct.

1   Q.   Okay.  And can a user -- what's a user allowed to enter

2   in there?

3   A.   Anything that they want.

4   Q.   Okay.  And then it says your name, phone number optional?

5   A.   Yeah.

6   Q.   E-mail address optional.  The user can categorize what

7   city or college.  And then do you see a box that says "Your

8   Hot Tips"?

9   A.   Yes.

10  Q.   What's that?

11  A.   That's where the user puts in the information.  And when

12  you see on the site where it says The Dirty Army, that's the

13  information that gets published.

14  Q.   Okay.  So just to clarify -- for instance, I'm calling

15  this a post.  There's several different posts about Ms. Jones,

16  correct?

17  A.   Yeah.

18  Q.   Okay.  And this is what we call a post.  And the actual

19  text that shows up on the web site, beginning with The Dirty

20  Army -- first of all, the user doesn't write "The Dirty Army,"

21  do they?

22  A.   No, it automatically -- it automatically puts that when

23  it gets published.

24  Q.   Okay.  So when I -- if I were to log in and create a hot

25  tip, the actual text that goes into that hot tip box, where

1    does that show up on this page?

2    A.    That's The Dirty Army part.

3    Q.    So after where it says Dirty Army in bold colon, and then

4    in this example, it talks about, "Nik, here we have Sarah J"?

5    A.    That's the hot tip.

6    Q.    That's the box where it says "Hot Tip"?

7    A.    Correct.

8    Q.    And then below that, below the user-submitted text,

9    that's a part in bold?

10   A.    That's my writing.

11   Q.    And that's always in bold like that?

12   A.    Yes.  If it says dash Nik, it's from me.

13   Q.    Okay.  Can we go back?  So looking back at the

14   Submit-the-Post page, okay, after the user submits their hot

15   tip -- and again, do you ever ask people to submit --

16   obviously, dirt gets submitted, but do you ever ask for

17   anything about any particular topic?

18   A.    No.  And I get stuff that's R rated all the time that

19   doesn't make the site.  We just delete it.

20   Q.    Do you allow nude images on your site?

21   A.    No.

22   Q.    Do you allow pornography?

23   A.    No.

24   Q.    How about profanity?

25   A.    I try to monitor it as best I can.  You know, if someone

1    says the word "fuck," we put an asterisk in the U.

2    Q.   Okay.  In terms of what other material a user can submit,

3    they can submit images using these Choose File buttons; is

4    that right?

5    A.   Yes.

6    Q.   Okay.  And then do the users have to agree to your terms

7    of service before they can submit something?

8    A.   Yes.  They have to read the terms of service, click the

9    box, before it can get to me.

10   Q.   Okay.  And are you familiar with the terms of service of

11   the web site?

12   A.   Yes.

13   Q.   Okay.  As part of your operation of the web site, do you

14   want people to submit false information?

15   A.   No, not at all.

16   Q.   Is that good for business?

17   A.   No.

18   Q.   In fact, it costs a lot of money to defend lawsuits when

19   false information gets on the site, right?

20   A.   Very much so.

21   Q.   Okay.  So looking at -- one last question about the

22   Submit-the-Post form that we just looked at.  Was the form

23   like that during all of 2009?

24   A.   Yes.

25   Q.   And do you know, from looking either -- from looking at

1    whatever, do you know how the posts about Ms. Jones got on the

2    web site?  Because people could also e-mail you directly and

3    say, here's some information; make it into a post, right?

4    A.   Yes.

5    Q.   And is that what happened with these particular ones?

6    A.   No.  This is just a submission.

7    Q.   All right.  So whoever submitted this had to agree to

8    your terms of service?

9    A.   Correct.

10   Q.   And looking at the terms of service -- is this the same

11   general terms of service that's been on the site for a long

12   time?

13   A.   Yes.

14   Q.   And do you specifically tell people that you don't want

15   defamatory information --

16        MR. DETERS:  Objection; leading.

17   A.   Yes.

18        THE COURT:  Overruled.

19   Q.   Okay.  Do your terms of service also -- what do they say

20   about -- is Dirty World accepting responsibility for

21   everything on the web site?  Do you guarantee that everything

22   is fact-checked, everything's accurate?

23   A.   No.

24   Q.   Does it say that in the terms of service?

25   A.   I believe so.  It says that in the disclaimer, too, that

1  we have on the site.

2  Q.  Okay.  Look at paragraph 3.  Do you see paragraph 3?  I'm

3  trying to put it to the middle there.

4  A.  Yes.

5  Q.  Beginning with "By submitting photos."  It says here,

6  "Comments or any other material which is false, defamatory, or

7  otherwise unlawful is not allowed."  Was that term of service

8  in place in all of 2009?

9  A.  Yes.

10  Q.  And that's been the case since the beginning of the web

11  site, has it?

12  A.  Yes.

13  Q.  How do you know when something's unlawful?  If I wanted

14  to go and log into your web site and post something, how do

15  you know whether what I'm posting is unlawful?  Do you?

16  A.  No.

17  Q.  Do you fact-check everything that appears on the site?

18  A.  No.  It's impossible.

19  Q.  How many posts -- and again, a post meaning like a

20  stand-alone thing like that.

21  A.  Yeah.

22  Q.  How many posts like this are on the web site as of today?

23  A.  I would say around 120,000.

24  Q.  Okay.  And then in addition to the posts, there can be

25  comments about posts submitted by users also?

1    A.   Correct.

2    Q.   Do you know, as we sit here today, how many comments

3    about posts there are, approximately?

4    A.   I would say over 2 million.

5    Q.   Okay.  How many new posts do you get every month?

6    A.   That I actually published or?

7    Q.   Yeah, the ones -- overall submissions, whether published

8    or not.

9    A.   I would say around 25 to 30 thousand.

10   Q.   Okay.  And how many of those make the web site?

11   A.   If I'm doing -- on a good month, I would say 2,500.

12   Q.   Mr. Deters talked before about the fact that you want

13   traffic to come to the web site, right?

14   A.   Yes.

15   Q.   Like any web site?

16   A.   Yes.

17   Q.   The more traffic hits your web site, the more value you

18   can offer to advertisers, right?

19   A.   Yeah, like -- like TMZ.  That's like, yeah, the same

20   thing.

21   Q.   Has it been your experience running the web site that the

22   more content you have, the more traffic you get?

23   A.   I don't really look at it like that.

24   Q.   Okay.  But I'm wondering why don't you allow everything

25   to appear?  You said that thousands of things are submitted

1    and you block apparently, presumably, a large number of those

2    submissions.  Tell us why.

3    A.   It's just part of my editing process.  You know, I want

4    to keep the site pretty neutral and across the board.  If I

5    let everything go on the site, it gives the site no meaning.

6    Like it just would be a whole bunch of garbage, a lot of

7    negative stuff.

8    Q.   Nik, did you ever -- do you recall ever receiving a post

9    about Sarah Jones that you did not publish?

10   A.   Yes.

11   Q.   Do you remember generally what time frame that post came

12   in?

13   A.   It was -- I'm not sure on the date, but I know it's

14   before the last hearing when I came out to Kentucky.

15   Q.   If I told you the last hearing was December of 2011,

16   would that kind of jog your memory?

17   A.   Yeah.  It was right at the beginning of December.

18   Q.   Do you remember what the nature of the post was, what the

19   subject matter was?  It was about Ms. Jones?

20   A.   Yes.

21   Q.   And what did the poster say about Ms. Jones?

22   A.   The poster said that Ms. Jones was sleeping with one of

23   her students; and that was, you know, pretty much of the gist

24   of the post.  I don't want to get into the graphics.

25   Q.   Okay.  And do you remember, when that post came in,

1    Ms. Jones had not yet been publicly accused in any way of the

2    Dixie Heights scandal, as we referred to it eventually?

3    A.   No.  It was -- she wasn't -- I don't know if she was

4    being investigated.  It wasn't out yet, no.

5    Q.   So that post that came in about that allegation against

6    Ms. Jones was before all that was known?

7    A.   Yes.

8    Q.   And you didn't publish it?

9    A.   No.

10   Q.   Why not?

11   A.   Honest answer, I thought it was Sarah and her counsel

12   trying to set me up on, you know, something.

13   Q.   Okay.  And to this day, you never -- when a post comes in

14   and you don't approve it, where does it go?

15   A.   It goes to the trash.

16   Q.   Okay.

17   A.   A folder of posts that we don't publish.

18   Q.   So to this day, though, you've never activated or

19   published that thing that came in regarding Sarah and the Cody

20   York situation?

21   A.   No, not that post, but I have put up other posts from

22   other media outlets after she was charged, yeah.

23   Q.   Well, since this case has been filed in, I think it was

24   December of 2009 it was first filed, there's been a huge

25   amount of media coverage of the case, hasn't there?

A.   Correct.

Q.   And what kind of web sites have you seen news coverage
about this case?

A.   Every single one.  Like you name it.  Huffington Post,
"Anderson Cooper."

Q.   So when Sarah said before that you had reposted her over
and over again -- I think the number was like 40 times -- was
that post like the sort of rumor gossip that we saw here or --

A.   No.  It was just duplicating articles that were already
published on line.

Q.   Okay.  Nik, a lot has been made about the fact that Sarah
wrote to you and asked you, begged you, pleaded with you, to
take these posts down and told you that they were false; and
at least for a period of time you kind of -- you didn't remove
the posts, right?

A.   No.

Q.   Have you ever -- first of all, how many times do you
remove posts on a daily basis?

A.   On a good day, I'll remove like 40 posts.  I remove stuff
every day.  I would say 10 posts to 15 on average.

Q.   Why do you do that?

A.   Just because if someone proves to me that, you know, it
is not factual, then I'll remove stuff.  You know, if I look
at the post -- you know, I try to play fair.  Like I -- you
know, what -- what blows my mind most is that, you know, I try

1    my best to play both sides.  And I'm not a judge by any means,
2    but I can't fact-check, so I do remove stuff when I feel like
3    it doesn't need to be on the site.
4    Q.   Okay.  Nik, have you ever removed anything based on
5    someone telling you, here's a post about me and it's false,
6    and you then removed it and later found out that it was
7    actually true?
8    A.   Yes, all the time.
9    Q.   Okay.  In fact, have you ever removed a post in that kind
10   of a situation, based on a request, before a lawsuit was
11   filed, and then gotten sued anyway?
12   A.   Yes.
13   Q.   Do you generally -- you know who Kristen Creighton is?
14   A.   Yes.
15   Q.   Who is Kristen Creighton?
16   A.   Kristen Creighton is a girl from Houston who was accused
17   of having STDs, and they wanted money.  I removed the posts
18   anyway.  They wanted money because I said that -- or I didn't
19   say.  The submitter who posted said she had STDs.  I removed
20   it.  Later they sued us, and then she actually got an STD test
21   and she was found positive that she had herpes.
22   Q.   Okay.
23   A.   And she sued me because --
24   Q.   But before the lawsuit was filed and before the post was
25   removed, did Ms. Creighton or her attorney represent to you

1    that the actual allegations were completely untrue?

2    A.   Yes.

3    Q.   And did you believe that?

4    A.   No.  I didn't know what to believe.

5    Q.   Okay.  But whether you believed it or not, you did take

6    the post down --

7    A.   Yes.

8    Q.   -- based on that threat.  Okay.  And that didn't stop

9    them from suing you, did it?

10   A.   No.

11   Q.   Okay.  Is that the only instance of that happening?

12   A.   No.  It happens a lot.

13   Q.   Okay.  Who is Carrie Prejean?

14   A.   Carrie Prejean was Miss California.  She was running for

15   Miss America.

16   Q.   And did somebody submit her to the web site?

17   A.   Yeah, she got submitted to the web site.  I guess the

18   pageant rules are pretty strict, and she got submitted, a

19   topless photo of herself in her underwear.

20   Q.   Okay.  And at the time that post regarding Ms. Prejean

21   came up, she was involved in something of a scandal based on

22   her answer to a question in the Miss U.S.A. pageant.  Do you

23   generally remember that?

24   A.   Yeah.  It was all over the media.

25   Q.   Okay.  And as part of that scandal, do you remember her

1  giving interviews where she said that she'd never actually

2  taken topless photos?

3  A.  Yeah.

4  Q.  And was that true?

5  A.  No.

6  Q.  But she told you that there weren't any -- I'm sorry.  At

7  some point, she contacted you and asked you to remove the one

8  photo that was there, right?

9  A.  Yes.

10 Q.  And did you remove it?

11 A.  No.

12 Q.  And did she then tell the media that she actually -- that

13 was the only photo that had ever been taken like that?

14 A.  Yes, that's what she told the media.

15 Q.  And that was a lie, wasn't it?

16 A.  Yes.  Their lawyers reached out and told us that was the

17 only photo and we should remove it.

18 Q.  Okay.  Do you know what happened to Ms. Prejean?

19 A.  She was -- they found out she was lying the whole time

20 and she got her crown taken away.

21 Q.  She was kicked off the Miss U.S.A.?

22 A.  Yes, because we got more pictures of her topless and

23 posted them, and she was caught with a lie.

24 Q.  Nik, at some point during this case, you and Sarah Jones

25 went on the "Anderson Cooper" show together to talk about this

1   case, right?

2   A.   Yes.  The first time we've actually talked.  I guess you

3   can call it talking.

4   Q.   And when that interview happened, you actually weren't

5   live in the studio.  You were via satellite?

6   A.   No, I was having my child at the time so I couldn't make

7   it to New York.

8   Q.   Okay.  But you went on the web site -- or you went on the

9   "Anderson Cooper" show and talked about the web site.

10  Ms. Jones talked about her side of the story and you talked

11  about yours, correct?

12  A.   Correct.

13  Q.   Okay.  After that show aired, Anderson Cooper actually

14  had his own blog as well, or a place where people can place

15  comments about the show, right?

16  A.   AndersonCooper.com.

17  Q.   Yes.  After that show aired, did people say -- did people

18  post comments about the program?

19  A.   Yes.

20  Q.   Did they post things about you?

21  A.   Yes.

22  Q.   Nik, I put on the display a comment that was posted on

23  AndersonCooper.com after you and Ms. Jones appeared there.

24  And it looks like somebody named Ed posted that you're a

25  pedophile with a huge collection of kiddy porn, you rape young

1    boys under ten years old and have HIV, you were caught selling

2    drugs to teenagers and elementary school kids.  Is any of that

3    true?

4    A.   No.

5    Q.   Did you ask Anderson to remove that?

6    A.   No.

7    Q.   What effect did that comment have on your life?

8    A.   Zero.

9    Q.   Did you think about suing Anderson Cooper because of

10   that?

11   A.   No.

12   Q.   Why not?

13   A.   People are entitled to their own opinions.

14   Q.   Mr. Deters has implied, I think, that you use

15   thedirty.com to ruin people's lives for profit.  You've heard

16   him say that?

17   A.   Yes.

18   Q.   Okay.  Does thedirty.com make a lot of money for you?

19   A.   No.

20   Q.   Are you familiar with the thedirty.com's finances?

21   A.   Somewhat.

22   Q.   Okay.  The posts that Ms. Jones is suing over are from

23   2009 and 2010.  Maybe just 2009.  Do you recall generally how

24   much money Dirty World made in 2009?

25   A.   I believe we didn't make any money in 2009.  I think we

1    lost about -- if I had to guess for the year, we were probably

2    in the red 200K.

3    Q.   And the year before that, 2008, do you remember how much

4    money Dirty World made?

5    A.   I would say we were in the red maybe 300, 400K.  I don't

6    know the exact number.

7    Q.   So you lost $300,000 in 2008.  And you lost how much in

8    2009?

9    A.   Around 200, probably a little bit more.

10   Q.   Okay.  In order to keep the web site going, did you have

11   to -- could you keep the web site going with those sort of

12   numbers?

13   A.   No.

14   Q.   At some point, did you wind up having to borrow money?

15   A.   Yes.

16   Q.   Okay.  How much did you borrow?

17   A.   I believe it was around 700,000.

18   Q.   Okay.  And is that money still owed today?

19   A.   Yes.

20   Q.   Okay.  Nik, I think we talked about -- again, I don't

21   want to beat a dead horse.  We talked about the posts

22   regarding Ms. Jones.  The actual text -- I'll shorten it down.

23   The statement that she had STDs, did you write that?

24   A.   No.

25   Q.   Do you know who did?

1   A.   No.

2   Q.   Did you ask anybody to do that?

3   A.   No.

4   Q.   Same question with regard to her sleeping with the entire

5   Bengals team.  Did you say that yourself?

6   A.   No.

7   Q.   Did you ask anyone else to say that?

8   A.   No, I did not.

9   Q.   Okay.  Did you even know who Sarah Jones was before this

10  case?

11  A.   No, not at all.

12  Q.   And you didn't know her husband, her then boyfriend and

13  then became husband, Nate Wilburn?

14  A.   No.

15  Q.   You did know Shayne Graham, though?

16  A.   Yeah, technically.  I saw him kick a couple times.

17  Q.   Okay.  But you knew him as a fan?

18  A.   As a football player, yes.

19  Q.   Okay.  Is there any specific reason why you would have

20  wanted to hurt Ms. Jones?

21  A.   No, not at all.

22  Q.   Before these posts appeared on the web site, or the

23  database that you clicked publish, did you know if the facts

24  in them were true?

25  A.   No.

1  Q.  Did you know if the facts were false?

2  A.  No.

3  Q.  Well, actually, some of the facts in them are true,

4  right?

5  A.  Yes.

6  Q.  Okay.  For example, Sarah was an NFL cheerleader.  That

7  turned out to be true?

8  A.  Yes.

9  Q.  She's a high school teacher.  That was true?

10  A.  Yes.

11  Q.  She had a boyfriend who cheated on her.  That was true?

12  A.  Yes.

13  Q.  So the parts that weren't true were the STDs, the

14  sleeping with the Bengals players, and that Nate may or may

15  not have bragged about having sex with her in the school?

16  A.  I couldn't even tell you if that's not true or true or

17  false.

18  Q.  At the time that these posts -- again, I understand

19  you've said it probably 20 times already, that you didn't know

20  Sarah, you didn't know Nate.  But when these posts went up on

21  the web site, did you have any reason to doubt their

22  reliability?

23  A.  No, not at all.

24  Q.  Okay.  And I think Mr. Deters asked you before whether

25  you had any reason to believe that they were true.  Somebody

1    submitted those to the web site, right?

2    A.   Yes.

3    Q.   And somebody clicked your terms of service, agreed that

4    it wasn't false or defamatory, and submitted this to the web

5    site, right?

6    A.   Yes.

7    Q.   And then based on those representations to you, you

8    allowed it to appear on the web site?

9    A.   Correct.

10   Q.   And at the time you did that, there was no other

11   information you had that could have told you that this wasn't

12   true?

13   A.   No.

14   Q.   Okay.  After the posts appeared on the web site,

15   Ms. Jones contacted you and then challenged the accuracy of

16   the posts, right?

17   A.   Correct.

18   Q.   Okay.  But again, at that point, you had her telling you

19   that it was false and you had the person who submitted it

20   maybe saying that it was true.  Did you have any way of

21   reconciling which party to believe?

22   A.   No.

23   Q.   So you just published it to allow the world to see it and

24   make their own decision?

25   A.   Correct.

1  Q.  I think earlier, Mrs. Jones or Mr. Deters made a comment

2  about you making posts in other people's names.  Do you

3  remember that?

4  A.  Yeah.

5  Q.  Do you have any idea what that's talking about?

6  A.  No, I don't.

7  Q.  The posts regarding Ms. Jones are not signed by anyone,

8  are they?  They're not signed by Eric Deters as the author or

9  Nate Wilburn or anyone else?

10  A.  No.

11  Q.  They're just anonymous, unsigned?

12  A.  Correct.

13  Q.  How many posts -- how many times are posts on the web

14  site like these, how many times are they ever signed by

15  anyone?

16  A.  If someone's not being anonymous, I've seen it at times

17  they'll put their name in.

18  Q.  Where you cite a source or something?

19  A.  Yeah.

20  Q.  Okay.  But when you make your own comments on the web

21  site, you always sign them "Nik," right?

22  A.  Correct.

23  Q.  In bold?

24  A.  Yes.

25  Q.  There's some dispute, Nik, over when you actually removed

1    these.  I think Ms. Jones says that it was when she got a
2    default judgment against Dirty World Entertainment Recordings,
3    which was August of 2010.  Do you think that you actually left
4    them on the site that long?
5    A.   I couldn't tell you the exact date; but, no, in my mind,
6    I felt they were only on the site for 60 days.
7    Q.   Okay.  And Mr. Deters was very clear with you that you
8    had, I think you said, 18 million hits a month to your web
9    site?
10   A.   Yes.
11   Q.   And the posts, three posts, were there for at least a few
12   months, right?
13   A.   Yes.
14   Q.   And so he was suggesting that perhaps millions and
15   millions of people had seen these particular posts?
16   A.   Yeah.  That's not true.
17   Q.   How do you know that's not true?
18   A.   Because when I put up a post, it's like a roll.  You
19   know, the first post goes to the top of the main page.  You
20   know, that post is probably on the main page for six hours,
21   seven hours at least, and then it just goes back into archive.
22   Q.   Okay.  Mr. Deters previously graced us with some of his
23   handwritten artwork.  I'll do the same.
24        When posts are submitted to The Dirty -- first of all,
25   does thedirty.com have a main page?

1  A.  It's just the home page.

2  Q.  So if I go to thedirty.com, that's what you'd call the

3  main page?

4  A.  Correct.

5  Q.  And then are there sub-pages underneath that?

6  A.  There's sub-cities like categories.

7  Q.  Okay.  So you could click on a category like Cincinnati,

8  for example?

9  A.  Yeah.

10  Q.  And that would take you to a different page?

11  A.  Yes.

12  Q.  With different content?

13  A.  Yes.

14  Q.  It's not necessarily -- material can be on both a

15  city-specific page and on the main page, right?

16  A.  I look at the main page as kind of like not an all-star

17  page, but just more relevant content from around the world,

18  because this is not --

19  Q.  To use a different analogy, the main page is kind of like

20  the front page of a newspaper, right?

21          MR. DETERS:  Objection; leading again.

22          THE COURT:  That's all right.  Let's move along.

23  Q.  Okay.  Mr. Richie, first of all, do you know, these posts

24  regarding Ms. Jones, did they appear on the main page or some

25  other subset of pages?

1    A.    They appear on both.

2    Q.    Can you tell by looking at the actual post where it

3    appeared?

4    A.    It says above on the top it was posted in Cincinnati,

5    Dirty Cheerleaders, and The Dirty.

6    Q.    Okay.  So it appeared in three different categories?

7    A.    Correct.

8    Q.    Did you select which categories this post would appear

9    in?

10    A.    No, the user does.

11    Q.    The user does that when they do the Submit Post form?

12    A.    Yes.

13    Q.    Okay.  And when a post appears even on the main page, how

14    long is it actually there?

15    A.    It depends on the day, but I would say six hours.

16    Q.    And why only six hours?  And I can kind of direct your

17    attention --

18    A.    As a new post comes in, it gets bumped down.

19    Q.    So --

20    A.    So if you look at Sarah Jones' post, for instance, it was

21    probably on the main page; and in six hours, it maybe got like

22    30,000 views, 50,000 views at the most, you know, if it's a

23    good traffic day.

24    Q.    Okay.  And then after a post is initially submitted to

25    the web site, it kind of moves down?

1    A.   Yeah.  It goes to what I call archive, like the next page

2    back.

3    Q.   Okay.  And then over time, it just keeps moving back

4    further and further away from the main page?

5    A.   Yes.

6    Q.   So do you have any knowledge of how far back people

7    usually scroll when they're reading your web site?  Can you

8    track that with some kind of technical method?

9    A.   We average, you know -- our traffic usually only goes --

10   we have a high bounce rate, so they go to the first page and

11   they usually -- sometimes they'll go to the second page and

12   then they're on to their next web site.

13   Q.   Okay.  I know a little bit about Internet and stuff, but

14   I don't know what a high bounce rate is.

15   A.   Bounce rate is what you call when a person -- like a time

16   on site.  If you have like a 90 percent bounce rate, that

17   means people come to your site really quickly and they bounce

18   to another web site.

19   Q.   Okay.  So regarding the posts with Ms. Jones, at some

20   point in time, they would have left the main page and gone

21   further back?

22   A.   Yes.

23   Q.   And that would have reduced the amount of people -- does

24   that reduce the amount of people that see them?

25   A.   Yes.

1    Q.   Okay.  Does that sometimes play into your decision

2    whether or not to remove something that's older, it's old

3    news?

4    A.   (Nods head affirmatively.)

5    Q.   Okay.  Nik, in the posts about Ms. Jones, one of them,

6    you made a comment, "Why are all high school teachers freaks

7    in the sack?"  Do you remember that?

8    A.   Correct.

9    Q.   What did you mean by that?

10   A.   I know this is kind of weird, but the media tends to --

11   other web sites and the news tend to really love the

12   teacher-student relations, sexual relationships.  At that

13   time, mentally, to me, I looked at it like why are all

14   teachers freaks in the sack in that regard.

15   Q.   Okay.  And that was referring to stories like Mary Kay

16   Letourneau --

17   A.   That was referring to teachers.  It wasn't Sarah Jones.

18   It was my opinion of, you know, why are all teachers freaks in

19   the sack.

20   Q.   When you made that comment, did you mean to tell people

21   that you were adopting the text regarding her having STDs?

22   A.   No, because the text was about Nate.

23   Q.   Okay.

24            MR. GINGRAS:  One second, Your Honor.

25            THE COURT:  All right.

1    MR. GINGRAS:  No further questions, Your Honor.

2    THE COURT:  Anything further for this witness?

3                      RECROSS-EXAMINATION

4    BY MR. DETERS:

5    Q.  Nik, first post was October 27th, 2009, and it was

6    removed August 26th, 2010.  That's ten months, isn't it?

7    A.  Am I just supposed to believe it from the paper, this

8    piece of paper?

9    Q.  Yes.  Do you deny it?

10   A.  Well, I don't remember when I removed the post, to be

11   honest.

12   Q.  Well, Sarah Jones has testified that it was removed

13   August 26th, 2010.  First post was October 27th, 2009.

14   A.  I find that hard to believe, but --

15   Q.  Did you save the binder that I gave you?

16   A.  No.  It's on the desk.

17   Q.  All right.  Look at Exhibit 34, Bates stamped --

18   MR. DETERS:  May I approach the witness?

19   THE COURT:  Yes.

20   Q.  -- 350.

21   A.  Thank you.

22   Q.  Now, you just went through defense counsel with how this

23   isn't a big deal to advertise.  It says, "With over 20 million

24   viewers per month, thedirty.com is a great place for your

25   company to bring in new business.  With tons of pricing

1    options, we can cater to your target audience and stay within

2    your budget.  Need advertising in a specific area?  Don't

3    forget to ask about our geo-location-based advertising

4    packages."

5         Now, 20,000 a month coming and going, and this was up ten

6    months.  And I think you said before that you think -- you

7    admit that probably 50,000 saw it nationwide and 300 saw it in

8    Cincinnati.

9    A.   Yes.  Cincinnati's not a big market for us.

10   Q.   All right.  Ten months.  Twenty -- is that true?  Is that

11   true, 20 million viewers a month, or is it not true?

12   A.   It's around 18, 20, yeah.

13   Q.   Isn't it true that your -- the overwhelming majority of

14   posts that come to you are people who are talking about their

15   ex-wife, their ex-girlfriend, revenge, something dirty?

16   A.   I wouldn't say dirty, but we get a lot of cheaters.

17   Q.   Ninety percent or more, isn't it?

18   A.   No, I wouldn't say that.

19   Q.   Well, if I were to put up on this laptop that I have here

20   your web site, and I started scrolling through it, how long

21   would it take for us to find a charity event?

22   A.   I don't know.

23   Q.   What if I were to tell you at lunchtime I looked at that

24   and I can't find one?

25             MR. GINGRAS:  Objection, Your Honor.

1          THE COURT:  It's cross-examination.

2          MR. GINGRAS:  Is Mr. Deters going to testify?  I'm

3    happy to cross-examine him if he is.

4          THE COURT:  Question is, what if I were to tell you

5    that, what would you say?  The gist being how common --

6    A.   I would say that you're lying because I know --

7          THE COURT:  Let's move along, fellas.

8    BY MR. DETERS:

9    A.   I would say that you're lying because I put up something

10   before we got to court today.  Might be on the second page.

11   Q.   The second page?

12   A.   I remember seeing pictures of me helping kids in Haiti

13   when I went out there.

14   Q.   You're broke, right?

15   A.   I guess you could say that.

16   Q.   Well, I saw where you're going to London, England to see

17   a soccer match at Manchester.  You're seeing a Manchester

18   soccer match.  You're going to Haiti.

19   A.   Yep.  Yeah.  What does that mean?

20   Q.   How do you pay for all this travel?

21   A.   Well, the soccer match, my parents actually, for my

22   birthday in February, they're paying for the plane ticket.

23   Q.   Got a reality show?

24   A.   I was on a reality show.

25   Q.   Okay.  Isn't it true that Monday is your biggest day?

1    Monday is the important date in your business?

2    A.   No, Wednesday.

3    Q.   Wednesday.  And why is that?

4    A.   Just the middle of the week.

5    Q.   Now, your counsel asked you what I mentioned about ruin

6    lives for profit.  Isn't it true that you use dirt that comes

7    to you, and that you will agree to take it down or put it up

8    if people pay you money?

9    A.   No.

10   Q.   You deny that?

11   A.   Totally deny it.

12   Q.   Have you ever hired a lawyer with a contingency fee

13   agreement to do that to a professional baseball player?

14          MR. GINGRAS:  Your Honor, can we approach?

15          THE COURT:  Okay.

16                     (Bench conference.)

17          MR. GINGRAS:  I think I said before, and I'll just

18   say it again, this is completely irrelevant.  This is a

19   different bad act he's attempting to prove that is two years

20   after these posts, has nothing to do with it.  It's a

21   collateral issue.  It's inflammatory, has nothing to do with

22   this case.

23          MR. DETERS:  Credibility is always an issue.  He lied

24   and just said he never does it, Your Honor, and I got

25   black-and-white proof that he has.

1           THE COURT:  Just the one instance or other instances?

2           MR. DETERS:  Well, other instances, but my rebuttal

3   witness is coming tomorrow morning, and she ought to be

4   allowed to testify, because he just lied.

5           THE COURT:  I think it's admissible not so much on

6   credibility but on malice.

7           MR. DETERS:  Malice, right.  That's right.

8           MR. GINGRAS:  Your Honor, she doesn't have an

9   extortion claim in this case.

10          MR. DETERS:  Oh, yes, she does.

11          MR. GINGRAS:  I'm sorry, I've read no pleading that

12  includes a claim --

13          MR. DETERS:  Your Honor, I've got a fee contract

14  where Nik Richie and her signed the same fee agreement with

15  the lawyer to get confidentiality from Barry Larkin for

16  $500,000.

17          MR. GINGRAS:  Your Honor, that's a 403(b) different

18  bad act he's trying to use solely to --

19          MR. DETERS:  It is.  It's malice.

20          MR. GINGRAS:  First of all, malice is not an

21  exception to 403(b); and secondly, malice toward a third

22  party, Judge.  A third party.  He's trying to show malice

23  toward a third party to imply there might be malice toward his

24  client.  Again, this is a different appeal issue we're going

25  to have.

1          THE COURT:  He's trying to show what kind of web

2     site.

3          MR. DETERS:  I'm going to ask him the question, too,

4     were you waiting for the Joneses to pay you some money.

5          THE COURT:  I think it's admissible.

6          MR. GINGRAS:  Your Honor, I think it jeopardizes the

7     appeal we're going to have.

8          MR. DETERS:  You keep threatening the Judge with that

9     appeal.

10          MR. GINGRAS:  I'm just making my record, Your Honor.

11          THE COURT:  This is like I see it.  It will be like

12     they see it on the appeal.

13               (Bench conference concluded.)

14     BY MR. DETERS:

15     Q.  Did you deny that?

16     A.  Yes.

17     Q.  You know a Heidi Heiser?

18     A.  Yeah.  It's your client.

19     Q.  Do you know a Jorge?

20     A.  No.

21     Q.  Hold on a second.  I might mispronounce it.  Do you know

22     a law firm of Jorgensen & Salberg?

23     A.  Yeah, they do -- they're actually my wife's law firm.

24     Q.  All right.  Isn't it true that that law firm, Jorgensen &

25     Salberg, entered into a fee agreement with both you and Heidi

1   Heiser to negotiate a confidentiality agreement concerning

2   Barry Larkin?

3           MR. GINGRAS:  Objection; foundation, Your Honor.

4   A.   If it is, I've never seen it.

5           THE COURT:  Excuse me.  He's laying the foundation.

6   He's asking him if it's true or not.

7   A.   If it is, I haven't seen it.

8   Q.   You've not seen it?

9   A.   No.

10          MR. DETERS:  May I approach the witness, Your Honor?

11  Q.   Or actually, you can look at that.  Look at Exhibit 42,

12  please.

13          THE COURT:  Just hand him the document and return to

14  the podium.

15          MR. DETERS:  Okay.

16          THE COURT:  I want to see what the question is.

17  Q.   This is Plaintiff's Exhibit 42.

18          THE COURT:  Okay.  The question is, did you enter

19  into this agreement?

20          THE WITNESS:  No.

21  Q.   Did you enter into a fee agreement with this law firm

22  with Heidi Heiser?

23  A.   No.

24  Q.   Were you planning on it?

25  A.   No.

1   Q.   Can you explain why your lawyer has your name and her

2   name on a contingency fee agreement?

3   A.   This is the first I've ever -- first time I've ever seen

4   it.

5   Q.   First time you've ever seen it?

6   A.   Yep.

7   Q.   Isn't it true that you went to Heidi Heiser's house to

8   get her cell phone?

9   A.   No.

10  Q.   You deny that?

11          THE COURT:  Okay.  I think we're going afield on this

12  line of questioning.  On a question like this, you've got to

13  take the witness' answer.

14          MR. DETERS:  All right.

15          THE COURT:  So he denies any such agreement.  Go on

16  to something else.

17  Q.   So you deny it?

18  A.   Heidi Heiser is a person who reached out to us.  She had

19  a 20-year affair with Barry Larkin.  Her -- Barry Larkin's

20  attorney, who was Frank Keyes, I believe, was a friend of

21  yours.  And what happened with Heidi Heiser is she wanted to

22  get her story out.  We posted it on the web site.

23          She had a 20-year affair.  She was very upset because

24  Barry Larkin got inducted into the Hall of Fame and she had

25  been sleeping with Barry Larkin; and she had images and

1  pictures of the affair, and she submitted it.  And I sourced

2  it, put the story up, and I even put on the post that --

3  because Frank Keyes, who was their attorney, wanted to pay to

4  get the digital rights to the images or whatever it was, and I

5  said no.

6  Q.  My final question to you on this matter is:  Did you

7  enter into an agreement with an attorney and Heidi Heiser to

8  extort money from Barry Larkin to take it down?

9        MR. GINGRAS:  Objection, Your Honor; argumentative,

10  irrelevant.

11  A.  Has nothing to do with Sarah Jones, but my answer's no.

12        THE COURT:  He's already answered it, hasn't he?

13  A.  My answer is no.

14  Q.  So you deny it.  Okay.

15  A.  This is the first I've ever seen it.

16  Q.  Moving on.

17  A.  This thing doesn't even have my signature.  What is this?

18  Q.  Now, you've testified that those posts that were up there

19  on Sarah, those three main ones that we allege, that you say

20  you don't know if they're false or not, right?

21  A.  Correct.

22  Q.  Did you hear your lawyer, in his question, say the only

23  thing that was false was the STDs, the sex with the spouse at

24  the school, and sex with every Bengal, and then you corrected

25  him and said you don't know?  Do you remember that exchange?

1    A.   Can you repeat it?

2    Q.   Well, I'll just do it.  So you're saying that you don't

3    know whether or not those are false, right?

4    A.   I don't know if they're true and I don't know if they're

5    false.  I don't fact-check.

6    Q.   You do acknowledge they're about Sarah?

7    A.   Sarah's within the posts.

8    Q.   And you do acknowledge they were published, to use your

9    word, 50,000?

10   A.   They were published on The Dirty.

11   Q.   Okay.  Now, your lawyer went through with you the terms

12   of service.  Remember that, your agreement that you have on

13   your web site, it's called the Terms of Service?

14   A.   Yeah.

15   Q.   And it's my understanding, Mr. Richie, that someone

16   submits it to the web site, they have to click on and agree to

17   the terms, right?

18   A.   Yes.

19   Q.   And then they submit something anonymously?

20   A.   Well, no.  They can source themselves.

21   Q.   Well, what good does it do, sir, to agree to terms of

22   service if they're anonymous?

23   A.   I don't understand.

24   Q.   You don't understand?

25            THE COURT:  He said something I didn't understand.

1    What do you mean, they can source themselves?

2    Q.   In other words, they can't identify --

3              THE COURT:  Hold on.

4              MR. DETERS:  I'm sorry.

5              THE COURT:  He said -- you say, then they submit

6    something anonymously, and he said, no, they can source

7    themselves.  What does that mean?

8    Q.   What does that mean?

9    A.   It means they can put their real name if they'd like.

10   Q.   But if they don't, they're anonymous?

11   A.   Yeah, they can submit anonymously.

12   Q.   So isn't it true that your lawyer established that people

13   could agree to the terms of service and then submit some libel

14   anonymously?

15   A.   The terms of service, what we request is that they submit

16   truthfully, but it's not my job to fact-check that.

17   Q.   Well, if they lied, you're not going to know who they are

18   because they're anonymous.

19   A.   Well, Sarah lies all the time.  We all know who she is.

20   Q.   Okay.  Got to ask you this.

21   A.   Yeah.

22   Q.   Isn't it true you don't know who submitted these posts

23   because they were anonymous?

24   A.   Yes.

25   Q.   All right.  Now, you know that.  So since you're the

1    editor and you know people are submitting things anonymously,

2    and you know that they're punching terms of service that you

3    can't track them, isn't it true then, you know that there's a

4    likelihood of what you put up and let stay up is false?

5            MR. GINGRAS:  Objection, Your Honor.  Calls for

6    speculation.

7            THE COURT:  I'll overrule it.  He can answer.

8    A.   It could be true, could be false.

9    Q.   All right.  But you don't police it because you can't

10   track them down, right?

11   A.   No.  Well, I have IP addresses if I really wanted to

12   track them down, but that's not what we do.

13   Q.   Well, did you really -- wait.  We asked for discovery for

14   who posted it.  Did you get the address so we could find out

15   who posted it?

16   A.   You asked me if I could.  I said yes.  He said, okay.

17   We'll reach out and do that.  You never did.

18   Q.   Are you sure about that?

19   A.   Check the deposition.

20   Q.   Did you check out who it was?

21   A.   No.  You never asked me to.

22   Q.   I'll check the deposition.

23        Do you know a Jorge -- and I'm sorry, I don't know

24   Spanish so I'm going to spell it.  J-o-r-g-e, Jorge A. Lopez?

25   A.   Yeah.  It's pronounced George.

1    Q.   Okay.  Jorge Lopez.  How do you know him?

2    A.   He's dealt with legal matters for my wife, Shayne.

3    Q.   And he's the lawyer at that law firm we spoke about

4    before, correct?

5    A.   Correct.

6    Q.   Now, Plaintiff's Exhibit 31, if you could turn to that.

7    Isn't it true that this is a letter that you sent to Sarah

8    after the "Anderson Cooper" show?

9    A.   Do you know what page it is?

10   Q.   Exhibit 31.  Just look at the blue cover sheets.  You'll

11   find it.

12   A.   Yeah, I sent this e-mail.  Yeah, I remember this was the

13   day my daughter was born.

14   Q.   Now, isn't it true that you testified at your deposition

15   the things that you block and you don't put up are usually

16   really, really nasty things like "Jim Johnson raped that

17   girl," things that are way over the line?

18   A.   I believe I told you I was like a lifeguard.  If there

19   wasn't a lifeguard, then, you know, you can throw anything

20   into the pool.

21   Q.   Okay.

22   A.   Are we going to talk about the e-mail?

23   Q.   No.  That's all I wanted to ask you about it.

24   A.   Okay.

25   Q.   Now, you said you didn't understand -- when I asked this

1    before, you said to your counsel, when posting in another

2    name, you didn't understand so I'm going to explain it again.

3    What I put up before was, I was saying Judge Smith is a

4    pedophile, and my name is signed to it.  And what I asked you

5    is, do you ever write something -- and you would be writing

6    "Judge Smith is a pedophile" -- and then putting somebody's

7    name to it which didn't write it?

8         And what you testified to, I understand, during your

9    cross-examination is you would never do that without their

10   permission, correct?

11   A.   Correct.

12   Q.   All right.  You are aware that the comment, "Why are all

13   high school teachers freaks in the sack?" that we're not

14   making any claim to that?  You do know that, don't you?

15   A.   Yeah, from what I heard.  Sarah admitted that she was.

16   Q.   What is Slangville?

17   A.   It's a web site.

18   Q.   Is there a connection to thedirty.com to Slangville?

19   A.   No.

20   Q.   Okay.

21        MR. DETERS:  That is all the questions I have,

22   Mr. Richie.  Thank you very much.

23        THE COURT:  Any further questions?

24        MR. GINGRAS:  About three or four follow-ups, Your

25   Honor.

1          THE COURT:  Okay.  That's fine.  Go ahead.

2                    REDIRECT EXAMINATION

3    BY MR. GINGRAS:

4    Q.   Nik, did you ever ask Sarah Jones for money to remove her

5    posts?

6    A.   Never.

7    Q.   And you, in fact, did remove them, right?

8    A.   Yes.

9    Q.   Okay.  I just heard Mr. Deters talk to you about the fact

10   that comments are submitted anonymously to the web site.  You

11   remember talking about that?

12   A.   Yes.

13   Q.   When a comment is submitted anonymously, you, in fact,

14   today, have a way of tracking who submitted that comment,

15   don't you?

16   A.   Yes.

17   Q.   Explain what that process is.

18   A.   I see IP addresses on the back end.  The servers log IP

19   addresses.

20   Q.   Okay.  So to use our -- to go back to our example, if I

21   wanted to log in to thedirty.com and use the Submit Post form

22   to submit a comment about Judge Smith or whoever Mr. Deters

23   was saying, would -- your system, your computer system, would

24   capture my IP address?

25   A.   Correct.

1    Q.   And what is an IP address?

2    A.   IP address is like a number that is assigned to a

3    computer or I guess you could say your Internet browser so you

4    could actually find the location of where the submission came

5    from.

6    Q.   Okay.  So if there's a post on your web site and I feel I

7    have been defamed by it, I could submit a subpoena to you to

8    ask you to reveal the IP address and use that to track who

9    defamed me?

10   A.   Correct.

11   Q.   Okay.  Is there some reason why the IP addresses of the

12   posts about Ms. Jones weren't tracked or weren't available?

13   A.   Well, back then, we weren't logging IP addresses.  We

14   were transferring servers for some reason.  It wasn't visible.

15   Q.   Okay.  So back in 2009, due to some technical difference

16   in your computer system, IP addresses were harder for you to

17   locate or before maybe unavailable?

18   A.   Correct.

19   Q.   Are they available now?

20   A.   Yes.

21   Q.   Does that include retroactively?  Can you go back under

22   your new system and find IP addresses that you thought weren't

23   available?

24   A.   I don't know.  I don't think so.

25   Q.   Do you have a technical person who handles that sort of

1    thing?

2    A.    Yes.

3    Q.    Okay.  But as of today, as of 2013 and 2012 and 2011, are

4    all IP addresses logged for both posts and comments about

5    posts?

6    A.    Yes.

7    Q.    So if somebody wanted to accuse you, for example, of

8    creating a post, you would have an IP address that actually

9    identified the original source from which that content was

10   posted?

11   A.    Correct.

12   Q.    And does that give you some comfort that when the user

13   submits something to your web site, agrees to your terms of

14   service, agrees not to defame anyone, agrees not to lie, that

15   if they break those rules, there might be a way to hold them

16   accountable by tracing their IP address?

17   A.    Correct.  It's third party.  You know, it's not me saying

18   that.  It gives it more validity.

19   Q.    Okay.  And when courts issue subpoenas and you receive

20   them, do you comply with them?

21   A.    Yes.

22   Q.    Okay.

23          MR. GINGRAS:  No further questions, Your Honor.

24          THE COURT:  Stick to the scope.

25

| | |
|---|---|
| 1 | FURTHER CROSS-EXAMINATION |
| 2 | BY MR. DETERS: |
| 3 | Q.  With respect to the IP addresses, you are aware that lots |
| 4 | of people use fake IP addresses? |
| 5 | A.  I'm not -- I'm not aware of that. |
| 6 | Q.  All right.  First question he asked you, Sarah Jones, |
| 7 | offering money, her and her family offering money to take it |
| 8 | down.  Do you remember that question, first question that he |
| 9 | just asked? |
| 10 | A.  Yes. |
| 11 | Q.  I thought of something.  They asked for you to take it |
| 12 | down, according to you, 13 times, according to her, over 25 |
| 13 | times.  Were you waiting for them to offer money to take it |
| 14 | down? |
| 15 | A.  No.  That's ridiculous. |
| 16 | Q.  It's ridiculous? |
| 17 | A.  Yeah. |
| 18 | MR. DETERS:  Thank you. |
| 19 | THE COURT:  Is that all for this witness? |
| 20 | MR. DETERS:  Yes, Your Honor. |
| 21 | THE COURT:  You can step down, sir. |
| 22 | THE WITNESS:  Thank you. |
| 23 | (The witness was excused.) |
| 24 | THE COURT:  Plaintiff have anything else? |
| 25 | MR. DETERS:  Your Honor, other than the television |

1    commercial and the rebuttal witness tomorrow morning, which

2    will be short, that's it.

3              THE COURT:  Television commercial or "Dr. Phil"?

4              MR. DETERS:  "Dr. Phil."  I'm sorry.

5              THE COURT:  Okay.

6              MR. DETERS:  Misspoke.  Long day.

7              THE COURT:  And you have another witness that you say

8    will be short?

9              MR. DETERS:  Unfortunately, I do not know.

10             THE COURT:  Does the defense anticipate having any

11   further evidence?

12             MR. GINGRAS:  No, Your Honor.

13             THE COURT:  Okay.  Well, we should be able to get it

14   to the jury tomorrow, then, before the snow hits, although now

15   they say it's not going to be as bad as they did this morning.

16             All right.  So I'll excuse you overnight.  Counsel

17   can come into chambers afterwards and we'll try to deal with

18   the instructions.

19             As far as your part is concerned, I'll excuse you

20   overnight, ask you to return at 9:00 in the morning so we can

21   get off to a good start again.  Hopefully, we'll get it to the

22   jury by noon.  The instructions won't be long because we're

23   working hard to keep them short.  And the closing arguments

24   won't be that long either.  Yes?

25             MR. WARD:  No, Your Honor, I was just standing up.  I

1   apologize.

2          THE COURT:  All right.  They probably want more than

3   the five minutes I'm inclined to give them, but I'll keep them

4   to about a half hour, probably, each.  I think everything can

5   be said in a half hour that needs to be said.

6          So ladies and gentlemen, I'll excuse you overnight.

7   Return at 9:00 tomorrow morning.  You know what I'm going to

8   say.  Continue to heed the admonition of the Court.  Don't

9   discuss the case among yourselves.  Don't discuss it with

10  anyone else.  Don't go on line and look at anything.  Don't

11  Google any witnesses.  Don't post anything on Facebook.  Don't

12  read anything on Facebook.  When the case is all over, you can

13  talk about it all you want.  Overnight here, let's not ruin

14  the case by spoiling everything.  One more night to exercise

15  self-restraint.

16         All right.  We'll see you at 9:00 in the morning.

17  Let me see counsel in chambers now.  Let me see if we can deal

18  with these instructions.

19              (The jury left the courtroom at 4:01 p.m.)

20                          -   -   -

21                  C E R T I F I C A T E

22         I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that the
    foregoing is a correct transcript from the record of
23  proceedings in the above-entitled case.

24   \s\ Joan Lampke Averdick              March 6, 2013
     JOAN LAMPKE AVERDICK, RMR-CRR         Date of Certification
25   Official Court Reporter

                                    INDEX
PLAINTIFF'S WITNESSES


SARAH JONES
          Cross-examination.......................... Page    3
          Redirect examination....................... Page   79


DEFENSE WITNESSES


NIK RICHIE
          Cross-examination.......................... Page   93
          Direct Examination......................... Page  163
          Recross-examination........................ Page  197
          Redirect Examination....................... Page  211
          Further cross-examination.................. Page  214

KRISTY MOLONY
          Direct Examination......................... Page  148
          Cross-examination.......................... Page  157
          Redirect Examination....................... Page  158
          Recross-examination........................ Page  159


PLAINTIFF'S EXHIBITS                                      ADMITTED


Exhibit No. 24, Fourth posting on thedirty.com, 12/8/09
Admitted........................................... Page  129


DEFENSE EXHIBITS


Exhibit A, Ben-Gal Cheerleader Regulations
Admitted........................................... Page    3

Exhibit B, Photo of Sarah Jones
Admitted........................................... Page    7

Exhibit C, Photo of Ben-Gal cheerleaders' trip to Kuwait
Admitted........................................... Page    8

1

Exhibit D, Biography of Sarah Jones on Bengals website
Admitted........................................... Page  11

2

Exhibit E, Ben-Gal cheerleaders' calendars
Admitted........................................... Page  12

3

Exhibit F, Poster of Pro Bowl cheerleaders
Admitted........................................... Page  14

4

5

Exhibit G, Photo of Sarah Jones at Pro Bowl
Admitted........................................... Page  15

6

Exhibit H, Sarah Jones' medical records
Admitted........................................... Page  21

7

8

Exhibit I, Sarah Jones' plea documents in state court
Admitted........................................... Page  26

9

10                            -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25