1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
2              NORTHERN DIVISION AT COVINGTON

3

SARAH JONES,              :  Docket No. CV 09-219
4                       :
         Plaintiff,      :  Covington, Kentucky
5                       :  Thursday, January 24, 2013
        versus          :  9:00 a.m.
6                       :
DIRTY WORLD, LLC, et al.,    :
7                       :  **DAY 3 of 3**
        Defendants.     :
8

9                        - - -

10             TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE WILLIAM O. BERTELSMAN
11           UNITED STATES DISTRICT COURT JUDGE

12                       - - -
APPEARANCES:
13

For the Plaintiff:       ERIC C. DETERS, ESQ.
14                     Eric C. Deters & Partners, PSC
                     5247 Madison Pike
15                    Independence, KY 41051

16  For the Defendants:      ALEXANDER C. WARD, ESQ.
                     ALEXIS MATTINGLY, ESQ.
17                    Huddleston Bolen, LLP - Ashland
                     855 Central Avenue, Suite 301
18                    P.O. Box 770
                     Ashland, KY 41101
19                     and
                     DAVID GINGRAS, ESQ.
20                    Gingras Law Office, PLLC
                     E. Chandler Boulevard
21                    #106-243
                     Phoenix, AZ 85048
22

Court Reporter:          JOAN LAMPKE AVERDICK, RMR-CRR
23                    Official Court Reporter
                     35 W. Fifth Street, Box 1073
24                    Covington, KY 41012
                     (859) 291-9666
25        Proceedings recorded by mechanical stenography,
transcribed by computer.

1      (Proceedings commenced at 10:00 a.m.)

2      THE COURT:  Good morning, everybody.  I understand in

3   spite of our lengthy dialogue in chambers, you want to bring

4   something up?

5      MR. WARD:  I beg your indulgence for one moment, Your

6   Honor.  It's merely this:  Your Honor has ruled on the issue

7   that it can't come in for credibility, but that it could for

8   motive or malice on this one thing.

9      THE COURT:  There were several things I mentioned

10  under 404(b).

11     MR. WARD:  Yes, Your Honor, and I'm not trying to

12  recite that all.  My only point would be, this is an

13  undisclosed witness.  If it were coming in for motive, malice,

14  and hint of plan, that's case-in-chief evidence for them on

15  how they operated the site, not rebuttal.  Credibility would

16  be rebuttal.  As it's an undisclosed witness, it shouldn't be

17  permitted unless it's purely rebuttal, and that is not

18  rebuttal evidence.

19     THE COURT:  Well, he is still on the case in chief.

20     MR. WARD:  But she's undisclosed.  He can't call a

21  witness that was disclosed at trial for the first time on case

22  in chief.

23     MR. DETERS:  Your Honor, this witness came available

24  to me way past the disclosure of witnesses.  And what have I

25  done?  I talked about this witness before the trial got

1    started, so they've known about this witness for three days.

2    There's been no ambush surprise.  I gave them the documents

3    that we used in testimony yesterday relative to it.  I mean --

4         MR. WARD:  We found out on Tuesday, right before

5    opening arguments.

6         THE COURT:  How long have you known about the

7    witness?

8         MR. DETERS:  Well, first, I've known about her, I

9    guess, for several weeks.  As far as knowing that she would be

10   able to -- there might be something that she would be able to

11   say relevant to this case, days before the trial.  Because it

12   was one of those things where it was like -- and I can prove

13   that.

14        THE COURT:  When was the witness disclosed to you?

15        MR. WARD:  Tuesday, in your chambers, in opening.

16        MR. DETERS:  And again, Your Honor, a rebuttal

17   witness.  And we did research on that issue.  I said, well, I

18   just found out about it.  She's a rebuttal witness.  What's

19   the rule of disclosing a rebuttal witness, or I'm not going to

20   call -- I can't call her.  In fact, I said that.  I can't call

21   her until I find out what his testimony's going to be.

22        MR. WARD:  But the ruling as to why she would be

23   relevant is all case-in-chief evidence, not rebuttal, because

24   it's not about his credibility.

25        MR. DETERS:  Well, the bottom line is, Your Honor,

1    this witness came to me late.  I've addressed it with the

2    Court and counsel in chambers before the trial started.

3         THE COURT:  They haven't had time to take her

4    deposition or anything.

5         MR. WARD:  And, Your Honor --

6         MR. DETERS:  They didn't ask for her deposition.

7         MR. WARD:  -- if he said they found out about her, he

8    should have said may call.  He could have done a supplement.

9    He didn't have to know will call.  We didn't know that until

10   we show up for openings.

11        MR. DETERS:  And the other thing, Your Honor, is

12   because I didn't pay for the flight for her to come in and she

13   didn't get on the airplane until after yesterday's court that

14   I knew that I was going to be allowed to call her.  So they

15   keep -- it's funny, you make a ruling, then they come up with

16   more arguments.

17        THE COURT:  Well, that's the nature of lawyers.

18        MR. DETERS:  I know.

19        MR. WARD:  It's not our fault her flight --

20        THE COURT:  Are you going to play the DVD first?

21        MR. DETERS:  I'm ready to play the DVD.

22        THE COURT:  Go ahead and play that while I think

23   about this.  Let me get the facts straight now.  You did not

24   find out about this witness --

25        MR. WARD:  Until your chambers.

1          THE COURT:  Until chambers.  Question is, is it a

2     rebuttal witness.  Well, we kind of have mixed up the cases so

3     neither side's really rested; but, on the other hand, he

4     testified he never did this stuff.

5          MR. WARD:  But Your Honor ruled it can't go to that

6     issue on credibility.

7          MR. DETERS:  Except the exceptions that you

8     mentioned; intent, malice.

9          THE COURT:  It would be admissible.  We're now on

10    whether it should have been disclosed earlier.  I'm pretty

11    strict about that.  Play the DVD while I think about it.

12         MR. WARD:  Thank you, Your Honor.

13         THE COURT:  Bring in the jury.  I have to bring in

14    the jury first.

15         COURT SECURITY OFFICER:  Yes, sir.

16         THE COURT:  Make sure you only show the parts we

17    discussed.

18         MR. DETERS:  We've got it ready, Your Honor.

19              (The jury entered the courtroom at 9:21 a.m.)

20         THE COURT:  All right.  You may be seated, ladies and

21    gentlemen.  Good morning.  Thank you for coming in on time.

22    We've been resolving some last-minute issues in chambers.  The

23    next order of business is for counsel to play a DVD of the

24    "Dr. Phil" interview.  So you may proceed.

25                        (Video playing.)

1           *Dr. Phil:  How are you?  Okay.  Take a look at this*

2    *web site.  It's called thedirty.com.  Now, let's look at some*

3    *of the posts.  They are saying that this woman [bleeped] my*

4    *best friend's boyfriend, and she has always been the type to*

5    *just go there, especially with big-cheeked forgies like this.*

6           MR. GINGRAS:  Your Honor, can we approach?

7           THE COURT:  I thought we were just going to do the

8    interview of Nik.

9           MR. DETERS:  The interview -- the introduction where

10   they had that woman was cut.  We went past that part.

11          MR. GINGRAS:  Your Honor, can we approach?

12          THE COURT:  Just go to where they start to ask him

13   questions.

14          MR. DETERS:  Okay.

15          THE COURT:  Now, is that your objection?

16          MR. GINGRAS:  Yes.

17          THE COURT:  I thought we said we were going to do

18   that.

19                    (Video on the screen.)

20          MR. GINGRAS:  Your Honor --

21          THE COURT:  Turn the video off.  Send the jury out.

22   Have you got it fixed, or should I send the jury out?

23          MR. DETERS:  No, send the jury out and we'll get it.

24          THE COURT:  All right.  Pardon us, ladies and

25   gentlemen.  We'll send you out until we get this fixed.

1          (The jury left the courtroom at 9:24 a.m.)

2          THE COURT:  Okay.  Get it fixed.

3          MR. DETERS:  There you go.  Perfect.  Ready to go.

4     It's where it needs to be, Your Honor.

5          THE COURT:  Okay.  Well, start it up and be sure it

6     is.  Play a couple minutes and see where it is.

7               (Video playing.)

8          *Dr. Phil:  Okay.  So you created this web site,*

9     *right?*

10         THE COURT:  Okay.  Stop right there.  Are we at the

11    right place?  Okay, you can stop it.

12         MR. WARD:  Your Honor, my problem now is that even

13    though in chambers we said we weren't showing all the intro

14    stuff, the jury just watched it.

15         THE COURT:  They only watched about a minute of it.

16         MR. DETERS:  Your Honor, with all due respect of what

17    he's talking about, the intro was not played.  That was not

18    the intro.  That is when he comes out on the stage and starts.

19    And we spoke about that.  The intro where they showed the girl

20    that he interviewed was not part of that, Your Honor, was not

21    part of that.  Furthermore --

22         THE COURT:  I'll instruct the jury only to consider

23    what is starting now.

24         MR. WARD:  Only the interview.

25         MR. DETERS:  And furthermore, the Court is aware of

1    this, is that they have shown the jury parts of their web

2    site.  In addition to that, with respect to this case, the

3    Court said they were allowed to see other samples of it.  So

4    there was absolutely nothing prejudicial at all.

5            THE COURT:  It wasn't that broad.  In this video, I

6    held that it is the statement of a party.  Well, the first

7    part you played was not the statement of a party.  I'm going

8    to instruct the jury not to consider it.  It wasn't that much

9    of it anyway.  It was just about a minute.

10            MR. DETERS:  Thank you.

11            THE COURT:  This is a statement of a party.

12            MR. DETERS:  Right.  Correct.

13            THE COURT:  Don't let it go beyond where he gets

14    done.

15            MR. DETERS:  We're not.

16            THE COURT:  Okay.  So we're ready then.  Now bring

17    the jury back.

18            COURT SECURITY OFFICER:  Yes, sir.

19            (The jury entered the courtroom at 9:28 a.m.)

20            THE COURT:  All right.  You may be seated, ladies and

21    gentlemen.  They're now to the right place.  Do not consider

22    anything that you have seen before what we're about to see

23    here.  Go ahead.

24                (Video playing.)

25            *MR. RICHIE:  When I created this -- when I started*

the site, I was looking at reality TV and how popular it was
and how popular celebrity gossip was, and I thought no one
actually did reality Internet; how could the tables be turned
in a gossip-type manner where it's about real people.

DR. PHIL:  Okay.  So you understand that these are --
as you say, these aren't public figures.

MR. RICHIE:  Right.

DR. PHIL:  And there is a distinction between a
public figure and not a public figure, in terms of some of the
definition of the law, which we'll get to in a minute.  But
these are just regular people going about their own business.

MR. RICHIE:  (Nods affirmatively.)

DR. PHIL:  Somebody takes their picture that doesn't
like them, or for whatever reason, and then they just write
terrible, insulting, humiliating things about them on the web
site.

MR. RICHIE:  It goes both ways, but yeah.  There's a
marketplace for it, and what I'm doing is a business.

DR. PHIL:  There's a marketplace for heroin, too, but
that doesn't justify being a heroin dealer.

MR. RICHIE:  Yeah, but if 15 million people are
coming to my site, then obviously it's something that's
demanded and needed, and I don't --

DR. PHIL:  Whoa, whoa, whoa.  Wait a minute.  You
just said it's demanded and needed.

1          MR. RICHIE:  Correct.  Yeah, I believe it is.

2          DR. PHIL:  You think it's needed?  You think this is

3     a necessary element in today's society?  Come on --

4          MR. RICHIE:  I think it's a form of holding people

5     accountable for their actions, Dr. Phil.

6          DR. PHIL:  Holding them accountable?  You actually

7     think you're holding people accountable?  Who are you holding

8     people accountable?

9          MR. RICHIE:  I'm not anybody.  But here's the thing:

10    People are sending me stuff from all over the world.  And I

11    didn't ask to be the guy.  I just stumbled upon it and the

12    timing was right.

13         DR. PHIL:  You do ask to be the guy.  You have a web

14    site called thedirty.com.

15         MR. RICHIE:  Which posts people's dirt, correct.

16         DR. PHIL:  You're wanting dirt on people.  And it's

17    not -- you're not posting people's dirt.  Many times, you

18    realize that you're posting lies about people.  Now, come on.

19         MR. RICHIE:  I moderate everything.  It's not like it

20    just comes up.  I go through it, and the stuff I don't

21    believe, I delete.  But lots of stuff comes -- people can say

22    whatever they want, yeah.  Yeah, I don't -- I'm not in these

23    people's lives.

24         DR. PHIL:  Let me -- let me be sure I understand what

25    you just said.  You go through and you delete --

1          MR. RICHIE:  The stuff that's too far-fetched.

2          DR. PHIL:  -- what you don't believe?

3          MR. RICHIE:  Yes.

4          DR. PHIL: Okay.  So you do edit the site?

5          MR. RICHIE:  Yes, everything's moderated.

6          DR. PHIL:  Okay.  So you do take ownership of this

7   site because you're editing it and therefore responsible for

8   what clears and what doesn't.

9          MR. RICHIE:  I'm not the one submitting the stuff.

10          DR. PHIL:  I didn't say you were.  I understand that.

11   You're hiding behind the legal loophole that I think is

12   fast-closing on that.  But you also just said that you edit

13   this site so, therefore, you take responsibility and have

14   control over it.

15          MR. RICHIE:  Yes.

16          DR. PHIL:  That's interesting that you say that.  I

17   would suspect that's probably going to be of some interest.

18   But nonetheless, you understand that people write outrageous

19   things about people?  They call them -- they call them gay.

20   They accuse them of doing all kinds of sexual misconduct.

21          MR. RICHIE:  I'm not the one sending it.  It's their

22   friend; it's their coworker.

23          DR. PHIL:  I think you -- I think what you're

24   doing --

25          MR. RICHIE:  Is news.

1          *DR. PHIL:  -- is very destructive to people.*

2          *MR. RICHIE:  No, it's new-wave social media, and I*

3    *think it's definitely revolutionary.*

4          *DR. PHIL:  You posted about one girl here.  You*

5    *allowed someone to post, 'She gave her stepfather a --'*

6                        (Video paused.)

7          THE COURT:  Hang on.

8          MR. GINGRAS:  Your Honor, can we approach?

9          THE COURT:  If you really have to.

10                       (Bench conference.)

11         MR. GINGRAS:  The part that they're about to play, or

12   they already played part of it again, he's quoting stories

13   about other people.  That's what Dr. Phil's just about to

14   read.  Again, it's not about the operation of the web site.

15   It's about other --

16         THE COURT:  They're asking the plaintiff who's a

17   party to the case.  As I recall, he tells them what his

18   philosophy is on these matters.  It's coming right out of his

19   mouth.

20         MR. GINGRAS:  Regarding other people.  And we already

21   talked about the fact that we don't know whether --

22         THE COURT:  It goes to malice.

23         MR. GINGRAS:  Whether the statement's true or false,

24   Your Honor, has a lot to do with malice.  We don't know if

25   it's true or false.

1          MR. DETERS:  It's Nik's question.  It states how he

2    operates the site.

3          THE COURT:  It's out of his mouth.

4          MR. WARD:  Aside from that, I would just post one

5    more objection, if nothing else, for the record, about the

6    fact that we're getting to hear Dr. Phil's opinions about

7    whether the site's good or bad.

8          THE COURT:  He's responding to what your client says.

9               (Bench conference concluded.)

10         THE COURT:  Ladies and gentlemen, this DVD is

11   admissible for what the defendant says, not what Dr. Phil

12   says.  All right.  Go ahead.

13                    (Video playing.)

14         *DR. PHIL:  -- in exchange for her boob job.  So you*

15   *take off the things that you think aren't realistic, and you*

16   *think that's --*

17         *MR. RICHIE:  I don't take off.  The submissions that*

18   *come in that are just too out of the ordinary, they don't even*

19   *go up.*

20         *DR. PHIL:  Only that one --*

21         *MR. RICHIE:  Only 10 percent of the stuff -- only*

22   *about 10 percent of the stuff that gets submitted makes the*

23   *web site.*

24         *DR. PHIL:  But you thought that was -- that one was*

25   *reasonable so you posted that one?*

1    MR. RICHIE:  According -- according to what I saw of

2    the image, I thought it looked realistic, yeah.

3          DR. PHIL:  You thought that looked realistic?  You

4    said she had herpes.

5          MR. RICHIE:  I didn't say that.

6          DR. PHIL:  Well, it's on your site.

7          MR. RICHIE:  Yeah.

8          DR. PHIL:  'She's got herpes.'  We're going to talk

9    to her in a little bit.  You thought those were -- that you

10   had a reasonable basis for considering those to be --

11         MR. RICHIE:  My site's a form of entertainment, just

12   like this show's a form of entertainment.  You know what I

13   mean?  It's a business.  Stuff comes in, and it's going to get

14   a reaction.  And, you know, it is what it is, Dr. Phil.

15         DR. PHIL:  No, I --

16         MR. RICHIE:  There's a demand for it.  You look at

17   the great shows.  Even your show.  Look at when you met Oprah,

18   your services, and Oprah made a statement about 'I'm never

19   eating meat again,' and look what happened now.  It's the same

20   exact thing.  Timing is a place for everything, and that's

21   where I'm coming from.  This is a business.  It's a form of

22   entertainment.

23         DR. PHIL:  How is accusing an innocent girl that you

24   don't know of performing oral sex on her stepfather for a boob

25   job the same as Oprah saying, 'I'm never eating beef again'?

1    How in the hell --

2           MR. RICHIE:  I'm just saying it's a libel --

3                       (Applause.)

4           MR. RICHIE:  It's a comment.  The greatest thing

5    about America is freedom of speech, correct?  Can you agree

6    with me on that at least?  No, you don't believe in freedom of

7    speech?

8           DR. PHIL:  Finish your question.

9           MR. RICHIE:  I'm saying, it's freedom of speech.

10   Someone said it and it went up.  And something great came out

11   of it and the site is growing.  And more people are sending in

12   this stuff.  I'm just saying --

13          DR. PHIL:  I think one thing you should do is at

14   least be honest about what you're doing.  You're trying to say

15   this is needed; I'm feeling a need in society?

16          MR. RICHIE:  There's a hundred --

17          DR. PHIL:  Come on.  You're selling dirt.

18          MR. RICHIE:  There's 15 million people --

19          DR. PHIL:  You're selling dirt and lies and you're

20   making a profit off of it.  Listen, there's a definition of

21   cyber bullying, and I want us to take a look at that.  The

22   definition of cyber bullying, "When the Internet, cell phones,

23   or other devices are used to send or post a text or images

24   intended to hurt or embarrass another person."  Now, that's

25   from the National Crime Prevention Council.  And cyber

*bullying generally involves underage people. If they're over*

*18, then it's not considered cyber bullying. It's called*

*cyber harassment or cyber stalking, and it's a very serious*

*crime.*

     *So my question to you is, do you think that these*

*posts that are put up are intended to embarrass or humiliate*

*or hurt someone?*

     *MR. RICHIE: I think people like seeing their*

*neighbor get to their highest point and fall. So, yes, in a*

*certain way, it is.*

     *DR. PHIL: In a certain way? Come on. You're not*

*being genuine about this.*

     *MR. RICHIE: No, no, no.*

     *DR. PHIL: You're not at home what they're doing.*

*You're not writing them so I'm not asking you to defend what*

*they say. They're being posted on your site. This is to hurt*

*someone.*

     *MR. RICHIE: It's -- it's to get a rise out of*

*someone. I'm not going to say hurt because I don't think -- I*

*don't think that's what it is.*

     *DR. PHIL: Well --*

     *MR. RICHIE: It's not the direction I look at it as.*

     *DR. PHIL: Ryan Halligan was 13 years old, and on*

*October 7th of '03, he killed himself after people posting bad*

*things on the Internet about him. Jeffrey Johnston, 15,*

1    *killed himself.  Rachel Neblett, Megan Meier, Hope Witsell,*

2    *Jesse Logan, Phoebe Prince, Alexis Pilkington, Tyler Clementi,*

3    *because all, after embarrassing, humiliating things were*

4    *posted about them, committed suicide, took their own lives.*

5            *In my opinion, it's not a matter of if but when*

6    *that's going to happen based on what's being posted on*

7    *thedirty.com.*

8            *MR. RICHIE:  So you're saying these people did this*

9    *through cyber bullying off mainstream sites, because you*

10   *actually did the research.  This is Facebook, MySpace.  These*

11   *are social --*

12           *DR. PHIL:  What's the point?*

13           *MR. RICHIE:  These are sites that are mainstreamed*

14   *and nationally recognized.*

15           *DR. PHIL:  When somebody --*

16           *MR. RICHIE:  And you're saying that somebody's going*

17   *to kill themselves going on thedirty.com or being on*

18   *thedirty.com eventually.*

19           *DR. PHIL:  I think it's a real danger.  Don't you?*

20   *You've got to worry about that.*

21           *MR. RICHIE:  No.*

22           *DR. PHIL:  You have no worry about that?*

23           *MR. RICHIE:  No.*

24           *DR. PHIL:  You don't think that's foreseeable, based*

25   *on what you see in these situations?*

1          *MR. RICHIE:  No, because here's the thing, Dr. Phil.*

2     *If someone's on my site, it's not like I'm the anti-Christ*

3     *leaving it up there.  There's a 48- to 72-hour removal policy.*

4     *I take stuff down all the time.  You know, my legal teams, we*

5     *go through submissions.  If we see something that's even*

6     *borderline, if someone says they're going to commit suicide, I*

7     *take it down.  I'm not doing this to -- it's not a personal*

8     *vendetta against anyone.*

9          *DR. PHIL:  I don't think -- I don't think it's a*

10     *personal vendetta.  I think it's profit for you.  I think*

11     *you're doing it for profit.  I don't think you care.*

12          *MR. GINGRAS:  First of all, the fact that I've seen*

13     *one --*

14                         (Video stopped.)

15          MR. GINGRAS:  Your Honor, Your Honor, Your Honor --

16          THE COURT:  Turn it off.  Turn if off.

17          MR. DETERS:  Nothing was said.

18          THE COURT:  I didn't hear anything.

19          MR. DETERS:  Nothing was said.

20          THE COURT:  Turn it off so the jury can't see it.

21     Turn it off.

22           Okay.  Have a seat, Mr. Deters.  All right, ladies

23     and gentlemen.  You have just seen this video.  This is

24     admitted for the statements of the defendant, Mr. Richie.

25     Ignore any -- do not consider any audience reaction.  Do not

consider the statements of Dr. Phil.  Of course, if he asks a

question that relates to what the defendant's -- this is

admissible for the defendant's own statements about how he

runs his business and his philosophy in doing it.  It's

relevant to the issue of malice and punitive damages in this

case.  But again, ignore any audience reaction, ignore

statements made by Dr. Phil, unless they're necessary to put

what the defendant said in context.

All right.  Is that the video?

MR. DETERS:  Yes, Your Honor.

THE COURT:  Okay.  Let's excuse -- there are no other

witnesses except the one we were talking about?

MR. DETERS:  Correct, Your Honor.

THE COURT:  All right.  Let the jury be excused

again.  I'm sorry, ladies and gentlemen.  Can't be avoided.

(The jury left the courtroom at 9:40 a.m.)

THE COURT:  Okay.  While the film was going on, I had

someone go out and retrieve my pretrial order, which is

supplemental to Federal Rule of Civil Procedure 26(a).  Joint

Rule 26, whatever the letter -- 26 runs on for seven or eight

pages.  In 26, it says a witness list must be provided.  This

is my order, my standard order I send out in every case.  It

was sent out in this case at least four or five months ago.

(1) on page 1, "The attention of the parties is

directed to Federal Rule of Civil Procedure 26(a)(2) and (3).

1   These rules must be strictly observed.  Time deadlines therein

2   shall be computed from the date of the final pretrial

3   conference rather than the trial.  Parties shall not stipulate

4   out of the requirement of filing expert reports or witness

5   lists.  Counsel are admonished that the production of the

6   witness list and expert reports must be strictly complied

7   with.  A summary of the expected testimony of each witness

8   shall be included in the list.  The summary to be provided

9   must fairly reflect the substance of a witness' testimony.

10  Statements such as, "The witness will testify concerning the

11  physical condition of the plaintiff," are inadequate.  Failure

12  to list a witness or provide adequate summary or expert report

13  will result in the witness not being permitted to testify in

14  whole or in part."  And I cited in this a decision I made in

15  1985.

16          "If a witness has been deposed, a reference to the

17  deposition will suffice, but the witness will be limited to

18  the testimony in said deposition."

19          Let me read the second-last sentence again.  "Failure

20  to list a witness or provide adequate summary or expert report

21  will result in the witness not being permitted to testify, in

22  whole or in part."

23          Mr. Deters, if you knew about this witness a couple

24  of weeks ago, you should have made a disclosure then, both

25  under the civil rule and my order, so that witness will not

1    testify.

2              MR. DETERS:  Your Honor, may I make a record?

3              THE COURT:  Pardon me?

4              MR. DETERS:  May I make a record?

5              THE COURT:  Yeah, sure.  Go ahead.

6              MR. DETERS:  The docket of this Court, on

7    August 30th, 2012, shows that there was a motion of extension

8    of time to disclose Rule 26(a) information.  Subsequent to

9    that, pretrial memorandums were filed on August 31st, 2012 by

10   both parties.  Subsequent to that, on 9/17/2012, a motion to

11   stay this case was granted, and the plaintiff's motion for

12   leave and motion for extension of time was granted.

13             Subsequent to the stay of this Court, the matter was

14   lifted on October 18th, 2012, when the stay was lifted.

15             Then on November 30th, 2012, there was a discovery

16   dispute where there was a motion to compel.  Subsequent to

17   that, on December 7th, 2012, a telephone conference with the

18   magistrate where discovery was gone over.  And subsequent to

19   that, discovery was submitted.

20             Can I have one second?  I need to talk to a witness,

21   to the witness.

22             The first contact that I ever had with the witness,

23   Heidi Heiser, was December the 18th of 2012.  And that was

24   simply a cursory, hey, I see that you've got some case, or a

25   case, against thedirty.com.

1    Subsequent to that, it was not until close to trial

2    where information that I had indicated that she may or may not

3    be a witness.  And I'm going to go ahead right on the record

4    and admit that I did not know I was going to call her and I

5    did not disclose her to the other side because I didn't know

6    if I would ever get a chance to call her anyway.

7    Then I decided, based upon what I knew about her

8    testimony, I knew that her testimony would not be able to come

9    in, probably, unless it was rebuttal as to what he would

10   testify to.  The record will show that I did bring this up

11   prior to the trial and mention it, and the record will also

12   show that the Court was allowing her to come testify as of

13   yesterday.  So she did not --

14   THE COURT:  Okay.  Well, it also showed nobody had

15   objected as of yesterday.

16   MR. DETERS:  Okay.  Well, no, they objected.

17   Anyway, so there was a ruling by this Court that was

18   going to allow her to testify, and I told her -- and I said, I

19   don't know if you're going to be able to testify or not.  So

20   she didn't get on a plane till after court yesterday, flew

21   into Columbus.  We picked her up in Columbus and we brought

22   her in here.

23   So it's my position that there was an order of the

24   Court that was going to allow me to have her testify.  There

25   was no secret, beginning of this trial, why she was going to

1    testify.  And, in fact, because of that, I asked the questions

2    that I wanted to ask of Nik Richie on the witness stand, and

3    the two things -- some of the things that he testified to that

4    I want to get in this record is he said he never put up posts

5    without the person's permission to use their name, which was

6    false based upon what this witness has to say.

7         In addition to that, I asked him if he ever -- he was

8    waiting for Sarah Jones or her family to ask for money.  He

9    said no.  I asked him if he was ever involved in an extortion

10   to use his web site for money and he said no, and he denied

11   the information.  But the record speaks for itself.

12        So if the Court is now ruling that she's not allowed

13   to testify under all those facts and circumstances, I accept

14   that ruling respectfully, but I want her to take the stand

15   under avowal, and I want to put into the record her testimony

16   for appeal purposes if necessary.

17        THE COURT:  Okay.  I'll let you do that after the

18   jury retires.  My order was clear.  I've been enforcing it for

19   30 years or more, 33 now.  And everybody who practices here

20   knows it.  As soon as you knew about this witness, you should

21   have notified opposing counsel you intended to call her and

22   provided some kind of a summary of what you knew she was going

23   to say so they could have had an opportunity to take her

24   deposition.  You mentioned it's been several weeks.

25        On television, they'll walk in the courtroom and say

1  well, I just found out about this witness.  You're not even

2  saying that.  You knew about it for a couple weeks.

3          MR. DETERS:  Being honest.

4          THE COURT:  Pardon?

5          MR. DETERS:  I said I'm being honest when I found out

6  about her, December 18th, but I didn't know if I was going to

7  call her.

8          THE COURT:  You should be honest.  You're making a

9  representation to the Court.  So I'm going to exclude that

10  witness.  You can put on the avowal while the jury's out.

11          MR. DETERS:  Okay.

12          THE COURT:  Okay.  Now, does anybody have any more

13  witnesses?  Plaintiff rest?

14          MR. DETERS:  Plaintiffs rest.

15          THE COURT:  Defendant rest?

16          MR. WARD:  We rest, Your Honor.

17          THE COURT:  All right.  I'll hear you on any motions

18  you may have.  You may proceed.  I guess the defendant goes

19  first.  We juggle the order around so usually the plaintiff

20  rests and then you have the defendant's case and the defendant

21  rests.  So we'll consider we're at the point where the

22  defendants rest -- the plaintiff rests rather.  So if you have

23  any motions, come to the podium and you can make them.

24          MR. GINGRAS:  I would ask if I can argue from here

25  because I have a lot of paper.  If you'll give me a minute to

1  move the paper.

2  THE COURT:  Yeah.  Everybody needs to hear you.

3  That's the only reason you have to come to the podium.

4  MR. GINGRAS:  Your Honor, pursuant to Rule 50 of the

5  Federal Rules of Civil Procedure -- I'm just making a

6  record -- defendants have moved for a judgment as a matter of

7  law on a couple of issues.  I understand the Court's intent is

8  probably to let the case go to a jury, but I just want to

9  preserve these arguments in case we need them for later.  One

10  issue --

11  THE COURT:  There's a button on the side you can

12  raise it.

13  MR. GINGRAS:  I'm okay.

14  THE COURT:  Well, I can't hear you.

15  MR. GINGRAS:  I didn't know you meant with power.

16  THE COURT:  We're totally up to date here.  Very

17  technologically sophisticated device.

18  MR. GINGRAS:  Your Honor, I had initially planned on

19  spending about 60 minutes covering the various issues.  I

20  think a lot of them I'm just going to skip because I prepared

21  my arguments prior to seeing Your Honor's ruling on various

22  jury instructions that have somewhat mooted the points I

23  wanted to make.

24  THE COURT:  Well, make your record.

25  MR. GINGRAS:  Sure.  I will.  Your Honor, one initial

1     thing that I don't think has ever been talked about in this

2     case -- because there was never a time to do so and now is the

3     time -- is the fact that Ms. Jones already has a final

4     judgment in the amount of $11 million against Dirty World

5     Entertainment Recordings, LLC, a judgment that was entered in

6     this case on August 25th, 2010.

7            There was never an opportunity to argue about this

8     before, among other things because under Rule 60, Mr. Deters

9     had one year from the date of entry of that order to seek

10    relief from it on the grounds of mistake, that he had sued the

11    wrong party.  That did not happen.  He had until August 25th,

12    2011 to basically come to the Court and say, this judgment was

13    a mistake, I sued the wrong party, please relieve me from it

14    so it has no preclusive effect in this case.  That didn't

15    happen; and, obviously, what happened was subsequently,

16    defendants filed a motion for summary judgment.  We talked

17    about that in December of 2011.  Your Honor denied it.  But

18    then around that same time, Ms. Jones' criminal matter came to

19    light, and then the case was stayed for a period of time.  So

20    I apologize that this is kind of coming up late, but here we

21    are.

22           Your Honor, so I would argue that under -- because

23    it's against a different party, the rule is not res judicata.

24    It's collateral estoppel.  And I would argue that under the

25    doctrine of collateral estoppel, the prior judgment bars all

1    of Ms. Jones' claims in this case.  I'll explain myself.  I
2    can see that you're a little bit confused.
3            THE COURT:  Is Mr. Richie going to pay the
4    $11 million?
5            MR. GINGRAS:  No.  Dirty World Entertainment
6    Recordings, LLC should pay the $11 million.  Let me explain
7    why.
8            THE COURT:  I thought it was stipulated they don't
9    exist.
10           MR. GINGRAS:  Not at all.  Not at all.  Your Honor,
11   Dirty World Entertainment Recordings is, I think, a California
12   entity.  And what happened was, Mr. Deters sued that entity,
13   and he basically said that's the right entity.  And he got a
14   default judgment against them, which immediately drew a huge
15   amount of media attention, both because of its size and the
16   fact that Ms. Jones was an NFL cheerleader.  And apparently
17   Mr. Deters told the media that he had won a lawsuit against
18   thedirty.com, which he had not.
19           But immediately, when that judgment was entered, I
20   think within a day literally, Mr. Richie spoke to Mr. Deters.
21   Said hang on a minute; you've got the -- first of all,
22   Mr. Richie had never been served at that point, and Dirty
23   World, LLC had not been named.  So Mr. Richie contacted
24   Mr. Deters and said, you got the wrong party.
25           And if Your Honor checks the record -- I had it in my

1   packet.  I can't find it right now.  But what happened,

2   subsequent to that was Mr. Deters filed a motion for leave to

3   amend to bring Dirty World, LLC into the case.  And in that

4   motion for leave to amend, he said, in his own pleading,

5   "Mr. Richie has contacted me, said that I sued the wrong

6   company.  I don't believe him."

7        Mr. Deters said he believed that he had the right

8   company.  He said that he had performed research that led him

9   to believe it was the right company.  And for that reason, he

10  didn't trust Mr. Richie.  So he didn't want to give up the

11  judgment that he had because he thought he had the right

12  party.

13       Your Honor, if he was right -- and maybe -- I won't

14  lie to the Court so I'm not going to stand here and tell you

15  that I think he is right.  I know he's wrong.  But if he had

16  been right, there would be nothing more to do.  He already a

17  judgment.  He's got an $11 million judgment.  He can go

18  collect it.

19       He had one year from the date of entry of that

20  judgment to seek relief under Rule 60.  He did not do that.

21  As a result of not seeking relief under Rule 60, judgment's

22  permanent and final, and he has a final judgment entered in

23  this case against, I agree, the wrong party; but, Your Honor,

24  that's collateral estoppel.  She cannot relitigate this case.

25  She cannot seek two inconsistent judgments in the same matter,

1    which is exactly what she's trying to do.

2              THE COURT:  He was never served.  Your client was

3    never served.  He wasn't a party to that.

4              MR. GINGRAS:  You're right.

5              THE COURT:  I thought the Court -- you should make a

6    motion for the Court to set that judgment aside if this

7    company that you sued actually exists.

8              MR. GINGRAS:  But, Your Honor --

9              THE COURT:  But you have, for collateral estoppel or

10   res judicata or merger, you've got to have people of the same

11   parties.

12             MR. GINGRAS:  No, no.  Your Honor, collateral

13   estoppel applies when it's different parties.

14             THE COURT:  It has to be actually litigated.

15             MR. GINGRAS:  I'm sorry?

16             THE COURT:  Anyway, your motion is overruled.

17             MR. GINGRAS:  Your Honor, I understand.  I just

18   wanted to make a record on that point.  And Your Honor, the

19   authority I was going to cite to you, *Frontier Insurance*

20   *Company v. Blaty*, B-l-a-t-y, 454 F.3d 590, Sixth Circuit case

21   from 2006.  And what it says is, among other things, that "The

22   District Court's discretion to vacate a judgment is

23   circumscribed by matters of public policy.  Once it becomes

24   final, the only way to vacate a judgment is under Rule 60."

25   And under Rule 60(b), you have one year from the date of entry

1    of a mistaken judgment to seek relief.

2              As defendants, we don't have to seek relief from the

3    judge.  The plaintiff does.  She's the one that asked the

4    Court for the judgment against the wrong party.  It's not my

5    job to do his job.  I wish it was.  I'd be getting paid more.

6    But anyway.  So I understand the Court's ruled on that.  I've

7    made my record on that.

8              THE COURT:  The other party apparently is totally

9    innocent, had nothing to do with the case, right?

10              MR. GINGRAS:  Well, Your Honor, you know what's

11    interesting --

12              THE COURT:  I don't know who they are, if they even

13    exist.

14              MR. GINGRAS:  Your Honor, you know what's

15    interesting -- and I appreciate that you've already denied

16    that part of it, but --

17              THE COURT:  I'm trying to make my own record.

18              MR. GINGRAS:  Yes.

19              THE COURT:  The other party is someone, if they

20    exist, but they have nothing to do with this particular web

21    site, I assume?

22              MR. GINGRAS:  Right.  And, Your Honor, as part of my

23    research --

24              THE COURT:  Assuming they did, he can get a judgment

25    against both parties.

1       MR. GINGRAS:  Sure, but you've got to get the right

2   people in the case, and you have to get your judgment --

3       THE COURT:  He ultimately did.

4       MR. GINGRAS:  What res judicata and collateral

5   estoppel do not allow is for a party to file a lawsuit against

6   party number 1, get a judgment against party number 1, and

7   then say, you know what, I don't like that judgment; I'm going

8   to go with party 2, number 3, number 4 --

9       THE COURT:  Actually, they have that all the time in

10  personal injury cases.  You sue one defendant and then you sue

11  another defendant if you can't get them in one case.

12      MR. GINGRAS:  Sure.  And --

13      THE COURT:  It happens all the time.

14      MR. GINGRAS:  Sure.

15      THE COURT:  If people damage your reputation, you can

16  sue them both.

17      MR. GINGRAS:  Well, anyway --

18      THE COURT:  What did you find out about that other

19  corporation, Mr. Deters?

20      MR. DETERS:  Please?

21      THE COURT:  When did you find out about that other

22  corporation?  Do they exist just on paper?

23      MR. DETERS:  Yeah.  To this day, we didn't find out

24  anything about that corporation.  And they obviously didn't

25  answer the lawsuit.  But you're right on the res judicata/

1  collateral estoppel.  You know, the parties, Nik Richie was

2  not served until we finally got him served and he was still

3  there.  And you're allowed to get a judgment against multiple

4  defendants.  But you've already overruled his motion and he's

5  still arguing.

6          MR. GINGRAS:  Your Honor, I spent a lot of time --

7          THE COURT:  He's answering my questions.

8          MR. GINGRAS:  Yeah, I just wanted to educate the

9  Court because I, frankly, found the issue very, very

10 interesting.  And what the cases generally involve is like

11 when you have a car accident and you sue one person that you

12 name as the driver and then you find out that actually that

13 person wasn't the driver and who you wanted was a passenger

14 and you had that name.  If you sue the wrong party, there's

15 remedies.  You can deal with that.

16         What you can't do is sue the wrong party, take it to

17 final judgment, wait three years, and then ask for a judgment

18 against someone else.  You can't do that.  That's what's

19 happening here.  You know, we don't need to debate it.  I

20 understand your position.

21         THE COURT:  I'm going to overrule it.

22         MR. GINGRAS:  It's an interesting issue.

23         THE COURT:  I think we had a 60-car pileup -- I'll

24 use that as an example -- the day before yesterday, during

25 that heavy snow period, out on the northern part of I-275.

1    Now, somebody could sue two or three people they know about;

2    and then later, if the recovery isn't adequate, they can sue

3    some more people if they find out about it later.

4          MR. GINGRAS:  If the statute of limitations hasn't

5    expired --

6          THE COURT:  There might be contribution among them.

7          MR. GINGRAS:  Sure.

8          THE COURT:  But they might be bound by the amount of

9    their damages.  So if your client wants to pay the $11

10   million, I'll sustain your motion; but other than that, it's

11   denied.

12         MR. GINGRAS:  Your Honor, I actually found a case

13   where a plaintiff's attorney named the wrong plaintiff in a

14   case and subsequently was found to be bound by res judicata,

15   having gotten a judgment in the name of the wrong person.

16         THE COURT:  Had the statute run on the right one?

17         MR. GINGRAS:  Yes.

18         THE COURT:  All right.  In any event, your motion is

19   denied.

20         MR. GINGRAS:  Okay.  Thank you, Your Honor.

21         THE COURT:  I don't really expect him to pay the

22   $11 million.

23         MR. GINGRAS:  Thank you.

24         THE COURT:  So what else you got?

25         MR. GINGRAS:  All right.  Moving right along.  Your

1   Honor, I think that the Court believes that there has been a

2   retraction demand made in this case.  I don't believe the

3   evidence showed a retraction demand.  I think there was --

4   hear me out, please.

5           THE COURT:  Okay.  I should have more of a poker

6   face, I guess.

7           MR. GINGRAS:  Okay.  And I apologize, Your Honor, if

8   I'm anticipating you too much.

9           THE COURT:  Well, I think the evidence was she

10  demanded 24 times for it to be taken down.

11          MR. GINGRAS:  Removal, Your Honor.  And this is

12  actually -- again, because I know that you have said The Dirty

13  is more of a newspaper and that's why you said the CDA didn't

14  apply, and I think Mr. Deters has used the term it's like a

15  newspaper.  This is where the law of the Internet and

16  newspapers is not consistent.  And I told you a long time ago

17  that I didn't think it was consistent.  You sort of disagreed

18  with me and brought us back into that newspaper realm.

19          But, Your Honor, if you think about it, the Internet

20  and newspapers have one major difference:  When a newspaper

21  prints a false article, what happens?  They push, you know,

22  "publish" or whatever, and they run off a hundred thousand

23  copies of their newspaper, and they go distribute it to all

24  over, you know, whatever convenient stores and home

25  deliveries, and all those copies of a newspaper are out there

1    in the world.  You can't click a button to remove that once

2    it's done.  So what the law historically did was impose a duty

3    on newspaper publishers to publish a retraction.  That was the

4    preferred --

5              THE COURT:  It's the Kentucky statute.

6              MR. GINGRAS:  That's a Kentucky statute.  That's

7    Kentucky KRS 411. -- oh, my notes are wrong.  It says .051.

8              THE COURT:  I think it also applies to electronic

9    news.

10             MR. GINGRAS:  Your Honor, I was actually fascinated,

11   reading that statute, that Your Honor found that statute to be

12   unconstitutional, if you recall.  Do you remember that?

13             THE COURT:  I don't know.

14             MR. GINGRAS:  You do or you don't?

15             THE COURT:  I do not remember.

16             MR. GINGRAS:  You don't remember it?  You held that

17   in a case called *White v. Manchester Enterprises*, in 1994.

18   Your Honor held the statute was unconstitutional because it

19   only applied to newspapers.  And in that case, although the

20   defendant was a newspaper, the plaintiff argued that the

21   statute was unconstitutionally ambiguous and arbitrary

22   because --

23             THE COURT:  I remember.

24             MR. GINGRAS:  Yeah.  It involved a woman who sued

25   over a false article involving a powwow, Indian powwow.  And

1    she argued, and Your Honor actually initially disagreed.  Then

2    you changed your mind and you agreed with her that, in fact,

3    the retraction statute was unconstitutional.  And apparently

4    the legislature in Kentucky -- I'm sure they have a lot of

5    respect for the Court, but they did not like that ruling so

6    they changed the law.  Did you know that?

7            THE COURT:  I did not.  I'm sure you'll tell me about

8    it.

9            MR. GINGRAS:  After your 1994 ruling, the statute was

10   amended to resolve the issue that Your Honor used to strike it

11   down, which was that it only applied to newspapers and not

12   other types of media.  So they expanded the retraction statute

13   to apply to all media more broadly so that it removed that

14   sort of that arbitrary piece of it.  Anyway, so that was the

15   interesting issue.

16           But let me just make a point.  In order for a

17   retraction demand under KRS 411.051 to be valid, it must be in

18   writing, signed by the plaintiff or her attorney or agent,

19   explaining which statements are false, avowal which statements

20   are, in fact, false, and demand must be delivered to the

21   defendants before suit.

22           Your Honor, I understand that you'll probably

23   overrule this argument but --

24           THE COURT:  She did all that, but some of it was

25   electronic.

1          MR. GINGRAS:  I don't believe that she ever -- and

2     again, if you think about it, if you just think about the fact

3     that with a newspaper, the only relief that a newspaper could

4     really give would be a retraction published in the next day's

5     paper or whatever, so that's what the statute kind of talks

6     about.

7          She didn't ask for a retraction because there's no

8     such thing on the Internet.  You don't publish retractions on

9     the Internet.  What a plaintiff wants, in a case like this, is

10    take it down, take it down, undelete.  That's what they want.

11    That's what she asked for.  She never asked for a retraction.

12         But just to preserve the point, Your Honor, I'm still

13    going to argue that statute applies in this case; and, as you

14    probably know, it absolutely bars any entitlement to punitive

15    damages if a pre-suit retraction demand that complied with the

16    statute wasn't made.  And it's my position that a request

17    complying with the statute wasn't --

18         THE COURT:  I don't want to make your argument for

19    you, but she made it by e-mail, which I think would be --

20         MR. DETERS:  Your Honor, in addition to that, besides

21    her e-mails, I wrote a letter as legal counsel to them to take

22    it down right before filing lawsuit.  So I want the Court to

23    know --

24         THE COURT:  I'll overrule that ground.  What else you

25    got?

1      MR. GINGRAS:  Okay.  Moving right along.  Your Honor,

2  a couple of your rulings, I was going to argue that she was a

3  public figure.  I think you've -- and it's a little bit -- I'm

4  not sure how to address it.

5      THE COURT:  Well, I'm giving the same instructions so

6  you don't really have to do anything.

7      MR. GINGRAS:  Well, you are and you have.  It halfway

8  solves the problem and then it creates a new problem.  And

9  I'll just very briefly comment about it.  The problem is that

10  the determination of whether a person is or is not a public

11  figure is a question of law for the Court.  It's not a

12  question of fact for the jury.

13      THE COURT:  I don't think she is a public -- I'll

14  hold she's not a public figure, but I'm giving the same

15  instruction because it involves a matter of public concern,

16  which is a school system.

17      MR. GINGRAS:  Okay.  And that --

18      THE COURT:  So that really makes no -- it doesn't

19  make as much difference as I thought it would when we sat down

20  here three days ago.  I've heard the evidence about all that

21  went on in the school.

22      MR. GINGRAS:  Sure.  And I think that kind of moots,

23  again, about 50 percent of the rest of what I was going to

24  argue.

25      Your Honor, if you would indulge me for about --

1          THE COURT:  Let the record show I'm giving your

2   instructions, same instructions as for a public figure.

3          MR. GINGRAS:  I appreciate that.

4          THE COURT:  Okay.

5          MR. GINGRAS:  Your Honor, if you indulge me for about

6   three minutes, I want to revisit a topic that we talked about

7   the last time I was here.  You know what the topic is.  It's

8   the Communications Decency Act.  Obviously, under Rule 54(b),

9   any nonfinal ruling made in the course of a case could be

10  changed, so I'm going to ask you to change it.  And I'm going

11  to ask you to find that the Communications Decency Act does

12  apply to my clients.  And I'm going to do that based on two

13  significant events that have changed or occurred since the

14  last time I was here.  I was here in December of 2011 talking

15  about this.  And I know Your Honor read the pleadings,

16  understood what we were talking about back then.

17         THE COURT:  I held an opinion.

18         MR. GINGRAS:  Right.  Your Honor, since that -- since

19  your decision last -- well, it was actually January of 2012, I

20  believe -- a couple of things have happened.  One is sort of

21  not that significant.  If I could approach --

22         THE COURT:  Yeah, go ahead.

23         MR. GINGRAS:  Your Honor, after this Court's decision

24  in January of 2012, one of your colleagues over in Missouri

25  looked at the exact same issue involving the exact same

1  client, involving thedirty.com and Mr. Richie, essentially an

2  identical set of facts, and reached the exact opposite

3  conclusion that you did.

4       I handled that case in Missouri. And to no one's

5  surprise, when Your Honor's decision was made in this case,

6  plaintiff's counsel in the Missouri case immediately said,

7  Aha, I win; I've got you. A Kentucky judge said you're wrong.

8  David Gingras, you don't know the CDA; Judge Bertelsman does.

9  And he asked the Missouri judge to follow Your Honor's ruling.

10      And I was, of course, somewhat dismayed. I didn't

11  want the Missouri court to follow your ruling, and he didn't.

12  And what I think is important is -- and, Your Honor, I know --

13      THE COURT: I think I read that and he distinguished

14  the facts.

15      MR. GINGRAS: Well, and that brings me to my second

16  point. The only distinguishing fact that the Missouri court

17  found between that case and this one was that in this case,

18  Ms. Jones, back in December of 2011, argued that the "freak in

19  the sack" comment that Mr. Richie added was defamatory; that

20  she was defamed by that, that it implied that she was freaky

21  in bed.

22      And, Your Honor, we now know in the ensuing year

23  that's happened, that issue has been taken off the table and

24  she has withdrawn her argument. To her distinct advantage,

25  she has withdrawn her argument about Mr. Richie's "freak in

1    the sack" defaming her.  And the advantage, of course, is that

2    Your Honor has precluded the introduction of text messages

3    that would have spoken to that issue directly and that I

4    understand would have been very embarrassing to Ms. Jones, but

5    I think they also would have proven the point.

6         So by withdrawing her "freak in the sack" theory of

7    the case, I believe this case becomes the Missouri case.  And

8    I think the Missouri judge got it right.  I respectfully

9    believe that Your Honor, for whatever reason, didn't reach the

10   correct conclusion.  Under Rule 54(b), you can correct that.

11   I know you think this is an important issue --

12        THE COURT:  It is.

13        MR. GINGRAS:  -- and it should go all the way to the

14   Supreme Court.  But Your Honor, at the same time -- this is

15   the final comment that I'll make -- I think that you think

16   that if the CDA didn't exist, that maybe the world would be a

17   better place, or maybe if my client's web site didn't exist,

18   the world would be a better place.  Dr. Phil certainly felt

19   that way.  I know Mr. Deters feels that way.  I'm sure

20   Ms. Jones feels that way.  I'm sure her family feels that way.

21        But let me remind you of something.  The purpose of

22   the CDA was to allow web site owners to get into text and

23   content from their users to select what they feel is

24   appropriate, to reject what they feel is too far afield, and

25   the rest is there.  The author's always responsible; the web

1    site's not.

2           You heard Mr. Richie testify during this case that he

3    actually blocked a post about Ms. Jones, specifically about

4    the Dixie Heights thing, that someone submitted that just

5    before we came here in December of 2011 to argue summary

6    judgment.  Someone submitted a post to the web site.

7           Nobody really -- I think maybe the Edgewood Police

8    knew about it, Ms. Jones knew about it, Mr. York knew about

9    it, but the whole world didn't know.  And Mr. Richie, if he

10   was really out to destroy her, I guess, or just hurt her, he

11   could have published that post, and he didn't.  He blocked it.

12   He chose to edit it, like he moderates the web site.  He's

13   never denied that from Day 1, because I don't believe there's

14   any legal repercussions for him doing that.  I think that's

15   what the CDA says he should do.  And he did.  He blocked a

16   post about Ms. Jones.

17          If the CDA didn't exist and if he faced liability for

18   editorial conduct, he would necessarily never touch any

19   content on the site, never look at it.  Anything that comes

20   in, goes up.  There would be more content, more negative

21   content, about Ms. Jones on the web site if the CDA didn't

22   exist.

23          So I just want to remind Your Honor that if we go

24   down that road of saying that Facebook is better because you

25   can publish anything at all and they don't prescreen it, but

Mr. Richie's bad because he does prescreen, Your Honor, that's directly opposite to what Congress intended when it enacted the CDA.

It intended to encourage people to look at content before it comes in, which Mr. Richie does. And you might not like his choices. You might not like his site. You might not like his attitude toward the world. I don't like his attitude toward the world a lot of times. I like him on other levels. But I don't -- I don't believe that we should be mean to people. But I believe he has a right to express opinions if they are opinions and not defamatory statements. And the CDA, as far as his choices, that's within the CDA.

So I won't beat that horse anymore, Your Honor. I just encourage you to realize that from a policy position, what this Court's ruling does is make the Internet more dangerous. There is no question that if Your Honor was right, the Internet would be much worse. So I just want you to read the *Crabtree* decision from Missouri, think about it. If Your Honor wants to change your mind, you can.

THE COURT: Let's see what the jury says. And then the rules provide, as you know, for a motion of what used to be called judgment notwithstanding the verdict, now called a delayed judgment as a matter of law or something of that sort.

Is this on? Yeah, I guess it is. Can you hear me all right?

1          MR. GINGRAS:  I can.

2          MR. WARD:  Yes, Your Honor.

3          THE COURT:  Okay.  So let's see what the jury says.

4    If you were able to persuade the jury, it will all be moot.

5    If you're not, you can file a motion and cite any additional

6    authorities that have occurred from anywhere, make those same

7    arguments.  I don't want to comment on this except in writing

8    after I've had sufficient time to think about it and weigh my

9    words carefully.

10         This case -- I think this statute presents very

11   important issues involving the First Amendment that, assuming

12   it's necessary for you to appeal, will be decided, as one

13   general said, by people who are above my pay grade.  So you

14   file your motion, if you need to, at the end, and I'll rule on

15   it, and we can see what happens.

16         MR. GINGRAS:  Thank you, Your Honor.

17         THE COURT:  All right.  So your motions for judgment

18   as a matter of law are overruled.

19         Mr. Deters, what do you have?

20         MR. DETERS:  Your Honor, the first motion that I

21   would like to make is to exclude from the evidence and to

22   exclude from any reference by defense counsel in their

23   opening -- or excuse me, in their closing -- all videos that

24   were played in their opening statement because they failed to

25   introduce those, use those in their case in chief or on

1     cross-examination.  They weren't used in evidence at all.

2     They played them during the opening and then they weren't used

3     again during the course of the body of the trial.

4              MR. WARD:  Mr. Deters, is this just so I can't use

5     video in closing?

6              MR. DETERS:  Yes.

7              MR. WARD:  I'm not going to.  I'm not going to, Your

8     Honor.

9              THE COURT:  Okay.  So much for that.

10             MR. WARD:  Saves us some time.

11             MR. DETERS:  I also would like to make a motion for a

12    directed --

13             THE COURT:  I think those are going to the public

14    figure issue.

15             MR. DETERS:  On the public figure, Your Honor, I

16    would just simply say that --

17             THE COURT:  I already held that she wasn't, but it's

18    a matter of public concern because of the educational aspect

19    of it.

20             MR. DETERS:  Your Honor, I have read the special

21    verdict instructions or questions, Number 1 and Number 2; and,

22    Your Honor, I want to move for a directed verdict on

23    liability.  For example, Question Number 1, "Has the

24    plaintiff, Sarah Jones, proved by the evidence that any of the

25    postings concerning her described in the evidence were

substantially false at the time they were posted?"  I think it
is impossible for a jury to conclude that they weren't all the
way false.  Chlamydia, gonorrhea, proven false.  They tried to
say, well, hepatitis A is an STD.  That has nothing to do with
gonorrhea and chlamydia.  It was proven false.

Now, I could see where they could make an argument
that having sex with every Bengal could be an exaggeration;
but the fact that it was chlamydia and gonorrhea and she's got
them, stated as fact, is not an exaggeration.  It's not
hyperbole.  It's nothing.

And then the whole issue with the Bengals, he
admitted on the stand that he does think that she did have sex
with at least one Bengal.

And then you have the issue of the sex in the school;
and there was nothing, no evidence, to contradict her
testimony.  They called no witnesses to contradict her
testimony that she did not have sex at the school.

So it's my opinion on Question Number 1, it is
impossible for a jury to conclude anything but yes; and,
therefore, a directed verdict should be granted.

On Question Number 2 --

THE COURT:  Hold on.  I'll rule on that one first.

MR. DETERS:  Okay.

THE COURT:  Okay.  The rule is that on a question --
the party with the burden of proof, the jury can always

1    disbelieve them.  So the jury could disbelieve what she's

2    saying.  The burden of proof, in this instance, is on her to

3    prove that they're false.

4         It's true, she's testified to it, and I haven't heard

5    much testimony that it is.  But the jury could always -- there

6    have been some challenges to her credibility, and the jury

7    could always disbelieve what she has said.  So that motion

8    will be overruled.  What's your next one?

9         MR. DETERS:  I'll make the same motion on Number 2 as

10   it relates to reckless disregard for the truth, because

11   Mr. Richie actually testified that he knows false things are

12   going up and he doesn't fact-check them, and total with

13   recklessness.  And with all due respect, Your Honor, I heard

14   you on the record in chambers.  You made a comment that you

15   actually believed that they admitted reckless disregard; that

16   there was like an admission of reckless disregard.  So I

17   understand what you're saying that they could disbelieve Sarah

18   Jones and maybe she does have it.  I understand that.

19        THE COURT:  Well, that's the law so you should

20   understand it.

21        MR. DETERS:  Yeah.  But on the issue of reckless

22   disregard, it's coming from them.  And based on what their

23   testimony is and what their admissions is, I don't know how a

24   jury can conclude any differently that they are completely

25   with reckless disregard for the truth.

1        THE COURT:  Rule 50 gives me the authority to reserve

2    on those motions till we see what the jury does, and that's

3    what I'll do.

4        MR. DETERS:  Okay.  Your Honor --

5        THE COURT:  That argument may have merit.

6        MR. DETERS:  This came up a little bit.  I want to

7    move to preclude the defense, in their closing, to referencing

8    anything relative to the ability to pay.  It's irrelevant.  It

9    came up a little bit during the course of the trial.

10        THE COURT:  Well, sometimes people on punitive

11    damages try to introduce the wealth of the defendant.

12        MR. DETERS:  All right.

13        THE COURT:  So that's why they were introducing that,

14    I presume.

15        MR. DETERS:  I also move --

16        THE COURT:  Are you going to make any reference to

17    the wealth of the defendant when you ask for punitives?

18        MR. DETERS:  No.  No.

19        THE COURT:  Well, I think -- I guess they could --

20        MR. DETERS:  Well, I take that back.  I take that

21    back.  I think -- I think that I'm going to -- there will be

22    some inferences about that.

23        THE COURT:  Well, then they got a right to.

24        MR. DETERS:  Right.

25        THE COURT:  Okay.  That's permissible.  I presume in

1  this case -- I don't know why this would be an exception --

2  the wealth of the defendant is admissible on punitive damages

3  because they're meant to punish people, and a $10,000 verdict

4  against some people could be equivalent to a million dollars

5  of punitive damages against a big corporation.  So I think

6  they can talk about that and so can you.

7      MR. DETERS:  Okay.  And my final motion is, I move

8  that, again on a directed verdict, that these are libel per se

9  because the chlamydia and gonorrhea, as well as the Bengals

10  statements and the other statements, relate to, under libel

11  per se, on chastity and loathsome disease; and I think that

12  you should consider this a libel per se situation, which

13  obviously means that to seek punitive damages, we don't even

14  need to obtain compensatory damages.

15      I don't know how the Court should not consider --

16      THE COURT:  I didn't instruct on that.

17      MR. DETERS:  Please?

18      THE COURT:  Maybe I did.  I said if you award some

19  compensatory damages.  I don't think that's going to come up.

20      MR. DETERS:  Okay.

21      THE COURT:  It is libel per se, but the research that

22  I did in the last few days, there's a recent Kentucky Court of

23  Appeals case that says where it's a matter of public interest,

24  the plaintiff still has to prove it.

25      MR. DETERS:  Okay.  Thank you.

1          THE COURT:  So the instructions say she's got to

2     prove it, and she did.  She offered evidence which, if

3     believed, she did prove it.

4          MR. DETERS:  Okay.  Thank you, Your Honor.

5          THE COURT:  Anything else before we take a little

6     break before we bring the jury in?

7          MR. WARD:  No, Your Honor.  Oh, Your Honor, do we

8     right now decide how he's going to split up his closing?

9          THE COURT:  He said yesterday he wanted --

10          MR. DETERS:  23 and 7.

11          MR. WARD:  Precise.  Okay.

12          THE COURT:  Well, why don't we make it an even --

13     I've got a stopwatch, I guess.

14          MR. DETERS:  Can you do 23 and 7 for me?

15          THE COURT:  I'll do 23 and 7.

16          MR. DETERS:  Thank you.

17          THE COURT:  23 in the beginning and 7 at the end?

18          MR. DETERS:  Yes.

19          THE COURT:  Okay.  All right.  We'll be back.  Let's

20     take about 15 minutes.  We'll come back.  Hopefully I'll go

21     through the instructions, we'll go right into the closing

22     statements.  All right.  We'll be in recess.

23               (Recess at 10:18 a.m. until 10:45 a.m.)

24          THE COURT:  I understand you have some issues with

25     some of the exhibits.

1            MS. MATTINGLY:  Your Honor, there are just a few that

2      I have some issues with them going back to the jury.

3            THE COURT:  Okay.  Well, let's hear them and we'll go

4      then right into the arguments.

5            MS. MATTINGLY:  Your Honor, specifically with respect

6      to 18 and 19, I believe that these are e-mails from Cheryl

7      Jones to my client.  She never testified.

8            MR. DETERS:  I'll agree to remove them.

9            THE COURT:  Okay.  Well, that one's resolved.

10           MS. MATTINGLY:  Twenty-six is a posting about

11     Sarah -- well, it's not about her.  It's the Bengals

12     cheerleaders and it's just a group shot.  Nothing in there

13     that they claim is defamatory so I don't know why it needs to

14     go back.

15           THE COURT:  It's a picture?

16           MR. DETERS:  Yeah.  What it was -- and it was

17     referenced during testimony -- was how he started picking on

18     all the Bengals.  Shows malice.

19           MS. MATTINGLY:  I don't know that that can go to say

20     anything no matter what was posted on it.

21           THE COURT:  Well, the picture doesn't show that.

22           MR. DETERS:  Well, they had typed -- they had things

23     underneath about they being all ugly and they ought to start

24     over, get rid of all of them.

25           THE COURT:  All right.  Well, that's probably

1  admissible.

2      MS. MATTINGLY:  Just if we could note our objection

3  for the record then.

4      THE COURT:  All right.  I don't think the case is

5  going to turn on that.

6      MS. MATTINGLY:  Thirty-four is what he references as

7  a home page.  It's several pages and it's just lots of posts

8  about lots of other people.

9      MR. DETERS:  I'll agree to remove it.

10      THE COURT:  All right.  Good.

11      MS. MATTINGLY:  Thirty-six references Sarah,

12  something about her reality show as Kim Kardashian.  Number 1,

13  it's nondefamatory.  Number 2 --

14      MR. DETERS:  I'll agree to remove it.

15      THE COURT:  All right.

16      MS. MATTINGLY:  Thirty-seven is -- I can't even

17  figure out what it is.  It's an e-mail with Eric and someone

18  else, and in there is some sort of posting about Sarah and her

19  criminal issue, but I can't tell --

20      MR. DETERS:  Agree to remove it.

21      MS. MATTINGLY:  Okay.

22      THE COURT:  All right.  Good.  Any problems with the

23  defendants' exhibits?

24      MR. DETERS:  Yes.

25      THE COURT:  You have some?

1          MR. DETERS:  Yeah.  I move to introduce the exhibits,

2     subject to her objections and the ones that I took out.  Madam

3     Clerk has all of them.

4          THE COURT:  Okay.  I said do you have any

5     objections --

6          MR. DETERS:  No, no objections.

7          THE COURT:  Are we ready to proceed, without having

8     to bring the jury out and send them back again?

9          MR. DETERS:  Ready to go.

10         THE COURT:  All right.  I remind you of my ground

11    rules that I set, which I think are standard in most courts.

12    You argue from the podium or the presenter.  You don't walk up

13    and lean on the jury rail like you see in the movies and that

14    kind of stuff.  You don't address opposing counsel to comment

15    on your views of their character, anything like that.  Don't

16    address them at all.  Address me.

17         MR. DETERS:  Your Honor, I did want to just go ahead

18    and make a record.  You've already overruled their motion

19    about that default judgment; but on the record, I was just

20    going to go ahead and make a motion, that Rule 60 motion that

21    he thought I should have made.  I don't think it's relevant.

22    I'm going to go ahead and just make the motion as a matter of

23    record.  Since it was brought to my attention, I'd feel silly

24    if I didn't make the motion, even though I don't agree that I

25    had to make the motion.

1          THE COURT:  Okay.  I think it ought to be made in

2     writing, but you can make it.

3          MR. DETERS:  Okay.

4          THE COURT:  There's rules in there about excusable

5     neglect.  You've got a judgment against somebody who had

6     nothing to do with the case so it ought to be removed.

7          MR. DETERS:  All right.  Thank you.

8          THE COURT:  All right.  Are we ready to go?  I've

9     appointed my chief law clerk as timekeeper, a highly

10    responsible position.  What is your division you wanted again,

11    Mr. Deters?

12         MR. DETERS:  23 and 7.

13         THE COURT:  All right.  You have 30 minutes each.

14    You're 23.  All right.  Bring the jury in.  I'll give them the

15    instructions.

16         In chambers, we noted a couple minor typos that I

17    changed in here.  There's nothing that would affect anything

18    substantial.

19         MR. WARD:  We got those, Your Honor, I'm pretty sure.

20         (The jury entered the courtroom at 10:50 a.m.)

21         THE COURT:  Good morning again, ladies and gentlemen.

22    Please be seated.  The evidence has been concluded.  The

23    witness we mentioned was determined as unnecessary so she

24    won't testify.  So the evidence is complete, the Court has

25    ruled on certain motions that are made at that time, and we

1     are ready to submit this case to the jury.

2            I'm going to give you my instructions.  I'm going to

3     read them to you, but you will have a copy of them -- you'll

4     have the original of them in the jury room.  There will be

5     some instructions and then what the law calls a special

6     verdict, but you can think of it as a questionnaire for you to

7     fill out.

8            Again, by way of a few preliminary remarks, this, as

9     in all other cases, the jury is the judge of the facts.  The

10    jury decides what the facts are in a case.  Criminal cases,

11    civil cases, doesn't make any difference.

12           The Court and the parties are bound by what the jury

13    finds the facts are; however, the jury is bound by what the

14    Court decides the law is.  So the jury is bound to follow

15    these instructions whether you agree with them or not.  You

16    may or may not agree with them.  I don't know.  But if you

17    shouldn't, you must follow the instructions on what the law is

18    given to you by the Court.

19           So let us begin with how are you to exercise this

20    serious responsibility of deciding what the facts are.  And we

21    have an instruction on that that we give in all cases, which

22    I'll read to you right now.  It's well drafted.  A committee

23    years ago got together and put it in plain English, and it's,

24    I think, pretty much in plain English so I'm just going to

25    read it.

1       Instruction Number 1:  You are the sole judges of the

2  credibility of the witnesses and the weight that their

3  testimony deserves.  You may be guided by the appearance and

4  conduct of the witness, or by the manner in which the witness

5  testifies, or by the character of the testimony given, or by

6  evidence contrary to the testimony.

7       You should carefully examine all the testimony given,

8  the circumstances under which each witness has testified, and

9  whether every matter in evidence is tending to show whether a

10  witness is worthy of belief.

11       I might pause for a moment to say, when I say the

12  jury is the judge of the facts, this involves assessing what

13  the law calls the credibility of the witness, how believable

14  is the witness.  You decide -- the witness may testify to

15  something.  You don't have to accept it.  You can accept all

16  or part of what any witness says and reject all of it.

17       Consider each witness' intelligence, motive, and

18  state of mind, and what the law calls demeanor -- that is how

19  they act -- or manner while testifying.  Consider the witness'

20  ability to observe the matters to which the witness has

21  testified and whether the witness impresses you as having an

22  accurate recollection of these matters.  Also, consider any

23  relation each witness may have with either side of the case,

24  the manner in which the witness might be affected by the

25  verdict, and the extent which the testimony of each witness is

either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony.  Two or more persons seeing an event may see or hear it differently.  In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from an innocent error or intentional falsehood.

After making your own judgment, you will give the testimony of each witness such weight, if any, that you think it deserves.  In short, you may accept or reject the testimony of any witness in whole or in part.  In addition, the weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact.  You may find that the testimony of a small number of witnesses as to any fact is more credible than the testimony of a large number of witnesses to the contrary.

And if I haven't mentioned it before, the law considers -- and in this case, it's particularly important -- a person's state of mind as being a fact for the jury to decide.  Therefore, you'll be, at some points, asked to determine whether certain people did or didn't act maliciously, they did or didn't act recklessly or carelessly,

1    or with knowing something was false, the knowledge somebody

2    had of something.  All of those things are state of mind of

3    which we can't bring in a photograph of their mind so you have

4    to determine that from the way they act and the way you would

5    determine in your everyday life how anybody's telling you the

6    truth or not.

7         And that's why they bring people in from the

8    community to make their judgments about these matters, because

9    those of us who have spent many decades in the legal

10   profession have a different viewpoint, perhaps.  And so they

11   bring in people from the community to resolve these matters,

12   including people's state of mind.

13        Okay.  Instruction Number 2:  You must decide this

14   case as an action between persons of equal standing and worth

15   in the community, and holding the same or similar stations in

16   life.  A business entity is entitled to the same fair trial in

17   your hands as a private individual.  All persons, including

18   business entities, stand equal before the law and are to be

19   dealt with as equals in a court of justice.

20        Instruction Number 3, getting now into the merits of

21   the case:  Defendants, when they republished the matters in

22   evidence, had the same duties and liabilities for republishing

23   libelous materials as the author of such materials, if you

24   find they were libelous.

25        So a defendant can't say, well, somebody told me this

1    and republish something.  The defendant has to make -- any

2    defendant in a libel case has to make a determination himself

3    whether or not it's true, although the law does give them the

4    right to make an honest -- as long as they do not act with

5    reckless disregard for the truth.  That may be a defense.

6        Say a newspaper gets something over the wire service

7    and it looks like it might be reliable.  They print it.  It's

8    a defense that they had reason to believe it was true,

9    good-faith reason to believe it was true.  This is spelled out

10   further in the instructions.  If anything I say orally you

11   don't understand, fall back on the instructions.  I think

12   they're clear.

13       Instruction Number 4:  In order to recover for a

14   defamatory statement, the plaintiff, Sarah Jones, must show

15   the statement is (1) facially defamatory (2) untrue, and (3)

16   that the defamatory statement was made with actual malice.

17       If untrue, a statement would be libel if it would (1)

18   bring the person about whom the statement is made into public

19   hatred, contempt, or ridicule (2) cause the person to be

20   shunned or avoided, or (3) injure the person in their business

21   or occupation.

22       A defamatory statement can be said to have been made

23   with actual malice only if it was made with knowledge that it

24   was false or with reckless disregard of whether it was false

25   or not.

1      That is to say that actual malice entails more than

2 mere negligence.  It requires that the publisher of the

3 defamatory falsehood at the time of the publication

4 entertained serious doubts as to the truth of the published

5 material.

6      Actual malice must be shown by clear and convincing

7 evidence.  You'll recall at the beginning, I said clear and

8 convincing evidence is somewhere between what goes in an

9 ordinary civil case, the preponderance of the evidence, and

10 what goes in a criminal case, proof beyond a reasonable doubt.

11      I always find it helpful to envision the scales of

12 justice.  By clear and convincing evidence, the scale would

13 have to go -- each party would put their evidence in the

14 scale, and the scale has to go halfway down, roughly.  More

15 than just tilted a little bit if they are to meet that burden

16 of clear and convincing evidence.

17      Instruction Number 5:  Under the First Amendment,

18 there is no such thing as a "false idea."  This means --

19 talking about the First Amendment of the Constitution of the

20 United States, the freedom of speech in the press.

21      This means that every person in the United States is

22 entitled to express his or her own personal opinions, even if

23 those opinions are offensive.

24      In order to protect the right to freedom of speech,

25 defamatory statements cannot be based on expressions of

1 opinion, even if the opinion is hurtful, mean, or insulting.

2 Rather, a defamatory statement must be based on a false

3 statement of fact.

4 Expressions of opinion are entitled to strong

5 protection under the First Amendment. Therefore, a statement

6 of opinion cannot support a defamation claim unless the

7 speaker's opinion also implies the existence of undisclosed

8 facts which are themselves defamatory.

9 If a speaker expresses an opinion based on facts

10 which are disclosed, then the speaker's opinion is protected

11 and cannot support a defamation claim.

12 If you find that a little wordy, I think if you read

13 it over in the jury room, you'll understand it.

14 Instruction Number 6: You have been instructed that

15 in order to recover, the plaintiff must prove that the

16 statements published are materially false. That is to say

17 that substantial truth is a defense to defamation, even if the

18 allegedly defamatory statement was made with or inspired by

19 malice or ill will or is libelous per se.

20 In considering the truth as a defense, you are

21 instructed that substantial truth provides a defense to

22 defamation, even if what was published is not the precise or

23 exact truth. Rather minor inaccuracies do not amount to

24 falsity as long as the substance, the gist, or the sting of

25 the libelous charge is justified. Put it another way, the

1    statement is not considered false unless it would have a

2    different effect on the mind of the reader than the truth

3    would have produced.

4         That's a good expression of it.  Let me read it

5    again:  Put another way, the statement is not considered false

6    unless it would have a different effect on the mind of the

7    reader than the truth would have produced.

8         That fits into the example I gave you on voir dire or

9    when you were first seated.  Let's say someone was accused of

10   stealing a million dollars.  When the proof came in, it proved

11   they only stole a half a million dollars.  That probably would

12   not have a different effect on the mind of the reader than the

13   truth would have produced.  They'd still know the person was

14   an embezzler.  So that would probably be substantially true.

15        Instruction Number 7:  When a statement appears to

16   contain one or more facts which would be defamatory, assuming

17   the facts are proven false, the statement is still entitled to

18   protection under the First Amendment when it is clear that the

19   statement contains hyperbole, exaggeration, or any other type

20   of speech which was clearly not intended to be taken literally

21   as fact.

22        What they mean is we sometimes say it's raining cats

23   and dogs, but it's not literally raining cats and dogs.

24   Somebody doesn't speak English to know that's a common

25   expression might run out and look around for the cats and

dogs; but we all, those who are familiar with it, know what that means.

So sometimes people will say how hot it is out, they'll say it's 150 degrees out. Well, everybody knows it's not really 150 degrees. The person's trying to make emphasis by what is formally called hyperbole, but just exaggeration. We all do that. And you have to interpret the light -- the statement made that's under consideration in the light of common sense to determine whether -- how it should be taken literally and how it should be interpreted. And it doesn't have to be taken literally if this device of hyperbole is being used. We all do that. I think you won't have any trouble with that.

Instruction Number 8: A statement is not defamatory unless it is "of and concerning" the plaintiff individually. This means that a statement which criticizes a large group of people will not support a defamation claim by each individual member of that group. This type of general statement is not "of and concerning" any one person and, therefore, is not actionable.

So, for example, a statement that "all lawyers are shysters" would not permit every lawyer in the country to sue for defamation because this statement was not "of and concerning" any one specific person. It was a general comment regarding a large group.

1          Instruction Number 9:  The following -- we will

2     instruct next on plaintiff's claim for damages.  However, you

3     should not interpret the fact that you are given instructions

4     concerning the plaintiff's damage claim as indicating that

5     plaintiff should or should not prevail in this case.  It is

6     your task to determine whether defendants are libel.  You are

7     being instructed on damages only so that you will have

8     guidance in the event you decide that the defendants are libel

9     and that plaintiff is entitled to recover money from

10    defendants.

11         However, any damages you award must have a reasonable

12    basis in the evidence.  Damages need not be mathematically

13    exact in a libel case, but there must be enough evidence for

14    you to make a reasonable estimate of damages without

15    speculation or guesswork.

16         For instance, one of the -- if you decided the

17    plaintiff is entitled to damages for mental distress, if you

18    want to award that, so obviously you can't bring in a balance

19    sheet or some statement from an accountant what her mental

20    distress is.  You have to use your common sense to determine

21    that.

22         Instruction Number 10:  Defendants are not liable for

23    any ailments plaintiff may suffer from those that were caused

24    by anything other than any wrongful actions by defendants.

25    Similarly, any physical or emotional injuries that you find

1    are attributable to a cause other than any wrongful actions by

2    defendants are not part of this action and should not be

3    considered by you.

4        If you find that the injuries of which plaintiff

5    complains were caused by something or someone other than

6    defendants, then defendants are not liable for such injuries.

7        Again, that's just common sense.

8        Now we get to punitive damages.  I'll just read the

9    instructions on them.

10        Punitive damages means damages, other than

11    compensatory and nominal damages, awarded against a person to

12    punish and to discourage him and others from similar conduct

13    in the future.  You may award plaintiff punitive damages only

14    if she has proven by the evidence that defendants acted toward

15    her, toward the plaintiff, with oppression, fraud, or malice.

16        "Oppression" means conduct which is specifically

17    intended by the defendant to subject the plaintiff to cruel

18    and unjust hardship.  "Fraud" means an intentional

19    misrepresentation, deceit, or concealment of material fact

20    known to the defendant and made with the intention of causing

21    injury to the plaintiff.  "Malice" means conduct which is

22    specifically intended by the defendant to cause tangible or

23    intangible injury to the plaintiff.  If you find from the

24    evidence that defendants acted toward plaintiff with

25    oppression, fraud, or malice, then you may, in your

1    discretion, award punitive damages to the plaintiff.

2            Instruction Number 12, again on punitive damages:  If

3    you determine that punitive damages should be awarded, you

4    shall then determine the sum of punitive damages.  In

5    considering the amount of punitive damages to be assessed, you

6    should consider the following factors:

7            (a) The likelihood that at the relevant time that

8    serious harm would arise from the defendant's -- I read that

9    wrong.

10           (a) The likelihood at the relevant time that serious

11   harm would arise from the defendant's misconduct;

12           (b) The degree of the defendant's awareness of that

13   likelihood;

14           (c) The profitability of the misconduct by the

15   defendants;

16           (d) The duration of the misconduct and any

17   concealment of it by the defendants; and

18           (e) Any actions by the defendants to remedy the

19   misconduct once it became known to the defendants.

20           I think that's again common sense.

21           All right.  That is now all the instructions.  I will

22   now read to you what the law calls a special verdict, the

23   questions that you will be asked to answer.  In all of these

24   questions, your verdict must be unanimous, but only the

25   foreperson need sign.  There's a place on here for the

foreperson to sign.

Special Verdict:  Please answer the following
questions according to the instructions given:

(1) Has the plaintiff, Sarah Jones, proved that any
of the defamatory postings concerning her described in the
evidence were substantially false at the time they were
posted?  Answer yes or no.

In other words, has she proved that what was said was
false.  That's the first requirement for recovery in a libel
case.  Truth is always a complete defense.

Note:  If you answered Question 1 "no," please return
to the courtroom.  If you answered Question 1 "yes," please
continue to answer the following questions.

(2) Do you find by clear and convincing evidence that
the false postings were made with the defendant's actual
knowledge of their falsity or reckless disregard for the
truth?  Answer yes or no.  And the foreperson need sign.

That's the standard for recovery in this kind of a
case, whether -- if you decide they're false, then did the
defendant have the required state of mind for damages, which I
said is up to the jury, a person's state of mind, actual
knowledge of the falsity of these postings or reckless
disregard for the truth.  I think that's English that doesn't
need to be defined.

If you answered Question 2 "no," please return to

1    the courtroom.  If you answered Question 2 "yes," please

2    proceed to the next question.

3         Three -- So you won't get to 3 unless you've answered

4    the ones yes up above that are so indicated, or no or yes,

5    whatever it was, to get to this part.

6         (3)  What sum in damages do you find for the

7    plaintiff, Sarah Jones, to compensate her for her mental

8    anguish and damage to her reputation as a proximate result of

9    said false postings?  Such damages shall not be awarded for

10   any period after February 1st, 2011.

11        So just take that -- I won't explain what the reasons

12   were, but just take that as given.  All right.  And there's a

13   place to put an amount and a place for a signature.

14        Now Question 4, If you answered Question No. 3 with

15   an amount -- that is, if you found something for mental

16   anguish and that sort of thing -- do you, in your discretion,

17   wish to award punitive damages to the plaintiff under

18   Instructions 11 and 12 above?  Answer yes or no.  Signature of

19   the foreperson.

20        And lastly, if you get this far, if you answered

21   Question No. 4 yes, what sum in punitive damages do you wish

22   to award to the plaintiff, Sarah Jones, under Instructions 11

23   and 12 above?

24        All right.  Now, when I'm just reading this, it might

25   sound quite complicated, but I think the attorneys will have

1    these in their hands.  That's why I give the instructions in

2    advance instead of afterwards.  The attorneys will have them

3    in their hands, and they'll go through them, and, of course,

4    each one of them will suggest different answers for these

5    questions, but they should give you a pretty good feel for

6    what the questions mean and how they fit into the case.

7         And lastly, when you retire, you will have these in

8    writing with you in the courtroom.  As you come to each one,

9    just sit down like it was your income tax return, what does it

10   mean, and answer it to the best of your ability and

11   impartially.

12        All right.  Mr. Deters, the plaintiff's going first.

13   You wish to divide your argument.  The timekeeper will tell

14   you when your first segment is up.

15        MR. DETERS:  All right.  Thank you.

16        THE COURT:  I should say -- excuse me, sir.  I should

17   say, closing statements, like opening statements, are not

18   evidence.  They are suggestions to you of how you should

19   interpret the evidence, but how you interpret it is up to you

20   in the final analysis.  You may go ahead, sir.

21        MR. DETERS:  Thank you, Your Honor.  Counsel, ladies

22   and gentlemen of the jury, although it may disgust you or me

23   or anyone, if postings to sites like these are true or

24   generally disgusting but they're not going to the character,

25   like Eric Deters is a lousy lawyer, Eric Deters is a schmuck,

1   knock yourself out.  Problem is, is that the law protects

2   people from defamation.  And the reason why it is so important

3   this day and age, because of the Internet, whoosh, everybody

4   gets it.  It's like gasoline being thrown on the fire.

5          Someone once said about libel and defamation, is if

6   you took a pillow in a windstorm, a duck feather pillow, and

7   you shook out the feathers from a four-story window in a

8   windstorm, and all those feathers go shew, you can never

9   collect them back again.  So once that defamation hits the

10  Internet, whoosh.  And he said 50,000 nationwide, 300.  Three

11  hundred people in the tri-state can spread bad things real

12  quick thanks to the Internet.

13         The Court ruled prior to trial -- and in the

14  instructions, you're going to see -- this case is about prior

15  to February 1st, 2011.  Everything you heard after February

16  1st, 2011 was for one issue, credibility.  It is the first

17  time in my life as a lawyer, 25 years, that I've had to listen

18  to someone's entire case be irrelevant.  Their entire case is

19  irrelevant.  They want you to say because she lied during a

20  police investigation, it's okay for them to have libelled and

21  slandered her two years prior.  All they got is lies.  And I

22  told you that on opening.  They're going to say, lie, lie,

23  lie.

24         He said to Dr. Phil, it's a business, form of

25  entertainment, is what it is.  The site's growing; I like to

1　get a rise.  That's what he said.  But now we know, let's

2　spread the word to America, the way you get off thedirty.com,

3　if you say I'm going to commit suicide, he takes it down.  So

4　thedirty.com should be shut down tomorrow because everybody

5　that has a posting should say, I'm going to commit suicide,

6　and he'll take it down.  That's what he said.

7　　　　You promised me in voir dire you would remember the

8　importance of the events before February 1st, 2011.  So I ask

9　you to remember that promise.

10　　　　I'm going to put this up.  Chronology.  Those are the

11　dates that really count.  October 27th, 2009, the first

12　defamatory.  Removed August 26th, ten months later.  The

13　cutoff of the case, February 1st, 2011.

14　　　　All of these things -- heck, we admitted she was a

15　liar.  She lied, lied, lied.  That's what I said in my

16　opening.  And she did.  I'm not going to burden you with

17　putting up all the e-mail dates.  There's a bunch of them that

18　she asked to be removed.  He acknowledges that he received all

19　those during his testimony, including the g-mail account.

20　　　　Point 1:  What lie did Sarah tell in 2011 or 2012

21　which has anything to do with the libels posted and left on

22　thedirty.com?  None.  Don't find for the plaintiff because she

23　lied a thousand times two years later.  That's their whole

24　case.

25　　　　The lies of Sarah Jones.  Nothing to do with the

libels.  She was worried about being prosecuted, worried about

being embarrassed.  Stupid lies that can embarrass.  No lies

under oath.  Her lies harmed her.  Again, they want you to

find for them and against Sarah because she lied after the

time involved.  Should their conduct be excused because she

lied regarding Cody York?  That's their case.  That's their

case.

Sarah lied on "Anderson Cooper."  She lied to

"Dateline."  She lied to police.  She lied to her mother.  She

lied to Cody York.  She lied to school officials.  All after

February 1, 2011.

Lies.  Lawyers lie to opposing counsel.  Lawyers

don't lie to Courts.  Lawyers better be careful lying to

juries.  Every single day, lawyers lie to lawyers.  "Hey, I

got to take $20,000," when you'll really take $10,000.  They

play poker.  Lawyers lie.  People tell white lies every day,

proven by "Liar Liar," the movie with Jim Carrey.

Perjury requires material lies.  My wife -- you're

talking about these love things.  My wife was so

embarrassed -- she's going to kill me if she ever hears

this -- she lied to me once that she was a lifeguard instead

of the snow cone girl because she was embarrassed she was a

snow cone girl way back when.  What the heck?  It's a weird

thing you do.

And I'll guarantee you, unlike him, I've lied to my

wife before.  But Nik Richie, somebody that does all this, he never has lied to his wife.  We'll see who's lying now.  Never lied to his wife.  He can't recall lying to police.  He can't recall lying to his mother.  He denies using his site for bad things.

Point 2:  Sarah's reputation in 2009 and 2012 is what counts during this trial.  Bingo.  She testified she had a sterling relationship.  The defense called a fellow teacher.  Knocked me out.  She came in, to my shock, said good reputation, her son loved her class.  I'm thinking to myself, what the?

That which is not public and not known in the community cannot adversely affect someone's reputation.  Reputation is what everyone knows about.  Up to February 1st, 2011, everyone knew that Sarah Jones was a good girl.  That's what counts.  She admitted her reputation is [*pbbth*] now.  Scandal at school.  No more reputation.  What counts is she had a good reputation up until the time of these posts and up and to February 1st, 2011.

The logic of the defendants.  The conduct of Sarah Jones in 2011 and 2012 excuses their conduct.  The posts are substantially true?  None of it's true.  The gist of the posts matches up with the facts of her life.  Pure and simple, this is a money grab, despite the fact that she asked 24 times, take them down; I don't want to sue.  Now she's a money

grabber.  She's an admitted liar and it's a grab for a lot of money.  Really?  They claim Sarah's lies are the same as their lies.  No, they weren't.

She survives so, so what?  She didn't lose her job. She became a Ben-gal captain.  She didn't lose her boyfriend. So the fact that she survived the libel and slander and didn't commit suicide, it is okay.  She wasn't harmed.

Defendant's reckless disregard for the truth.  Allow everything to go up, don't fact-check, allow anonymous postings.  Useless terms of service.  We're going to promise that this is true, and then I'm going to post it anonymously, and I expect you to accept that.

He didn't post Cody York posts.  Why?  Because he thought it was a setup.  Ooh, let's give him a break now because he did one good thing.

And I have all of his testimony, because I had it transcribed.  On page 11 of the transcript, he approved, he approved, he approved.

"It's not my job to fact-check the stuff."

"You decide what is posted, whether it stays up."

"It's impossible for me to fact-check."

"It's not my job to decide what's true and what's not true."

"Those posts that were up there on Sarah, those three main ones that we allege, that you say you don't know if

they're false or not, right?"

        "Correct."

        "You don't know whether or not they're false?"

        "I don't know.  I don't fact-check."

        He doesn't have to do that.  He could require people to give their names, Social Security number, date of birth, and everything else before they post something.  He doesn't want that.  Why?  He needs action.  He needs traffic.  He needs people coming to that web site.  Why?  More money, more advertisers.  Money, money, money.

        Not only do we have substantially false, we have 100 percent false.  Sarah Jones did not have sex with Shayne Graham.  Sarah Jones did not have sex with any Bengal.  Sarah Jones did not have chlamydia or gonorrhea ever.  Neither did Nate Wilburn.  Sarah Jones did not have sex with Nate Wilburn anywhere at Dixie Heights, nor with Cody York.  And Mr. Gingras' question, So the only things that aren't true are the STDs, sex everywhere, and every Bengal?  And then Mr. Richie said, Uh, no, I'm not saying that's true.

        And then we aren't suing -- remember this, we aren't suing for the comment, "Why are all teachers freaks in the sack?"  That's a general common exaggeration.  Fact -- you heard those instructions.  Fact, she has chlamydia and gonorrhea.  She had sex with every Bengal.  She had sex at Dixie Heights High School.

1    This is from the opening statement of the counsel:

2    "So essentially, their complaint is that the posts said that

3    the plaintiff was sexually immoral or promiscuous and the

4    plaintiff potentially had STDs."  Potentially?  "So what's the

5    truth?  The truth is the plaintiff was sexual immoral."  When?

6    Two years afterwards.

7    She had a sexual relationship with her student when

8    she was a teacher at Dixie Heights.  And the truth is, she has

9    an STD.  Yes, hepatitis A, contracted in the seventh grade by

10   an inhaler from a classmate.  And guess what, folks?  They are

11   saying because of that, it's okay that they posted she had

12   gonorrhea and chlamydia.  That's the logic of this guy.

13   Malice.  Refusal to remove.  Taunt.  Increasing the

14   abuse.  Puts up a post on my daughter.  War mentality.  Let's

15   go to war.  And all the posts after the posts.

16   But guess what?  It doesn't stop there.  It's like

17   the rape shield law we need in these kind of cases.  Why?

18   Because guess what happened in this courtroom?  Left the

19   bikini photo up during questioning.  Left the plea deal up.

20   Focus on the lies after the fact.  Focus on the Dixie scandal,

21   hepatitis A, bad relationship with Nate Wilburn.  She

22   survived.  Attempted to have fellow teacher trashed.  Show you

23   the sexy calendar photos.  Show you the other sexy photos.

24   Misrepresented --

25   MR. WARD:  Objection, Your Honor.  May we approach

1  briefly?

2          THE COURT:  All right.  Time out.

3                  (Bench conference.)

4          MR. WARD:  I have a huge problem with, you admonished

5  us before not to personally go after counsel.

6          THE COURT:  He didn't go after counsel personally.

7          MR. WARD:  He said the logic of this guy about my

8  opening argument.  I kind of get that.  But now he's saying

9  that we intentionally left things on the monitor, all this

10 stuff, trying to act like we're playing charades.

11         THE COURT:  He didn't say he meant to attack your

12 character and you're a piece of work, anything like that.

13         MR. WARD:  Okay.

14         THE COURT:  So I'll overrule the objection.

15         MR. WARD:  Okay.

16                 (Bench conference concluded.)

17         THE COURT:  All right.  Overruled.  Time in again.

18 Shall I make the signal?

19         MR. DETERS:  They showed you sexy calendars.  Why?

20 Look at these sexy pictures.  If she says sexy pictures, she

21 must have chlamydia and gonorrhea.  I don't know.  I wonder

22 how many of the Ben-gal cheerleaders have chlamydia and

23 gonorrhea because they posed for a sexy picture.

24         Misrepresented Morgan McCafferty.  Misrepresented the

25 actress comment, the actress that she holds it all in.  That

1    young lady went through -- if you look at some statistics,

2    you'd probably find -- what is the biggest, most stressful

3    thing that can happen in life?  Loss of a child.  I've seen it

4    firsthand.  My wife lost a child.

5         Guess what she did in one year?  Lost her career,

6    lost her job, lost her husband, publicly humiliated.  What

7    more can you ask for?  I know what, a felony prosecution.  She

8    survived it all.  But guess what?  Because she survived, it's

9    okay for them to trash her.

10        Also, they said embarrassing texts.  The pink pool,

11   the pink swimming pool, like she wants a pink swimming pool.

12   And then they've called her a liar, a felon, a money grab, and

13   then they try to insinuate that she fell in love with him when

14   he was a freshman.  Well, guess what?  If she did, she had

15   restraint because nothing happened, at least not till the

16   senior year.  But they try to embarrass her.

17        Then they bring up another student.  Oh, Zeke Pike

18   said, "I've got to go see my girlfriend," a obvious reference

19   from a teenager with testosterone.  But no, no, no.  They

20   imply, ooh, there's something else going on.  And guess what

21   shows up on their dirty.com site?  Zeke Pike.

22        Instruction Number 3 is the most important

23   instruction for me.  Why?  Defendants Nik Richie, Dirty World,

24   LLC, when they republished the matters in evidence, had the

25   same duties and liability for republishing libelous material

as the author of such material.  What that means, folks,
somebody puts libel on there, they leave it go, they're
responsible.  Dr. Phil would make a great lawyer.  "You own
it."  "You own it."

Instruction Number 4, Facially defamatory, untrue.
Defamatory statement was made with actual malice.  What's
malice?  Bring the person upon whom the statement is made into
public hatred, contempt, or ridicule.  Hmm.  E-mails at work,
embarrassed with her family.  But it's okay.  They say, hey,
if only her family members and they don't believe it, then
it's okay that everybody else in the world sees it, because
your family members got your back.

Caused the person to be shunned or avoided.  I'd say.
Also injure the person in their business or occupation.  She
had to go through Dixie Heights, check the videos, had to
convince her cheerleading coach this isn't true.  Malice.

Punitive damages.  The likelihood, at the relevant
time, that serious harm would arise from the defendant's
misconduct.  She's a teacher, NFL.  The degree of defendant's
awareness of the likelihood.  They know that.  The
profitability of the misconduct by the defendants.  Twenty
million people a month.  The duration of the misconduct and
any concealment of it by the defendants.  Left up for ten
months.

And then finally -- and this is my favorite -- any

1  actions by the defendants to remedy the misconduct once it

2  became known to defendants.  Never.  They didn't want to take

3  it down.  Did not want to take it down.

4  Let me tell you something, folks.  I've messed up

5  before.  I'm a lawyer.  I make mistakes.  One thing that I've

6  learned is you make a mistake, don't lie about it.  Own up to

7  it.  Why?  It decreases what happens.  That's that simple.

8  That simple.  They could have taken these things down.  No

9  lawsuits, no litigation, no ambulance chaser in here

10  representing Sarah Jones.

11  And I am sick and tired of the public thinking that

12  she thinks that she's allowed to come in here and get money.

13  How dare she; she pled guilty to a felony.  And you are the

14  first ten people to get to hear the whole truth and nothing

15  but the truth so help me God, which is they defamed her and it

16  hurt her.  And they expect us just to drop this case because

17  what she went through and let them off the hook?  She's had

18  courage.  She has chutzpa.  And she deserves her day in court.

19  Special verdict.  "Has the plaintiff, Sarah Jones,

20  proved any of the defamatory postings concerning her described

21  in the evidence were substantially false?"  I think we've

22  proved they were completely false.

23  "Do you find by clear and convincing evidence the

24  false postings were made with the defendant's actual knowledge

25  or reckless disregard for the truth?"  What Sarah went

1    through, she threw up, depressed, on Lexapro, couldn't help

2    checking the posts.  Kept telling students there were no STDs.

3    All eyes were on her.  Was taunted, worried about her job,

4    worried about keeping her Ben-gal position, missed a few days

5    of work, and it affected her marriage and relationship.

6         Money.  Folks, I told you, I'd take a win and

7    $10,000.  I'd take whatever you want to give.  But let me tell

8    you something, you have to factor in all Sarah went through

9    from October, 2009 through February 1st, 2011.  But I want to

10   tell you something, because I don't care.  Whatever you do, my

11   life goes on.  Sarah's life goes on.

12        You know what?  You can do something big today.  You

13   can send a message across America, we're going to stop the

14   libel and slander on Internet web sites like thedirty.com.

15   You award a lot of compensatory damages and get out of your

16   mind what's going to her and think about ten times that for

17   punitive damages, you can send a message.

18        You know what folks, I've laid it out here.  You are

19   the first jury probably in America to have the opportunity to

20   do something bigger than yourself.  When was the last time you

21   had that chance?  Maybe some of your jobs, you get to do that

22   every day.  I don't know.  This is a once-in-a-lifetime

23   opportunity to do something big.  You know what, I'm asking

24   you to do it, not for a money grab, but to shut them down.

25   But that choice is yours, not mine.  Whatever you do, we live

1   with.  But you've got a unique opportunity.

2        You cannot award punitive damages unless you award

3   something in compensatory damages; and the higher the

4   compensatory damages, the more punitive damages that you can

5   award.  Cause them pain.

6        What is unbelievable about this is that a young

7   woman, being truly emotionally harmed by the world, being told

8   you were a slut, having sex with all the Bengals, having

9   chlamydia and gonorrhea, has survived it all.  Has survived it

10  all.  And you heard her say that the relationship with Cody

11  York harmed her?  She testified they're still dating.

12       But again, we only are allowed to get damages,

13  compensatory, for those two years.  Sock it to them.  If you

14  don't, I'm okay.  You can do something big today.  Thank you.

15       MR. WARD:  May it please the Court --

16       THE COURT:  Yes, go ahead.

17       MR. WARD:  -- Counsel.  Wow.  Well, here we are.

18  You've now heard all the evidence you're going to hear in this

19  case.  I want to take up a couple things right off the bat,

20  very important things.

21       And the first one is kind of interesting because the

22  plaintiff brought up hyperbole, and I'm going to show you the

23  instruction that the Judge just gave on it.  And it says,

24  "When it's clear that the statement contains hyperbole,

25  exaggeration, or any other type of speech which was clearly

not intended to be taken literally as fact, it can't support

defamation."

Here's that first post about Shayne Graham.  And what

they complained about from this post is when it says, "She

slept with every other Bengals football player."

So the question becomes, was that a statement of

hyperbole, exaggeration; or did whoever posted that, whoever

said it, intend for the readers to literally believe that she

slept with every Bengals football player?  If it's

exaggeration or hyperbole, you're finished with it.  You don't

consider it.  You don't even look at it when you go to that

Question Number 1.

What happened in court about that?  Mr. Deters asked

the question to Nik Richie and rolled his eyes and leaned back

and said, "Do you believe she slept with every Bengals

football player?" because it's ridiculous.  No one ever really

thought that that statement was saying that she slept with

every Bengals football player.  That being the case, that

means that it's hyperbole and exaggeration; and under the

Judge's instructions, that means you don't consider it

anymore.  So the Bengals football players is out.

Something else.  We talked about an expression of an

opinion.  You cannot enter a verdict against the defendant

based upon an expression of opinion.  I'm going to show you

that instruction.  What it says, "If a speaker expresses an

opinion based on facts which are disclosed, then the speaker's

opinion is protected and cannot support a defamation claim."

Again, if it's an opinion, within that instruction,

you don't consider it anymore.  It's out of this case because

it's protected.  Okay?

Let's look at the STD post.  What they complain about

says, "Her ex, Nate, cheated on her with over 50 girls in four

years."  A disclosed fact, statement of fact.  "In that time,

he tested positive for chlamydia infection and gonorrhea."

Again, that poster's statement of disclosed fact.  This is the

part, "So I'm sure Sarah also has both."  So what you have

there is two stated disclosed facts about her ex-fiance,

ex-husband, and then you have, "So I'm sure she has both as

well."  The opinion based on those disclosed facts.

I'm from Ashland.  It's cold here today so I'm sure

it's cold in Ashland, too.  Did I just tell you, as a matter

of fact, that I know it's cold in Ashland, or was that my

opinion based upon the fact that we're relatively close in

geography?

If you think "so I'm sure she does too" is an

opinion, then it's out of the case.  You don't consider it

anymore when you get to that Question Number 1.

So what does that leave us?  Sleeping with Bengals

players is out.  Clear hyperbole, folks.  Clear exaggeration.

STD opinion is out.  You can't consider those posts.

1          But what if you disagree with me?  And you may.  What

2     if you think sleeping with an entire football team was not an

3     exaggeration?  What if you think "I'm sure she does too" is

4     intended as a statement of fact, not an opinion based upon

5     those statements about Nate?  Well, the plaintiff still

6     doesn't get your verdict.

7          I guess at this point, the message is, don't lose the

8     forest for the trees, right?  What's the big picture?  It's

9     not what co-counsel for the plaintiff, Dr. Phil, said.  And as

10    the Judge instructed you, you weren't even supposed to

11    consider that.  It was only the testimony of what Nik said on

12    there, the statements that Nik said on there.

13         So what is the big picture?  It's simply what I told

14    you upfront, that you can't believe the plaintiff.  And you

15    can't.  And all this talk about (1) it's just not true, that

16    there was no evidence of lies before February of 2011, but the

17    fact that we have all the lies that we have doesn't mean that

18    you should disregard that when you're considering her

19    credibility on anything she's told you.  You have to ask the

20    question, does a person's character change overnight?

21         And let's talk about that very first statement that

22    there was no evidence of lies before February, 2011.  There

23    was the e-mail introduced where she admitted that she's lied

24    about how old she was in these first two pictures with Shayne

25    Graham.  She said, in that e-mail, that she was 19 in these

1    pictures.  That was back in 2009, right when they were posted.

2    And the funny thing about that, or the sad thing about that,

3    or whatever, is there doesn't appear to be any reason

4    whatsoever why she lied.  She had turned 21 for the tryouts.

5    She says these are pictures when she was a cheerleader.  She

6    could have said, I was 21 in these pictures at a charity

7    event.  But for no reason that I can figure out, she decided

8    to lie.  And that's back in 2009.  Clearly within the relevant

9    time period because it was right about this post.

10        And to get to their point that this whole case is

11   about they want you to be mad at her because she lies, this

12   isn't an argument that you punish her because she lies.  It's

13   because you can't believe her.  You can't give her a verdict

14   here because her whole case was her unsupported testimony.

15   Just her word.  So it's only fair that you are allowed to ask,

16   what is her word worth?

17        I'm not going to reshow you those videos of lying or

18   text messages showing lying, and you can hold your applause

19   until the end.  But I trust you remember them, and I hope you

20   viewed her testimony with those in your mind.  And I'll remind

21   you that she has the burden to prove that what was posted was

22   substantially untrue.

23        And I do have to point out a couple more descriptions

24   of lying that she brought forth in the trial that we didn't

25   have before.  We now have out of context.  That was for all

the text messages, right?  They were out of context.  She said

maybe her and Cody were on the phone, hung up, and decided to

then text so we didn't know really what was going on in those

conversations.

I ask you this:  How can, "We have dated for over a

year," "I have loved you since freshman year when you were

14," how can, "We have been living a lie for over a year," how

can recollections of flirting and hugging freshman year, how

can those things be out of context?  They are what they are.

I have no idea.

And then there was everybody lies.  Mr. Deters said

every lawyer lies all the time.  Well, I can tell you this:

If everybody lies as much as Sarah Jones, I'm about to start

feeling a lot better about myself.

Moving on.  I talked to you about a few things in

opening argument.  Well, one of the things is this case -- and

this is a legal thing to go along with the instructions --

this case is about public concern issues.  Postings, public

schools.  Why does that matter?  Well, if that's the case, you

have to prove actual malice to recover for defamation.  Actual

malice.  So even if, for whatever reason, you were to believe

that those posts were untrue, if it wasn't posted with actual

malice, she doesn't recover.  So that's another layer on the

case.

You have actual truth.  The plaintiff has to convince

you that what was posted wasn't true.  You have substantial truth.  Was the gist of what was posted true?  And on that one, I want to show you really quickly this instruction.  The Judge told you about it, read it to you.  What that means is, "Put another way, that the statement is not considered false unless it would have a different effect on the mind of the reader than the truth would have produced."  It's not all the specifics, right?  And the Judge told you that.

And then because of the public aspect of the trial, you have actual malice.  Even if it wasn't true or substantially true, was it posted with actual malice?

So let's talk about actual truth really quickly.  And again, this is all if it wasn't exaggeration or opinion that you get to this point.  Actual truth.  I honestly don't know how you could decide one way or the other if what was posted was true or was not.  And that's entirely the plaintiff's fault.  It is her burden to prove it was false, but she can't do that because she can't tell the truth.  She lied to police, lied to reporters, lied to her family, lied to her boyfriend.  She lied about relationships, lied about crimes, lied for this case.  Even though she says she only lied to protect herself criminally, I want you to remember that she told you she lied for this case.  When she went on "Anderson Cooper," she hadn't been indicted.  When she said she had to lie for court, that was for this court.  That was for this case.

1    She has told you all that she would lie for this case

2    in this court.  That's for you-all.  Not criminal penalties or

3    anything else.

4    She's admitted she would lie to defend her court

5    case, but here we are in a court case.  How can she ask you to

6    believe her now?  How do we know anything she says isn't just

7    another lie to help her out in court?  Do you remember her

8    saying, "They can't know that"?  Is this just another case of

9    they can't know that, right?

10    And what did she give you to support her poor

11    credibility?  She said, you know she didn't sleep with any

12    Bengals because that was a, quote, line you don't cross.  But

13    falling in love with a student and sleeping with a student is

14    a line you can cross?

15    And remember, she has a lot of reasons to lie, up to

16    11 million reasons, and that house with a bowling alley and a

17    pool and Cody's Mercedes.  And she knew it was important to

18    get that money, right, the money she hadn't asked you for or

19    you hadn't awarded, because she told Cody, "If I don't get

20    that money and your car, you're out of here."

21    Frankly, given her tremendous history of lying, it is

22    unfair for her to ask you to take her word for anything.

23    Without -- and without that, that's the entirety of her case,

24    her word.

25    Let's put that aside.  What about substantial truth,

1    the gist of what was in the post?  He talked about a young

2    lady being called a slut.  Sexually immoral is the term I use.

3    If it wasn't an exaggeration, that's one issue.  And the STDs,

4    if it's not an opinion, is the other.

5         Well, she is admittedly sexually immoral, and she has

6    an STD.  She has hepatitis A, folks.  You can believe or not

7    how she got it.  They didn't give you any documents to back

8    that up, how she got it.  But it doesn't matter.  It's an STD,

9    period, by the government, the Center for Disease Control.

10    Just like -- and that's not this case, but if someone were to

11    get HIV through a blood transfusion, it's classified as an STD

12    even though they didn't get it sexually, right?

13         And as to sexual immorality, I'm not going to insult

14    your time anymore by talking about that, but I will point out

15    the plaintiff loves to talk about this time frame between 2009

16    and February of 2011, but we know that it was before February,

17    '11 that she was with Cody because she told him, remember,

18    that she loved him when she was in Iraq.  And then she had to

19    admit that that was in January, right?  So it's only one

20    month, but we know it goes back into their time period.  And

21    that was the one where she said, I believe, "I can't talk my

22    way out of this."  She admitted that.

23         And we also know that she said in those texts that

24    she was in a committed relationship with Cody for over a year.

25    So that takes us back into 2010, right, well within their time

frame, which was when she was also engaged to and through her marriage to her ex-husband, who she told us cheated on her. The one that, remember, she married so that he would give his deposition for this case.

And that doesn't even include love-at-first-sight texts since freshman year, hugs and flirting. All of those posts take us back before -- all of those texts talk about stuff before these posts.

She is sexually immoral. Now, she said that the families are supportive. That is what it is, but we know the law was not supportive of that relationship.

And one more thing. I mentioned in opening that she likes to say teaching was her ministry. Did you-all catch where she said that she used to be a part of a group that told students to wait until marriage to have sex? Wow.

And then there's actual malice. She gave you zero evidence of actual malice. As the Judge told you, to meet actual malice, you have to have knowledge that the statement was false or a reckless disregard for the truth. And that's explained, and I'm going to show it to you. "It requires that the publisher of the defamatory falsehood, at the time of publication, entertain serious doubts as to the truth of the published material." At the time of publication.

Let's look at the only evidence that exists as to whether Nik had serious doubts as to the truth of the

1    published materials when he posted them.  And that is the

2    issue:  When he published them, did he have serious doubts?

3         At the time of publication, the entirety of the

4    evidence you have heard here, that he didn't know the

5    plaintiff, didn't know her ex, Nathan.  The poster of the

6    materials agreed to the terms of the service, right, that

7    swore that these are not true -- or that these are true and

8    that they're not defamatory.  We know now they talk about that

9    it doesn't matter, but we do know that he tracks their IP now,

10   that he has the technology to do so.

11        He didn't have the plaintiff's denials when he posted

12   these materials.  So all that he had was someone saying

13   they're true, they're not defamatory, and the posts.  Those

14   denials came after the posts were published.  So there's

15   absolutely no evidence of any serious doubts or why Nik would

16   have any doubts at all, and that means actual malice.  That

17   means no actual malice.  That means a verdict for the

18   defendants.  It's not actual malice, period.

19        And I'll do this.  You remember the Judge said the

20   example of that is a newspaper and they get a story over the

21   wire so they have reason to believe it's true.  They have no

22   reason to believe it's not true.  They post it.  That's not

23   actual malice.

24        In this case, Nik runs a web site.  He receives a

25   story over the terms of use, agreeing that it's true and not

defamatory, and he posts it.  That's the entirety of the
evidence that he has at that time.  That's not actual malice.
And because there's no evidence of actual malice, you have to
find for the defendants.

So if you get past the defenses of exaggeration and
opinion, every one of those other things -- her failure to
prove falsity, substantial truth, and lack of actual malice --
means a verdict for the defendants.  But there's more.  She
has to show damages and harm.  And it has to be harm from
these posts.

Well, she was a teacher before the posts and after
the posts.  She was a teacher until it was clear she was going
to be indicted.  She might be a teacher again if she hadn't
had to agree to never teach again as part of her plea
agreement.

She was a cheerleader before the posts.  She was a
cheerleader after the posts.  In fact, she got promoted to
head cheerleader, sent to the Pro Bowl, the highest honor.
She was a cheerleader until she was indicted.

All the evidence is that she lost her job and her
hobby because of her own admitted criminal conduct.

She said she couldn't get jobs with people other than
her lawyer.  That's all because of her own criminal conduct.
The posts didn't affect her earnings at all.  Her damages were
self-inflicted.

1          But what about other damages, purely reputation

2     damages, aside from the completely missing economic damages?

3     They don't exist either.  She claims no one close to her

4     believed the posts.  None of the other cheerleaders believed

5     posts.  She tells you that she assumed someone out there that

6     we don't know, nameless people, believed the posts; but what

7     we have that we know is that the people she knows didn't and

8     the cheerleaders didn't.

9          And he talks about Kristy Molony who came in to

10    testify.  She said there were some whispers maybe, that she

11    personally thought Sarah didn't do a good job setting

12    boundaries; that another student that plaintiff's counsel

13    actually brought up -- I didn't bring him up even though he

14    keeps saying I did -- referred to Sarah as his girlfriend in

15    the 2009 fall.  But aside from that, she said the plaintiff's

16    reputation was good, right, until what?

17         Mr. Deters asked the question, was her reputation

18    good until the Dixie Heights scandal?  And she said yes, her

19    reputation was good until the Dixie Heights scandal.  Well,

20    she didn't know about the posts on The Dirty.  She was a

21    teacher at that school.  Didn't know.  Didn't know about the

22    posts.  It wasn't the talk of the school for all she could

23    tell.  What does that mean?  It means that thedirty.com posts

24    didn't hurt her reputation.

25              According to the one witness with knowledge not named

Sarah Jones, the one witness forced to come in and testify,
her reputation was fine until the Dixie scandal, which is the
Cody York scandal.  She cannot recover -- as instructed by the
Court, she cannot recover here for damages she sustained as
part of that Dixie Heights scandal.

So for all that, they ask you for a lot of money.
Wants you to put people out of business.  Punitive damages.
To get to punitive damages (1) you have to find malice, fraud,
or oppression.  You've heard the malice standard.  The others
are defined for you in the materials.  We have no evidence of
any of that.

I'll wrap it up this way:  The truth is, she didn't
show you she should get one dollar.  The plaintiff is asking
you for money even though she has given you no reason to
believe her at all.  I guess she is a good actress, but she's
not that good, right?  The plaintiff is the type of person
that if she tells you it's raining outside, you can get your
picnic basket ready.  And that's her fault.  You just can't
believe her.

She hasn't earned a verdict from you.  The evidence
does not support a plaintiff's verdict in this case, as you've
been instructed by the Judge.  So your verdict should be for
the defendants.

So when you get this verdict form and you see that
Question 1, has she proven substantial falsity, you check no.

On the second page, if you get there, on actual malice, when
it says has she proven by clear and convincing evidence actual
malice, you check no.

I truly appreciate your time and your service, coming
out here to help us out with this case. And because I respect
your time, I'm not going to take any more of it. Thank you.

THE COURT: Are you going to use your time?

MR. DETERS: Yeah. I left six minutes off. I'm
probably not going to use it so I was just wondering if --

THE COURT: You can use it.

MR. DETERS: Thank you.

THE COURT: A total of 30 minutes.

MR. DETERS: Thank you.

THE COURT: Quit or you can use it.

You can come back for another ten if you want to.

MR. WARD: I think I'm done, Your Honor.

MR. DETERS: The reason why I said Instruction
Number 3 was the most important instruction to me, because it
just blows out of the water what he just told you about the
fact that -- what he knew when it was published. Why?

Instruction Number 3, "Defendants, when they
republished the matters in evidence, had the same duties and
liabilities for republishing libelous material as the author
of such materials," which means when he publishes it and
republishes it -- because every single time, because it's on

the Internet, somebody logs on, bang. That's a republication
of that thing. And it was on there for ten months. So he has
argued with a straight face all that matters is the fact that
it was not known to him at the time it went up the first time.
Do you hear any objections to what I just told you? Nope,
because it was true.

Her reputation? Kristy Molony said she kind of kept
to herself, but she said in Dixie Heights, she had a good
reputation and she had a good reputation in the community.
Just the fact you had a good reputation doesn't mean it
doesn't take a hit and it doesn't mean that people out there
aren't -- you heard her testimony about Charlotte Jacobs, the
Ben-gal cheerleader, and everything else she went through.

The big picture. He says big picture, forest through
the trees. It's not true there are no lies before February,
2011. It's not true. I forgot about the one, and he pointed
it out. When she sent, on November 11th, 2009, to ask him to
take it down and she used the word 19. And she testified she
said that because you can't post things if you're a teenager.
That's what she was trying to do. Okay? That's the one lie
that they point out. And I wonder -- I can tell you right
now, I can tell you, I'd tell my kid to do it. Tell him
you're 14 if you have to to get it off of there.

Her whole case is her unsupported testimony. Really?
Madam Clerk, where are the exhibits? I will not mess

1    them up.

2              THE CLERK:  Please don't.

3              MR. DETERS:  Their exhibits, our exhibits.  Plenty of

4    things besides testimony, including, you heard her testimony,

5    and they got them, her medical records.  Her medical records

6    support no STD.  So once again, with a straight face, he tells

7    you there's nothing besides her word.  Really?  Medical

8    records, no STD.

9              Public concern issues.  Absolutely.  I've already

10   made my point about that.

11             I'm just going to skip through these.  All right.  I

12   was a little surprised that counsel put this up here and

13   said -- well, you've already seen them.  I'm not going to put

14   them up.  The one about Shayne Graham, Plaintiff's Exhibit 1,

15   he says, "She has also slept."  "Also slept," after talking

16   being out on the town with Shayne Graham, clearly stating as

17   fact she has.  I'm not an English teacher, but I remember

18   enough at St. Cecelia Grade School to know that when you say

19   "she has," it's a declaratory statement.  It's not "I think."

20   "She has."

21             So the implication is clear -- by the way, you're

22   allowed to use common sense -- that she was having sex with

23   Shayne Graham.  Not true.

24             In addition to that, she also slept with every other

25   Bengal.  I admitted that in my closing.  That could be

considered exaggeration.  But guess what?  Nik admits that he thinks that she slept with more than one.   Incredible. Exaggeration?  Don't think so.

Then on the opinion, again going back to Sister Helen would be proud of me, "Her ex, Nate, cheated on her with over 50 girls in four years.  In that time, he tested positive." Not "I heard," "I think."  "He tested positive."  A declaratory statement.  And then it goes on, "So I'm sure" -- I'm sure -- "Sarah also has both."  And then Counsel left off the next one.  "He brags about doing Sarah in the gym, football field, her classroom at school.  She teaches at Dixie Heights."  He didn't even address that one with you.

She was willing to lie in the criminal case.  We admit it.  Unfair to take her word?  That's for you to decide.

And then again, he just keeps beating her up.  She has an STD.  By golly, the fact she has hepatitis A, that's an STD, that's a good-enough STD for me.  Guess what, folks?  It didn't say she has an STD.  It said chlamydia and gonorrhea. Now, if this would have said she has an STD, they could maybe make that argument.  It says chlamydia, an STD.

Reckless disregard for the truth.  Malice is reckless disregard for the truth.  And remember his testimony about how he doesn't check facts?  People can go in there.  Counsel made a big deal about, oh, you have to sign in and say you're pledging to tell the truth when he knew they can do it

1   anonymously.

2        And he's got his army, The Dirty Army. You know, I

3   want to share something with you. You get ideas from all

4   kinds of people. My godfather gave me a good one yesterday.

5   He said, you know what an army is? It's crippling. An

6   army -- what does an army do? An army fights, it battles,

7   that war mentality. It goes out there and gets you. And see,

8   once those posts go up, everybody else just jumps on it. It's

9   like blood in the water for sharks. Put a little blood in

10   that water, here come the sharks.

11        I knew the mentality -- I was thinking about this.

12   The kind of people that must go to dirty.com. Well, I've

13   looked at the site so I know a little bit about it. The kind

14   of people that go to this thing, I mean the people that love

15   it, I don't get it.

16        Finally, the special verdict. Number 1, "Has the

17   plaintiff proved that any of the defamatory postings

18   concerning her described in the evidence were substantially

19   false?" I think we've proven all the way false. All we've

20   got to do is prove one. All we have to do is prove one. So

21   do you think the Bengals thing is false, the chlamydia and

22   gonorrhea's false, the sex at the school false?

23        And guess what? I like simple. You know why I like

24   simple? You call a witness, I've seen it blow up in my face.

25   That's why I only called her and I only called him, because I

1    didn't need anybody else.  Look what happened to them.  They

2    brought in one more witness.  What happened?  Kristy Molony,

3    blew up in their face, turned out to be our witness.

4         So when they say, well, how come they didn't call in

5    all these people, if I called her mom, do you think her mom

6    would say, well, she was a pretty bad girl?  No.  What do you

7    expect her mom to say?  I wanted you to see the contrast of my

8    wounded client and that guy.

9         Now, second, "Do you find by clear and convincing

10   evidence that the false postings were made with the

11   defendant's actual knowledge or their falsity or reckless

12   disregard for the truth?  And when he kept reposting them,

13   what was he being told?  "Take them down.  Take them down.

14   I'm not, I'm not.  I don't have sexually transmitted disease.

15   These are hurting me."  Begging, begging, begging.  And he

16   just blew her off.

17        And then what did he say?  "Shayne Graham pissed me

18   off.  Shayne Graham pissed me off.  I'm not taking them down."

19   So then she bears the brunt of Shayne Graham pissing him off.

20        There's a movie out right now called Victor Hugo.

21   And I own the book.  I've read it twice.  And I like the Liam

22   Neeson portion of it.  I think everybody in the world ought to

23   know the story of "Les Miserables."  It's about humanity.

24   Now, in this case, it's not a criminal case so we don't have

25   the complete context, but it's about humanity.  It's my new

1    word because over the last few words, I've kind of had some

2    things I had to deal with, and every time I found somebody

3    that was like, I'm going to show some humanity, you're like,

4    that's awesome.  Humanity, a gift you can give.

5           Do you see any humanity coming from thedirty.com?

6    Some great moral purpose from thedirty.com?  Some good thing

7    for society from thedirty.com?  Some humanity from

8    thedirty.com?  And it's not only that.  They not only don't

9    have any humanity for Sarah Jones, they want to keep pounding

10   her into the ground.

11          My favorite quote from Shakespeare, last thing I'm

12   going you tell you.  It's from Portia from "Merchant of

13   Italy."  But again, not completely in context, but I think you

14   can have it.  You can practice this today.  You can practice

15   humanity.  You can practice some mercy on her.  Guess what

16   folks?  She was humiliated.  Did you see her crying in court?

17   Awful.  Ten months home incarcerated.  You heard her testify

18   to that.  Don't -- when you serve your time and you do your

19   punishment, it's over?  Guess not.

20          Portia:  "The quality of mercy is not strained.  It

21   droppeth as the gentle rain from heaven upon the place

22   beneath.  It is twice blessed.  It blesses him that gives, him

23   that takes."

24           Do something big today.  Show some humanity and some

25   mercy.  She's been through enough.  Thank you.

1     MR. WARD:  I guess I will take one more minute since

2 he brought up something I guess he thinks I should have talked

3 about.

4     THE COURT:  Shouldn't be anything new.

5     MR. WARD:  It's not.  He pointed out that I didn't

6 talk about what's worse, he brags about doing Sarah in the

7 gym, football field, in her classroom, in the school she

8 teaches at, Dixie Heights.  Did you hear any evidence as to

9 whether Nate bragged about that or not?  It's not about this

10 case.  Did Nate say it or did he not?  I don't know, but

11 that's not anything you heard about in court, is it?

12     So when he asked you to do something big today, he

13 keeps wanting you to do something big, all I ask you to do is

14 weigh the evidence and apply it to the law the Judge gave you.

15 Thank you.

16     THE COURT:  All right.  Thank you, sir.  I guess I

17 have the last word.

18     Okay.  It's all over.  You heard a lot of arguments

19 on both sides.  Both sides have capable lawyers.  But you have

20 the last -- actually, you're the ones that actually have the

21 last word.  So I'll ask you to retire and carefully consider

22 your verdict.

23     First thing you should do is elect a foreman or a

24 foreperson to preside over your deliberations.  Second thing

25 you should do is eat lunch that they ordered for you.  You can

1    deliberate during lunch.  And we will be here if you have any

2    questions.

3            If you have any questions, write them out.  It has to

4    be done in a formal way.  Write them out, give them to the

5    court officer.  He'll bring them to me.  I'll get counsel

6    together and we'll discuss how to answer them.  You can't just

7    answer them off the cuff.

8            So I'll ask you then to retire and deliberate and

9    consider your verdict.

10                    (The jury left the courtroom at 12:05 p.m.)

11           THE COURT:  Okay.  Attorneys probably have some time

12   to go get some lunch, but then probably come back in about 45

13   minutes or so in case they have any questions.  Wouldn't

14   surprise me if they did.  Instructions have by their nature --

15   yes, sir?  You can leave.

16           MR. GINGRAS:  Yes, as I mentioned before, because we

17   have a flight to catch, we may not be here.  If we are not --

18           THE COURT:  As long as somebody on your side is here

19   if they have a question.

20           MR. GINGRAS:  I just wanted to thank Your Honor.

21           THE COURT:  Is the defendant leaving as well?

22           MR. GINGRAS:  Yes.

23           THE COURT:  All right.

24           MR. GINGRAS:  Thank you.

25           THE COURT:  All right.

1          MR. WARD:  Thank you, Your Honor.

2          MR. DETERS:  Thank you, Your Honor.

3          THE COURT:  Here's the official copy of the

4    instructions.  We'll be in recess.  The attorneys come back in

5    about 45 minutes and let me know where you'll be.  We've got

6    plenty of phones and everything around the courthouse, rooms

7    to use if you want to work.

8          (Proceedings concluded at 12:07 p.m.)

9                         -  -  -

10                  C E R T I F I C A T E

11          I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that the
     foregoing is a correct transcript from the record of
12   proceedings in the above-entitled case.

13    \s\ Joan Lampke Averdick              March 6, 2013
     JOAN LAMPKE AVERDICK, RMR-CRR         Date of Certification
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25